IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHAMDU CALEB NALLS, *et al.*

    *Plaintiffs*,

    *v.*

BALTIMORE COUNTY,
MARYLAND, *et al.*,

    *Defendants*.

Civil Action No. ELH-23-0183

**MEMORANDUM OPINION**

This suit arises from a chaotic encounter in a motel parking lot in January 2020, involving plaintiffs Shamdu Caleb Nalls ("Caleb"); Dayaneris Dmeza; Shaneris Nalls ("Shaneris"); Shamdu Veraby Nalls ("Veraby"); and Nehemiah Lembert and numerous officers of the Baltimore County Police Department ("BCPD").[1]  Plaintiffs have sued multiple defendants: Baltimore County and BCPD Officers Kyle Amrhein; William Halstead; Priscilla Harshadavid; Erik Legge; David Lehnert; Paul Schulman; Rachael Steigen; Evan Vicarini; and Anthony Vitacco.  ECF 21 ("First Amended Complaint").

Plaintiffs allege that on January 25, 2020, at about 7:30 p.m., two BPCD officers approached a parked car in which Shaneris, then a minor, and three of her friends were sitting.  Two of the friends were also minors.  The officers allegedly approached the car to investigate the smell of marijuana, and asked Shaneris whether she had any marijuana.  In response, Shaneris stated that she possessed a marijuana cigarette.  Thereafter, the officers ordered Shaneris and her friends out of the vehicle.  Shaneris's family members, who had been eating at a nearby restaurant,

---

[1] Several plaintiffs have the same last name.  Therefore, I shall refer to these individuals by their first names.

responded to the scene.  An altercation followed, during which the officers attempted to subdue the plaintiffs with physical force, including by tasing Caleb and Veraby.

The First Amended Complaint contains fourteen counts.  With respect to the police officers, plaintiffs assert three claims pursuant to 42 U.S.C. § 1983:  use of excessive force, in violation of the Fourth and Fourteenth Amendments (Count I); false arrest and false imprisonment, in violation of the Fourth and Fourteenth Amendments (Count II); and malicious prosecution, in violation of the Fourth and Fourteenth Amendments (Count III).  In addition, as to the police officers, plaintiffs allege use of excessive force, in violation of Articles 24 and 26 of the Maryland Declaration of Rights (Count V); malicious prosecution, in violation of Articles 24 and 26 of the Maryland Declaration of Rights (Count VI); false arrest and false imprisonment, in violation of Articles 24 and 26 of the Maryland Declaration of Rights (Count VII); common law battery (Count IX); false arrest and false imprisonment under Maryland common law (Count X); malicious prosecution, under Maryland common law (Count XI); gross negligence (Count XII); negligence (Count XIII); and "failure to intervene" (Count XIV).  With respect to Baltimore County, plaintiffs allege failure to train, in violation of the Fourth and Fourteenth Amendments, pursuant to *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978) (Count IV).[2]  With respect to Baltimore County, plaintiffs assert a "Maryland Common Law *Longtin* Claim"  (Count VIII).[3]

Pursuant to Fed. R. Civ. P. 12(b)(6), defendants have moved to dismiss the First Amended Complaint, in part.  ECF 24.  In particular, defendants have moved to dismiss Count III (malicious

---

[2] Plaintiffs do not cite 42 U.S.C. § 1983 in relation to their assertion of *Monell* liability. But a *Monell* claim is just a claim that municipality is liable under § 1983.  *See Monell*, 436 U.S. at 701 ("holding that municipal bodies sued under § 1983 . . . are subject to suit under § 1983").

[3] Plaintiffs do not provide a citation for "*Longtin*."  Presumably, they are referring to the case of *Prince George's County v. Longtin*, 419 Md. 450, 490–98, 19 A.3d 859, 883–88 (2011), which provides that a municipality may be liable for an unconstitutional policy or practice.

prosecution under the Fourth and Fourteenth Amendments); Count VI (malicious prosecution under Articles 24 and 26); Count XI (common law malicious prosecution); Count XIII (negligence); and Count XIV (failure to intervene).  Defendants have also moved to dismiss, in part, Count I (use of excessive force under the Fourth and Fourteenth Amendments); Count II (false arrest under the Fourth and Fourteenth Amendments); Count V (use of excessive force under Articles 24 and 26); Count VII (false arrest under Articles 24 and 26); Count IX (battery); Count X (common law false arrest), and Count XII (gross negligence).  Defendants have not moved to dismiss Count IV (failure to train under *Monell*) or Count VIII ("Maryland Common Law *Longtin* Claim").

The motion is supported by a memorandum. ECF 24-1 (collectively, "Motion to Dismiss" or "Motion").  Defendants have also filed exhibits containing footage of the incident captured by the body cameras worn by Officers Lehnert (ECF 6-3), Vicarini (ECF 6-2; ECF 15-2), Legge (ECF 15-3), Harshadavid (ECF 15-4), and Amrhein (ECF 15-5).  S*ee* ECF 6-1 at 3 n.1; ECF 24-1 at 4 n.1.  Plaintiffs have replied.  ECF 26.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.      Factual Background[4]

On January 25, 2020, at about 7:00 p.m., plaintiffs were dining at City View Bar and Grill, located on Security Boulevard in Baltimore County, in celebration of Shaneris's upcoming 18th birthday.  ECF 21, ¶ 22.  At about 7:30 p.m., Shaneris Nalls and three female friends were seated in Shaneris's vehicle, which was "parked in a parking lot, without keys in the ignition, and next to

---

[4] At this juncture, the Court assumes the truth of the allegations in the First Amended Complaint.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

other parked vehicles." *Id.* ¶ 24. "As the women were seated in the vehicle, Officers Vicarini and Schulman drove by in their police cruiser." *Id.* ¶ 25. After Officers Vicarini and Schulman parked their police vehicle "at the end of the parking lot," they "approached the car" in which Shaneris and her friends were sitting. *Id.* ¶ 26. In body camera footage captured after all plaintiffs left the scene, Officer Vicarini can be heard explaining to another officer why he approached the car, stating: "'Yeah, we drove by and they gave us the [expletive] crim look.'" *Id.*[5]; *see* ECF 15-2 at 15:30.

When Officers Vicarini and Schulman "approached the vehicle, the windows of the vehicle were rolled up." ECF 21, ¶ 29; *see id.* ¶ 27. Nevertheless, Officer Vicarini "later claim[ed] [that] he could smell the 'strong odor of marijuana emanating from inside the vehicle.'" *Id.* ¶ 27. Defendant officers "demanded that . . . Shaneris Nalls roll down the window." *Id.* Shaneris complied, and the officers began questioning her. *Id.*

"At or around this time, Plaintiff[s] Dayaneris Dmeza and Nehemiah Lembert approached" Officers Vicarini and Schulman "to determine what was occurring." *Id.* ¶ 30. Plaintiffs informed the officers that Dmeza is the mother of Shaneris. *Id.*

Officers Vicarini and Schulman asked Shaneris if she possessed any marijuana. *Id.* ¶ 31. And, "Officer Vicarini told [Shaneris] that if she handed over any marijuana that she was in possession of, she would be free to leave, without citation." *Id.* Thereafter, Shaneris "admitted to being in possession of a rolled marijuana cigarette, commonly referred to as a 'roach,' which she handed over to the officers." *Id.* However, Officer Vicarini stated that he believed that there was more marijuana in the car. *Id.* ¶ 32. In response, Shaneris "indicated that she already gave him the joint." *Id.* Officers Vicarini and Schulman then instructed Shaneris and the three other

---

[5] The alteration appears in the suit.

occupants to exit the car.  *Id.* ¶ 33.  After Shaneris got out of the vehicle, the officers asked to see

her driver's license.  *Id.*  Shaneris "informed them [that] she was not currently in possession of it."

*Id.*

After all occupants of the car had exited, "Officer Schulman, Officer Vicarini, . . .

Dayaneris Dmeza, . . . Shaneris Nalls, . . . Nehemiah Lembert and the three other women [were]

stand[ing] next to the passenger side of the vehicle. . . ."  *Id.* ¶ 35.  As they stood near the car,

"Officer Schulman repeatedly question[ed] Plaintiff Dayaneris Dmeza and Plaintiff Shaneris Nalls

about whether . . . Shaneris Nalls ha[d] a valid identification card."  *Id.*  "All four of the vehicle's

doors [were] open."  *Id.*

As Officer Schulman questioned Dmeza and Shaneris, he requested the assistance of

additional officers.  *Id.* ¶ 36.  Officers Lehnert, Legge, Harshadavid and Vitacco were among the

officers who responded to the scene.  *Id.*  Caleb and Veraby also arrived at the scene.  *Id.*  They

identified themselves as family members of Dmeza and Shaneris, and repeatedly asked what was

going on.  *Id.* ¶ 37.  Caleb and Veraby were accompanied by Lembert, who had "left briefly to

inform" Caleb and Veraby "of what was occurring."  *Id.* ¶ 36 n.2.  Officer Vicarini instructed the

assisting officers to "'hook 'em'" if "'they start to get out of hand.'"  *Id.* ¶ 36.

In an apparent effort to "understand and deescalate the situation," Veraby repeatedly stated,

"'Let's talk.'"  *Id.* ¶ 37.  Officer Schulman asked Veraby "to step aside to speak," and Veraby

"obeyed."  *Id.*

At some point, Shaneris returned to her car "to sit in the front passenger seat while waiting

for the Officers."  *Id.* ¶ 38.  Because "[i]t was the middle of January," and she did not have a jacket,

she wanted "to keep warm."  While Shaneris was sitting in the car, Dmeza approached her.  *Id.*  At

that point, "Officer Vicarini yelled to 'Get out of the car,' and 'Back up!'"  *Id.*  "Dmeza attempted

to obey but, as she was doing so," Officer Vicarini "grabbed" Dmexa's "hoodie in the chest area and violently shoved her into the side of the vehicle." *Id.*

Shaneris attempted to step between Officer Vicarini and Dmeza. *Id.* ¶ 40. Officer Vicarini then "violently threw" Shaneris "to the ground." *Id.* Officer Vicarini then "began to kneel" on Shaneris, who "cried that she was not attempting to resist." *Id.* Officer Vicarini "ultimately placed [Shaneris] under arrest" and "handcuff[ed] her as she remained on the ground." *Id.* In the meantime, more officers arrived. *Id.* ¶ 39.

As Officer Vicarini restrained Shaneris, Officer Vitacco "slamm[ed]" Dmeza "into a large metal fence," which was "located behind the parked vehicle." *Id.* ¶ 41. Although Veraby and Dmeza "were not legally married," they "considered themselves married religiously." *Id.* ¶ 41 n.4. After seeing Officer Vitacco slam Dmeza into the fence, Veraby "approached Officer Vitacco" and Dmeza. *Id.* ¶ 41. "Seconds later," Veraby "was attacked from behind by Officer S[c]hulman" and another unnamed officer, "who violently slammed [Veraby] into the parked car and down onto the pavement." *Id.* [6]

While Veraby lay face down on the ground, with his hands behind his back, at least four officers, including officers Amrhein, Vitacco, Halstead, and Schulman, "beat, kicked, and tased" him. *Id.* ¶ 42. One officer "violently kicked" Veraby "in the head and face." *Id.* As a result, Veraby lost "consciousness." *Id.* ¶ 43. After Veraby regained consciousness, two officers dragged him to a police cruiser. *Id.* ¶ 44. As the officers shoved Veraby into the cruiser, one officer, "thought to be Officer Amrehin [sic], tased" him. *Id.*

---

[6] The First Amended Complaint also asserts that, as Veraby "attempted to nonviolently intervene in the beating of" Dmeza," he was "violently, and without warning, punched multiple times by" Officer Vicarini. ECF 21, ¶ 41. As noted, *infra*, the footage from Officer Vicarini's body camera footage does not show any physical encounter with Veraby.

"At the same time, Officer Vitacco violently threw" Dmeza "face first into the concrete sidewalk next to the fence." *Id.* ¶ 45.  Then, according to plaintiffs, Officer Vitacco "violently pressed his knee on top of [Dmeza's] head as her face pressed into the concrete." *Id.*  "Immediately thereafter, Officer Harshadavid rushed over and placed her bodyweight on top of" Dmeza "before putting [Dmeza] in handcuffs." *Id.*

When Lembert approached, he "attempted to check the safety and wellbeing" of Dmeza, but Officers Harshadavid, Steigen, and Halstead "violently grabbed" him and "violently forced" him "into the fence and then to the ground." *Id.* ¶ 46.  Lembert was on the ground, with his hands behind his back, and four officers were on top of him. *Id.* ¶ 47.  Officer Halstead then "placed his hand around [Lembert's] neck and attempted to strangle" him. *Id.*  Two other officers also placed their hands on Lembert's neck. *Id.*  While Lembert "frantically pleaded that his hands were behind his back and [that] he was not resisting, Officer Steigen placed her forearm against his throat." *Id.* ¶ 48.  The officers then placed Lembert in handcuffs, while one or more of them "placed their bodyweight onto his back as he laid face down on the sidewalk." *Id.* ¶ 49.  Officer Steigen released her weight from Lembert only after Officer Harshadavid instructed her to do so. *Id.* ¶ 50.

When Caleb saw Dmeza "being assaulted" by the officers, he "rushed past officers—with his hands in the air—to check on the safety of his mother." *Id.* ¶ 51.[7]  Caleb was "instructed" to back up, which he did. *Id.*  Nevertheless, Officers Amrhein and Lehnert "shoved [Caleb ] further back as he cried about the wellbeing of his mother." *Id.*  "In an attempt to get the Defendant Officers to let go," . . . Caleb "spun in a circle." *Id.* ¶ 52.  In doing so, he lost his balance and fell.

---

[7] The First Amended Complaint does not identify the person referred to as the mother of Caleb.  However, from context, it is reasonably apparent that Dmeza is the person referred to as Caleb's "mother."

*Id.*  He attempted to break his fall with his hands, which were spread in an open palm.  *Id.*  As Caleb fell, "Officer Lehnert grabbed" him, "pulling [them both] backward into a police car."  *Id.*  Caleb fell onto Officer Lehnert with his hands in the air.  *Id.*

Officer Amrhein then "deployed his taser, striking" Caleb in "the groin area."  *Id.* ¶ 53.  As a result, Caleb fell "face forward onto the pavement."  *Id.*  Yet, "Officer Amrhein continued to tase" Caleb, "even as he [was] on the ground."  *Id.*  Then, Officer Lehnert handcuffed Caleb, who was pleading that he could not breathe.  *Id.* ¶ 54.  To protect himself, Caleb "attempted to curl into a ball."  *Id.* ¶ 56.  "As he curled up," an unnamed officer asked Officer Lehnert whether Caleb "was handcuffed."  *Id.*  Although Officer Lehnert confirmed that Caleb was handcuffed, *id.*, the other officer "yanked" Caleb "by the neck, then attempted to press down on his head and neck," as another unnamed officer "lifted [Caleb] up from the ground."  *Id.* ¶ 57.

As a result of the melee, Shaneris "sustained multiple injuries, including bruising and abrasions to her face and body."  *Id.* ¶ 63.  Dmeza, too, allegedly "sustained multiple injuries[,] including bruising, abrasions and a concussion."  *Id.* ¶ 65.  Caleb "sustained injury to his right knee, right shoulder, [and] left shoulder[,] and suffered from a concussion."  *Id.* ¶ 67.  Veraby "sustained injury including but not limited to an orbital floor fracture and bruising and abrasions to his face and body."  *Id.* ¶ 69.  Lembert "also sustained injury including, but not limited to, bruises, abrasions, and injury to both shoulders."  *Id.* ¶ 71.

After all plaintiffs were in custody, "they were transported to the Baltimore County Woodlawn Precinct[,] where they were processed, charged, and booked."  *Id.* ¶ 60.  Shaneris was charged with possession of more than ten grams of marijuana.  *Id.* ¶ 62.  This charge was later dismissed.  *Id.*

Dmeza was charged with failure to obey a reasonable and lawful order by a law enforcement officer, in violation of Md. Code (2021 Repl. Vol., 2023 Supp.), § 10-201(c)(3) of the Criminal Law Article ("C.L."), and disorderly conduct, in violation of C.L. § 10-201(c)(2). *Id.* ¶ 64.  These charges "were placed on the stet docket on July 30, 2020." *Id.*

Caleb was charged with second degree assault of a law enforcement officer, in violation of C.L. § 3-202(c)(2); second degree assault, in violation of C.L. § 3-203; resisting or interfering with an arrest, in violation of C.L. § 9-408(b); failure to obey a reasonable and lawful order, in violation of C.L. § 10-201(c)(3); disorderly conduct, in violation of C.L. § 10-201(c)(2); malicious destruction of property valued at over $1,000, in violation of C.L. § 6-301; and obstructing and hindering. *Id.* ¶ 66.  A nolle prosequi was later entered with respect to each charge. *Id.*

Veraby was charged with two counts of second degree assault of a police officer, in violation of C.L. § 3-202(c)(2); two counts of second degree assault, in violation of C.L. § 3-203; one count of resisting or interfering with an arrest, in violation of C.L. § 9-408(b); one count of failure to obey a reasonable and lawful order, in violation of C.L. § 10-201(c)(3); one count of disorderly conduct, in violation of C.L. § 10-201(c)(2); and one count of obstructing and hindering. *Id.* ¶ 68.  These charges were placed on the stet docket on January 8, 2021. *Id.*

Lembert was charged with second degree assault of a law enforcement officer, in violation of C.L. § 3-202(c)(2); second degree assault, in violation of C.L. § 3-203; and resisting or interfering with an arrest, in violation of C.L. § 9-408(b). *Id.* ¶ 70.  A nolle prosequi was later entered with respect to each charge. *Id.*

Plaintiffs have "file[d] formal complaints against the involved officers for their excessive use of force." *Id.* ¶ 72.  Although "the specific outcome of the investigation is unknown, . . . on or about December 15, 2021, the [BCPD] Internal Affairs Section . . . wr[ote] letters to the

Plaintiffs noting that 'the officer was in violation of Departmental Rules and Regulations.'" *Id.* ¶ 73 (citing ECF 1-1).[8]

Additional facts are included, *infra*.

## II.    Legal Standards

### A.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

---

[8] The First Amended Complaint does not identify this officer, nor does it identify which rule or regulation the officer was found to have violated.

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570*; see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at 317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

A plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). However, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Instead, to satisfy the minimal requirements of Rule 8(a)(2), the

11

complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

When ruling on a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Bing v. Brio Sys.*, LLC, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss

filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*' " *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250); *see L.N.P. v. Kijakazi*, 64 F.4th 577, 585–86 (4th Cir. 2023).

It is well settled that a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See, e.g., De Simone v. VSL Pharmaceuticals*, 36 F.4th 518, 531 (4th Cir. 2022) (recognizing that, generally, new arguments cannot be raised in a reply brief); *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

### B.

As noted, defendants have filed exhibits containing body camera footage of the incident. *See* ECF 6-2; ECF 6-3; ECF 15-2; ECF 15-3; ECF 15-4; ECF 15-5.

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits"); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Fusaro*, 930 F.3d at 248; *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017),

*cert. denied sub nom.*, *City of Greensboro v. BNT Ad Agency, LLC*, 583 U.S. 1044 (2017);

*Kensington Volunteer Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012).

To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Courts have concluded that, in some circumstances, video recordings of the subject matter of a complaint may be considered when evaluating a motion to dismiss. *See Estate of Green v. City of Annapolis*, ___ F. Supp. 3d ___ , JRR-22-3198, 2023 WL 6381453, at *7 (D. Md. Sep. 30, 2023); *Thompson v. Badgujar*, PWG-20-1272, 2021 WL 3472130, at *4 (D. Md. Aug. 6, 2021); *Fijalkowski v. Wheeler*, 361 F. Supp. 3d 577, 582 n.3 (E.D. Va. 2019). In particular, the Fourth Circuit has stated that, "[i]n addition to the facts as stated in the complaint, [a] district court

correctly consider[s] . . . body camera footage in deciding whether to grant the motions to dismiss." *Lawhon v. Mayes*, 2021 WL 5294931, at *1 (4th Cir. Nov. 15, 2021).

For example, in *Estate of Green*, 2023 WL 2023 WL 6381453, at *7, Judge Rubin of this court concluded that "Plaintiffs' reference in the Complaint to the body-worn camera footage, coupled with their averments in the Opposition regarding the same, provide[d] ample support for the court to consider the body-worn camera footage in resolving" a motion to dismiss.  And, in *Thompson*, 2021 WL 3472130, at *4, Judge Grimm found it appropriate to consider a video depicting the subject matter of the lawsuit because the video was "explicitly incorporated into the complaint and [was] indisputably integral to the claims."

In the usual course, "when a . . . video is referenced as integral to the complaint, disputes between the allegations of the complaint and what is plain from the video are resolved in favor of the video." *Thompson*, 2021 WL 3472130, at *3 (citing *Fayetteville Inv'rs*, 936 F.2d at 1465); *cf. Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011).  In other words, the "exhibit-prevails rule" applies; it "provides that, 'in the event of a conflict between the bare allegations of the complaint and any exhibit attached . . . the exhibit prevails.'"  *Goines*, 822 F.3d at 166 (citing *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).  But, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it."  *Goines*, 822 F.3d at 167.  Therefore, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true."  *Id.*

In the context of summary judgment, the Supreme Court said in *Scott v. Harris*, 550 U.S. 372 (2007), that, when "opposing parties tell two different stories" at summary judgment, "one of

which is blatantly contradicted" by video evidence, "so that no reasonable jury could believe it, a court should not adopt that version of the facts . . . ." *Id.* at 380.  Rather than crediting a "visible fiction" propounded by the party whose account is contradicted by the video evidence, a court should "view[] the facts in the light depicted by the videotape." *Id.* at 381; *see also United States v. Kehoe*, 893 F.3d 232, 240 (4th Cir. 2018).  Nevertheless, a court should not "reject a plaintiff's account" of events simply because "a video . . . offers *some* support for a governmental officer's version of events." *Witt*, 633 F.3d at 276 (emphasis in *Witt*); *see also Aleman v. City of Charlotte*, 80 F.4th 264, 294–95 (4th Cir. 2023); *Sawyer v. Asbury*, 537 F. App'x 283, 291 (4th Cir. 2013), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 396-9 (2015), *as recognized by Brooks v. Johnson*, 924 F.3d 104 (4th Cir. 2019).

In *Aleman*, 80 F.4th 264, a deadly force case, the district court made findings at summary judgment based on video footage that was "not clear in all details and did not capture everything that occurred at the shooting scene." *Id.* at 291.  The Fourth Circuit observed that the video footage was "subject to different interpretations . . . ." *Id.*  Therefore, it concluded that the district court erred by interpreting the video at summary judgment. *Id.*  According to the Court, the district court was not permitted to decide at that stage "what the video footage shows or what it did not capture." *Id.*

Here, plaintiffs refer in their First Amended Complaint to "events . . . recorded by the body-worn cameras of each of the Officer Defendants."  ECF 21, ¶ 39.  And, in their Opposition, plaintiffs state:  "Public records, such as body worn camera footage, may 'be properly considered in the context of a Rule 12(b)(6) motion without converting that motion to one for summary judgment.'"  ECF 25-1 at 3 n.3 (citing *Carter v. Balt. City.*, 39 F. App'x 930, 933 (4th Cir. 2002)).  But, plaintiffs also state, ECF 25-1 at 5–6:

[W]hile there are numerous body-worn camera videos from the night in question, the video footage is "not clear enough to be decisive." As previously noted, at the time of filing, Baltimore County only supplied Plaintiffs' counsel with redacted versions of the body-worn camera footage in response to a Maryland Public Information Act Request.[] Even without the redactions the video footage is unclear as to which Defendant Officer committed each individual tortious blow. At the time of the assaults, there were five Plaintiffs and, at least, the nine Baltimore County Officer Defendants on the scene. Though the videos are extensive, the videos do not capture—or capture at all—each and every movement of each and every party on the scene.

On the basis of the assertions in the First Amended Complaint, I understand plaintiffs to regard the body camera footage as integral to the suit. Nevertheless, plaintiffs contend that the video footage is not dispositive. Indeed, each camera provides a view from only one angle.

Plaintiffs' argument largely concerns *how* the Court should interpret the video footage. Plaintiffs do not suggest that the Court should not consider the footage at all. Therefore, in my review of the sufficiency of plaintiffs' allegations, I may consider the body camera footage (ECF 6-2; ECF 6-3; ECF 15-2; ECF 15-3; ECF 15-4; ECF 15-5), because it is integral to the suit and the authenticity is not challenged.

However, I shall draw conclusions on the basis of the video footage only when the footage "quite clearly contradicts" the allegations in the First Amended Complaint. *Witt*, 633 F.3d at 276 (citation and internal quotation marks omitted). Conversely, I shall not draw a conclusion on the basis of the video if the video merely "offers *some* support" for the conclusion. *Id.* And, mindful of *Aleman*, 80 F.4th at 293, I shall not "render[] [my] own interpretation of the video footage" when the video footage "is subject to different interpretations" or may not be complete.

## C.

Counts I, II, III, and IV of the First Amended Complaint are predicated on 42 U.S.C. § 1983.

Section 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). Under § 1983, a plaintiff may file suit against any person who, acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).

However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey*, 526 U.S. at 707.

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997). "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is

identical.'"  *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982).  A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Polk Cnty. v. Dodson*, 454 U.S. 312, 317–18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326, (1941)); *see also Philips*, 572 F.3d at 181 (citations and internal quotation marks omitted) ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.").

The doctrine of respondeat superior does not apply in § 1983 cases.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).  Indeed, "'[i]n a § 1983 suit . . . each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.'"  *Younger v. Crowder*, 79 F.4th 373, 381 n.12 (4th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 677) (alteration in *Younger*).  If a plaintiff has not alleged any personal connection between a defendant and a denial of constitutional rights, the claim against that defendant must fail.  *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *see also Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (same); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (same).

But, as the Fourth Circuit articulated in *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013), a supervisor may be held liable "for the failings of a subordinate under certain narrow circumstances."  Pursuant to § 1983, liability for supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)); *see Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020); *Wilkins v.*

*Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014).  This requires a plaintiff to allege, *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994):

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

To qualify as "pervasive," the challenged conduct must be "widespread, or at least . . . used on several different occasions."  *Shaw*, 13 F.3d at 799.  Therefore, it is insufficient to point "to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence . . . nor can he reasonably be expected to guard against the deliberate [unlawful] acts of his properly trained employees when he has no basis upon which to anticipate the misconduct."  *Id.* (quoting *Slakan*, 737 F.2d at 373) (alteration inserted).  But, a supervisor's "continued inaction in the face of documented widespread abuses . . . provides an independent basis" for § 1983 liability against that official for his deliberate indifference or acquiescence to "the constitutionally offensive conduct of his subordinates."  *Slakan*, 737 F.2d at 373; *see Shaw*, 13 F.3d at 799.

### III.   Discussion

### A.  Count I; Count V (Excessive Force)

Count I of the First Amended Complaint generally alleges that the nine officer defendants used excessive force against one or more of the plaintiffs, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.  ECF 21, ¶¶ 81–88.  Count V alleges that defendants used excessive force against the plaintiffs, in violation of Articles 24 and 26 of the Maryland Declaration of Rights.  *Id.* ¶¶ 128–132.

Article 24 "is the state law equivalent of the Fourteenth Amendment" to the United States Constitution. *Hawkins v. Leggett*, 955 F. Supp. 2d 474 (D. Md. 2013). That is, Article 24 "has been interpreted to apply 'in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution,' so that 'decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities.'" *Frey v. Comptroller of Treasury*, 422 Md. 111, 176, 29 A.3d 475, 513 (2011) (quoting *Att'y Gen. of Md. v. Waldron*, 289 Md. 683, 704, 426 A.2d 929, 941 (1981)). "Therefore, the analysis under Article 24 is, for all intents and purposes duplicative of the analysis of the Fourteenth Amendment." *Hawkins*, 955 F. Supp. 2d at 496.

Article 26 is the state law equivalent to the Fourth Amendment to the Constitution. *Padilla v. State*, 180 Md. App. 210, 225, 949 A.2d 68, 77 (2008). It "protects the same rights as those protected under the Fourth Amendment to the United States Constitution . . . ." *Dent v. Montgomery Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010). As a result, "Maryland courts . . . construe[] Article 26 *in paria materia* with the Fourth Amendment to the United States Constitution." *Padilla*, 180 Md. App. at 226, 949 A.2d at 78 (collecting cases).

As indicated, both Article 24 and Article 26 are construed *in pari materia* with the Fourteenth and Fourth Amendments to the Constitution, respectively. Accordingly, I shall consider Counts I and V of the First Amended Complaint together. *See Dent*, 745 F. Supp. 2d at 661.

## 1.

The Fourth Amendment guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend IV. It is made applicable to the States through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The Supreme Court has interpreted the Fourth Amendment to

prohibit a law enforcement officer from using excessive force to effect a seizure.  *See Graham v. Connor*, 490 U.S. 386, 394 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985); *see also Franklin v. City of Charlotte*, 64 F.4th 419, 530–31 (4th Cir. 2023); *Aleman*, 80 F.4th at 285–87; *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022); *Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Hupp v. Cook*, 931 F.3d 307, 320–23 (4th Cir. 2019); *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).

Indeed, "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment . . . rather than under [the Fourteenth Amendment's] 'substantive due process' approach."  *Graham*, 490 U.S. at 388; *see also Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir. 2022) (observing that "§ 1983 claim that [an officer's] use of force violated [a plaintiff's Fourteenth Amendment due process rights . . . has been foreclosed by the Supreme Court since 1989") (citing *Graham*, 490 U.S at 395).

Whether an officer's use of force was reasonable under the Fourth Amendment is "'predominantly an objective inquiry.'"  *Cybernet, LLC v. David*, 954 F.3d 162, 169 (4th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  To determine the reasonableness of an officer's actions, a court must conduct "'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham*, 490 U.S. at 396).

In particular, a court should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396; *see E.W. by and through*

*T.W. v. Dolgos,* 884 F.3d 172, 179 (4th Cir. 2018); *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 733 (4th Cir. 2013).  The three *Graham* factors are not "exclusive."  *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  That is, a court must consider "the proportionality of the force in light of *all* the circumstances."  *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (emphasis added).  "Those circumstances include 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'"  *Lombardo v. City of St. Louis, Missouri*, 594 U.S. 464, 467 (2021) (quoting *Kingsley*, 576 U.S. at 397).[9]

## 2.

As noted, Counts I and V generally allege that the individual "Defendants" used excessive force against the "Plaintiffs."  ECF 21, ¶¶ 81–88, 128–132.  Defining a "count" in this fashion might seem like a convenient shorthand in a case with multiple parties on each side, but it only conceals the inevitable complexity.  The essential question remains whether an individual defendant has harmed one or more individual plaintiffs.

It may be that, with respect to a given defendant, one plaintiff has stated a claim but the others have not.  In that case, the one plaintiff's claim may proceed as to that defendant, but the other plaintiffs' claims as to that defendant must be dismissed.  Similarly, it may be that a plaintiff has asserted a claim against some, but not all defendants. Therefore, I must consider separately, with respect to each of the five plaintiffs and each of the nine individual defendants, whether one or

---

[9] "At the summary judgment stage, once [the court has] viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law."  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (citing *Scott*, 550 U.S. at 381 n.8); *see Knibbs*, 30 F.4th at 214.

more of the five plaintiffs has stated a claim for excessive force against one or more of the nine defendants.

### a. Officer Amrhein

In the Motion, defendants assert, ECF 24-1 at 16, that the only "specific factual allegations" related to excessive force, lodged against Officer Amrhein, are that (1) he was one of the four officers who "beat[], kicked, and tased" Veraby, *id.* (citing ECF 21, ¶ 42)[10]; (2) he tased Veraby, ECF 24-1 at 16 (citing ECF 21, ¶¶ 44, 53); and (3) he "shoved" Caleb.  ECF 24-1 at 16 (citing ECF 21, ¶ 51).  Defendants concede that "these two plaintiffs"—Veraby and Caleb—"make sufficient allegations of excessive force" against Officer Amrhein.  ECF 24-1 at 17.  But, according to defendants, "[t]here are no allegations at all pertaining to the other three Plaintiffs, and thus all claims brought by those Plaintiffs against [Officer] Amrhein must be dismissed."  *Id.* at 16–17.

In their Opposition, plaintiffs do not contest that the First Amended Complaint fails to allege that Officer Amrhein used excessive force against Dmeza, Shaneris, or Lembert.  ECF 25-1 at 4–5.[11]  Indeed, the First Amended Complaint contains no allegations that Officer Amrhein had any physical contact with Dmeza, Shaneris, or Lembert.   Therefore, I shall dismiss Counts I and

---

[10] In the Motion, defendants attribute the claim that Officer Amrhein was among the officers who "beat[], kicked, and tased" Veraby to paragraph 41 of the First Amended Complaint. *See* ECF 24-1 at 16.  But, that claim appears in paragraph 42 of the First Amended Complaint.  *See* ECF 21, ¶ 42.

[11] Plaintiffs suggest that Officer Amrhein may be liable to Dmeza, Shaneris, and Lembert for excessive force insofar as he "fail[ed] to intervene" on their behalf to protect them from the excessive force used by other officers.  ECF 25-1 at 5.  In support of this claim, plaintiffs cite *Randall v. Prince George's Cnty.*, 302 F.3d 188 (4th Cir. 2002), in which the Fourth Circuit held that "a bystanding officer . . . may be treated as an accomplice" if he "(1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act."  *Id.* at 203.  I consider plaintiffs' claims of bystander liability separately, *infra.*

V with respect to Officer Amrhein, except insofar as plaintiffs allege that he used excessive force against Veraby and Caleb.

### b. Officer Vicarini

According to defendants, only Shaneris and Dmeza assert any allegations against Officer Vicarini. ECF 24-1 at 19. Therefore, defendants assert that "all claims by the other three plaintiffs must be dismissed as to [Officer] Vicarini." *Id.* I agree. Because the First Amended Complaint does not include any factual allegations that Officer Vicarini used physical force of any kind against Caleb or Lembert, I shall dismiss Counts I and V of the First Amended Complaint to the extent that plaintiffs allege that Officer Vicarini used excessive force against Caleb and Lembert.

However, the First Amended Complaint does allege that, as Veraby "attempted to nonviolently intervene in the beating of" Dmeza, he was "violently, and without warning, punched multiple times by" Officer Vicarini. ECF 21, ¶ 41. Defendants counter that Officer Vicarini's body worn camera video (ECF 15-2) shows no physical interaction between Officer Vicarini and Veraby. ECF 24-1 at 19.

Plaintiffs do not address defendants' contention that the video taken from Officer Vicarini's body camera does not show any interaction between Officer Vicarini and Veraby Nalls. Nevertheless, they assert generally that, although "the videos are extensive, the videos do not clearly capture—or capture at all—each and every movement of each and every party on the scene." ECF 25-1 at 6.

As indicated, body camera footage may not provide a complete view of a situation in every respect. Nevertheless, the video captured by Officer Vicarini's own body camera, which begins before the altercation occurred and ends after all the plaintiffs have left the scene, is clearly inconsistent with plaintiffs' allegation that Officer Vicarini "punched" Veraby "multiple times."

ECF 21, ¶ 41; *see* ECF 15-2.  In fact, as defendants state, the video shows no interaction at all between Officer Vicarini and Veraby.  Therefore, Counts I and V of the First Amended Complaint are subject to dismissal, insofar as they assert that Officer Vicarini used excessive force against Veraby.  *See Thompson*, 2021 WL 3472130, at *3 ("[W]hen a . . . video is referenced as integral to the complaint, disputes between the allegations of the complaint and what is plain from the video are resolved in favor of the video.").

Defendants acknowledge that the First Amended Complaint includes a factual allegation that Officer Vicarini used force against Dmeza.  ECF 24-1 at 19, 22–23.  In particular, the suit alleges that as Dmeza approached Shaneris, who was then seated in the passenger seat of her car, Officer Vicarini "yelled . . . 'Get out of the car,' and 'Back up!'"  ECF 21, ¶ 38.  Thereafter, according to the suit, Dmeza "attempted to obey but, as she was doing so, Officer Vicarini . . . grabbed . . . Dmeza's hoodie in the chest area and violently shoved her into the side of the vehicle." *Id.*  However, defendants assert that "whatever physical contact [Officer Vicarini] had with [Dmeza] does not amount to excessive force."  ECF 24-1 at 22.

The video footage (ECF 15-2 at 4:30–4:45) shows that, after Officer Vicarini ordered Shaneris out of the car, Dmeza leaned into the passenger side of the vehicle and reached into the center console.  *Id.* at :23– :42.  When Officer Vicarini noticed that Dmeza was leaning into the car, he ordered Dmeza to get out of the car.  *See id.*  Dmeza obeyed, and said that she was "fine" and that she "wasn't doing nothing," or words to that effect.  *See id.* at :36–:40.  Officer Vicarini responded:  "I know, but I see you reaching in the car that we're going to search."  *See id.* at :38– :42.  According to the video, several minutes later, Dmeza again approached the passenger seat of the car, where Shaneris was seated.  *See id.* at 4:30–4:35.  Thereafter, Officer Vicarini said, "Get out of the car," or words to that effect.  *See id.*  And, he attempted to separate Dmeza from Shaneris,

27

who was seated in the car, by placing his hand and forearm on Dmeza's chest and pushing her back against the closed rear door of the car. *Id.* at 4:35. The video shows no further physical interaction between Officer Vicarini and Dmeza.

At this stage of the litigation, I cannot conclude that I have been presented with all facts relevant to Officer Vicarini's alleged use of force against Dmeza. To be sure, the body camera footage depicts the use of force. But, it may be that, after discovery, this body camera footage will constitute only a portion of "the relevant set of facts" on the basis of which the reasonableness of Officer Vicarini's use of force must be evaluated. *Harris*, 550 U.S. at 381 n.8. In other words, other facts relevant to this use of force may yet be discovered. Therefore, I cannot conclude that Officer Vicarini's use of force against Dmeza was reasonable as a matter of law.[12]

Defendants do not appear to request dismissal of Counts I and V to the extent that they assert use of excessive force by Officer Vicarini against Shaneris. *See* ECF 24-1 at 19 (requesting dismissal of "all claims by Shaneris Nalls [against Officer Vicarini] not based on excessive force"). The First Amended Complaint alleges that Officer Vicarini "violently threw" Shaneris "to the ground" and "kneel[ed] on" her "as she cried that she was not attempting to resist." ECF 21 at ¶ 40. Therefore, I am satisfied that Shaneris has stated a claim for excessive force against Officer Vicarini.

In sum, I shall dismiss Counts I and V with respect to Officer Vicarini, except insofar as plaintiffs allege that he used excessive force against Shaneris and Dmeza.

---

[12] My decision to defer ruling on the reasonableness of Officer Vicarini's use of force against Dmeza is not inconsistent with my conclusion, on the basis of the body camera footage, that Veraby failed to state a claim for excessive force against Officer Vicarini. As noted, Officer Vicarini's body camera footage shows that he used force of some kind against Dmeza. In contrast, Officer Vicarini's body camera footage shows no physical encounter of any kind with Veraby.

### c.  Officer Halstead

Defendants seek dismissal of Counts I and V with respect to Officer Halstead, except insofar as plaintiffs allege that Officer Halstead used excessive force against Lembert and Veraby. ECF 24-1 at 23.

The First Amended Complaint alleges that Officer Halstead was one of four officers who "beat, kicked, and tased" Veraby.  ECF 21, ¶ 42.  Moreover, the First Amended Complaint alleges that, when Lembert was "on the ground, with his hands behind his back and four . . . Officers on top of him, Officer Halstead placed his hand around [Lembert's] neck and attempted to strangle" him.  *Id.* ¶ 47.  The First Amended Complaint does not otherwise include factual allegations relating to Officer Halstead's alleged use of force.

Therefore, Counts I and V are subject to dismissal with respect to Officer Halstead, except insofar as they assert that Officer Halstead used excessive force against Lembert and Veraby.

### d.  Officer Harshadavid

According to defendants, only "Dmeza and Lembert allege any facts pertaining" to Officer Harshadavid.  ECF 24-1 at 24.  Therefore, defendants assert that any claims of excessive force lodged against Officer Harshadavid by the remaining three plaintiffs—Caleb, Veraby, and Shaneris—"must be dismissed." *Id.*

Defendants correctly assert that the First Amended Complaint contains no allegations that Officer Harshadavid used force of any kind against Caleb, Veraby, or Shaneris.  Accordingly, Counts I and V are subject to dismissal with respect to Officer Harshadavid, insofar as they allege that she used excessive force against Caleb, Veraby, or Shaneris.

As defendants acknowledge, ECF 24-1 at 24, the First Amended Complaint alleges that Officer Harshadavid "placed her bodyweight on top of" Dmeza "before putting [her] in

handcuffs." ECF 21, ¶ 45; *see* ECF 15-4 at 3:15–3:41. But, defendants maintain that Officer Harshadavid's use of force against Dmeza was not excessive. ECF 24-1 at 25.

Officer Harshadavid's body camera footage shows that Officer Harshadavid approached Dmeza as Officer Vitacco was attempting to subdue her. *See* ECF 15-4 at 2:30–2:50. The video indicates that Officer Harshadavid placed her body weight on Dmeza as Officer Vitacco attempted to place Dmeza in handcuffs. *Id.* at 2:30–3:50. Dmeza can be heard asking Officer Harshadavid to make Officer Vitacco "stop," or words to that effect. *Id.* at 2:34–2:36. The video shows that Officer Vitacco twice attempted to place Dmeza in the prone position on the sidewalk. *Id.* at 2:40– 2:58. Both times, Dmeza sat up, apparently so that she could speak directly to Officer Harshadavid. *Id.* After the officers succeeded in placing Dmeza in the prone position, Dmeza did not immediately place her hands behind her back, as the officers requested. *See id.* at 2:50– 3:15. However, she can he heard saying that her arms were stuck beneath her body. *See id.* Once Dmeza had been placed in handcuffs, both officers released their weight. *See id.* at 3:40. Officer Harshadavid then helped Dmeza return to a sitting position. *See id.* at 3:45.

The Fourth Circuit has said that "[a]pplying 'just enough weight' to immobilize an individual 'continu[ing] to struggle' during handcuffing is not excessive force." *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 906 n.11 (4th Cir. 2016) (quoting *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997)) (alterations in *Armstrong*). In particular, the Fourth Circuit has said that no excessive force is used when an arrestee is "resisting [officers'] efforts to restrain him," the officers "stop[] applying force to [the arrestee's] back when their restraints [are] secure," and the arrestee is "left in the prone position for a very short period of time after being restrained." *Id.*

Arguably, the body camera footage tends to establish the reasonableness of Officer Harshadavid's use of force.  Nonetheless, at this juncture, it is not appropriate for the Court to interpret the video.  *See Aleman*, 80 F.4th at 291.  Moreover, given the posture of the case, plaintiffs are entitled to an opportunity during discovery to develop any additional facts that may be relevant to the reasonableness of Officer Harshadavid's use of force.

In sum, Counts I and V must be dismissed to the extent that they assert that Officer Harshadavid used excessive force against Caleb, Veraby, or Shaneris.  Defendants have conceded that "Lembert has sufficiently pleaded claims of excessive force against [Officer] Harshadavid." ECF 24-1 at 26.  And, as to Dmeza's use of force claim, I shall also deny the Motion.  Officer Harshadavid must otherwise be dismissed from Counts I and V.

### e.   Officer Legge

Defendants observe that the First Amended Complaint's "only factual allegations against [Officer] Legge are that he, along with three other Defendants, 'violently forced [Plaintiff Lembert] into the fence and then to the ground' and then was 'on top of him.'"  *Id.* at 27 (quoting ECF 21, ¶¶ 46–47).  They seek dismissal of Counts I and V with respect to Officer Legge except insofar as they are brought by Lembert.  *See* ECF 24-1 at 27.

I agree that the factual allegations relating to Officer Legge's use of force only concern his interaction with Lembert.  These allegations appear in paragraphs 46 and 47 of the First Amended Complaint.  *See* ECF 21, ¶¶ 46–47.  Therefore, I shall dismiss Counts I and V with respect to Officer Legge, except insofar as the counts assert that Officer Legge used excessive force against Lembert.

### f. Officer Lehnert

According to defendants, the only factual allegations in the First Amended Complaint concerning Officer Lehnert relate to his interaction with Caleb.  ECF 24-1 at 27.  Therefore, defendants contend that Counts I and V must be dismissed with respect to Officer Lehnert, insofar as the counts assert that he used excessive force against Shaneris, Veraby, Dmeza, or Lembert.  *Id.*

The First Amended Complaint is devoid of factual allegations concerning Officer Lehnert, except with respect to his interaction with Caleb.  Therefore, I shall dismiss Counts I and V of the First Amended Complaint with respect to Officer Lehnert, insofar as they assert that Officer Lehner used excessive force against against Shaneris, Veraby, Dmeza, or Lembert.

Defendants acknowledge that the First Amended Complaint alleges that Officer Lehnert used force of some kind against Caleb.  *Id.*  But, according to defendants, the First Amended Complaint alleges, at most, that Officer Lehnert "grabbed" Caleb or "pushed him back when he attempted to interfere with police investigation or arrest."  *Id.* at 28.  And, in defendants' view, "[t]hese allegations do not amount to unreasonable or excessive force."  *Id.*

In particular, the First Amended Complaint asserts that Caleb "rushed past officers," but backed up, "with his hands . . . in the air," after being instructed to do so.  ECF 21, ¶ 51.  Nonetheless, according to the First Amended Complaint, "Officer Lehnert shoved [Caleb] further back as he cried about the wellbeing of his mother."  *Id.*  The First Amended Complaint also alleges that, as Caleb "put his hands outward, in an open palm," to try to brace himself as he fell, "Officer Lehnert grabbed" and "pull[ed] the duo backward into a police car."  *Id.* ¶ 52.  After Officer Amrhein tased Caleb, Officer Lehnert "placed handcuffs on [Caleb] who was attempting to plead that he cannot breathe."  *Id.* ¶¶ 53–54.  "Officer Lehnert allowed [Caleb] to roll onto his side to catch a breath."  *Id.* ¶ 55.

Video taken from Officer Lehnert's body camera contains footage of the encounter during which Caleb "rushed past officers" and was, according to the First Amended Complaint, "shoved" by Officer Lehnert.  ECF 21, ¶ 51; *see* ECF 6-3.  This footage shows that, after Officer Lehnert arrived on the scene, he asked Caleb to move away from the area in the parking lot where other officers were gathered with Shaneris and Dmeza.  *See* ECF 6-3 at 1:45–2:20.  In addition, the video shows that Caleb shouted, "They be power trippin', yo, I hate that shit."  *See id.* at 2:10–2:20.  Caleb then turned around and began walking away from the officers.  *Id.* at 2:20–2:30.  Nonetheless, after a commotion broke out, Caleb rushed toward Officer Lehnert, with his right arm raised. *See id.* at 2:30–2:45.  As Caleb rushed toward Officer Lehnert, Officer Lehnert twice said, "Stay back!"  *Id.* at 2:30–2:45. But, Caleb continued to approach Officer Lehnert.  *See id.* at 2:30–2:50.  Officer Lehnert positioned himself in front of Caleb and physical contact occurred as Caleb attempted to move past Officer Lehnert.  *See id.*  While trying to block Caleb from moving past him, Officer Lehnert said,  "Calm down, calm down."  *See id.* at 2:45–3:00.

The video appears inconsistent with plaintiffs' allegation that Officer Lehnert "shoved" Caleb as he was "back[ing] up, with his hands . . . in the air."  *Compare* ECF 6-3 at 2:30–2:50 *with* ECF 21, ¶ 51.  In fact, the video shows that Caleb initiated the physical contact with Officer Lehnert and continued that physical contact despite being instructed to retreat and having an opportunity to do so.

It is a basic truth of Fourth Amendment jurisprudence that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates" the prohibition against excessive force.  *Graham*, 490 U.S. at 596.  Even with the benefit of hindsight, I cannot see any basis on which to conclude that Officer Lehnert's attempt to block Caleb from moving past him involved the use of excessive force.

Notably, Officer Lehnert's body camera footage does not capture the period during which he is alleged to have "grabbed" and "pull[ed] [Caleb] backward into a police car" and then handcuffed him.  ECF 21, ¶ 52.  However, Officer Amrhein's body camera footage does appear to capture these events.  *See* ECF 15-4 at 2:00–2:35.  This footage is consistent with the allegations in the First Amended Complaint that Officer Lehnert "grabbed" and "pull[ed] [Caleb] backward into a police car" and then handcuffed him.  ECF 21, ¶ 52.  And, at this juncture, I cannot determine whether "grabb[ing]," "pulling," and handcuffing of Caleb by Officer Lehnert constituted an unreasonable use of force.  *See id.*

For the foregoing reasons, I conclude that Caleb is the only plaintiff to have stated a claim for use of excessive force against Officer Lehnert.  Therefore, Counts I and V of the First Amended Complaint must be dismissed with respect to Officer Lehnert, except insofar as they are brought by Caleb Nalls.

### g.  Officer Schulman

Defendants acknowledge that the First Amended Complaint contains allegations that Officer Schulman "attacked [Veraby] from behind," "slammed" Veraby Nalls "into [a] parked car and down onto the pavement," and "beat[], kicked, and tased" Veraby.  ECF 24-1 at 28–29 (citing ECF 21, ¶¶ 31, 35, 41, 42).  But, they contend that the suit does not allege that Officer Schulman used force of any kind against any other plaintiff.  ECF 24-1 at 28–29.

I agree.  Therefore, I shall deny the Motion as to Counts I and V with respect to the claim that Officer Schulman used excessive force against Veraby.  But, I shall grant the Motion as to Caleb, Shaneris, Lembert, and Dmeza.

### h.  Officer Steigen

Defendants concede that the First Amended Complaint "adequately pleads claims based on excessive force by Lembert against Steigen."  ECF 24-1 at 29 (citing ECF 21, ¶¶ 46–50).  However, defendants assert that, because "[n]o other plaintiffs plead any other facts against [Officer] Steigen[,] . . . their claims against her must be dismissed."  ECF 24-1 at 29.

It is true that the suit contains no allegations that Officer Steigen used force of any kind against Caleb, Shaneris, Veraby, or Dmeza.  Therefore, Counts I and V of the First Amended Complaint must be dismissed with respect to Officer Steigen, except insofar as they assert that Officer Steigen used excessive force against Lembert.

### i.  Officer Vitacco

Defendants concede that Dmeza and Veraby adequately plead claims based on excessive force by Officer Vitacco.  *Id.* at 30; *see* ECF 21, ¶¶ 41–42, 45.  But, defendants assert:  "No other plaintiffs plead any other facts against [Officer] Vitacco so their claims against him must be dismissed."  ECF 24-1 at 30.

Upon review of the First Amended Complaint, I agree that it contains no allegations that Officer Vitacco used force of any kind against Caleb, Shaneris, or Lembert.  Therefore, Counts I and V must be dismissed with respect to Officer Vitacco, except insofar as they assert that Officer Vitacco used excessive force against Dmeza and Veraby.

### j.  Summary

In sum, I conclude that (1) Veraby and Caleb have stated a claim for excessive force against Officer Amhrein; (2) Shaneris and Dmeza have stated a claim for excessive force against Officer Vicarini; (3) Lembert and Veraby have stated a claim for excessive force against Officer Halstead; (4) Lembert and Dmeza have stated a claim for excessive force against Officer Harshadavid; (5)

Lembert has stated a claim for excessive force against Officer Legge; (6) Caleb has stated a claim for excessive force against Officer Lehnert; (7) Veraby has stated a claim for excessive force against Officer Schulman; (8) Lembert has stated a claim for excessive force against Officer Steigen; and (9) Dmeza and Veraby have stated a claim for excessive force against Officer Vitacco.

Counts I and V of the First Amended Complaint must otherwise be dismissed.

### B.  Count II; Count VII (False Arrest and False Imprisonment)

Count II of the First Amended Complaint alleges that all nine individual defendants subjected each plaintiff to false arrest and false imprisonment, in violation of the Fourth and Fourteenth Amendments.  *See* ECF 21, ¶¶ 89–94.  And, Count VII advances the same allegations under Articles 24 and 26 of the Maryland Declaration of Rights.  *Id.* ¶¶ 151–156.

As noted, Article 24 and Article 26 are construed *in pari materia* with the Fourteenth and Fourth Amendments to the United States Constitution, respectively.  *See Dent*, 745 F. Supp. 2d 661.  However, the federal law doctrine of qualified immunity is not a defense to claims brought under the Maryland Declaration of Rights.  *See*, *e.g.*, *Littleton v. Swonger*, 502 F. App'x 271, 274 n.2 (4th Cir. 2012); *Richardson v. Orangeburg Sch. Dist. No. 1*, 53 F.3d 329 (table), 1995 WL 255941, at *3 n.2 (4th Cir. 1995); *Okwa v. Harper*, 360 Md. 161, 201, 757 A.2d 118, 140 (2000); *Thacker v. City of Hyattsville*, 135 Md. App. 268, 290, 762 A.2d 172, 183–84 (2000).

I shall consider Counts II and VII of the First Amended Complaint together.  But, to the extent that defendants assert qualified immunity with respect to plaintiffs' claims of false arrest, I shall consider that defense only with respect to Count II.

### 1.

Claims for false arrest and false imprisonment lodged pursuant to 42 U.S.C. § 1983 "overlap."  *Wallace v. Kato*, 549 U.S. 384, 388 (2007).  Both are "essentially claims alleging a

seizure of the person in violation of the Fourth Amendment." *Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001). Therefore, "there is no cause of action for 'false arrest' [or false imprisonment] under section 1983 unless the arresting officer lacked probable cause" or reasonable suspicion for the seizure in question. *Harrison v. Deane*, 426 F. App'x 175, 181 (4th Cir. 2011) (citation omitted).

Probable cause is "'defined in terms of facts and circumstances sufficient to warrant a prudent [person] in believing that the suspect had committed or was committing an offense.'" *Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir. 2000) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). Notably, "even a very minor criminal offense" committed in the presence of a law enforcement officer may provide probable cause for arrest. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *accord McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019). "In assessing whether probable cause exists, [a court] must examine the totality of the circumstances." *Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000); see *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011).

"Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *see also Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (describing probable cause as "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life"). "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). In particular, it "'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Gates*,

462 U.S. at 232).  Thus, "[p]robable cause 'is not a high bar.'"  *Wesby*, 583 U.S. at 57 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).

In *Pringle*, 540 U.S. at 370-71, the Supreme Court explained (citations and internal quotation marks omitted):

>[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.
>
>The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized[.]

Generally, warrantless seizures and searches are per se unreasonable, subject only to a few well-established exceptions.  *See Katz v. United States*, 389 U.S. 347, 357 (1967); *see also Riley v. California*, 573 U.S. 373, 382 (2014) (stating that, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement"); *Kentucky v. King*, 563 U.S. 452, 459-60 (2011); *Gates*, 462 U.S. at 230–31; *see also United States v. Watson*, 423 U.S. 411, 424 (1976) (holding that warrantless arrests are permitted if an officer has probable cause to believe a felony has been committed, even if committed outside the officer's presence). The government bears the burden of justifying a warrantless seizure.  *United States v. Feliciana*, 974 F.3d 519, 523 (4th Cir. 2020); *Kehoe*, 893 F.3d at 237; *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013).

What has become known as the "*Terry* stop and frisk" is one of the exceptions to the warrant requirement.  *Terry v. Ohio*, 392 U.S. 1 (1968).  Under *Terry*, a police officer may stop and temporarily detain an individual for investigative purposes without violating the Fourth

Amendment's prohibition against unreasonable searches and seizures, as long as the officer has a reasonable, articulable suspicion, based on specific facts, that criminal activity is afoot. *Id.* at 30; *see United States v. Peters*, 60 F.4th 855, 862 (4th Cir. 2023). That is, the *Terry* stop "must be justified by reasonable suspicion of criminal activity or some other exception" to the warrant requirement. *Feliciana*, 974 F.3d at 522; *see United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Reid v. Georgia*, 448 U.S. 438, 440 (1980); *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015); *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011). The purpose of a *Terry* stop is investigative — to verify or to dispel the officer's suspicion surrounding the suspect. *Terry*, 392 U.S. at 22, 30.

Reasonable suspicion "is a less demanding standard than probable cause . . . ." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). It requires "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Kansas v. Glover*, 589 U.S. ___, 140 S. Ct. 1183, 1187 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)) (additional citation omitted); *see also Wingate v. Fulford*, 987 F.3d 299, 305 (4th Cir. 2021); *Feliciana*, 974 F.3d at 523.

The standard "'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.'" *Glover*, 140 S. Ct. at 1188 (citations omitted) (emphasis added in *Glover*). Moreover, officers must be permitted to make "'commonsense judgments and inferences about human behavior.'" *Id.* (citation omitted); *see Navarette v. California*, 572 U.S. 393, 404 (2014). Therefore, in assessing reasonable suspicion, courts must "give due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see also Glover*, 140 S. Ct. at 1189; *United States v. Critchfield*, 81 F.4th 390, 393 (4th Cir. 2023);

*Feliciana*, 974 F.3d 519, 525 (4th Cir. 2020); *United States v. McBride*, 676 F.3d 385 (4th Cir. 2012); *Sowards*, 690 F.3d 583, 587–88 (4th Cir. 2012); *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010); *United States v. Branch*, 537 F.3d 328, 33–37 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009).

Notably, reasonable suspicion is an "objective standard." *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2014). Therefore, the officer's subjective state of mind is not considered. *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013), *cert. denied*, 572 U.S. 1009 (2014); *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011). But, as the Fourth Circuit has said, the court "must not discount the officers' experience and training 'to detect the nefarious in the mundane.'" *Critchfield*, 81 F.4th at 395 (quoting *United States v. McCoy*, 513 F.3d 405, 415 (4th Cir. 2008)). On the other hand, a mere "'hunch'" or "'inchoate and unparticularized suspicion'" is not enough. *Wardlow*, 528 U.S. at 124 (citation omitted); *see Critchfield*, 81 F.4th at 393; *United States v. Gist-Davis*, 41 F.4th 259, 264 (4th Cir. 2022).

To be sure, the matter of reasonable, articulable suspicion is sometimes elusive. Indeed, the Supreme Court has acknowledged the difficulty in specifying exactly what is meant by the term "articulable suspicion." *Ornelas*, 517 U.S. at 699–700. Moreover, it has recognized that the standard is "'not readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* at 695–96. However, "the detaining officer [must] '. . . either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.'" *Williams*, 808 F.3d at 246 (citation omitted).

In making this assessment, a court considers the totality of circumstances. *See Arvizu*, 534 U.S. at 273; *Peters*, 60 F.4th at 864; *United States v. Cloud*, 994 F.3d 233, 242 (4th Cir. 2021).

"A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." *George*, 732 F.3d 296, 299 (4th Cir. 2013) (citing *Wardlow*, 528 U.S. at 124).   And, "[f]acts innocent in themselves may together amount to reasonable suspicion." *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020); *see United States v. Sokolow*, 490 U.S. 1, 9–10 (1989).

In sum, "[t]he suspicion must be articulable . . . ." *Critchfield*, 81 F.4th at 393.  But, "'[t]o be reasonable is not to be perfect.'" *Glover*, 140 S. Ct. at 1188 (citation omitted).

### 2.

Defendants argue that none of the nine individual officers can be liable for false arrest, because each arrest in which the officers participated was supported by probable cause.  ECF 24-1 at 16–27.   In particular, they assert that "each plaintiff committed obstruction and hindering," a common law offense under *Titus v. State*, 423 Md. 548, 588, 32 A.3d 44 (2011), and "fail[ed] to obey a lawful order in the presence of at least one officer," in violation of C.L. § 10-201(c)(3). ECF 24-1 at 11.  Defendants explain, *id.*:

> (1) Shaneris Nalls reentered the vehicle after being ordered out and before it could be searched and she and Dayaneris Dmeza physically resisted removal from the car, assaulting Defendant Vicarini (ECF No. 15-2 at 4:33–4:40); (2) Shamdu Caleb Nalls attempted to intervene in the arrest of Shaneris Nalls and Dayaneris Dmeza by pushing past several officers, ignoring orders to stay back (ECF No. 15-3 at 00:33–00:40); (3) Shamdu Veraby Nalls physically intervened in the arrest of Dayaneris Dmeza (ECF No. 15-3 at 00:40–00:43); (4) Nehemiah Lembert attempted to physically intervene in the arrest of Plaintiff Dmeza and Defendant Harshadavid told him multiple times to stay back so that the officers could "do their job." (ECF No. 15-4 at 2:11–2:24.)

In   their   Opposition,   plaintiffs   argue   that   Officers   Vicarini   and   Schulman "unconstitutionally seized" Shaneris by demanding that she roll down her window and provide her identification, without probable cause to believe that she had committed a crime.  ECF 25-1 at 7–

8. According to plaintiffs, it follows that "any subsequent interactions were improper and illegal." *Id.* at 8.

Plaintiffs also argue that, "[e]ven if the original stop of the vehicle [were] lawful, or consensual," the officers' arrest of Shaneris "was still illegal." *Id.* In particular, plaintiffs assert that Shaneris's reentry of the vehicle did not provide probable cause for her arrest because, by reentering the vehicle, she "did not intend to prevent the officer from performing his duty." *Id.* at 9. Moreover, plaintiffs contend that, "once in the vehicle," Shaneris could not have "refuse[d] the orders of [Officer Vicarini]," because "[s]he was never given the chance to obey." *Id.* at 9–10. Finally, according to plaintiffs, Shaneris's attempt to separate Dmeza from Officer Vicarini by "plac[ing] her arm across" Dmeza did not provide probable cause for her arrest. *Id.* at 9.

With respect to Dmeza, plaintiffs assert that Officer Vicarini and Officer Vitacco arrested Dmeza without giving her an opportunity to obey the officers' instructions to move away from the car. *Id.* at 10. In plaintiffs' view, Dmeza cannot have refused an order that she had no opportunity to obey. *See id.*

As to the arrests of Caleb, Veraby, and Lembert, plaintiffs assert that "all three . . . were attempting to intervene on the illegal arrest of . . . Dmeza, along with the subsequent excessive force used against . . . Dmeza." *Id.* at 12. Plaintiffs argue that, "because the means adopted by the [officers] to arrest . . . Dmeza were illegal," defendants cannot show that Caleb, Veraby, and Lembert "obstructed or hindered an officers' [sic] order." *Id.* at 12. Therefore, according to plaintiffs, "there was no probable cause to arrest" Caleb, Veraby, or Lembert. *Id.*

In their Reply, defendants argue, first, that, by "approach[ing] the vehicle" in which Shaneris was seated and telling "her to roll down the window so they could ask her some questions," Officers Vicarini and Schulman did not effect a seizure unsupported by probable cause.

ECF 26 at 3–4. In particular, defendants contend that the officers' approach to the car where Shaneris was seated, and their subsequent questioning of her, "fall[s] under," and is justified by, "the general principle that '[law enforcement] may approach an individual on a public street and ask questions without implicating the Fourth Amendment's protections.'" *Id.* at 4–5 (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)).

Second, defendants maintain that Shaneris's "decision to reenter the vehicle" after having been told to exit it "provided [the officers] with probable cause that she had committed the crimes of obstruction and failure to obey a reasonable order to prevent a disturbance of the peace." ECF 26 at 5. Defendants state: "Plaintiffs never explain why . . . Shaneris Nalls had the right to reenter the vehicle before it had been searched, other than implying that she was entitled to enter the car for warmth and that this somehow negated probable cause." *Id.* at 6 (citing ECF 25-1 at 9). According to defendants, the fact that Shaneris entered the car to keep warm is irrelevant, because "officers assess probable cause based on 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" ECF 26 at 6 (quoting *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017)).

Third, defendants insist that there was probable cause for the arrest of Dmeza. ECF 26 at 6–7. In particular, defendants state, *id.* at 7: "When Defendant Vicarini again ordered Plaintiff Shaneris Nalls out of the vehicle, body worn camera footage conclusively shows conduct by Plaintiff Dmeza that supplied a reasonable belief that she was obstructing and interfering with Defendant Vicarini in the performance of his duties as a police officer."

Finally, defendants maintain that there was probable cause to arrest Lembert, Caleb, and Veraby. *Id.* at 7–8. According to defendants, plaintiffs' argument that there was no probable cause to arrest Lembert, Caleb, and Veraby "rests on the false premise that the arrest of the other two

plaintiffs was unlawful and thus they were entitled to interfere in their arrest." *Id.* at 7 (citing ECF 25-1 at 11–12).

I turn to consider whether the facts, as alleged, are sufficient to establish, if proved, that the police conduct was not based on probable cause.

### a.  Shaneris Nalls

Plaintiffs contend that the arrest of Shaneris was not based on probable cause.  They assert that Officer Vicarini ordered Shaneris out of the car pursuant to an unlawful seizure.  From the fact that the seizure was unlawful—that is, unsupported by reasonable suspicion or probable cause—it follows, they claim, that any order that she exit the car was also unlawful.  And, they posit that Shaneris's refusal to obey an unlawful order cannot amount to common law obstruction and hindering, *see Titus*, 423 Md. 548, 588, 32 A.3d 44, or "failure to obey a lawful order in the presence of at least one officer," in violation of C.L. § 10-201(c)(3).  Therefore, plaintiffs conclude that the fact that Shaneris reentered the car did not provide probable cause to believe that she had committed a crime.

To determine whether a seizure is supported by reasonable suspicion or probable cause, it is necessary, first, to determine if and when a seizure has occurred.  In this regard, the Fourth Circuit's opinion in *Santos v. Frederick County Bd. of Comm'rs*, 725 F.3d 451 (4th Cir. 2013), is instructive.  In *Santos*, the Court explained that there are "three categories of police-citizen encounters," *id.* at 460–61:

> First, "consensual" encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Second, brief investigative detentions—commonly referred to as "*Terry* stops"—require reasonable, articulable suspicion of criminal activity. *Terry* [*v. Ohio*, 392 U.S. 1, 21 (1968)].  Finally, arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2006).

A police-citizen encounter rises to the level of a Fourth Amendment seizure when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . . " *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *Terry*, 392 U.S. at 19 n.16). This inquiry is objective, [*United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002)], asking whether "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Jones*, 678 F.3d at 299 (quoting [*United States v. Mendenhall*, 446 U.S. 544, 554 (1980)]). An encounter generally remains consensual when, for example, police officers engage an individual in routine questioning in a public place. *United States v. Gray*, 883 F.2d 320, 323 (1989) . . . .

Therefore, as *Santos* indicates, not every contact between police and an individual constitutes a seizure that implicates the Fourth Amendment. For example, the Fourth Amendment is not implicated in a police-citizen encounter in which a law enforcement officer approaches someone on the street or in a public place to ask a few questions or for identification. *United States v. Drayton*, 536 U.S. 194, 200–01 (2002); *Bostick*, 501 U.S. at 434; *Mendenhall*, 446 U.S. at 555; *see also United States v. Lewis*, 606 F.3d 193, 197–98 (4th Cir. 2010); *United States v. Black*, 525 F.3d 359, 364 (4th Cir. 2008), *cert. denied*, 555 U.S. 875 (2008); *Weaver*, 282 F.3d at 309. In other words, "mere police questioning does not constitute a seizure." *Muehler v. Mena*, 544 U.S. 93, 101 (2005).

As noted, the First Amended Complaint alleges that, as Shaneris was "seated in the vehicle, Officers Vicarini and Schulman drove by in their police cruiser." ECF 21, ¶ 25. Then, according to the suit, "[w]ithout any reasonable, articulable suspicion, . . . Officer Vicarini and Officer Schulman parked their vehicle at the end of the parking lot and approached [Shaneris's] car." *Id.* ¶ 26.

"It is axiomatic that police may approach an individual on a public street and ask questions without implicating the Fourth Amendment's protections." *Weaver*, 282 F.3d at 309. Similarly, the police may approach an individual in a parked car in a public parking lot, without implicating

45

the Fourth Amendment's protections. *See Lewis*, 606 F.3d at 197–198. Therefore, the officers' approach to the car where Shaneris was seated was, by itself, not sufficient to implicate the Fourth Amendment's protections.

The First Amended Complaint alleges that, when Officer Vicarini and Officer Schulman "approached the vehicle," its "windows . . . were rolled up." ECF 21, ¶ 29. The officers then "demanded" that Shaneris "roll down the window." *Id.* According to plaintiffs, Shaneris "placed the key in the ignition and turned the battery on so she could roll the driver's window down, [because] she reasonably believed she was not free to leave." *Id.* Plaintiffs acknowledge that "[i]t is . . . at this point . . . that the Officers would have reasonably been able to smell marijuana and discern that its origin was this particular vehicle." *Id.* n.1.

By alleging that Shaneris did not feel free to leave after the police demanded that she roll down the window, plaintiffs seem to suggest that the officers conducted a seizure within the meaning of the Fourth Amendment. *See Jones*, 678 F.3d at 299. Courts are divided about whether a police officer's request that the occupant of a car roll down the car window amounts to a Fourth Amendment seizure. *Compare Purce v. United States*, 482 A.2d 772, 777 (D.C. 1984) (no seizure when officer "tapped on the car window, awakened [the occupant], and asked him for identification"); *Akins v. State*, 596 S.E.2d 719, 721 (Ga. Ct. App. 2004) (no seizure when officer asked the occupant of a parked car "to roll down her window in order to talk to her and determine her well-being"); *People v. Clark*, 541 N.E.2d 199, 203 (Ill. App. Ct. 1989) (no seizure when officer "tapped on the window" of a parked car, "identified himself, and said to open it"); *State v. O'Neil*, 62 P.3d 489, 497–98 (Wash. 2003) (no seizure when officer "shined his spotlight" on parked car, "approached the car and shined a flashlight into it," and "asked [the occupant] to roll his window down"), *with United States v. Ingram*, 151 F. App'x 597, 599 (9th Cir. 2005) (seizure

occurred when officer approached parked car and "directed" the occupant "to roll down his window"); *United States v. Carroll*, 591 F.2d 1132, 1135 (5th Cir. 1979) ("The Agents' tapping on the window and their questioning of [the occupant] constituted a stop within the meaning of the Fourth Amendment."); *Borowicz v. North Dakota Dep't of Transp.*, 529 N.W.2d 186, 188 (N.D. 1995) (stating that "a stop arguably occurred when [a police officer] requested [the occupant of a parked car] to open the door of the pickup and asked [him] to produce his driver's license"); *Maine v. Patterson*, 868 A.2d 188, 192–93 (Me. 2005) (seizure occurred when police officer approached a "vehicle parked among other cars in a well-used parking lot" and "instructed" the occupant "to roll down the window").

As noted, "'consensual' encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections." *Santos*, 725 F.3d at 460 (quoting *Bostick*, 501 U.S. at 434). The "seemingly routine approach of the police" is a "traditional hallmark of a police-citizen consensual encounter." *Jones*, 678 F.3d at 300. A "routine" encounter is one in which an officer "merely approach[es] an individual on the street or in another public place" and "ask[s] him if he is willing to answer some questions" or "put[s] questions to him if the person is willing to listen." *Id.* (quoting *Bostick*, 501 U.S. at 434). The Court has distinguished this kind of "routine" encounter from an encounter "targeted at" a particular person suspected of wrongdoing. *Jones*, 678 F.3d at 301.

In determining whether a seizure occurred, a court may take into account an "officer's tone of voice and general demeanor." *Weaver*, 282 F.3d at 310. In addition, a court may consider "whether [officers] treated" a person "as though they suspected him of 'illegal activity rather than treating the encounter as "routine in nature."'" *Jones*, 678 F.3d at 300 (quoting *Gray*, 883 F.2d at 322–23).

According to the First Amended Complaint, the officers approached the vehicle because they suspected Shaneris of illegal activity. ECF 21, ¶ 26. Plaintiffs allege that the officers drove past Shaneris's parked car and made eye contact with her. *Id.* ¶¶ 25–26. Then, the officers "parked their vehicle at the end of the parking lot" and returned, on foot, to Shaneris's vehicle. *Id.* ¶ 26. And, after approaching Shaneris's car, the officers "demanded" that she lower her window. *Id.* ¶ 29.

As I see it, the factual allegations, to the effect that the officers drove past Shaneris, parked their vehicle, returned to her vehicle, demanded that she lower her car window, and instructed her to exit her vehicle, are sufficient to support the claim that this was not a routine encounter. Plaintiffs have sufficiently alleged that it was "one targeted at" Shaneris. *Jones*, 678 F.3d at 301. Moreover, in light of Officer Vicarini's instructions, a minor might "have believed that [s]he was not free to leave." *Id.* at 299 (internal quotation marks and citations omitted). I am satisfied, based on these assertions, that plaintiffs have alleged that a seizure occurred when the officers approached Shaneris in her car, "demanded," ECF 21, ¶ 29, that she lower her window, and instructed her to exit the vehicle.

I must then determine whether, assuming the truth of the allegations in the First Amended Complaint, the seizure—whether attributed to the window-lowering instruction or, alternatively, to the instruction to exit the car—was supported by reasonable, articulable suspicion of wrongdoing, or probable cause to believe that a crime was being or had been committed. Defendants assert that the "smell of marijuana" provided Officer Vicarini with a legal basis "to question" Shaneris and also "probable cause to search the vehicle." ECF 24-1, ¶ 20. According to the First Amended Complaint, however, "[i]t is only . . . when . . . . Shaneris Nalls exited the vehicle"—that is, after the seizure in question had occurred, regardless of whether the seizure is

48

attributed to Officer Vicarini's instruction to lower the window or to his instruction to exit the car—"that the Officers would have reasonably been able to smell marijuana and discern that its origin was this particular vehicle."  ECF 21, ¶ 29 n.1.

As indicated, at this stage of the litigation, I must "accept as true all of the factual allegations contained in the complaint, and must draw all reasonable inferences [from those facts] in favor of the plaintiff."  *Retfalvi*, 930 F.3d at 605 (internal quotation marks and citations omitted) (alteration in *Retfalvi*).  Therefore, for present purposes, I must accept as true that, at the time Officer Vicarini seized Shaneris by demanding that she lower her window and/or exit the car, he could not have smelled any odor of marijuana emitted from Shaneris's vehicle.  It follows that, assuming the truth of the allegations in the First Amended Complaint, the officers' seizure of Shaneris was unsupported by reasonable, articulable suspicion or probable cause.

As noted, plaintiffs argue that, because the initial seizure of Shaneris was without legal basis, "any subsequent [instructions] were improper and illegal."  ECF 25-1 at 8.  In so arguing, plaintiffs suggest that their failure to obey "improper and illegal" instructions cannot provide probable cause to believe that they committed the crimes of obstructing and hindering under *Titus*, 423 Md. 548, 588, 32 A.3d 44, or "failure to obey a lawful order in the presence of at least one officer," in violation of C.L. § 10-201(c)(3).

At this juncture, I need not resolve whether all orders made pursuant to an allegedly unlawful stop are themselves unlawful.  In my view, the relevant video footage and the allegations in the First Amended Complaint leave considerable uncertainty about whether Officer Vicarini had, in fact, ordered Shaneris to *remain* outside the car.  Therefore, I conclude that Shaneris has stated a plausible claim of false arrest against Officer Vicarini.

**b.  Dayaneris Dmeza**

As noted, video captured by Officer Vicarini's body camera shows that, after Officer Vicarini ordered Shaneris out of the car, Dmeza leaned into the passenger side of the vehicle and reached into the center console.  ECF 15-2 at :23–:42.  When Officer Vicarini noticed that Dmeza was leaning into the car, he ordered Dmeza to get out of the car.  *See id.*  Dmeza obeyed, and said that she was "fine" and that she "wasn't doing nothing," or words to that effect.  *See id.* at :36–:40.  Officer Vicarini responded:  "I know, but I see you reaching in the car that we're going to search."  *See id.* at :38–:42.  The video shows that, several minutes later, Dmeza again approached the passenger seat of the car, where Shaneris had seated herself.  *See id.* at 4:30–4:35.  Thereafter, Officer Vicarini said, "Get out of the car," or words to that effect.  *See id.*  And, he attempted to separate Dmeza from Shaneris, who was seated in the car, by placing his hand and forearm on Dmeza's chest and pushing her back against the closed rear door of the car.  *Id.* at 4:35.

Defendants argue that, by "physically resist[ing] [the] removal of [Shaneris] from the car [and] assaulting [Officer Vicarini]," Dmeza provided the officers with probable cause to arrest her.  ECF 24-1 at 11.  In contrast, plaintiffs argue that Dmeza was placed under arrest before being "afforded an opportunity to follow [Officer] Vicarini's instructions."  ECF 25-1 at 10.

The video footage supports plaintiffs' contention that Dmeza was placed under arrest before she had an opportunity to obey Officer Vicarini's order.  *See* ECF 15-2 at 4:30–4:40.  And, the video does not clearly show that Dmeza "assault[ed]" Officer Vicarini.  ECF 24-1 at 11.  In other words, neither the pleaded facts nor Officer Vicarini's body camera footage establish that there was probable cause to arrest Dmeza.  Therefore, I conclude that Dmeza has stated a plausible claim of false arrest against each officer alleged to have participated in the arrest: Officer Vicarini, *see* ECF 21, ¶ 38; Officer Vitacco, *see id.* ¶ 45; and Officer Harshadavid.  *Id.*

### c.  Caleb Nalls

Officer Lehnert's body camera footage clearly shows that Caleb initiated physical contact with Officer Lehnert and continued that physical contact despite being instructed to retreat and having an opportunity to do so.  *See* ECF 6-3 at 2:30–3:00.  Therefore, the police had probable cause to believe that Caleb had, at the very least, disobeyed a lawful order in violation of C.L. § 10-201(c)(3).  As a result, I shall dismiss Count II and Count VII insofar as they are asserted by Caleb, without prejudice to plaintiffs' right to amend the First Amended Complaint to include allegations tending to show that there was no probable cause for Caleb's arrest.

### d.  Veraby Nalls

Citing three seconds of footage from Officer Legge's body camera, defendants assert that there was probable cause to arrest Veraby because he "physically intervened in the arrest of Dayaneris Dmeza."  ECF 24-1 at 11 (citing ECF 15-3 at :40–:43).  At this juncture, based on  the video footage, it is not clear enough to support the conclusion that there was probable cause to arrest Veraby for a violation of C.L. § 10-201(c)(3) or any other crime.  Therefore, I look to the allegations in the First Amended Complaint to decide whether the pleaded facts, if proven, would establish that there was probable cause to arrest Veraby.

The First Amended Complaint alleges, in pertinent part, ECF 21, ¶¶ 41, 42:

41.  . . .  As Plaintiff Shamdu Veraby Nalls attempted to nonviolently intervene in the beating of his wife, he was violently, and without warning, punched multiple times by Defendant Vicarini. Seconds later, Plaintiff Shamdu Veraby Nalls was attacked from behind by Officer Shulman and another Officer Defendant who violently slammed Plaintiff into the parked car and down onto the pavement.

42.  In a display of grossly excessive force, Plaintiff Shamdu Veraby Nalls would ultimately be beat, kicked, and tased, by at least four Defendant Officers – including Officers Amrhein, Vitacco, Halstead, and Shulman – while his hands were behind his back and he was laid face down on the ground. One Officer Defendant violently kicked Plaintiff Shamdu Veraby Nalls in the head and face.

These allegations are sufficient to state a claim for false arrest by Veraby against the officers involved in Veraby's arrest: Officer Schulman, *see* ECF 21, ¶ 41; Officer Amrhein, *id.* ¶ 42; Officer Vitacco, *id.*; and Officer Halstead.  *Id.*

### e.  Nehemiah Lembert

According to defendants, there was probable cause to arrest Nehemiah Lembert because he "attempted to physically intervene in the arrest of . . . Dmeza" even after Officer "Harshadavid told him multiple times to stay back."  ECF 24-1 at 11 (citing ECF 15-4 at 2:11–2:24).  In their Opposition, plaintiffs acknowledge that Lembert was "attempting to intervene on [sic] the illegal arrest of . . . Dmeza."  ECF 25-1 at 12.  But, they deny that this attempted intervention was unlawful.  *Id.*

Footage from Officer Harshadavid's body camera indicates that she instructed Lembert to "stay back."  *See* ECF 15-4 at 2:11–2:30.  This footage also shows that, despite the instruction, Lembert rushed past Officer Harshadavid.  In my view, this footage establishes that there was probable cause to arrest Lembert for disobedience of a lawful order, in violation of C.L. § 10-201(c)(3).  Therefore, I shall dismiss Count II and Count VII insofar as they are asserted by Nehemiah Lembert, without prejudice to plaintiffs' right to amend the First Amended Complaint to include allegations tending to show that the officers lacked probable cause to arrest Lembert.

### 3.

I have concluded that Shaneris has stated a claim for false arrest against Officer Vicarini.  I have also concluded that Dmeza has stated a claim for false arrest against Officer Vicarini, *see* ECF 21, ¶ 38, Officer Vitacco, *see id.* ¶ 45, and Officer Harshadavid.  *Id.*  And, I have determined that Veraby stated a claim for false arrest against Officer Schulman, *see id.* ¶ 41, Officer Amrhein, *id.* ¶ 42, Officer Vitacco, *id.*, and Officer Halstead.  *Id.*

However, my inquiry does not end here, because I must next consider defendants' assertion of qualified immunity with respect to the claims advanced in Count II.    ECF 24-1 at 30–31. According to defendants, "there was no case law that would have placed any defendant on notice that . . . it would be false arrest under the Fourth Amendment to arrest any of these plaintiffs under these pleaded facts . . . ." *Id.* at 31.  In their Opposition, plaintiffs assert that, in light of *Hupp*, 931 F.3d at 320–21, a reasonable officer would have known that there was no probable cause to arrest a person for disobeying an order when the person was not "given the opportunity to comply." ECF 25-1 at 12–13.  In plaintiffs' view, "[t]he facts in *Hupp* are directly analogous to the case at hand wherein Plaintiffs Dmeza and Shaneris Nalls were grabbed a split second after being told to back up or to get out of the car and were consequently arrested."  *Id.* at 13.

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Barrett v. PAE Government Servs., Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *Wesby*, 583 U.S. at 62–63) (cleaned up); *see Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5–6 (2021) (per curiam); *City of Tahlequah Okla. v. Bond*, 595 U.S. 9 (2021) (per curiam); *Taylor v. Riojas*, 598 U.S. 7, 7–9 (2020); *Hulbert v. Pope*, 70 F. 4th 726, 732 (4th Cir. 2023); *Franklin*, 64 F.4th at 530, 534–35; *Hicks v. Ferreyra*, 64 F.4th 156, 169 (4th Cir. 2023); *Davison v. Rose*, 19 F.4th 626, 640 (4th Cir. 2021); *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015).

The Fourth Circuit has repeatedly said: "'Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Garrett v. Clarke*, 74 F.4th 579, 583 (4th Cir. 2023) (quoting *Davison*, 19 F.4th at 640); *see also Amisi v. Brooks*, ___ F.4th ___ , 2024 WL 718699, at *3 (4th Cir. Feb. 22, 2024); *Ray v. Roane*, ___ F.4th ___ , 2024 WL 716690, at *6 (4th Cir. Feb. 22, 2024); *King v. Riley*, 76 F.4th 259, 264–65 (4th Cir. 2023); *Owens*, 767 F.3d at 395.

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An official who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see Hicks*, 64 F.4th at 169; *Barrett*, 975 F.3d at 428–29; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 219 (4th Cir. 2018); *Ray*, 781 F.3d at 100. Countless cases support these principles. *See, e.g., Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Robertson v. Anderson Mill Elem. School*, 989 F.3d 282, 288 (4th Cir. 2021); *Ray*, 948 F.3d at 229–30; *Hupp*, 931 F.3d at 317; *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson*

*v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018);

*Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254,

255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582–83 (4th

Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730

F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*,

568 U.S. 1068 (2012).

Qualified immunity is an affirmative defense. *Hicks*, 64 F.4th at 169; *Ridpath v. Bd. of

Governors Marshall Univ.,* 447 F.3d 292, 305 (4th Cir. 2006). But, it does not merely provide a

defense to liability. Rather, it provides "*immunity from* suit . . . ." *Mitchell v. Forsyth*, 472 U.S.

511, 526 (1985) (emphasis in *Mitchell*); *see Gilliam v. Sealey*, 932 F.3d 216, 229 (4th Cir. 2019),

*cert. denied,* ___U.S.___, 140 S.Ct. 2641 (2020); *see also Ussery v. Mansfield*, 786 F.3d 332, 337

(4th Cir. 2015). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted

to go to trial.'" *Id.* (quoting *Mitchell*, 472 U.S. at 526).

To determine whether qualified immunity applies, courts generally conduct a two-step

inquiry. *King,* 76 F.4th at 265; *Hicks*, 64 F.4th at 169. First, courts ask whether the facts alleged,

"[t]aken in the light most favorable to the party asserting the injury, . . . show the [official's]

conduct violated a constitutional [or statutory] right." *Saucier*, 533 U.S. at 201. Second, courts

ask whether the right at issue "'was clearly established in the specific context of the case—that is,

[whether] it was clear to a reasonable [official] that the conduct in which he allegedly engaged was

unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*,

312 F.3d 625, 635 (4th Cir. 2002)); *see also Cannon v. Village of Bald Head Island*, 891 F.3d 489,

497 (4th Cir. 2018); *Scinto*, 841 F.3d at 235. "'Courts are no longer required to analyze these

questions sequentially, but it is often the better approach' to 'determine first whether the plaintiff

has alleged a deprivation of a constitutional right at all.'" *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 178 (4th Cir. 2018) (internal citation omitted).[13]

"The plaintiff bears the burden of proof on the first question—i.e., whether a constitutional violation occurred . . . . [and] [t]he defendant bears the burden of proof on the second question—*i.e.*, entitlement to qualified immunity." *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007) (internal citations omitted); *see also Stanton*, 25 F.4th at 233. As indicated, if an official is shown to have violated the rights of a plaintiff, the court must "evaluate whether the right at issue was 'clearly established' at the time of the [official's] conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).

"The inquiry into whether a constitutional right is 'clearly established' requires defining the right at issue." *Hicks*, 64 F.4th at 170; *see Pfaller*, 55 F.4th at 445; *Halcomb*, 992 F.3d at 319–20. "The Supreme Court has cautioned against defining a right with 'a high level of generality'. . . ." *Hicks*, 64 F.4th at 170 (citing *Kisela v. Hughes*, 584 U.S. ___, 138 S.Ct. 1148, 1152 (2018)); *see City of Escondido v. Emmons*, 586 U.S. ___, 139 S. Ct. 500, 503 (2019); *White v. Pauly*, 580 U.S. 73, 79 (2017); *Younger*, 79 F.4th at 385. Instead, the court must "define the right at issue with specificity." *Knibbs*, 30 F.4th at 223.[14]

---

[13] The Fourth Circuit has "effectively done away with the clearly established prong of qualified immunity for a subset of deliberate indifference cases," *Younger*, 79 F.4th at 385 n.17, namely, cases in which the alleged "Eighth Amendment violation[] inherently include[s] knowing disregard for the law." *Pfaller v. Amonette*, 55 F.4th 436, 445–48 (4th Cir. 2022); *see Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022).

[14] Defining the right at issue is not necessarily an easy task. In *Younger*, 79 F.4th 373, the Fourth Circuit determined that the district court "failed to heed [the] requirement" of specificity. *Id.* at 386 n.20. In that case, which involved the brutal beating of a prisoner by correctional officers, the district court defined the right at issue as a "prisoner's 'right to be protected from

"'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (internal quotation marks omitted); *see King*, 76 F.4th at 265. Notably, the "clearly established" standard "requires that the contours of the legal rule be 'so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Garrett*, 74 F.4th at 584 (quoting *City of Tahlequah*, 595 U.S. at 12 (internal quotation marks omitted)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Tarashuk v. Givens*, 53 F.4th 154, 162 (4th Cir. 2022) (integral quotation and citation omitted); *see King*, 76 F.4th at 265–66.

In assessing qualified immunity, the court is guided by cases from the Supreme Court, the Fourth Circuit, and "the highest court of the state in which the action arose." *Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017). In the absence of controlling authority, the court considers "whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority." *Id.* (internal quotation marks omitted). And, "even when the facts in the record establish that the [official's] conduct violated a plaintiff's constitutional rights, the [official] still is entitled to immunity from suit 'if a reasonable person in the [official's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff],

---

malicious attack . . . from the very officials tasked with ensuring their security.'" *Id.* Yet, according to the Fourth Circuit, the district court's definition was too general. *Id.*

qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170).

However, "[t]here is no requirement that the 'very action in question [have] previously been held unlawful' for a reasonable official to have notice that his conduct violated that right." *Scinto*, 841 F.3d at 236 (second alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Government officials "can still be on notice that their conduct violates established law even in novel factual circumstances, so long as the law provided fair warning that their conduct was wrongful." *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 418 (4th Cir. 2020) (internal quotation marks omitted); *see also Hope*, 536 U.S. at 741 (concluding that cases involving "fundamentally" or "materially similar" facts are not necessary to a finding that the law is clearly established).

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–19.

"A qualified immunity defense can be presented in a Rule 12(b)(6) motion, but . . . when asserted at this early stage of the proceedings, 'the defense faces a formidable hurdle' and 'is

usually not successful.'" *Owens*, 767 F.3d at 396 (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)). This is because "qualified immunity is an affirmative defense." *Ridpath v. Marshall Univ. Bd. of Govs.*, 447 F.3d 292, 305 (4th Cir. 2006). As such, it is generally not fit for resolution on a motion to dismiss. *Goodman v. Praxair*, 494 F.3d 458, 464 (4th Cir. 2007). Indeed, it is only "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, [that] the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Id.* "This principle only applies, however, if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Id.* (citing *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir.1993)) (emphasis in *Goodman*); *accord Desser v. Woods*, 266 Md. 696, 296 A.2d 586, 591 (1972); *see also Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (stating that "a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial.'") (quoting *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992) (alteration in *Crooke*).

At this juncture, I am unable to determine whether the officers are entitled to qualified immunity with respect to the false arrest claims lodged by Shaneris, Dmeza, and Veraby. Based on the allegations in the suit and the body camera video, I conclude that Shaneris, Dmeza, Veraby have plausibly alleged that they were arrested without probable cause. But, as the parties develop the record, additional facts pertaining to probable cause may emerge. Therefore, I cannot say that the Court has been provided with "all facts necessary to the affirmative defense" of qualified immunity. *Goodman*, 494 F.3d at 464 (internal quotation marks, citation, and alteration omitted).

In sum, for the reasons stated above, I conclude that Count II and Count VII of the First Amended Complaint must be dismissed, except insofar as they assert that (1) Shaneris Nalls was

subjected to false arrest by Officer Vicarini; (2) Dayaneris Dmeza was subjected to false arrest by Officer Vicarini, Officer Vitacco, and Officer Harshadavid; and (3) Veraby was subjected to false arrest by Officer Schulman, Officer Amrhein, Officer Vitacco, and Officer Halstead.

### C.  Count X (Common Law False Arrest)

Count X alleges that each of the nine individual defendants subjected each plaintiff to false arrest and false imprisonment, in violation of Maryland common law.  *Id.* ¶¶ 178–190.

Section 2-202 of the Criminal Procedure Article ("C.P.") of the Md. Code (2018 Repl. Vol., 2023 Supp.) provides: "A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer may arrest without a warrant any person whom the police officer reasonably believes to have committed the crime."

Under Maryland law, a plaintiff alleging false arrest must show (1) a deprivation of liberty, (2) "without consent," and (3) "without legal justification."  *Heron v. Strader*, 361 Md. 258, 264, 761 A.2d 56, 59 (2000).  "The test of legal justification, in the context of false arrest and false imprisonment, is judged by the principles applicable to the law of arrest."  *Id.* (Internal quotation marks and citations omitted).  "Therefore, 'where the basis of a false imprisonment action is an arrest by a police office, the liability of the police officer for false imprisonment will ordinarily depend upon whether or not the officer acted within his legal authority to arrest."  *Id.* at 264–65 (quoting *Montgomery Ward v. Wilson*, 339 Md. 701, 721, 664 A.2d 916, 925 (1995)).

The Maryland Court of Appeals[15] has observed:  "The term legal justification has created some confusion in other courts."  *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 654, 261 A.2d

---

[15] In Maryland's general election of November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland.  And, the voters also approved changing the name of the Maryland Court of

731, 738 (1970) (citing *Roberts v. Hecht Co.*, 280 F. Supp. 639 (D. Md. 1968)).  In particular, "[t]his confusion arises because of the frequent statements that probable cause is not a defense to an action for false imprisonment but legal justification is."  *Paul*, 256 Md. at 654, 261 A.2d at 73. For example, in *Roberts v. Hecht Co.*, 280 F. Supp. 639 (D. Md. 1968), the court concluded that there was probable cause to detain the plaintiff, but "no justification for such detention."  *Id.* at 643.

In *Ashton v. Brown*, 339 Md. 70, 121, 660 A.2d 447, 472 (1995), the Maryland Court of Appeals stated:  "The Court has consistently held that probable cause is not a defense in an action for false imprisonment based upon a police officer's warrantless arrest for the commission of a non-felony offense, or upon an arrest by a private person."  However, the cases cited by the court in *Ashton* in support of this statement were decided before 1969.  *See id.*  This is important because, in 1969, the Maryland General Assembly extended the authority of a police officer to make a warrantless arrest for a misdemeanor.  *See Ashton* 339 Md. at 122, 660 A.2d at 473.  The *Ashton* Court explained, *id.*:

> In 1969 the General Assembly enacted Ch. 561 of the Acts of 1969, which is now codified, as amended, at Code (1957, 1992 Repl. Vol., 1994 Cum. Supp.), Art. 27, § 594B.  The Title to the 1969 Act stated that the purpose of the legislation was to codify the common law of warrantless arrest, and in addition, "as to certain offenses, to extend, the authority of a police officer to make an arrest without a warrant . . . ."  The common law right of a police officer to arrest without a warrant for misdemeanors actually committed in his presence was extended in Art. 27, § 594B(b):  "A police officer who has probable cause to believe that a . . . misdemeanor is being committed in the officer's presence or within the officer's

_____

Special Appeals to the Appellate Court of Maryland.  These changes went into effect on December 14, 2022.  *See* Press Release, *Voter-Approved Constitutional Change Renames High Courts to Supreme and Appellate Court of Maryland*, MARYLAND COURTS (Dec. 14, 2022), https://perma.cc/K87C-UUCG.

To avoid confusion, I will refer to the Maryland courts by the names that were in effect when the cited cases were decided.

view, may arrest without a warrant any person whom the officer may reasonably believe to have committed such offense."

The court then observed that, "[i]n light of the legislative extension of the authority to make warrantless arrests, it appears in the present case that if a police officer . . . had probable cause to believe that the curfew ordinance"—a misdemeanor—"was being violated . . . the police officer could have arrested the [violator] with lawful justification, even though the curfew ordinance was in fact invalid." *Id.* Therefore, the court acknowledged that arrest for a misdemeanor may be legally justified by the existence of probable cause *if* the General Assembly has authorized arrest for a misdemeanor based on the existence of probable cause. *See id.* Indeed, as the court more recently stated, *Okwa*, 360 Md. at 190, 757 A.2d at 134: "One of the many powers given to police officers in this State is the authority, under certain circumstances, to make arrests without an arrest warrant. The boundaries of this particular authority are defined in the Maryland Code."

Willful failure to obey a reasonable and lawful order by a police officer is a misdemeanor. *See* C.L. § 10-201(c)(3); C.L. § 10-201(d) ("A person who violates this section is guilty of a misdemeanor . . . ."). And, C.P. § 2-202 provides: "A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer may arrest without a warrant any person whom the police officer reasonably believes to have committed the crime." Therefore, under Maryland statutory law, probable cause may legally justify a warrantless arrest for a felony *and* a warrantless arrest for a misdemeanor.

It follows that the essential question in determining whether any plaintiff in this case has stated a claim for common law false arrest against any defendant is the same question that was central to my analysis of Counts II and VII: was there probable cause for each arrest in question? As a result, my analysis of Counts II and VII controls the disposition of Count X.

Accordingly, I conclude that Count X of the First Amended Complaint must be dismissed, except insofar as it asserts that (1) Shaneris Nalls was subjected to false arrest by Officer Vicarini; (2) Dayaneris Dmeza was subjected to false arrest by Officer Vicarini, Officer Vitacco, and Officer Harshadavid; and (3) Veraby Nalls was subjected to false arrest by Officer Schulman, Officer Amrhein, Officer Vitacco, and Officer Halstead.

### D. Count III; Count VI; Count XI (Malicious Prosecution)

Count III of the First Amended Complaint alleges that each individual defendant subjected each plaintiff to malicious prosecution, in violation of the Fourth and Fourteenth Amendments. ECF 21, ¶¶ 95–111. Count VI alleges that each individual defendant subjected each plaintiff to malicious prosecution, in violation of Article 24 and Article 26 of the Maryland Declaration of Rights. *Id.* ¶¶ 133–150. And, Count XI alleges that each individual defendant subjected each plaintiff to malicious prosecution under Maryland common law. *Id.* ¶¶ 191–207.

To prove a claim of malicious prosecution, in violation of the Fourth Amendment, "a plaintiff must show 'that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.'" *Hupp*, 931 F.3d at 324 (citing *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2019)).

Articles 24 and 26 of the Maryland Declaration of Rights "'are construed *in pari materia* with the Fourth and Fourteenth Amendments,'" and therefore "the elements of malicious prosecution and the standard for probable cause are identical to the federal constitutional claim." *Talley v. Anne Arundel Cnty.*, RDB-21-0347, 2021 WL 4244759, at \*10 (D. Md. Sept. 17, 2021) (quoting *Littleton*, 502 F. App'x at 274) (additional citations omitted). Under Maryland law, "[t]he elements of malicious prosecution are: [1] a criminal proceeding instituted or continued by the defendant against the plaintiff; [2] without probable cause; [3] with malice, or with a motive other

than to bring the offender to justice; and [4] termination of the proceedings in favor of the plaintiff." *Heron*, 361 Md. at 264, 761 A.2d at 59 (citing *DiPino v. Davis*, 354 Md. 18, 59, 729 A.2d 354, 373 (1999); *Montgomery Ward v. Wilson*, 339 Md. 701, 714, 664 A.2d 916, 922 (1995)).

The Fourth Circuit has explained that a "claim for false arrest alleges that a warrantless arrest lacked probable cause." *Munday*, 848 F.3d at 257 (citing *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181–82 (4th Cir. 1996)). But, "a claim for malicious prosecution alleges that an arrest made pursuant to a warrant lacked probable cause." *Id.*

In the Motion, defendants assert that plaintiffs failed to plead an essential element of malicious prosecution, namely, that the arrests in question were made pursuant to a warrant unsupported by probable cause. ECF 24-1 at 9–10. In their Opposition, citing *Munday*, 848 F.3d 248, plaintiffs concede that they have not pleaded a claim for malicious prosecution under the Fourth Amendment or the common law. ECF 25-1 at 4 ("Plaintiffs Concede on the Claims of Malicious Prosecution"). Indeed, the First Amended Complaint alleges that plaintiffs "all were arrested without . . . a warrant." ECF 21, ¶ 92. Given plaintiffs' concession and the fact that the First Amended Complaint does not allege that the plaintiffs were arrested pursuant to a warrant, I shall dismiss Count III, Count VI, and Count XI of the First Amended Complaint.

### E.  Count IX (Battery)

Count IX alleges that each individual defendant committed common law battery against each plaintiff.

"Battery [in Maryland] is commonly defined as a harmful, unlawful, or offensive touching." *Claggett v. State*, 108 Md. App. 32, 47, 870 A.2d 1002, 1009 (1996) (Hollander, J.) (citing *Ford v. State*, 330 Md. 682, 699, 625 A.2d 984, 992 (1993)). The tort of battery is "the

unpermitted application of trauma by one person upon any part of the body of another person." *Johnson v. Valu Food, Inc.*, 132 Md. App. 118, 123, 751 A.2d 19, 21 (2000).

"An officer is not liable for battery for using a reasonable amount of force when effectuating a lawful detention or arrest." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (citing *Ashton*, 339 Md. at 119 n.24, 660 A.2d at 471 n.24; *Busch v. State*, 289 Md. 669, 426 A.2d 954, 958 (1981); *Hines v. French*, 157 Md. App. 536, 549–553, 852 A.2d 1047, 1055–56 (2004)). "However, if during a valid arrest 'an officer uses excessive force, or force greater than is reasonably necessary under the circumstances, the officer may be liable' for battery." *Stutzman*, 350 F. Supp. 3d at 383 (quoting *French v. Hines*, 182 Md. App. 201, 266 957 A.2d 1000,1037 (2008) (Hollander, J.)). Therefore, "[t]o the extent that [a plaintiff] has stated a claim against a defendant for excessive force under the Fourth Amendment," he also has "stated a claim for battery" under Maryland law. *Stutzman*, 350 F. Supp. 3d at 383.

I concluded, *supra*, that (1) Veraby and Caleb have stated a claim for excessive force against Officer Amhrein; (2) Shaneris and Dmeza have stated a claim for excessive force against Officer Vicarini; (3) Lembert and Veraby have stated a claim for excessive force against Officer Halstead; (4) Lembert and Dmeza have stated a claim for excessive force against Officer Harshadavid; (5) Lembert has stated a claim for excessive force against Officer Legge; (6) Caleb has stated a claim for excessive force against Officer Lehnert; (7) Veraby has stated a claim for excessive force against Officer Schulman; (8) Lembert has stated a claim for excessive force against Officer Steigen; and (9) Dmeza and Veraby have stated a claim for excessive force against Officer Vitacco.

Defendants concede that Count X may proceed with respect to all officers except Officer Lehnert "to the extent that [the] claim is based on [those officers'] excessive force." *See* ECF 24-

1 at 16 (Officer Amrhein), *id.* at 19 (Officer Vicarini), *id.* at 23 (Officer Halstead), *id.* at 24 (Officer Harshadavid), *id.* at 27 (Officer Legge), *id.* at 28 (Officer Schulman), *id.* at 29 (Officer Steigen and Officer Vitacco).  In their Opposition,  plaintiffs do not address Count X.  In any event, I am satisfied that, insofar as the First Amended Complaint plausibly alleges that the plaintiffs in the preceding paragraph were subjected to excessive force by the defendants specified in that paragraph, the First Amended Complaint also plausibly alleges that these plaintiffs were subjected to common law battery by the specified defendants.

### F.  Count XII (Gross Negligence)

Count XII asserts that each individual defendant committed gross negligence causing injury to every plaintiff.  ECF 21, ¶¶ 208–217.

"'[G]ross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Stracke v. Estate of Butler*, 465 Md. 407, 419, 214 A.3d 561, 568 (2019) (quoting *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007)); *see also State v. Kramer*, 318 Md. 576, 590, 569 A.2d 674, 681 (1990) (defining gross negligence as "a wanton or reckless disregard for human life.").  "Only conduct that is of extraordinary or outrageous character will be sufficient to imply" that a person acted with gross negligence.  *Kramer*, 318 Md. at 590, 569 A.2d at 681.

Defendants have moved to dismiss Count XII except "to the extent that [the] claim is based on excessive force."  *See* ECF 24-1 at 16, 17 n.7, 19, 23, 24, 27, 28, 29.  In their Opposition, plaintiffs appear to confirm that their claim of gross negligence is based on "the force used to effectuate Plaintiffs' arrests."  ECF 25-1.

I am satisfied that the plaintiffs who have stated claims for excessive force against particular defendants have also stated claims of gross negligence against those defendants. Count XII shall otherwise be dismissed.

### G.  Count XIII (Negligence)

Count XII asserts that each individual defendant was negligent in causing injury to every plaintiff. ECF 21, ¶ 218–221.

In the Motion, defendants assert that the officers are protected from liability for negligence by public official immunity. ECF 24-1 at 13. And, according to defendants, Baltimore County is protected from liability for negligence, because it inherits the immunities possessed by its employees. *Id.* (citing Md. Code (2020 Repl. Vol., 2023 Supp.), § 5-303(e) of the Courts and Judicial Proceedings Article; *Hines v. French*, 157 Md. App at 571, 852 A.2d at 1067)). Defendants also assert that Baltimore County enjoys governmental immunity with respect to all common law torts. ECF 24-1 at 14.

In their Opposition, plaintiffs do not respond to defendants' claims of immunity with respect to Count XIII. Therefore, defendants argue in their Reply that the Court should construe Count XIII as abandoned. ECF 26 at 1–2.

As defendants observe, *see id.*, courts in this District have found that, "[b]y . . . fail[ing] to respond to [an] argument" presented in a motion to dismiss a claim, a "plaintiff abandons" that claim. *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010); *see also Mentch v. Eastern Savings Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) ("[Plaintiff abandoned her harassment claim by failing to address that claim in her opposition to [defendant's] motion for summary judgment, or to offer clarification in response to [defendant's] reply brief."). In my view, it is appropriate to construe Count XIII as abandoned.

Plaintiffs' failure to respond in the Opposition was not for want of space: their Opposition is thirteen pages long, which is seventeen pages less than the maximum length allowed by the Local Rules. *See* Local Rule 105.3 ("[M]emoranda in support of a motion *or in opposition thereto* shall not exceed thirty (30) pages . . . .") (emphasis added). Moreover, after defendants asserted in the Reply that plaintiffs had abandoned Count XIII, plaintiffs could have requested permission to file a surreply, so as to make clear that they wished to pursue Count XIII. *See* Local Rule 105.2(a). However, plaintiffs did not do so.

Therefore, I shall dismiss Count XIII.

### H.  Count XIV (Failure to Intervene)

Count XIV alleges that each individual officer is liable to every plaintiff for failing to intervene in other officers' violations of "Plaintiffs' rights, including but not limited to Plaintiffs' right to be free from excessive force, false arrest, and false imprisonment." ECF 21, ¶¶ 222–228. The First Amended Complaint does not state that Count XIV is brought under 42 U.S.C. § 1983 or otherwise identify the source of this cause of action. I shall construe Count XIV as an assertion of bystander liability, lodged pursuant to 42 U.S.C. § 1983.

In the Fourth Circuit, a failure-to-intervene claim lies where there is "an omission to act . . . coupled with a duty to act." *Randall*, 302 F.3d at 202. To state a claim "on a theory of bystander liability," the plaintiff must plausibly allege that the officer "(1) kn[ew] that a fellow officer [was] violating an individual's constitutional rights[[]]; (2) ha[d] a reasonable opportunity to prevent the harm; and (3) cho[se] not to act." *Id.* at 204; *see also Brooks v. Johnson*, 924 F.3d 104, 110 (4th Cir. 2019). As to the first element, the Fourth Circuit noted in *Randall*, 302 F.3d at 203 n.24: "[A] bystanding officer, by choosing not to intervene, functionally participates in the

unconstitutional act of his fellow officer. If the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible."

In their Motion, defendants argue that "there are insufficient facts pleaded" to establish the plausibility of the "blanket allegations" advanced in Count XIV, "especially the assertion that 'Each of the Defendant Officers had a reasonable opportunity to interevent [sic].'" ECF 24-1 at 16 (quoting ECF 21, ¶ 226) (typographical error in First Amended Complaint).

In the Opposition, plaintiffs state, ECF 25-1 at 5:

> [T]he decision to not piece out individual excessive force by each Plaintiff against each alleged Defendant Officer involved was not made haphazardly. . . . Each of the Defendant Officers were on scene when the assaults of each individual Plaintiff took place. Each of the Defendant Officers were confronted with another's illegal act, i.e., excessive force and illegal arrest. Each of the Defendant Officers possessed the power to prevent the excessive force and illegal arrests but chose not to act. . . . Thus, even if one particular Defendant Officer did not personally strike or arrest one particular Plaintiff, that Officer is still liable for that Plaintiff's claims. All Defendants are liable for the actions of other Baltimore County Officers on scene for which they had an opportunity to intervene [sic].

In so arguing, plaintiffs provide no citations to the First Amended Complaint or to the officers' body camera footage. Their assertion that "Each of the Defendant Officers were confronted with another's illegal act, i.e., excessive force and illegal arrest," is left entirely without factual support. *Id.* Plaintiffs have not attempted to explain how their allegations of fact satisfy the elements of bystander liability. Moreover, the video makes plain that events unfolded quickly, and it is certainly not clear who knew what or when they knew it. And, the events here are a far cry, for example, from conventional failure-to-intervene claims, often arising from circumstances in which one or more officers stand silent in the presence of an officer who continues to subdue a single individual with unconstitutional force.

At bottom, plaintiffs' invocation of bystander liability appears to be an attempt to hold all officers liable for excessive force without taking the time or trouble of "piec[ing] out [the]

individual excessive force by each Plaintiff against each alleged Defendant Officer." *Id.* But, invoking the theory of bystander liability does not relieve a plaintiff of his or her burden to plead facts that, if true, would establish that a specific defendant "functionally participate[d]" in the violation of the plaintiff's constitutional rights. *Randall*, 302 F.3d at 203 n.24.

"In Section 1983 cases, a government official is 'only liable for his or her own misconduct.'" *Bailey v. Campbell*, KDB-5:22-0052, 2023 WL 482211, at *3 (quoting *Iqbal*, 556 U.S. at 677). For that reason, courts are rightfully "critical of complaints that fail to isolate the allegedly unconstitutional acts of each defendant" or "make only categorical references to 'Defendants.'" *Langford v. Joyner*, 62 F.4th 122, 125 (4th Cir. 2023) (internal quotation marks, alterations, and citations omitted). "[R]equiring specific factual allegations for each defendant gives fair notice to *that* defendant of the plaintiff's claim and the underlying factual support." *Id.*

In sum, it is the obligation of a plaintiff to "piece out" in a complaint which defendants are liable to which plaintiffs. At least with respect to theory of liability advanced in Count XIV, plaintiffs have not done so.

## IV.    Conclusion

For the foregoing reasons, I shall grant the Motion in part and deny the Motion in part.

In particular, I shall grant the Motion with respect to Count III (Fourth and Fourteenth Amendment malicious prosecution), Count VI (Article 24 and 26 malicious prosecution), Count XI (common law malicious prosecution), Count XIII (negligence), and Count XIV (failure to intervene).

But, I shall deny the Motion respect to Count I (Fourth and Fourteenth Amendment excessive force) and Count V (Article 24 and 26 excessive force) insofar as (1) Veraby and Caleb have stated a claim for excessive force against Officer Amhrein; (2) Shaneris and Dmeza have

stated a claim for excessive force against Officer Vicarini; (3) Lembert and Veraby have stated a claim for excessive force against Officer Halstead; (4) Lembert and Dmeza have stated a claim for excessive force against Officer Harshadavid; (5) Lembert has stated a claim for excessive force against Officer Legge; (6) Caleb has stated a claim for excessive force against Officer Lehnert; (7) Veraby has stated a claim for excessive force against Officer Schulman; (8) Lembert has stated a claim for excessive force against Officer Steigen; and (9) Dmeza and Veraby have stated a claim for excessive force against Officer Vitacco.  I shall otherwise grant the Motion with respect to Count I and Count V.

I shall deny the Motion with respect to Count IX (battery) insofar as the plaintiffs who have stated a claim for excessive force against an officer or officers have also stated a claim against that officer or those officers for battery.  I shall otherwise grant the Motion with respect to Count X. Likewise, I shall deny the Motion with respect to Count XII (gross negligence) insofar as the plaintiffs who have stated a claim for excessive force against an officer or officers have also stated a claim of gross negligence against that officer or those officers.  I shall otherwise grant the Motion with respect to Count XII.

And, I shall deny the Motion with respect to Count II (Fourth and Fourteenth Amendment false arrest), Count VII (Article 24 and 26 false arrest), and Count X (common law false arrest) insofar as these Counts assert that (1) Shaneris Nalls was subject to false arrest by Officer Vicarini; (2) Dayaneris Dmeza was subject to false arrest by Officer Vicarini, Officer Vitacco, and Officer Harshadavid; and (3) Veraby Nalls was subject to false arrest by Officer Schulman, Officer Amrhein, Officer Vitacco, and Officer Halstead.  I shall otherwise grant the Motion with respect to Count II, Count VII, and Count X, without prejudice to plaintiffs' right to amend the First

Amended Complaint with allegations tending to establish that there was no probable cause to arrest

Caleb Nalls or Nehemiah Lembert.

An Order follows, consistent with this Memorandum Opinion.


Date: March 15, 2024                                      _____/s/_____

                                                         Ellen Lipton Hollander
                                                         United States District Judge