IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHAMDU CALEB NALLS, *et al.*

  *Plaintiffs*,

  *v.*                                  Civil Action No. ELH-23-0183

BALTIMORE COUNTY,
MARYLAND, *et al.*,

  *Defendants*.

**AMENDED MEMORANDUM OPINION**[*]

This case is rooted in an altercation between members of the Baltimore County Police Department ("BCPD") and a family, which "got way too out of hand real quick." ECF 50-13 (body camera footage of BCPD Officer Erik Legge), at 2:27–2:29.[1]

On the evening of January 25, 2020, the Nalls family had gathered at a restaurant to celebrate the upcoming 18th birthday of Shaneris Nalls. Later, Shaneris sat in her mother's car in a parking lot, along with three girlfriends. BCPD Officers Evan Vicarini and Paul Schulman approached the vehicle, allegedly because the occupants looked "suspicious." ECF 50-4. Officer Vicarini claims that, as he approached the vehicle, he detected the odor of marijuana. Upon questioning Shaneris, she admitted that she had a marijuana cigarette. But, it had not been smoked.

---

[*] A few days before I issued the Memorandum Opinion (ECF 61), the Supreme Court decided *Zorn v. Linton*, 607 U.S. __, 2026 WL 795469 (Mar. 23, 2026) (per curiam). *Zorn* discusses qualified immunity, although it reiterates existing law. Nevertheless, I have made a handful of non-substantive revisions to the Memorandum Opinion, primarily to reference *Zorn*. The Order (ECF 62) is unchanged.

[1] Indeed, a family birthday celebration morphed into a "Terrible, Horrible, No Good, Very Bad Day." *See* JUDITH VIORST, ALEXANDER AND THE TERRIBLE, HORRIBLE, NO GOOD, VERY BAD DAY (1972).

Shaneris and her girlfriends were ordered to exit the vehicle. Family members soon arrived at the scene. ECF 21, ¶ 36; *see* ECF 50-3. Other police officers also responded. During the altercation that ensued, the officers used physical force, including tasing, to arrest five people. ECF 21, ¶¶ 38–60.

Plaintiffs Shaneris Nalls ("Shaneris"); Shamdu Caleb Nalls ("Shamdu" or "Caleb"); Dayaneris Dmeza; Shamdu Veraby Nalls ("Mr. Nalls" or "Veraby"); and Nehemiah Lembert have sued Baltimore County and nine BCPD police officers: Kyle Amrhein; William Halstead; Priscilla Harshadavid; Erik Legge; David Lehnert; Paul Schulman; Rachael Steigen; Evan Vicarini; and Anthony Vitacco. ECF 21 ("Amended Complaint"). Mr. Nalls and Dmeza are the parents of Shaneris and Shamdu. Lembert is Dmeza's nephew. Plaintiffs state: "Dayaneris Dmeza and Shamdu Veraby Nalls were not legally married under Maryland Law, [but] they considered themselves married religiously." ECF 21, ¶ 11 n.4.[2]

Plaintiffs claim, *inter alia*, that they were subjected to the use of excessive force. The Amended Complaint (ECF 21) contains fourteen counts. With respect to the police officers, plaintiffs assert three claims pursuant to 42 U.S.C. § 1983: use of excessive force, in violation of the Fourth and Fourteenth Amendments (Count I); false arrest and false imprisonment, in violation of the Fourth and Fourteenth Amendments (Count II); and malicious prosecution, in violation of the Fourth and Fourteenth Amendments (Count III). In addition, plaintiffs allege claims against the officers under Articles 24 and 26 of the Maryland Declaration of Rights: excessive force (Count V); malicious prosecution (Count VI); and false arrest and false imprisonment (Count VII).

---

[2] Because two plaintiffs share the same first and last names, as father and son, I shall refer to the son by his first name (Shamdu) and to the father by his surname (Mr. Nalls). In addition, because siblings Shamdu and Shaneris have the same surname, I shall refer to Shaneris by her first name.

2

Plaintiffs also assert several claims under Maryland common law: battery (Count IX); false arrest and false imprisonment (Count X); malicious prosecution (Count XI); gross negligence (Count XII); negligence (Count XIII); and "failure to intervene" (Count XIV).  As to Baltimore County, plaintiffs assert claims of failure to train, in violation of the Fourth and Fourteenth Amendments, pursuant to *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978) (Count IV), as well as a "Maryland Common Law *Longtin* Claim" (Count VIII).[3]

By Memorandum Opinion (ECF 27) and Order (ECF 28) of March 15, 2024, I dismissed plaintiffs' claims for malicious prosecution (Count III, Count VI, Count XI); negligence (Count XIII), and failure to intervene (Count XIV).  I also dismissed portions of plaintiffs' claims of excessive force (Count I and Count V), battery (Count IX), gross negligence (Count XII), and false arrest and false imprisonment (Count II, Count VII, Count X).

Numerous claims remain, as follows:

1. Plaintiffs' claims against Baltimore County under *Monell*, 436 U.S. 658 (Count IV), and *Longtin,* 419 Md. 450, 19 A.3d 859 (Count VIII).

2. Plaintiffs' claims of excessive force under the Fourth and Fourteenth Amendments (Count I) and Articles 24 and 26 of the Maryland Declaration of Rights (Count V), as well as plaintiffs' claims of common law battery (Count IX) and gross negligence (Count XII), asserted by:

    a. Shamdu and Mr. Nalls against Officer Amrhein;

    b. Shamdu against Officer Lehnert;

---

[3] Plaintiffs do not provide a citation for "*Longtin.*"  Presumably, they are referring to the case of *Prince George's County v. Longtin*, 419 Md. 450, 490–98, 19 A.3d 859, 883–88 (2011), which provides that a municipality may be liable for an unconstitutional policy or practice.  In any event, defendants do not seek summary judgment as to Count IV or Count VIII.

    c.  Mr. Nalls against Officer Schulman;

    d.  Dmeza and Mr. Nalls against Officer Vitacco;

    e.  Shaneris and Dmeza against Officer Vicarini;

    f.  Lembert and Mr. Nalls against Officer Halstead;

    g.  Lembert and Dmeza against Officer Harshadavid;

    h.  Lembert against Officer Legge; and

    i.  Lembert against Officer Steigen.

3. Plaintiffs' claims of false arrest and false imprisonment under the Fourth and Fourteenth Amendments (Count II), Articles 24 and 26 of the Maryland Declaration of Rights (Count VII), and common law (Count X), asserted by:

    a.  Shaneris against Officer Vicarini;

    b.  Dmeza against Officers Vicarini, Vitacco, and Harshadavid; and

    c.  Mr. Nalls against Officers Schulman, Amrhein, Vitacco, and Halstead.[4]

Defendants have moved for summary judgment (ECF 47) supported by a memorandum ECF 47-1 (collectively, the "Motion") with respect to all of plaintiffs' claims as to the individual officers.  The Motion is also supported by several exhibits.  These include Answers of Officers Vicarini and Amrhein to Shamdu's First Set of Interrogatories (ECF 47-2 at 1–12; *id.* at 17–30); Officer Vicarini's Incident Report (*id.* at 13–16); and camera footage of the incident captured by the body worn cameras ("BWC") of Officers Schulman, Vitacco, Legge, Vicarini, Amrhein, Harshadavid, Halstead, and Steigen.  *See* ECF 47-3 to ECF 47-10.

---

[4] Except as stated above, Count I, Count II, Count V, Count VII, Count IX, Count X, and Count XII were previously dismissed.  *See* ECF 27 at 21–52, 60–63, 64–67; ECF 28.

Plaintiffs oppose the Motion (ECF 50), supported by a memorandum (ECF 50-1) (collectively, the "Opposition") and twenty-three exhibits. ECF 50-2 to ECF 50-24.[5] The exhibits include copies of the defendants' body worn camera footage as well as recorded statements provided to the BCPD Internal Affairs Section ("IAS") in September 2020 by Officers Vicarini, Schulman, Vitacco, Amrhein, and Halstead. ECF 50-3 to ECF 50-4; ECF 50-6; ECF 50-9 to ECF 50-14; ECF 50-16 to ECF 50-17; ECF 50-19 to ECF 50-22; ECF 50-24. Additionally, plaintiffs have submitted documents prepared by the defendant officers regarding the incident, including the Statement of Probable Cause prepared by Officer Vicarini and the Incident Report prepared by Officer Schulman. ECF 50-2; ECF 50-5. Defendants replied. ECF 54 (the "Reply").[6]

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion as to the claims of excessive force, battery, and gross negligence (Counts I, V, IX, and XII) by Lembert and Dmeza against Officer Harshadavid; Dmeza against Officer Vicarini; and Lembert against Officer Legge. I shall also grant the Motion as to the claims

---

[5] Plaintiffs appended to their Opposition the BWC of Officer Lehnert (ECF 50-17) and additional BWC for Officer Schulman (ECF 50-11), along with duplicate copies of the BWC defendants submitted for Officers Schulman (ECF 50-10), Vitacco (ECF 50-12), Legge (ECF 50-13), Vicarini (ECF 50-3), Amrhein (ECF 50-14), Harshadavid (ECF 50-16), Halstead (ECF 50-19), and Steigen (ECF 50-24).

[6] In general, I provide a brief description of each exhibit when it is referenced for the first time. For the convenience of the reader, I have also included an Appendix of the exhibits.

Both parties submitted duplicate video exhibits. But, the DVDs submitted by defendants for each officer fail to include exhibit numbers. Therefore, the Court cannot readily link a particular DVD to an ECF number. Additionally, in their Motion, defendants include citations to copies of the officers' body camera footage submitted in support of defendants' motion to dismiss (ECF 15). *See, e.g.,* ECF 47-1 at 4. For convenience, I cite only to plaintiffs' video exhibits.

of false arrest and false imprisonment by Mr. Nalls lodged against Officers Schulman, Amrhein, Vitacco, and Halstead (Counts II, VII, and X).  I shall otherwise deny the Motion.[7]

### I.   Exhibits

### A. Video Evidence

The parties submitted extensive video evidence.  ECF 47-3 to ECF 47-10; ECF 50-3; ECF 50-10 to ECF 50-14; ECF 50-16; ECF 50-17; ECF 50-19; ECF 50-24.  Each officer's camera lens provides a limited view of the events it captured.  In other words, each body camera reflects one angle from one lens.

The video footage of nine officers totals approximately two hours.  The video footage is sometimes blurry and difficult to decipher.  And, as discussed, *infra*, despite the time spent parsing through the video footage, many issues of fact remain disputed.

In general, if a party's account of events is contradicted by video evidence, a court should view the facts "in the light depicted by the videotape."  *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also United States v. Kehoe*, 893 F.3d 232, 240 (4th Cir. 2018).  But, *Scott* does not license a court to reject one side's account as a matter of law if the "documentary evidence, such as a video," merely "offers *some* support for [the other side's] version of events." *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (emphasis in *Witt*); *see also Sawyer v. Asbury*, 537 F. App'x 283, 291 (4th Cir. 2013), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015), *as recognized by Brooks v. Johnson*, 924 F.3d 104 (4th Cir. 2019).

Notably, "the *Scott* standard does not upend the traditional summary judgment analysis. Instead, it 'simply reinforces the unremarkable principle that 'at the summary judgment stage, facts

---

[7] Because there are five plaintiffs, nine police officer defendants, and multiple claims by various plaintiffs against various defendants, the Court has had to write a painfully long opinion to address each claim as to each party.

must be viewed in the light most favorable to the nonmoving party' when 'there is a *genuine* dispute as to those facts.'" *Simmons v. Whitaker*, 106 F.4th 379, 385 (4th Cir. 2024) (emphasis in original). Indeed, "even an unchallenged video must be taken in the light most favorable to [the nonmovant] at summary judgment if it does not blatantly contradict his account of the facts." *Id.*

The Fourth Circuit "has emphasized that *Scott*'s holding is cabined to situations where documentary evidence *blatantly contradicts* a plaintiff's account." *Lewis v. Caraballo*, 98 F.4th 521, 529 (4th Cir. 2024) (cleaned up) (emphasis in original). It admonished that, when "[t]he record . . . is scant, the video grainy, and the testimony conflicting [a] reasonable jury could find for either party if given the chance. So it must be given the chance." *Brown v. Wal-Mart Stores E., LP*, 139 F.4th 356, 367 (4th Cir. 2025).

As the Fourth Circuit has explained, "'*Scott* is the exception, not the rule,' and . . . it does not apply *even where* documentary evidence renders the plaintiff's story 'unlikely,' so long as it is not 'utterly discredited.'" *Lewis,* 98 F.4th at 529 (quoting *Harris v. Pittman*, 927 F.3d 266, 275–76 (4th Cir. 2019)) (emphasis in *Lewis*). This is a "high bar." *Lewis*, 98 F.4th at 529.

*Witt*, 633 F.3d 272, is informative. There, the plaintiff alleged that three officers used excessive force. *Id.* at 273. The district court denied the officers' motion for summary judgment, finding that there were genuine disputes of material fact concerning whether the plaintiff "posed a threat to the safety of the [officers] and whether he resisted or attempted to evade arrest." *Id.* at 276 (citations and internal quotation marks omitted). Although there was dashboard camera footage of the incident, in the district court's view, "the poor quality of the video did not resolve these disputes." *Id*.

On appeal, the officers argued that the footage "compel[led] adoption of [their] version of the facts and rejection of" the plaintiffs' version. *Id.* The Fourth Circuit disagreed. It explained

that, unlike the video in *Harris*, the dashboard camera footage did "not 'clearly' or 'blatantly' contradict" one party's "'version of the story.'" *Id.* at 277 (quoting *Harris,* 550 U.S. at 378, 380). In particular, the Court observed that "the video lack[ed] sound," which prevented the viewer from hearing any verbal exchange between the plaintiff and the defendants. *Witt,* 633 F.3d at 277. And, in the Court's view, "the unreliable quality of the video" made it "difficult to decipher . . . the true sequence of events." *Id.* Therefore, the Court concluded that the video "provide[d] little assistance in resolving the parties' disputes as to the facts." *Id.*

The Fourth Circuit's decision in *Aleman*, 80 F.4th 264, is also instructive. There, the plaintiff, the girlfriend of a man shot and killed by a police officer, alleged, *inter alia*, that the officer's use of lethal force was excessive, in violation of the Fourth Amendment. *Id.* at 269. The district court awarded summary judgment to the police officer based, in part, on "its own interpretation of the video footage from the body cameras worn by [the defendant officer] and his colleagues." *Id.* at 282. On appeal, the Fourth Circuit vacated the award of summary judgment.

In the Court's view, "one of the few important things that [were] undisputed about the video footage [was] that it is not clear in all details and did not capture everything that occurred at the shooting scene." *Id.* at 293. Moreover, the Court's "own review of the video footage . . . confirmed that it [was] subject to different interpretations." *Id*. Under these circumstances, the Court explained, "neither the district court nor [the Fourth Circuit] is permitted to decide at the summary judgment stage . . . what the video footage shows or what it did not capture." *Id.*

Here, the videos bring to mind the adage that "a picture is worth a thousand words." They contain disturbing scenes of fear, anger, chaos, and commotion. Yet, they sometimes require more than one viewing to decipher the content. The Court has endeavored to recount what appears in the video footage when it "quite clearly" establishes a certain fact. *See Witt,* 633 F.3d at 276. But,

8

mindful of *Aleman*, 80 F.4th at 293, the Court notes, on occasion, instances where video footage "is subject to different interpretations." The Court has not drawn conclusions on the basis of video evidence that is subject to more than one interpretation or merely "offers *some* support" for a conclusion. *Id.* at 295 (emphasis in *Aleman*) (cleaned up) (citation omitted). And, where the video is unclear, the Court points out the lack of clarity.

To the extent that the Court quotes statements of particular individuals from the videos, the Court has attempted to do so accurately, of course. But, ascertaining what was said is often difficult, and there may be minor errors in the quotes. In any event, it will be for the factfinder to ascertain what was said by each individual.

## B. Other Exhibits

Under Fed. R. Civ. P. 56(c)(1), a party may support his position on summary judgment by "citing to particular parts of materials in the record" or, alternatively, by showing that the "adverse party cannot produce admissible evidence to support the fact." *See, e.g.*, *Whittaker v. Morgan State Univ.*, 524 F. App'x 58, 60 (4th Cir. 2013) (per curiam) (affirming grant of summary judgment where plaintiff's sole evidence was an unauthenticated letter). Pursuant to Fed. R. Civ. P. 56(a)(c)(2), a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Notably, neither side has presented any objection to the many exhibits submitted in connection with the Motion.

With respect to the IAS statements submitted by plaintiffs, they describe the recorded statements as "sworn." *See, e.g.,* ECF 50-1 at 6. However, the officers did not take an oath during their interviews. *See, e.g.,* ECF 50-4. Rather, the officers affirmed that they received an order to "answer all questions asked of" them. *See, e.g., id.* at 1:35–1:37.

Defendants assert that the IAS statements "would be admissible at trial as statements of a party opponent under [Fed. R. Evid.] 801(d)(2)(a)." ECF 54 at 2. They note that "Plaintiffs have presented" the IAS statements "in their entirety[.]" *Id.* [8]

As to the incident reports and Statement of Probable Cause, defendants claim that these documents are admissible "as business records and such records are admissible because they are reliable, accurate and trustworthy." *Id.*; *but see Harper v. Lemon,* FDW-14-182, 2016 WL 6436573, at *5 (W.D.N.C. Oct. 28, 2016) (declining to consider "the unsworn incident reports and witness statements submitted by [officers who did not have personal knowledge of the alleged excessive force] . . . to support Defendants' summary judgment motion as to Plaintiff's excessive [sic] claim").[9]

"'It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.'" *Solis v. Prince George's County*, 153 F. Supp. 2d 793, 798 (D. Md. 2001) (quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)). And, "[w]hen there is contrary evidence, a court may not simply accept what may be a self-serving account by the police

---

[8] As to plaintiffs, but not defendants, the IAS statements appear to constitute statements of party opponents. *See* Fed. R. Evid. 801(d)(2)(a) ("A statement made by a party is not hearsay if "[t]he statement is offered against an opposing party . . . ."); *United States v. Moss*, 445 F. App'x 632, 634 (4th Cir. 2011) (per curiam) ("[A] statement offered against a party is not hearsay if it is a party's own statement."); *In re Air Crash at Charlotte, N.C. on July 2, 1994*, 982 F. Supp. 1060, 1065 (D.S.C. 1996) ("'*A party may not utilize its own admissions* at the trial. It is *only when the admission is offered against the party who made it that it comes within the exception to the hearsay rule for admissions of a party opponent*.'") (emphasis in original) (quoting 8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2264 at 571–72 (1994)).

Therefore, the defendants are generally not entitled to make affirmative use of such statements at trial. But, the IAS statements could be used to refresh recollection if a foundation is established.

[9] To the extent that defendants seek to introduce these documents to prove the truth of the matters asserted, the documents would likely be inadmissible at trial.

officer." *Jackson v. Carin*, 128 F.4th 525, 535 (4th Cir. 2025) (quoting *Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006)) (internal quotation marks omitted). Indeed, "[s]elf-serving statements are not enough to defeat a motion for summary judgment." *Chafin v. State Farm Fire & Cas. Co.*, H-03-0153, 2003 WL 23571723, at *2 (S.D.W. Va. Nov. 20, 2003), *aff'd*, 98 F. App'x 250 (4th Cir. 2004). Surprisingly, plaintiffs do not contest the admissibility of these documents in their Opposition. However, plaintiffs claim that the Statement of Probable Cause "contains a number of factual misrepresentations." ECF 50-1 at 17; *see id.* at 17 n.13.

In sum, there are no objections to the Court's consideration of any exhibits. Therefore, at this juncture, I will consider all the exhibits submitted by the parties.[10]

## II.    Factual Summary[11]

At about 7:00 p.m. on January 25, 2020, Shaneris and a group of family and friends gathered at a restaurant in Baltimore County to celebrate Shaneris's upcoming eighteenth birthday. ECF 21, ¶ 23; *see* ECF 50-3 (Vicarini body camera footage), at 2:59–3:08; ECF 50-4 (Vicarini

---

[10] As the Supreme Court has explained, "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). "[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). The "courts 'call balls and strikes'; they don't get a turn at bat." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curiam); *see also Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985) (stating that, in the context of pro se plaintiffs, the Court "will not . . . require the district courts to anticipate all arguments that clever counsel may present in some appellate future. To do so . . . would . . . transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.").

[11] I attempt to recount the pertinent events chronologically. But, this is not always feasible, because many events overlap in time. To the extent relevant, I incorporate the factual summary in my Memorandum Opinion of March 15, 2024. *See* ECF 27.

IAS statement), at 5:28–5:34.  A motel, known as the Knights Inn, is adjacent to the restaurant. ECF 50-6 (Schulman IAS statement), at 2:12–2:17.

Officer Vicarini and Officer Schulman described the area as a "high crime and drug area," and characterized the Knights Inn as "a very busy motel" with a restaurant component and "a lot of activity."  ECF 50-4 at 2:13–2:20; ECF 50-6 at 2:12–2:24; *see also* ECF 47-2 (Vicarini Incident Report), at 16.  Officer Vicarini claims he had made multiple arrests of persons sitting in the parking lot with handguns and dealing narcotics.  ECF 50-4 at 2:13–2:20.

Around 8:05 p.m., Officer Schulman and Officer Vicarini were on routine patrol in the area of the Knights Inn.  ECF 50-2 (Vicarini's Statement of Probable Cause), at 2; ECF 50-4 at 1:58–2:11, 2:25–2:30; ECF 50-5 (Schulman Incident Report), at 1; ECF 50-6 at 2:02–2:08.  As they drove through the parking lot in a marked police vehicle (ECF 50-4 at 2:37–2:48, 2:55–2:57; *see* ECF 47-2 at 14), they "observed a silver Honda Civic" with four doors, "occupied by four females."  ECF 50-2 at 2.  Shaneris was later identified as the occupant in the driver's seat.  A black car was parked adjacent to the passenger side of the vehicle.  *See, e.g.,* ECF 50-3 at 0:00.  A black metal fence with see-through gaps between each post is located at the rear of the parking lot. *See* ECF 50-24 (Steigen body camera footage), at 1:21–1:22.[12]

Officer Vicarini asserted in his IAS statement that a dim light was on in the car, and the four girls were looking at something in the center console.  ECF 50-4 at 2:48–2:56.  As the police vehicle drove by, the women "looked up and seemed increasingly nervous at [the police officers'] presence."  *Id.* at 3:00–3:05; *see also* ECF 47-2 at 14.  According to Officer Vicarini's Statement of Probable Cause, dated January 25, 2020, "[a]ll four females stared at the officers until" the officers "passed them."  ECF 50-2 at 2.  Officer Vicarini thought the girls' behavior was

---

[12] The fence resembles a wrought iron fence.

"suspicious." ECF 50-4 at 3:04–3:06. He and Officer Schulman parked the patrol car and walked towards the Honda. ECF 50-2 at 2.

In body camera footage captured later that night, Officer Vicarini can be heard explaining to another officer why he approached the car. He said: "'Yeah, we drove by and they gave us the fucking crim look.'" ECF 50-3 at 15:30–15:35.

In the Statement of Probable Cause, Officer Vicarini wrote: "As Officer Vicarini approached the Honda he could smell the strong odor of marijuana emanating from inside the vehicle due to his training, knowledge, and experience." ECF 50-2 at 2; *see also* ECF 50-4 at 3:14–3:20; ECF 47-2 at 14. However, in Officer Schulman's IAS statement, he could not remember when, or if, Officer Vicarini could smell marijuana. ECF 50-6 at 2:39–3:02; *but see* ECF 50-5 at 1 (Schulman claiming that Vicarini "could smell an odor of burnt Marijuana emanating from inside the vehicle.").

Plaintiffs claim, and defendants do not dispute, that when Officers Vicarini and Schulman approached the Honda, the windows were rolled up. ECF 50-1 at 3. Moreover, the key was not in the ignition. ECF 21, ¶ 24.

Officer Vicarini asked the women what they were doing in the area and if they had any illegal narcotics in the car. ECF 50-4 at 3:25–3:27. He reported that the driver of the car, Shaneris, told him that she had marijuana in the car. *Id.* at 3:32–3:39. Officer Vicarini recalled that he "kindly" asked Shaneris to give him the weed, but she refused to do so, calling it her "birthday weed." *Id.* at 3:38–3:50; *see* ECF 47-2 at 14. I pause to note that, as discussed, *infra*, in 2014, the Maryland General Assembly decriminalized possession of less than 10 grams of marijuana. *See* Md. Code (2012 Repl. Vol., 2014 Supp.), §§ 5-601(c)(2) and 5-601.1 of the Criminal Law Article ("C.L.").

13

Officer Vicarini's body camera footage begins after the initial encounter with Shaneris; it does not capture his approach to the vehicle. *See* ECF 50-3 at 0:00. It shows the opening of the driver's side door to the car. *Id.* at 0:01. The window of the driver's door is rolled down. *Id.* at 0:00–0:06. Officer Vicarini has one arm on the top of that door, while leaning into the car and using his flashlight to illuminate the interior. *Id.* at 0:00–0:07. In Officer Vicarini's IAS statement, he claimed that he "got" Shaneris to step out of the vehicle. ECF 50-4 at 3:51–3:55. But, his body camera does not capture how he did so or what he said to Shaneris. *See* ECF 50-3 at 0:00–0:10.

Plaintiffs state that around this time, Shaneris's cousin, Lembert, came to the scene. ECF 21, ¶ 36 n.3; *see* ECF 50-1 at 28 (citing ECF 50-3 at 0:27–0:29). Vicarini's body camera footage shows an individual in the vicinity, but the identity is not clear. ECF 50-3 at 0:06–0:30.

Shaneris's mother, Dmeza, approached the vehicle a few seconds after Shaneris exited the car. ECF 50-3 at 0:20–0:28. Officer Vicarini surmised that Shaneris had contacted Dmeza. ECF 50-4 at 3:57–4:03. In Vicarini's Incident Report, he claims that Dmeza "runs up to the passenger side of the vehicle, enters the vehicle", and "attempts to open up the center console." ECF 47-2 at 14; *see also* ECF 50-5 at 1. Officer Vicarini's body camera shows Dmeza opening the door on the passenger side, leaning into the car, and reaching towards something in the center. But, it is not clear that she was attempting to open the center console. ECF 50-3 at 0:20–0:28.

When Officer Vicarini noticed Dmeza approaching the vehicle, he stated, "Woah, woah," and Officer Schulman yelled, "Get out of the car" *Id.* at 0:26–0:30. Dmeza responded, "I'm not doing nothing, I'm just checking." *Id.* at 0:30–0:36. Her hands were up and her palms were open at chest level. Dmeza stepped away from the vehicle and reiterated that she was "doing nothing" *Id.* at 0:38–0:40. The remaining passengers exited the automobile. *Id.* at 0:28–0:42.

14

Dmeza said: "But y'all ain't even have no right to search." *Id.* at 0:40–0:42. Officer Vicarini countered, "Yes we do." *Id.* at 0:41–0:43. Dmeza responded, "There's no smoke, there's no smoke." *Id.* at 0:41–0:46. Officer Schulman stated: "The smell of weed, we're good." *Id.* at 0:44–0:47. He also said words to the effect, "Weed is illegal. Stop saying it's just weed." *Id.* at 1:02–1:05.

Officer Vicarini called for another unit to respond to the scene, for a "non-emergency." *Id.* at 0:45–0:50. At this time, the doors on the passenger side are open, and the window for each passenger door is rolled up. *Id.* at 0:59. Shaneris spoke briefly with her mother. *Id.* at 1:08–1:16. Officer Vicarini stated: "We're trying to be cooperative with you guys. It is what it is. If you find a little bit that's fine." *Id.* at 1:11–1:16.[13] Shaneris stated, "Just do what y'all have to do." *Id.* at 1:18–1:20. Dmeza pointed and asked Officer Vicarini to get Shaneris's father. *Id.* at 1:25–1:30.

Officer Schulman asked Shaneris for identification. *Id.* at 1:48–1:49. She stated that she did not have identification and indicated that the vehicle belonged to her mother. *Id.* at 1:52–1:59. Dmeza asked whether the police officers needed Dmeza's identification and offered it. *Id.* at 1:52–2:00. Officer Schulman asked if Shaneris had a driver's license. ECF 50-11 (Schulman initial body camera footage), at 0:39–0:40.[14] Dmeza responded that Shaneris did not have her license "on her" because Dmeza was driving the car. *Id.* at 0:40–0:46.

Tensions seemed to rise. Dmeza repeatedly stated, "Do what you got to do" and asked: "What do y'all have to wait for another unit for?" ECF 50-3 at 2:35–2:41. Vicarini responded: "Because you guys are getting a little bit too far out of hand." *Id.* at 2:41–2:45. Dmeza then

---

[13] I listened to this portion of the BWC multiple times to verify Vicarini's comment.

[14] Plaintiffs submitted two physical exhibits of Officer Schulman's body camera footage from the encounter, one titled, "Schulman Initial BWC" (ECF 50-11) and another titled "Schulman BWC" (ECF 50-10). For consistency, I will adopt these terms.

stepped back and opened her hands wide, stating "We good." *Id.* at 2:44–2:46.   As another police vehicle arrived, Dmeza stated, "Y'all making a big deal." ECF 50-11 at 1:02–1:03.   Schulman responded, "You're making a big deal." *Id.* at 1:04–1:05.   Shaneris answered: "Y'all don't have no right to direct what I say out my mouth. Y'all don't have no right." ECF 50-3 at 2:48–2:56.

Dmeza and a friend of Shaneris approached Shaneris, attempting to calm her, and Dmeza commented, "This is not how you want to spend your birthday." *Id.* at 2:59–3:08.   As this conversation took place, Officer Vicarini called for more back up. *Id.* at 3:24–3:39.

Officers Lehnert, Legge, Harshadavid, and Vitacco were among the officers who responded to the scene.   ECF 50-12 (Vitacco body camera footage), at 0:00–0:03; ECF 50-13  at 0:00–0:06; ECF 50-16 (Harshadavid body camera footage), at 1:40–1:49; ECF 50-17 (Lehnert body camera footage), at 1:34–1:41.   Around the same time, Shaneris's brother, Shamdu, and her father, Mr. Nalls, also arrived.   ECF 50-3 at 3:36; ECF 50-12 at 0:00–0:06.   Shamdu is about 6 feet and five inches tall.   ECF 47-2 at 24.   Shamdu and Mr. Nalls both indicated that they were Shaneris's family and wanted to make sure she was alright.   *See, e.g.,* ECF 50-3 at 3:40–3:51.

Officer Vicarini, apparently addressing Shamdu and Mr. Nalls, stated: "Hey guys, stay back that way for me please.   Alright, get back, get back." *Id.* at 3:35–3:40.   Mr. Nalls responded, "We can't stay back, that's my daughter." *Id.* at 3:40–3:42.   Shamdu moved closer to the officers who were interacting with Shaneris and Dmeza and said words to the effect: "That's my sister. You are not ready to tell me to back up from my little sister. That's my baby sister.   I am her older brother." ECF 50-11 at 1:20–1:29.

At about the same time, Officer Schulman walked towards Mr. Nalls and Shamdu and spoke with Mr. Nalls. *Id.* at 1:35–1:48; *see* ECF 50-12 at 0:00–0:28.   Mr. Nalls told Officer Schulman, "Chill, let's talk, let's talk, no, let's talk, let's talk, that's my daughter." ECF 50-12 at

0:15–0:20.  Schulman can be heard yelling, "Alright, relax, relax."  ECF 50-11 at 1:35–1:37.

Officer Schulman asked Mr. Nalls if he was Shaneris's father and placed his hand on Mr. Nalls's

upper arm and guided him down the parking lot.  ECF 50-12 at 0:25–0:27; ECF 50-13 at 0:04–

0:08.  Mr. Nalls does not appear to resist.  *See id.*

Shaneris approached her family members.  ECF 50-3 at 3:48–3:50.  But, Officer Vicarini

told Shaneris to "back up" and put his arm out to move Shaneris back towards her car.  *Id.* at

3:48–3:59.  Dmeza was situated between Officer Vicarini and Shaneris, and seemed to direct

Shaneris to move away from the officer.  *Id.* at 3:50–4:00.

Officer Vicarini then told another officer, "Start hooking people if they get out of hand."

*Id.* at 3:56–3:58.  Dmeza turned to Officer Vicarini and raised her hands to her chest level with her

palms open, stating, "Don't touch me, I didn't do nothing."  *Id.* at 3:58–4:00.  At the same time,

Shaneris, accompanied by a few friends, walked toward the fence located behind the parked cars.

*Id.* at 4:01–4:03.  Officer Vicarini told Dmeza to "stay with [her] daughter and tell her to calm

down[.]"  *Id.* at 4:01–4:04.  Dmeza walked backwards, stating: "It's not that serious, y'all bored

right now."  *Id.* at 4:03–4:15.  Shaneris made a similar comment.  *Id.* at 4:18–4:20.

At the same time, Shaneris approached her mother and other family members.  *Id.* at 4:12–

4:20.  Officer Vicarini walked in front of Shaneris.  *Id.* at 4:12–4:20; *see* ECF 50-13 at

0:08–0:15.  Shamdu shouted, "They be power tripping yo, I hate that shit, yo."  ECF 50-3 at 4:24–

4:26.  Officer Vicarini announced: "They get out of hand, start hooking 'em."  *Id.* at 4:26–4:28.

Around this time, Officer Schulman's body camera stops recording, although it resumed later.  *See*

ECF 50-11 at 1:45–1:49.

Shaneris then reentered her car.  ECF 50-3 at 4:34–4:36; ECF 50-16 at 2:01–2:03.

According to Officer Vicarini's IAS statement, he saw Shaneris enter the car and sit in "the front

passenger side of the vehicle, reaching for something." ECF 50-4 at 5:54–6:00. Plaintiffs claim that Shaneris entered the car to "take cover" from the cold. ECF 50-1 at 9. Moreover, Officer Vicarini's body camera footage reflects that Shaneris stated she was "cold" before she entered the car. ECF 50-3 at 4:31–4:33.

Upon seeing Shaneris enter the vehicle, Vicarini stated, "Get out of the car," or words to that effect. ECF 50-3 at 4:33–4:34. Shaneris began to exit the vehicle. ECF 50-16 at 2:00–2:05. Dmeza, who was standing next to Shaneris, told Officer Vicarini to "relax." ECF 50-3 at 4:35–4:36. Dmeza also moved toward Shaneris and the open car door. ECF 50-16 at 2:02–2:03. Officer Schulman claimed in his IAS statement that Dmeza entered the car to recover the marijuana. ECF 50-6 at 8:58–9:03.

According to Officer Vicarini's IAS statement, Dmeza grabbed Officer Vicarini somewhere in his upper body to stop him from removing Shaneris from the car. ECF 50-4 at 6:21–6:24, 10:05–10:23; *see* ECF 47-2 at 14. The body camera footage of Officer Vicarini does not capture Dmeza grabbing Officer Vicarini. But, Officer Harshadavid's body camera footage appears to show Officer Vicarini using his forearm to push Dmeza in the chest and away from the car. ECF 50-16 at 2:02–2:04. Yelling ensued. ECF 50-3 at 4:37–4:39; ECF 50-12 at 0:51–0:56; ECF 50-16 at 2:04. Officer Vicarini took hold of Shaneris while Officer Vitacco held Dmeza. ECF 50-16 at 2:03–2:10.

Around this time, Officer Amrhein arrived. ECF 50-14 (Amrhein body camera footage), at 1:39–1:46. The defendant officers generally had separate interactions with each plaintiff, many of which overlap in time. Therefore, I will review the facts as they pertain to each plaintiff.

### 1.  Shaneris Nalls

After Shaneris exited the Honda for the second time, Officer Vicarini restrained Shaneris by pulling her arms behind her back and pushing her against the black car parked adjacent to Shaneris's vehicle.  ECF 50-3 at 4:40–4:52.  Officer Vicarini then shouted, "Hook 'em. Hook 'em," and called for more units.  *Id.* at 4:45–4:49.

At about the same time, Officer Vitacco had moved Dmeza towards the fence.  ECF 50-12 at 0:59.  While Shaneris was screaming, she turned her head towards the fence, where her mother was interacting with Officer Vitacco.  ECF 50-3 at 4:56–5:02.  Dmeza was on the ground, as discussed, *infra*.  *See* ECF 50-12 at 1:05–1:10.  Shaneris called out, "Please stop", "Please stop."  ECF 50-3 at 4:55–5:02.  Then, Officer Vicarini brought Shaneris to the ground.  *Id.* at 5:05–5:06.[15]

Although Officer Vicarini had already brought Shaneris to the ground, he repeatedly ordered her to get on the ground.  *Id.* at 5:07–5:14.  Officer Vicarini's hands can be seen on Shaneris's head, seeming to hold her hair and pushing her into the concrete.  *Id.* at 5:11–5:15.  Shaneris stated, "I'm going, I'm going, please leave me alone."  *Id.* at 5:13–5:15.  Officer Vicarini then shouts, "Tase 'em."  *Id.* at 5:15.  Shaneris responded, "No, don't tase 'em", and lifted her head up from the concrete.  *Id.* at 5:15–5:17.  Officer Vicarini shouted, "Get 'em. Get 'em.", *id.* at 5:17–5:18, while Shaneris shouted "No." *Id.* at 5:18–5:20.  Vicarini appears to use his arm and hand to push Shaneris's face into the concrete.  *Id.* at 5:20–5:23.  Then, Vicarini lifted his elbow from Shaneris's head.  *Id.* at 5:23.  Vicarini told Shaneris to "stop it" while Shaneris repeatedly asked for her phone.  *Id.* at 5:24–5:29.  Shaneris again asked Officer Vicarini to "stop." *Id.* at 5:35–5:40.  As Shaneris laid on the ground, she turned her face to Vicarini.  *Id.* at 5:32–5:34.  He grabbed Shaneris's arms and appeared to handcuff her, although his video camera footage becomes

---

[15] In the Court's view, it appears that Officer Vicarini brought Shaneris to the ground forcefully.  *See* ECF 50-3 at 5:05–5:06.

shaky. *Id.* at 5:36–5:39. But, Vicarini again ordered Shaneris to get on the ground as she said, "Ow." *Id.* at 5:39–5:43.

Officer Amrhein approached Officer Vicarini and Shaneris. *Id.* at 5:42–43. He shouted at Shaneris, "Get your hands behind your fucking back, I will tase you." *Id.* at 5:45–5:48. Officer Vicarini said, "We're good. I got 'em," and Officer Amrhein moved away. *Id.* at 5:48–5:50. Officer Vicarini again called for backup. *Id.* at 6:03–6:06.

After Vicarini handcuffed Shaneris, he continued to kneel on her for over two minutes. *Id.* at 5:51–8:05; *see* ECF 50-12 at 3:44–3:46, 4:12–4:14; ECF 50-24 at 2:24–2:29. Shaneris can be heard repeatedly stating, "I can't breathe. I can't breathe." ECF 50-3 at 6:07–6:23.

While Shaneris was laying in a prone position, with Officer Vicarini on top of her, she called to her mother: "Mom. Chill mom. Chill." *Id.* at 7:21–7:24. As other officers approached Officer Vicarini, he stated, "Get the wagon." *Id.* at 7:32–7:35. Shaneris twice asked Officer Vicarini if she could "get up" and "get in the car." *Id.* at 7:35–7:39; *id.* at 7:41–7:43. Shaneris also said to Officer Vicarini: "Please, I'm a minor. Can you please get off of me. I am having a hard time breathing, can I please get up." *Id.* at 7:56–8:03. Officer Vicarini responded that Shaneris could move on her side but she could not "get up." *Id.* at 8:04–8:10. Officer Vicarini moved Shaneris onto her side, still on the ground, although the body camera footage is not entirely clear. *Id.* at 8:09–8:13; *see id.* at 9:04.

Dmeza called to her daughter, *id.* at 8:11, and Shaneris responded, "I'm good." *Id.* at 8:12–8:15. She also told her mother not to cry. *Id.* at 8:18–8:24. Shaneris then stated, "It's because we colored. I swear." *Id.* at 8:25–8:32. She protested, "We wasn't even yelling. I didn't resist you or nothing." *Id.* at 8:36–8:43.

20

Officer Vicarini directed the other officers to "keep watching around. There's too many people here." *Id.* at 8:52–8:55. Shaneris again asked Officer Vicarini if she could get up, *id.* at 9:00, but Officer Vicarini refused to allow her to do so. *Id.* at 9:01. Shaneris then shouted to another officer, "Ma'am, my grandmother is in the restaurant, she's in the restaurant, please, we can't leave her long." *Id.* at 9:09–9:20. Another officer came towards Shaneris and Officer Vicarini and told Shaneris to "sit up straight" and brought her to a seated position on the ground. *Id.* at 9:20–9:31.

Shouting continued, and Officer Vicarini called several officers toward him. *Id.* at 10:04–10:11. He stated, "I need you to make sure we got the right people and the right cars . . . move people where they need to." *Id.* at 10:12–10:21. Meanwhile, Shaneris asked if she could get up, to which Vicarini responded, "No, you are not getting out of the cuffs." *Id.* at 10:22–10:30. Then, another officer, whose identity is not clear, approached Shaneris and brought her to a police vehicle. *Id.* at 10:48–10:57; *see also* ECF 50-10 (Schulman body camera footage), at 5:46–5:48.

### 2. Dayaneris Dmeza

At around the time that Shaneris exited the Honda for the second time, Officer Vitacco grabbed Dmeza by the arm of her sweater and she responded, "Don't touch me." ECF 50-12 at 0:52–0:54. She also asked, "Why are you touching me? I didn't do anything." *Id.* at 0:54–1:04. Officer Vitacco initially moved Dmeza toward the fence by her arm, to which she responded, "No, no." *Id.* at 0:56–0:58. Officer Vitacco then pushed Dmeza against the fence, with her face pressed against it. *Id.* at 0:59. Dmeza turned around with her arms open and outstretched. *Id.* at 1:00–1:02.

Mr. Nalls then moved towards the interaction, shouting "Come on, come on." *Id.* at 1:00–1:05. Officer Vitacco shouted, "Do not touch me." *Id.* at 1:03–1:06. Officer Vitacco's BWC

21

becomes blurry. But, Dmeza ends up on the ground. *Id.* at 1:07–1:10. Plaintiffs claim that Officer Vitacco "grabbed" Dmeza "by her sweatshirt" and "violently forced her" or "slammed" her "to the ground." ECF 50-1 at 19–20.

According to plaintiffs, in falling, Dmeza "first hits her knees, before then hitting the concrete with her head/facial area." *Id.* at 19. Defendants concede that Officer Vitacco took Dmeza "with some force down to the sidewalk." ECF 47-1 at 24. But, they claim that if Officer Vitacco had taken Dmeza face down to the sidewalk, "there would [be] some obvious facial injury such as a scrape or bleeding." *Id.* And, according to defendants, "the video shows [Dmeza's] face with no visible injury after" she fell to the ground. *Id.*

Officer Harshadavid approached Officer Vitacco and Dmeza. ECF 50-16 at 2:32. Officer Vitacco instructed Dmeza to put her hands behind her back. ECF 50-12 at 1:17–1:19. While Officer Vitacco was holding Dmeza by the hood of her sweater, ECF 50-16 at 2:34–2:41, Dmeza told Officer Harshadavid, "Imma put it behind my back. Please tell him to stop." ECF 50-12 at 1:17–1:23; ECF 50-16 at 2:34–2:36. Dmeza also told Officer Harshadavid that her mother was "in there", and raised her hand seemingly to gesture at the restaurant. ECF 50-16 at 2:36–2:39.

Officer Vitacco pushed Dmeza towards the ground. *Id.* at 2:36–2:42. While Dmeza is on the ground, he shouts, "Stop fighting." ECF 50-12 at 1:30–1:36. Dmeza responds, "I am not fighting" and appears to attempt to put her hand behind her back. *Id.* at 1:35–1:41. Officer Vitacco appears to pull Dmeza's arm while Officer Harshadavid shouted, "Put your hands behind your back." ECF 50-16 at 2:53–2:56; ECF 50-12 at 1:38–1:41. Officer Harshadavid and Officer Vitacco handcuffed Dmeza as she lay in a prone position on the concrete. ECF 50-12 at 2:09; *see also* ECF 50-16 at 3:12–3:34. Dmeza stated several times, "I'm calm." ECF 50-16 at 2:56–3:03.

22

During this time, it appears that Officer Vitacco's knee was on Dmeza's neck. *Id.* at 3:20–3:41. Dmeza told the officers repeatedly that she had "asthma." ECF 50-12 at 2:20–2:24; ECF 50-16 at 3:18–3:42. Then, Officer Harshadavid helped Dmeza sit up. ECF 50-16 at 3:44–3:50.

Dmeza saw Officer Steigen kneeling on top of Lembert and said multiple times, "Please get off my nephew," and explained, "My nephew got asthma." ECF 50-16 at 3:52–4:16. She also said, "I can't breathe", and "my daughter is right there on the floor. What's wrong with my son?" *Id.* at 4:34–5:04. Officer Harshadavid told Dmeza, "You gotta breathe." *Id.* at 5:09–5:12. Dmeza, with her hands handcuffed behind her back, stated: "Please get off my nephew. Y'all doing too much." *Id.* at 4:10–4:16.

Officer Vitacco's body worn camera shows Dmeza sitting on the ground, asking, "Can you please, can you please, this is really tight." ECF 50-12 at 6:13–6:19. Officer Vitacco asked Dmeza, "Do you know why you're being arrested right now?" *Id.* at 6:19–6:22. Dmeza answered, "No, I don't." *Id.* at 6:21–6:22. Officer Vitacco responded: "Because you put your hands on the other officers, and then you put your hands on me." *Id.* at 6:20–6:24. Dmeza responded, "I didn't put my hands on them." *Id.* at 6:24–6:25. Officer Vitacco disagreed, stating, "You did." *Id.* at 6:25. Dmeza answered, "I swear to God, I didn't. I didn't put my hands on no one, please." *Id.* at 6:26–6:30.

Officer Vitacco leaned down and checked Dmeza's handcuffs, stating: "The cuffs are fine . . . you have plenty of room." *Id.* at 6:30–6:42. Then, he and Officer Harshadavid walked Dmeza to a police car. *Id.* at 6:54–7:09; ECF 50-16 at 8:15–8:30. Officer Harshadavid searched Dmeza, while she stood handcuffed at the police car. ECF 50-16 at 8:32–9:08. The officers put Dmeza in the police car. *Id.* at 9:20–9:30.

### 3. Shamdu Caleb Nalls

At about the time that Shaneris exited her vehicle for the second time, Shamdu had begun to walk away from the scene. But, he turned around as he heard his sister and mother screaming. ECF 50-13 at 0:29–0:35. Shamdu approached his mother and sister, but Officer Legge stated, "Hold up, hold up, hold up." *Id.* at 0:31–0:33. Around the same time, Officer Amrhein arrived and ran towards the sound of the shouting. ECF 50-14 at 1:45.

Officer Lehnert put his hands on Shamdu to keep him from approaching Shaneris and Dmeza. ECF 50-13 at 0:34–0:36. Shamdu pushed Officer Lehnert's arms away and continued to walk towards his mother and Shaneris, shouting "What are you doing to my mother?" *Id.* at 0:35–0:37. Officer Lehnert ordered Shamdu to turn around, and Shamdu put his hands up, with his palms open, at his chest level. ECF 50-17 at 2:37. Officer Lehnert again told Shamdu to turn around as he pulled Shamdu's arms behind his back. *Id.* at 2:37–2:39. During this interaction, Shamdu screamed and said several times, "That's my mother." ECF 50-14 at 1:59–2:06. Officer Lehnert held Shamdu's hands behind his back. *Id.* at 2:00.

Officer Amrhein approached the commotion, put his hand on Shamdu's chest, and pushed him backward. ECF 50-14 at 1:59–2:03. A struggle ensued. Shamdu was no longer restrained by Officer Lehnert and moved backwards between two parked cars in the parking lot. *Id.* at 2:03–2:08. I discuss, *infra,* the disputed circumstances that led to Shamdu becoming unrestrained.

Shamdu continued to move backwards towards a parked police car. *Id.* at 2:10–2:12. Plaintiffs assert that the video captures "the moments Defendant Lehnert wrapped his right arm around" Shamdu's "torso, and drove his right shoulder into Plaintiff's abdomen with such force to drive Plaintiff Shamdu into the marked police vehicle, where he lands with an audible thud." ECF 50-1 at 22. In contrast, defendants claim that "the video shows merely that [Shamdu] fell into the car." ECF 47-1 at 21. Neither Officer Amrhein's body camera nor Officer Lehnert's body camera

24

clearly shows how Shamdu collided with the police car.  *See* ECF 50-14 at 2:08–2:13; ECF 50-17 at 2:58–3:09.  But Officer Amrhein's body camera makes clear, and neither party disputes, that Shamdu collided with the car with some force.  *See* ECF 50-14 at 2:11–2:13.

Officer Amrhein claimed that at some point during this tussle Shamdu was "flailing his arms" and struck Officer Amrhein "across the head" on the left side of his face around his temple. ECF 50-20 (Amrhein IAS statement), at 13:49–14:05.  Officer Vicarini's Incident Report indicates that Shamdu "los[t] control and str[uck] Ofc Amrhein with his open hand on the officers [sic] left side of his face."  ECF 47-2 at 15.  However, this conduct is not captured on the BWC.

Then, Officer Amrhein used his taser, with a red dot appearing on the top of Shamdu's leg. ECF 50-14 at 2:13.  Officer Amrhein's body camera captures him yelling, "Don't fucking move," while tasing Shamdu.  ECF 50-14 at 2:13–2:18.  When Officer Amrhein deployed his taser, Shamdu had his back against the police cruiser with at least one hand up at his chest level, with his palm open, and facing the officer.  *Id.* at 2:09–2:13.  In response to the taser, Shamdu screamed in pain and fell to the ground.  *Id.* at 2:14–2:17.  In his IAS statement, Officer Amrhein acknowledges that he did not warn Shamdu before tasing him.  ECF 50-20 at 14:35–14:42.

Thereafter, Officer Lehnert sat on Shamdu's back and handcuffed him.  ECF 50-14 at 2:23–2:35.  As Officer Lehnert sat on Shamdu, Shamdu exclaimed, "I'm not fighting y'all, that's my mother."  *Id.* at 2:33–2:36; ECF 50-17 at 3:22–3:26.  Shamdu was in a prone position, with his face down on the concrete.  ECF 50-17 at 3:39.  He told the officers he could not breathe.  ECF 50-14 at 2:49–2:50.  Officer Lehnert then used his hand to turn Shamdu on his side.  ECF 50-17 at 3:41–3:44.

Officer Lehnert's body camera footage shows that after Officer Schulman and Officer Halstead moved down the parking lot with Mr. Nalls, Officer Schulman ran toward Shamdu and

asked, "Is he cuffed?"  ECF 50-17 at 3:51–3:54; ECF 50-11 at 0:53–0:59.   Officer Lehnert answered, "Yes, he's cuffed, but he's tased."  ECF 50-17 at 3:53–3:54; ECF 50-13 at 1:56–2:00. Shamdu stated, "What you doing?" ECF 50-13 at 2:01.  At the same time, Officer Schulman took Shamdu's head in his hands and, with the assistance of Officer Legge, brought Shamdu to a standing position, leaning against the front of Shaneris's vehicle.  ECF 50-17 at 3:53–3:58; ECF 50-13 at 2:02–2:10.  During this time, an officer shouted, "Get down, on the ground" and Shamdu responded, "You just told me to get up." ECF 50-13 at 2:02–2:08.  Officer Schulman left Shamdu and walked toward Mr. Nalls, as discussed, *infra*.  ECF 50-17 at 3:58–4:00; *see* ECF 50-11 at 1:00–1:42.  Officer Legge and Officer Lehnert remained with Shamdu.  ECF 50-17 at 4:00–4:38.

Shamdu commented, "I graduated college, bro, I am not on no criminal shit."  ECF 50-13 at 2:10–2:13.  Officer Legge asked Shamdu, "Why are you acting like this man?"  *Id.* at 2:13–2:14.  Shamdu responded: "Because my mother got slammed."  *Id.* at 2:14–2:16.  Officer Legge stated, "I tried to talk to you over there and you wouldn't listen to me."  *Id.* at 2:16–2:18.  Shamdu told Officer Legge, "You would do the same if your mother got slammed.  That's my mother, she gave birth to me, you gotta understand, I wasn't swinging on y'all, I was trying to make sure my mother was good."  *Id.* at 2:18–2:24.  Officer Legge asked Shamdu to "settle down," and Shamdu responded, "I'm good."  *Id.* at 2:26–2:28.  Officer Legge noted, "This got way too out of hand real quick."  *Id.* at 2:27–2:29.  Shamdu protested, "Y'all didn't have to tase me, I had my hands up. You tased me for no reason, damn near next to my dick."  *Id.* at 2:29–2:33.  Officer Legge stated, "Everything will get reviewed, OK."  *Id.* at 2:33–2:34.

Officer Legge and Officer Lehnert then walked Shamdu, in handcuffs, towards a police car.  *Id.* at 2:46–2:58.  Officer Legge asked Shamdu to enter the car, but Shamdu stated that the

back of the car was too small for him. *Id.* at 2:59–3:07. Shamdu stated, "I didn't swing at y'all. I did nothing wrong, I came and tried to find out the situation." *Id.* at 3:27–3:33.

Officer Legge asked if Shamdu needed medical attention. *Id.* at 3:37. Shamdu stated he did not need medical attention, again reiterating that he had his hands up when he was tased. *Id.* at 3:38–3:41. Shamdu continued, "I was trying to get to my mother." *Id.* at 3:49–3:50. Officer Legge told Shamdu, "You pushed two officers" and Shamdu responded, "I didn't mean to push them." *Id.* at 3:51–3:54.

### 4. Nehemiah Lembert

Officer Legge's body camera footage shows Lembert standing between two cars in the parking lot before the interaction involving Dmeza, Shaneris, and Officer Vicarini intensified. ECF 50-13 at 0:19–0:23. After Officer Vicarini took hold of Shaneris and Officer Vitacco took hold of Dmeza, Officer Harshadavid walked past Officer Vicarini and toward Lembert. ECF 50-16 at 2:07–2:12. Lembert was standing on the sidewalk behind the parked vehicles.

From Officer Harshadavid's body camera footage, Lembert appears to be craning his neck, as if to see what was going on. *Id.* at 2:12–2:15. Officer Harshadavid walked towards Lembert and said, "Get back, get back. Let them do their job." *Id.* at 2:12–2:19. Her hand was outstretched, and she touched Lembert's stomach, seemingly to push him back. *Id.* at 2:15–2:19. Lembert shouted, "Get off of him like that." ECF 50-24 at 1:19–1:21.[16] Officer Steigen put her hand on Lembert's chest, pushing him backward. ECF 50-16 at 2:21. Lembert screamed, "Yo, what are you doing?" *Id.* at 2:22–2:24. At the same time, Lembert moved towards

---

[16] The BWC does not make clear who Lembert was referring to when he made this statement. *See* ECF 50-24 at 1:19–1:21.

Dmeza and Officer Vitacco. *Id.* at 2:23–2:25. A hand can be seen briefly on Lembert's shoulder. *Id.* at 2:25.

Officer Vicarini stated in his Incident Report that, as he was removing Shaneris from the car, Lembert was at the rear of the Honda and pushed Officer Steigen "with two open palms." ECF 47-2 at 15; *see* ECF 50-5 at 2 (same). But, the body camera footage does not show Lembert pushing Officer Steigen.

After Lembert moved towards Dmeza and past Officer Harshadavid, Officers Halstead, Steigen, and Legge pushed Lembert against the fence. ECF 50-16 at 2:28–2:30. Officer Halstead put his hands on Lembert's chest and pulled his shirt. ECF 50-19 (Halstead body camera footage), at 0:38–0:40. The officers also ordered Lembert to the ground as they pushed him against the fence. ECF 50-13 at 0:54–0:56. Lembert said, "I'm calm," while Officer Halstead shouted, "Get your hands behind your back" and then grabbed Lembert and shouted, "Get down on the ground now." *Id.* at 0:56–1:03; ECF 50-19 at 0:43–0:49. Lembert stated, "I am going down." ECF 50-13 at 1:02. Officer Halstead screamed, "Go down when we ask you to." ECF 50-19 at 0:49–0:52.

Officer Halstead's body camera footage shows hands around Lembert's neck, as the Officers wrestled him to the ground. ECF 50-19 at 0:52–0:57. Officer Steigen's body camera also shows hands around Lembert's neck. ECF 50-24 at 1:42–1:46. In Officer Halstead's statement to IAS, he claimed that Lembert continued to resist, and so the officers took Lembert's legs out from under him. ECF 50-21 (Halstead IAS statement), at 2:50–2:58. However, Lembert's alleged resistance is not captured on the BWC.

As the officers pushed Lembert to the ground, he shouted, "I'm not resisting"; "My hands are behind my back"; "Stop, you're choking me"; and "Get off of my neck." ECF 50-13 at 1:04–1:19; ECF 50-19 at 0:53–1:04. The officers brought Lembert to a seated position. ECF 50-13 at

1:01–1:08.   Officer Steigen appears to have her hands around Lembert's neck, while Officer Halstead is holding his leg.  *Id.* at 1:14–1:18; ECF 50-24 at 1:41–1:55.

From the video footage, it appears that, after Lembert was in a seated position, Officer Halstead ordered Lembert to get on his stomach.  ECF 50-19 at 1:06–1:12.  Officers Halstead, Legge, and Steigen appear together to handcuff Lembert.  *Id.* at 1:09–1:26; ECF 50-13 at 1:25–1:44.  In the process, various officers are on Lembert's back.  *Id.*  In Officer Halstead's IAS statement, he claimed that Lembert was resisting the officers' commands to get on the ground by clenching his fists and tensing his body.  ECF 50-21 at 28:26–28:32.

Officer Steigen briefly left Lembert handcuffed on the ground and ordered bystanders to get back.  ECF 50-24 at 2:14–2:29.  Officer Halstead ran toward the altercation between Officer Schulman and Mr. Nalls, as discussed *infra*.  ECF 50-19 at 1:28–1:38.  Officer Legge remained with Lembert for a few more seconds before appearing to proceed to the vicinity of Shamdu.  ECF 50-13 at 1:51–1:59.

Officer Steigen returned to Lembert, who was face down and handcuffed on the sidewalk.  ECF 50-24 at 2:35.  Officer Steigen then kneeled on Lembert's back, and Lembert asked Steigen to stop putting pressure on him.  *Id.* at 2:35–3:10; *see* ECF 50-16 at 4:01. Lembert said: "You are making it hard for me to breathe."  ECF 50-24 at 2:37–2:44.  Officer Steigen's BWC appears to show Lembert struggling to breathe.  *Id.* at 2:39–3:06.  Steigen responded, "OK," but she does not appear to release pressure on Lembert's back.  *Id.* at 2:43–2:44.

Officer Harshadavid turned Lembert on his side.  *Id.* at 3:07–3:14.  Officer Steigen told Officer Harshadavid to watch Dmeza, and she kneeled on Lembert's legs, while holding one of his forearms in her hand and placing another hand on the top of Lembert's knee.  *Id.* at 3:11–3:17; ECF 50-16 at 4:11–4:28.  Lembert stated, "I didn't even do anything, y'all just slammed me against

29

the gate." ECF 50-24 at 4:14–4:22. Lembert then asked Officer Steigen, "Why are you pressing down harder, bruh, I'm on the ground." *Id.* at 4:31–4:36. Officer Steigen replied, "OK" but does not appear to move. *Id.* at 4:40–5:11. Officer Steigen and another officer raised Lembert to a standing position and walked him towards a police vehicle. *Id.* at 5:12–5:24.

### 5.  Shamdu Veraby Nalls

When Officer Vitacco first pushed Dmeza against the fence, Mr. Nalls rushed towards Dmeza and Officer Vitacco. ECF 50-12 at 1:04. As Mr. Nalls approached, Officer Vitacco exclaimed, "Do not touch me." *Id.* at 1:06. However, the BWC does not make clear if Mr. Nalls and Officer Vitacco actually made physical contact. *See id*. at 1:01–1:06.

Officer Legge's BWC shows Officer Schulman grabbing Mr. Nalls from behind and pushing him into Shaneris's car. ECF 50-13 at 0:43–0:45. Although the footage from Officer Legge's body camera is blurry, Officer Schulman appears to pull Mr. Nalls off the vehicle and walk with him between two other vehicles in the parking lot. *Id.* at 0:45–0:49. Officer Amrhein ran to Officer Schulman and Mr. Nalls, who were standing between the two cars. ECF 50-14 at 1:51–1:54. It appears that Officer Schulman pushed Mr. Nalls during this exchange, while Mr. Nalls shouted, "You know I ain't do nothing" or words to that effect. *Id.* at 1:53–1:54. Then, Officer Amrhein walked away from Mr. Nalls towards Shamdu, as discussed. *Id.* at 1:54–1:56.

Officer Schulman's body camera again began recording. *See* ECF 50-10 at 0:00.[17] It shows Mr. Nalls approaching Dmeza while she is on the ground, restrained by Officer Vitacco and Officer Harshadavid, with Nalls stating: "She don't resist, she don't resist." *Id.* at 0:00–0:35. At least one arm of Mr. Nalls is extended outward toward his side. *Id.* at 0:10. He also removed

---

[17] Officer Schulman's body camera footage does not begin to register sound until ECF 50-10 at 0:29.

his hat while talking to Officer Schulman. *Id.* at 0:04–0:06. At first, Mr. Nalls was standing with his back against Shaneris's car, talking with Officer Schulman. *Id.* at 0:12–0:19. The BWC is not clear, but it appears that Schulman pushed Mr. Nalls to move away from Dmeza and Officer Vitacco. *Id.* at 0:19–0:25.

Mr. Nalls moved towards Dmeza and faced Officer Schulman, with his back against the fence. *Id.* at 0:34. Officer Schulman ordered Mr. Nalls to get back, and Mr. Nalls responded, "You don't want this." *Id.* at 0:32–0:38. Officer Vicarini's Incident Report claims that at this time, Mr. Nalls grabbed "a hold of Lt. Schulman's arms[.]" ECF 47-2 at 16. Although Officer Schulman's body camera footage is not clear, it appears that Mr. Nalls stretched his arm outwards. ECF 50-10 at 0:37–0:40. Plaintiffs claim that Mr. Nalls "extended his arms to create space" between himself and Officer Schulman. ECF 50-1 at 26. Plaintiffs also claim that Officer Schulman then grabbed Mr. Nalls's forearms. *Id.* According to plaintiffs, Mr. Nalls "was clearly afraid for his own safety, and pushed on Defendant Schulman to make space." *Id.*

At the same time, Mr. Nalls asserts, "I will eat you." ECF 50-10 at 0:41–0:42; ECF 50-19 at 1:30–1:31. Officer Schulman responded, "stop" and "back up" and "calm the fuck down." ECF 50-10 at 0:44–0:47. In Officer Schulman's IAS statement, he claims that Mr. Nalls "grabbed" his arms. ECF 50-6 at 11:35–11:46.

In Officer Halstead's IAS statement, he claimed that he saw a male subject engage in a pushing match with Officer Schulman. ECF 50-21 at 2:57–3:10. Halstead ran toward the tussle, leaving Lembert on the ground. ECF 50-19 at 1:28–1:38; *see* ECF 50-21 at 3:01–3:14. Officer Halstead claimed that, as he approached Mr. Nalls, Mr. Nalls struck him with his left hand on the right side of Halstead's face. ECF 50-21 at 3:14–3:17; *see also* ECF 47-2 at 16.

Officer Halstead joined Officer Schulman in the altercation with Mr. Nalls and all three men moved from the sidewalk behind the parking lot into the area between two cars parked in the lot. ECF 50-19 at 1:28–1:34. Officer Halstead's video footage becomes blurry as he joined the fray, and his BWC does not appear to capture his full interaction with Mr. Nalls. *See id.* at 1:35–1:39.[18] Officer Halstead claimed in his IAS statement that at some point during the struggle with Mr. Nalls, he handcuffed one hand, but Mr. Nalls reached his hand under his stomach and made fists. ECF 50-21 at 3:30–3:41.

Ultimately, Officers Halstead, Schulman, Amrhein, and Vitacco converged on Mr. Nalls. ECF 50-19 at 1:28–1:38; ECF 50-12 at 2:28–3:08; ECF 50-14 at 2:54–3:53; ECF 50-10 at 1:01–1:28. The body camera footage of each officer and their interactions with Mr. Nalls is not entirely clear.

Officer Amrhein's body camera shows Mr. Nalls running backwards between two cars in the lot, bent over, as Officers Schulman and Halstead are moving toward him. ECF 50-14 at 2:54–2:56. It also shows an officer putting his hand on Mr. Nalls's head and pushing him against a car in the parking lot. *Id.* at 2:57–3:00. An officer repeatedly instructed Mr. Nalls to put his hands behind his back. *Id.* at 3:01–3:06. Officer Amrhein can be seen holding a taser. *Id.* at 3:06. Then, an officer can be heard struggling with Mr. Nalls, and an officer can be heard screaming, "Put your hands behind your fucking back." *Id.* at 3:13–3:30. Multiple officers appear to strike Mr. Nalls. One of the officers shouted, "Hit his fucking face." *Id.* at 3:39–3:41.

After Officer Vitacco handcuffed Dmeza, with the help of Officer Harshadavid, Vitacco's body camera footage shows him joining the other officers in the struggle with Mr. Nalls. ECF 50-

---

[18] The video camera footage contains sounds of possible blows. But, it is not for the Court to identify or determine the nature of the sounds. ECF 50-19 at 1:32–1:38.

12 at 2:28–2:36.  Although the body camera footage is blurry (ECF 50-12 at 2:32), an officer's voice can be heard stating, "We're not fucking playing games, put your hands behind your back." *Id.* at 2:32–2:36.  At some point during the struggle, it appears that one of the officers handcuffed Mr. Nalls, shouting: "I got it, I got it."  ECF 50-14 at 3:37–3:48.   In  Officer Halstead's IAS statement, he claims that he handcuffed Mr. Nalls.  ECF 50-21 at 3:35–4:14.

On Officer Schulman's body camera footage, Mr. Nalls can be heard stating, "Yo, you're tasing me."  ECF 50-10 at 1:02–1:04.  The body camera footage also shows at least two officers who appear to be applying force to Mr. Nalls.  *Id.* at 1:11–1:26.

Mr. Nalls was left on the ground, with his arms handcuffed behind his back and blood coming from his nose.  ECF 50-12 at 4:41–4:57.  Mr. Nalls stated, "I'm going to fucking eat y'all bitches" and "Y'all fucking beat the shit out of me for no reason."  *Id.* at 4:45–5:09.  Officer Schulman walked towards Mr. Nalls and stated, "I told you to relax."  ECF 50-10 at 3:48–3:52.  Mr. Nalls responded, "So what, man, y'all would fucking hit me."  *Id.* at 3:53–3:55.  Officer Schulman responded, "You grabbed me."  *Id.* at 3:54–3:56.

Officer Vicarini recounted in his Incident Report that Officers Schulman and Amrhein struck Mr. Nalls "several times with their closed fists[.]"  ECF 47-2 at 16.   Officer Amrhein claimed in his IAS statement that he kicked Mr. Nalls on the top of his head, which he characterized as a "glancing blow" that did not really "connect."  ECF 50-20 at 24:27–24:46.  Amrhein also related that he struck Mr. Nalls with a hammer fist at the top of his head.  *Id.* at 24:45–25:16.  Moreover, Amrhein said that he wanted to deploy the taser on Mr. Nalls, may have stunned Mr. Nalls with it, but was not sure if the taser connected.  *Id.* at 20:30–21:03.  In any event, Officer Amrhein asserts that the tase had no effect on Mr. Nalls, and he then holstered his taser. *Id.* at 20:49–21:19.

In Officer Halstead's IAS statement, he claimed that he struck Mr. Nalls twice with closed fists. ECF 50-21 at 3:50–4:07. In Officer Vitacco's IAS statement, he claimed that he struck Mr. Nalls with a closed fist on the side of his face and the back of his head approximately five times. ECF 50-22 (Vitacco IAS statement), at 19:09–19:59. In Officer Schulman's IAS statement, he stated that he made two or three strikes to Mr. Nalls's face, but denied doing so while Mr. Nalls was handcuffed. ECF 50-6 at 16:37–17:00, 17:50–17:58.

### 6. After the Fray

Officer Schulman characterized the incident as an "old school fucking melee." ECF 50-10 at 8:19–8:22. By the time plaintiffs had been handcuffed, approximately ten to fifteen bystanders had gathered, appeared to be shouting at the police, and were recording the events on their cell phones. *See* ECF 50-12 at 3:24–3:43; ECF 50-17 at 4:38, 5:30–6:19, 11:52. One person can be heard shouting, "All of this for what?" ECF 50-17 at 6:38–6:40. Officer Vitacco approached the onlookers and shouted, "Back up or everyone is getting sprayed. Back up. Back up." ECF 50-12 at 3:18–3:25.[19]

As the officers were placing plaintiffs in police vehicles, Officer Schulman asked another officer if they could "fit big boy in a car" (ECF 50-10 at 6:30–6:35; *see* ECF 50-13 at 7:31–7:35), presumably referring to Shamdu. Officer Legge stated that Shamdu had been tased. ECF 50-10 at 6:35–6:40; ECF 50-13 at 7:39–7:41. He indicated that he had asked Shamdu if he needed medical attention, and Shamdu had said no, but that the officers would need a medic to get the taser prongs out. ECF 50-10 at 6:36–6:43; ECF 50-13 at 7:45–7:48. Officer Amrhein stated he "tried to tase the other guy" but his "one cartridge went down." ECF 50-14 at 7:18–7:26. He later stated, "I tased two of 'em . . . but I only deployed once." *Id.* at 13:01–13:06.

---

[19] Officer Vitacco claims he was referring to pepper spray. ECF 50-22 at 21:52–21:58.

After Shaneris was taken to the police car, Officer Vicarini, using a flashlight, searched the silver Honda. ECF 50-3 at 11:20–14:01. He told another officer, "They had weed in there, that's why." *Id.* at 11:29–11:34; *see* ECF 50-10 at 6:17–6:23. Officer Vicarini opened the center console and began searching it. ECF 50-3 at 11:35–11:51. He saw a glass jar, which he placed on top of the car. *Id.* at 13:56–14:01. Vicarini then stated, "Over this much weed. That's what all this was for." *Id.* at 14:01–14:06.

A report from the BCPD indicates that "THC" was "present" in a "[j]ar with plant matter" along with a "cigarette with plant matter[.]" ECF 50-8. The BCPD Forensic Services Laboratory Report states that the jar contained 8.72 grams of marijuana. ECF 50-8. In reports created by officers following the altercation, however, the officers claimed that 15 grams of marijuana were recovered. *See, e.g.,* ECF 47-2 at 16; *see also* ECF 50-2 at 10.

As Officer Vicarini engaged in a warrantless search of the trunk of the vehicle, another officer approached. ECF 50-3 at 15:30. Officer Vicarini stated, "We rolled by and they gave us the fucking crim look." *Id.* at 15:30–15:34. An unidentified officer stated to Officer Vicarini, "Homeboy snuffed me in my chest." *Id.* at 16:01–16:04. Officer Vicarini responded, "He punched you?" *Id.* at 16:05. The officer responded, "Yeah." *Id.* Vicarini answered, "Damn." *Id.* at 16:05–16:06. Vicarini also instructed: "Whoever was involved or had any assault performed on them or personally locked someone up, just make sure they stay back . . . until I get accounts from everyone." *Id.* at 16:12–16:19.

One officer stated, "I tased two people." But, it is not clear from the body camera footage who made this statement. *Id.* at 17:54–17:56. Officer Vicarini responded, "Good job." *Id.* at 17:56–17:58. A female, apparently a friend of Shaneris, then reentered the Honda. *Id.* at 18:03–

35

18:11.  Vicarini asked her to "hand" him "that joint that's in there."  *Id.*  The female handed something to Vicarini, but the BWC does not reflect the nature of the item.  *Id.*

Officer Vicarini then said to Shaneris's friends: "Quick lesson for you guys.  The amount of weed that was in there, you guys wouldn't have had anything done to you.  I promise, I wouldn't have written you a civil citation.  But I have a job to do . . . All this got out of hand, solely because someone wanted to have an attitude and not help me do a job.  You guys would have been on your way."  *Id.* at 18:50–19:07.  Shaneris's friends entered the vehicle and Officer Vicarini asked them if they had identification.  *Id.* at 19:42–19:52.  One of the women in the car was speaking on a video call with another individual, and can be heard stating, "They came over here,  ten fucking deep, over some little ass weed.  First of all, we wasn't even smoking."  *Id.* at 20:13–20:23.  Then, Officer Vicarini stated, "I can write a citation, if you want to."  *Id.* at 20:28–20:30.  Shaneris's friend responded, "I am just telling the story," to which Officer Vicarini replied: "If you guys want to be like that it's fine."  *Id.* at 20:29–20:42.

Plaintiffs were "transported to the Baltimore County Woodlawn Precinct where they were processed, charged, and booked."  ECF 21, ¶ 60.  They also received medical attention.  ECF 50-21 at 21:50–22:03; *see* ECF 50-17 at 30:41 (Lembert receiving medical care for his facial injuries at the police precinct); *id.* at 33:06–33:14 (Shamdu speaking with BCPD officials discussing removal of taser prongs by police personnel and refusing to be taken to the hospital).  Plaintiffs have submitted photographs taken by the Baltimore County Crime Lab, documenting the physical injuries of Dmeza and Mr. Nalls.  Photographs of Mr. Nalls appear below (ECF 50-23):





According to Officer Vicarini's Incident Report, the conflict with Shamdu "damaged the side" of Patrol Car 242, with an "estimate" of $300 to repair it.  ECF 47-2 at 15.  Photographs of

the police vehicle show a dent to a rear door, below the handle.  ECF 50-18 (Photographs of damaged police vehicle).

Officer Vicarini stated in his Incident Report that Officer Amrhein "sustained a large abrasion and swelling on his left knee, a small cut on his nose, and bruising with swelling on his left thumb" as a result of "fighting" with Shamdu.  ECF 47-2 at 15; *see id.* at 27 (Officer Amrhein claiming that he sustained these injuries from fighting Mr. Nalls and Shamdu).  He also reported that Officer Schulman suffered a swollen and injured right hand because of the altercation with Mr. Nalls.  *Id.* at 16.  Defendants have not provided any evidence of the injuries.

Shaneris was charged with possession of more than ten grams of marijuana.  ECF 21, ¶ 62; ECF 50-7 (Shaneris Nalls Juvenile Referral).  However, as stated, the BCPD lab report indicated that the police recovered less than ten grams from the vehicle.  In any event, this charge was later dismissed.  ECF 21, ¶ 62.[20]

Dmeza was charged with failure to obey a reasonable and lawful order of a law enforcement officer, in violation of Md. Code (2021 Repl. Vol., 2023 Supp.), § 10-201(c)(3) of the Criminal Law Article, and disorderly conduct, in violation of C.L. § 10-201(c)(2).  *Id.* ¶ 64. These charges "were placed on the stet docket on July 30, 2020." *Id.*[21]

Shamdu was charged with second degree assault of a law enforcement officer, in violation of C.L. § 3-202(c)(2); second degree assault, in violation of C.L. § 3-203; resisting or interfering

---

[20] Plaintiffs did not provide documentation of the various charges.  Nor do plaintiffs provide a statutory citation to the Maryland law that Shaneris allegedly violated.

[21] A stet is a type of disposition of a criminal case in Maryland.  *What is a Stet in Maryland and How is it Used?* SMITH MARTELLA LAW GROUP, LLC (last accessed March 8, 2026), https://perma.cc/HP6A-ERTH.  Under Maryland Rule 4-248(a), "[o]n motion of the State's Attorney, the court may indefinitely postpone trial of a charge by marking the charge 'stet' on the docket."  When a case is placed on the stet docket, the case becomes inactive.

with an arrest, in violation of C.L. § 9-408(b); failure to obey a lawful order of a law enforcement officer, in violation of C.L. § 10-201(c)(3); disorderly conduct, in violation of C.L. § 10-201(c)(2); malicious destruction of property valued at over $1,000, in violation of C.L. § 6-301; and obstructing and hindering. *Id.* ¶ 66. The charges were later nolle prossed. *Id.*

Mr. Nalls was charged with two counts of second degree assault of a police officer, in violation of C.L. § 3-202(c)(2); two counts of second degree assault, in violation of C.L. § 3-203; one count of resisting or interfering with an arrest, in violation of C.L. § 9-408(b); one count of failure to obey a lawful order of a law enforcement officer, in violation of C.L. § 10-201(c)(3); one count of disorderly conduct, in violation of C.L. § 10-201(c)(2); and one count of obstructing and hindering. *Id.* ¶ 68. These charges were placed on the stet docket on January 8, 2021. *Id.*

Lembert was charged with second degree assault of a law enforcement officer, in violation of C.L. § 3-202(c)(2); second degree assault, in violation of C.L. § 3-203; and resisting or interfering with an arrest, in violation of C.L. § 9-408(b). *Id.* ¶ 70. The charges were later nolle prossed. *Id.*

On January 28, 2020, three days after the melee, plaintiffs filed complaints against the officer defendants with BCPD's "Internal Affairs Section," based on claims of "excessive use of force." *Id.* ¶ 72. In September 2020, IAS conducted interviews of Officers Vicarini, Schulman, Vitacco, Amrhein, and Halstead in connection with Shamdu's complaint. ECF 50-4; ECF 50-6; ECF 50-9; ECF 50-20 to ECF 50-22; *see* ECF 50-4 at 0:02–0:06; *see also* ECF 1-1 (IAS Letter).

Plaintiffs appended to their suit a letter addressed to Shamdu from Captain David Trivett, Commander of IAS, dated December 15, 2021. ECF 1-1. Captain Trivett informed Shamdu that an "investigation determined that the officer was in violation of Departmental Rules and Regulations" and said "Corrective administrative action will be initiated." But, the letter does not

identify this officer, nor does it identify which rule or regulation the officer was found to have violated. *See* ECF 1-1. Apart from this letter, as of the filing the Amended Complaint, plaintiffs did not know "the specific outcome of the investigation[.]" ECF 21, ¶ 73.

Additional facts are included, *infra*.

### III.    Legal Standards and Doctrines

### A.  Fed. R. Civ. P. 56

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647,

658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014). But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ." But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322–24. In other words, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted). Rather, "there must be evidence on

41

which the jury could reasonably find for the nonmovant." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).  And, "to avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997).

The court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *Ricci*, 557 U.S. at 586; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Knibbs v. Momphand*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Brown v. Lott*, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty., Md.*, 893 F.3d 213, 218–19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *In re French*, 499 F.3d 345, 352 (4th Cir. 2007).  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate,

42

because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Notably, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)). But, if testimony of a nonmovant is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017). Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (citing *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)). On the other hand, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

### B.  42 U.S.C. § 1983

Count I and Count II of the Amended Complaint are lodged pursuant to 42 U.S.C. § 1983. Section 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 707 (1999). Under § 1983, a plaintiff may file suit against any person who, acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See Filarsky v. Delia*, 566 U.S. 377 (2012); *Quinn v.*

*Zerkle,* 111 F.4th 281, 290 (4th Cir. 2024)*; Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).

However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey*, 526 U.S. at 707.

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997). "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' applicable to Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cnty. v. Dodson*, 454 U.S. 312, 317–18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 (citations and internal quotation marks omitted) ("[P]rivate activity will generally not be

deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.").

The doctrine of respondeat superior does not apply in § 1983 cases. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Indeed, "'[i]n a § 1983 suit . . . each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.'" *Younger v. Crowder*, 79 F.4th 373, 381 n.12 (4th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 677) (alteration in *Younger*). If a plaintiff has not alleged any personal connection between a defendant and a denial of constitutional rights, the claim against that defendant must fail. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *see also Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (same); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (same).[22]

### C. Maryland Declaration of Rights

Plaintiffs assert claims of excessive force (Count V) and false arrest and false imprisonment (Count VII) pursuant to Article 24 and 26 of the Maryland Declaration of Rights.

Article 24 constitutes the State's constitutional guarantee of due process and equal protection of the law. *Town of Easton v. Pub. Serv. Comm'n*, 379 Md. 21, 41 n.11, 838 A.2d 1225, 1237 n.11 (2003). It "'is the state law equivalent of the Fourteenth Amendment'" to the Constitution. *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 496 (D. Md. 2013) (quoting *Rosa v. Bd. of Educ. of Charles Cnty.*, AW-11-02873, 2012 WL 3715331, at *6 (D. Md. Aug. 27, 2012)).

---

[22] As the Fourth Circuit articulated in *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013), a supervisor may be held liable "for the failings of a subordinate under certain narrow circumstances." Pursuant to § 1983, liability for supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)); *see Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020); *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014).

Notably, Article 24 "has been interpreted to apply 'in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution,' so that 'decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities.'"  *Frey v. Comptroller of Treasury*, 422 Md. 111, 176, 29 A.3d 475, 513 (2011) (quoting *Att'y Gen. of Md. v. Waldron*, 289 Md. 683, 704, 426 A.2d 929, 941 (1981)).  "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Hawkins*, 955 F. Supp. 2d at 496; *see Littleton v. Swonger*, 502 F. App'x 271, 274 (4th Cir. 2012) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[ ]"); *Dent v. Montgomery Cty. Police Dept.*, 745 F. Supp. 2d 648, 661 (D. Md. 2010) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[ ]"); *Tyler v. City of College Park*, 415 Md. 475, 499–500, 3 A.3d 421, 435 (2010) (recognizing that Maryland courts "interpret Article 24 *in pari materia* with the Fourteenth Amendment to the United States Constitution."); *Doe v. Dept. of Pub. Safety & Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009) (same).

It follows that the same standard of objective reasonableness applies to the analysis of an Article 24 claim as for analyzing a claim under the Fourteenth Amendment.  *Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011) (en banc) (citing *Randall v. Peaco*, 175 Md. App. 320, 329, 927 A.2d 83, 89 (2007)); *see Beall v. Holloway-Johnson*, 446 Md. 48, 68, 130 A.3d 406, 417–18 (2016) ("The analysis for an Article 24 violation follows the analysis used for claims under the Fourteenth Amendment to the United States Constitution and, as a result, 'all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, . . . should be analyzed under the Fourth Amendment['s] reasonableness standard.'") (quoting *Okwa v. Harper,* 360 Md. 161, 204, 757 A.2d 118, 141 (2000)); *Espina v. Prince George's Cnty.*, 215

Md. App. 611, 654, 82 A.3d 1240, 1266 (2013) ("[A]n Article 24 claim is viable if a claimant can prove excessive force under the *Graham* test."), *aff'd sub nom. Espina v. Jackson*, 442 Md. 311, 112 A.3d 442 (2015).

Article 26 is the State's analog to the Fourth Amendment to the Constitution. *Padilla v. State*, 180 Md. App. 210, 225, 949 A.2d 68, 77 (2008) (Hollander, J.). Therefore, it protects the same rights as those protected under the Fourth Amendment. *See Dent*, 745 F. Supp. 2d at 661. Accordingly, "Maryland courts . . . construe[] Article 26 *in pari materia* with the Fourth Amendment to the United States Constitution." *Padilla*, 180 Md. App. at 226, 949 A.2d at 78; *see Lewis*, 98 F.4th at 530, n.4; *Parker v. State,* 402 Md. 372, 400, 936 A.2d 862, 878 (2007); *Patterson v. State,* 401 Md. 76, 113, 930 A.2d 348, 372 (2007); *Byndloss v. State,* 391 Md. 462, 465 n.1, 893 A.2d 1119, 1121 n.1 (2006); *Davis v. State,* 383 Md. 394, 408, 859 A.2d 1112, 1120 (2004); *Scott v. State,* 366 Md. 121, 139, 782 A.2d 862, 873 (2001); *Richardson v. McGriff,* 361 Md. 437, 452–53, 762 A.2d 48, 56 (2000); *Purnell v. State,* 171 Md. App. 582, 607, 911 A.2d 867, 882 (2006), *cert. denied,* 398 Md. 315, 920 A.2d 1060 (2007).

Because both Article 24 and Article 26 are construed *in pari materia* with the Fourteenth and Fourth Amendments to the Constitution, I shall consider Counts I and V together, and I shall consider Counts II and VII together. *See Dent*, 745 F. Supp. 2d at 661. However, the doctrine of qualified immunity  is not a defense to State claims brought under the Maryland Declaration of Rights. *See*, *e.g.*, *Littleton*, 502 F. App'x at 274 n.2; *Richardson v. Orangeburg Sch. Dist. No. 1*, 53 F.3d 329 (table), 1995 WL 255941, at *3 n.2 (4th Cir. 1995); *Okwa*, 360 Md. at 201, 757 A.2d at 140; *Thacker v. City of Hyattsville*, 135 Md. App. 268, 290, 762 A.2d 172, 183–84 (2000).

Other legal doctrines are reviewed in the course of the Discussion.

### IV.  Discussion

### A.  Excessive Force (Count I and Count V)

In Counts I and V, five plaintiffs assert excessive force claims against nine police officers, in violation of the Fourth and Fourteenth Amendments to the Constitution and Articles 24 and 26 of the Maryland Declaration of Rights.   ECF 28; *see* ECF 21, ¶¶ 81–88, ¶¶ 128–132.  In particular, Shamdu and Mr. Nalls assert excessive force claims against Officer Amrhein; Shamdu lodges a force claim against Officer Lehnert; Mr. Nalls asserts a force claim against Officer Schulman; Dmeza and Mr. Nalls lodge claims against Officer Vitacco; Shaneris and Dmeza lodge force claims against Officer Vicarini; Lembert and Mr. Nalls assert claims against Officer Halstead; Lembert and Dmeza allege claims against Officer Harshadavid; Lembert asserts a claim against Officer Legge; and Lembert lodges a claim against Officer Steigen.  ECF 28.

Defendants contend that they are entitled to summary judgment because their use of force was reasonable.  ECF 47-1 at 11; *see id.* at 12-26.  As to Count I, they also contend that they are entitled to qualified immunity, discussed *infra*.

I begin with a discussion of the law concerning use of excessive force.  Then, I discuss separately each contention as to each party.

### 1.

An excessive force claim implicates the Fourth Amendment.  It guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend IV.  The Fourth Amendment is made applicable to the States through the Fourteenth Amendment.  *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

The Supreme Court has interpreted the Fourth Amendment to prohibit a law enforcement officer from using excessive force to effect a seizure.  *See Graham v. Connor*, 490 U.S. 386, 394

48

(1989); *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985); *see also Franklin v. City of Charlotte*, 64 F.4th 419, 530–31 (4th Cir. 2023); *Aleman*, 80 F.4th at 285–87; *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022); *Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Hupp v. Cook*, 931 F.3d 307, 320–23 (4th Cir. 2019); *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).

In *Graham*, 490 U.S. 386, a touchstone case, the Supreme Court rejected the notion "that all excessive force claims brought under § 1983 are governed by a single generic standard." *Id.* at 393.  Instead, the "validity" of an excessive force claim must be "judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." *Id.* at 394.

A claim of use of excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen" should be evaluated "under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* at 395; *see Henry,* 652 F.3d at 531 ("The Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of seizures effectuated by excessive force. Whether an officer has used excessive force is analyzed under a standard of objective reasonableness.") (internal quotation marks and citations omitted); *see also Knibbs*, 30 F.4th at 214 (observing that a "§ 1983 claim that [an officer's] use of force violated [the plaintiff's] Fourteenth Amendment due process rights . . . has been foreclosed by the Supreme Court since 1989") (citing *Graham*, 490 U.S. at 395).

The "'question [is] whether the totality of the circumstances justified a particular sort of . . . seizure.'" *Buchanan*, 325 F.3d at 527-28 (alteration in original) (quoting *Garner*, 471 U.S. at 8–9).  The Supreme Court recently explained in *Barnes v. Felix*, 605 U.S. 73, 79-81 (2025) (emphasis added):

> The "touchstone of the Fourth Amendment is 'reasonableness,'" as measured in objective terms. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). So

49

the question . . . is whether the force deployed was justified from "the perspective of a reasonable officer on the scene," taking due account of both the individual interests and the governmental interests at stake. *Graham*, 490 U.S., at 396; *County of Los Angeles v. Mendez*, 581 U.S. 420, 428, (2017).

That inquiry into the reasonableness of police force requires analyzing the "totality of the circumstances." *Id.,* at 427–428; *Garner*, 471 U.S., at 9. There is no "easy-to-apply legal test" or "on/off switch" in this context. *Scott v. Harris*, 550 U.S. 372, 382–383 (2007). Rather, the Fourth Amendment requires, as we once put it, that a court "slosh [its] way through" a "factbound morass." *Id.,* at 383. Or said more prosaically, deciding whether a use of force was objectively reasonable demands "careful attention to the facts and circumstances" relating to the incident, as then known to the officer. *Graham*, 490 U.S., at 396. For example, the "severity of the crime" prompting the stop can carry weight in the analysis. See *id.*; *Garner*, 471 U.S., at 11. So too can actions the officer took during the stop, such as giving warnings or otherwise trying to control the encounter. See *id.,* at 12; *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). And the stopped person's conduct is always relevant because it indicates the nature and level of the threat he poses, either to the officer or to others. *See Ibid.*; *Graham*, 490 U.S., at 396.

Most notable here, the "totality of the circumstances" inquiry into a use of force has no time limit. Of course, the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review. But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. Or as the Federal Government puts the point, those later, "in-the-moment" facts "cannot be hermetically sealed off from the context in which they arose." Brief for United States as *Amicus Curiae* 14. Taking account of that context may benefit either party in an excessive-force case. Prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead they may show why such an officer would have perceived the same conduct as innocuous. The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.

Whether an officer's use of force was reasonable under the Fourth Amendment is "'predominantly an objective inquiry.'" *Cybernet, LLC*, 954 F.3d at 169 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *see Kingsley*, 576 U.S. at 397; *Benton v. Layton*, 139 F.4th 281, 288 (4th Cir. 2025), *cert. denied*, 2026 WL 79874 (Jan. 12, 2026); *Rambert v. City of Greenville*, 107 F.4th 388, 397 (4th Cir. 2024). To determine the objective reasonableness of an officer's actions, a court must conduct "'a careful balancing of the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham*, 490 U.S. at 396); *accord Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017). Objective reasonableness "turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham*, 490 U.S. at 396; *see Rambert*, 107 F.4th at 397).

"'The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force.'" *Lewis*, 98 F.4th at 531 (quoting *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996)). The court must "make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397; *see deWet v. Rollyson*, 157 F.4th 344, 349 (4th Cir. 2025). Moreover, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. The "objective standard adequately protects an officer who acts in good faith." *Kingsley*, 576 U.S. at 399.

In particular, courts look to several factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the individual] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see Williams v. City of Charlotte,* 2025 WL 841836, at *3 (4th Cir. Mar. 18, 2025) (per curiam); *Quinn*, 111 F.4th at 296; *Craven v. Novelli,* 2024 WL 1952590, at *7 (4th Cir. May 3, 2024) (per curiam); *E.W. by and through T.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018); *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 733 (4th Cir. 2013). But, the three *Graham* factors are not "exclusive," as other "objective circumstances potentially [could be] relevant to a

determination of excessive force." *Kingsley*, 576 U.S. at 397.  And,  this standard must be applied in a fact-sensitive manner, rather than "'mechanically.'"  *Lombardo v. City of St. Louis, Missouri*, 594 U.S. 464, 466 (2021) (per curiam) (quoting *Kingsley*, 576 U.S. at 397).

"Ultimately, the overarching inquiry is whether the force that was used was proportional under the circumstances." *Nazario v. Gutierrez*, 103 F.4th 213, 234 (4th Cir. 2024); *see Somers v. Devine*, 132 F.4th 689, 698 (4th Cir. 2025); *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). "Those circumstances include 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Lombardo*, 594 U.S. at 467 (quoting *Kingsley*, 576 U.S. at 397).  The court may also consider whether the officers had probable cause to effect an arrest, along with the severity of the crime.  *See Gardner,* 2025 WL 2206325, at \*2 (concluding that the "officers' use of force . . . was objectively reasonable" when, among other things, the "officers had probable cause to arrest" the plaintiff "for disorderly conduct").  Additionally, a court may consider whether "the officer gave 'warnings' before using force[.]" *Zorn,* 2026 WL 795469, at \*2 (quoting *Barnes*, 605 U.S. at 80).

To prevail, a plaintiff must show that "the use of force is deliberate – *i.e.*, purposeful or knowing." *Kingsley*, 576 U.S. at 396.  But, a plaintiff need not prove a defendant's "state of mind." *Id.*

A court may "separately consider non-continuous uses of force during a single incident to determine if all were constitutionally reasonable." *Streater v. Wilson*, 565 F. App'x 208, 211 (4th Cir. 2014).  That said, "'[a]rtificial divisions in the sequence of events do not aid a court's

evaluation of objective reasonableness.'" *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (brackets added) (quoting *Smith*, 781 F.3d at 101).

"At the summary judgment stage, once [the court has] viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law." *Henry*, 652 F.3d at 531 (citing *Scott*, 550 U.S. at 381 n.8); *see Rambert*, 107 F.4th at 396 (stating that "when the historical facts are settled, the question of the objective reasonableness of officers' conduct is a question of law to be decided by the court[]"); *see Armstrong v. Hutcheson*, 80 F.4th 508, 510 (4th Cir. 2023) ("When the facts are settled, as they are here, the question of objective reasonableness is for the court."). But, "if there are genuine disputes over what happened factually, courts must construe all historical facts in favor of the non-moving party to determine whether the dispute affects the outcome of the claim under the governing law." *Id.* at 514. When the court is determining whether an officer's use of force was reasonable under the Fourth Amendment, "the court must decide, under the nonmovant's version of the facts, the purely legal issue of whether a constitutional violation has occurred." *Id.* But, it is not the function of the court to decide disputed facts.

As discussed earlier, Article 24 "is the state law equivalent of the Fourteenth Amendment" to the Constitution. *Hawkins*, 955 F. Supp. 2d at 496. "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Id*. And, Article 26 is the state law equivalent to the Fourth Amendment to the Constitution. *Padilla*, 180 Md. App. at 225, 949 A.2d at 77. As a result, "Maryland courts . . . construe[] Article 26 *in pari materia* with the Fourth Amendment to the United States Constitution." *Id.* at 226, 949 A.2d at 78 (collecting cases).

**2.**

**a.  Claims of Shamdu and Mr. Nalls against Officer Amrhein**

Defendants contend that Officer Amrhein confronted Shamdu when Shamdu was attempting "to physically intervene in the arrest of Plaintiff Dmeza." ECF 47-1 at 16 (citing ECF 47-3 at 1:58). As defendants tell it, Officer Amrhein pushed Shamdu "several times in an effort to [get] him back" but Shamdu failed to "comply and then swings his arm, striking Officer Amrhein on the side of his face." ECF 47-1 at 16 (citing ECF 47-2 at 24). Defendants claim that, "in response", Amrhein deployed his taser at Shamdu just once, "and not 'in the groin area' but on [Shamdu's] upper thigh as the dot of light from the taser indicates." ECF 47-1 at 16 (citing ECF 47-3 at 2:16). Further, defendants claim that Officer Amrhein then "roll[ed]" Shamdu "onto his stomach and another officer place[d] him in handcuffs." ECF 47-1 at 16 (citing ECF 47-3 at 2:17).

According to defendants, "a single use of a taser under these circumstances was a reasonable use of force." ECF 47-1 at 17.[23] They posit that a reasonable officer in Amrhein's position would have "perceive[d] some immediate danger," *id.*, because Shamdu "had just assaulted" Officer Amrhein "and was a large man . . . ." *Id.* at 16.

Plaintiffs dispute that Shamdu "struck" Officer Amrhein. ECF 50-1 at 22 n.16. According to plaintiffs, when Officer Vitacco threw Dmeza to the ground, Shamdu "raised his hands in the air, in an attempt to indicate he was not a threat." ECF 50-1 at 22 (citing ECF 50-17 at 2:37-2:44). They claim that "[t]he only support" defendants provide for their contention is their own Statement

---

[23] Defendants claim that because "Plaintiffs do not address th[e] use of the taser" by Officer Amrhein "in their opposition" they have "abandoned that part of this excessive force claim." ECF 54 at 12 n.10. This assertion is specious. Plaintiffs describe the use of force against Shamdu in their Opposition, including Officer Amrhein's use of the taser, and claim that the force was excessive. *See* ECF 50-1 at 22–24.

of Probable Cause, "which has been shown to contain misleading and/or false allegations." *Id.* at 22 n.16; *see* ECF 50-1 at 22.

"Deploying a taser is a serious use of force." *Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 903 (4th Cir. 2016). Nevertheless, defendants maintain that Officer Amrhein's use of force was reasonable. ECF 47-1 at 16–17. They rely, *inter alia*, on *Brooks,* 924 F.3d 104. *See* ECF 47-1 at 16. *Brooks* is inapposite.

In *Brooks*, 924 F.3d at 107, a prison correctional officer tased a prisoner three times because the prisoner "refused to hold still for an identification photograph." Six officers became involved in an effort to compel the prisoner to take the photograph. *Id.* at 108. For over seven minutes, Brooks resisted. *Id.* Then, while two officers held "Brooks in place," another officer tased Brooks three times. *Id.* at 109. Plaintiff fell and experienced a knee injury. *Id.*

The officer who deployed the taser was dismissed from the case early on because of a procedural issue. *Id.* at 109–10. The remaining officers had been "present during the incident but did not themselves deploy the taser." *Id.* at 110. Because they had not operated the taser, plaintiff sought relief under the theory of bystander liability. *Id.* Defendants moved for summary judgment, asserting that plaintiff's claim failed because the tasing officer had not acted unlawfully. *Id.* The district court granted defendants' motion, finding that the record, viewed in the light most favorable to Brooks, "failed as a matter of law to establish an Eighth Amendment violation." *Id.*

The Fourth Circuit considered the "critical Eighth Amendment question" of whether the use of the taser was made "'in a good faith effort to maintain or restore discipline' or 'maliciously' and 'for the very purpose of causing harm[.]'" *Id.* at 108 (citation omitted). The Court explained that an Eighth Amendment excessive force claim involves both an objective and a subjective component. *Id.* at 112. In vacating the district court's grant of summary judgment, the Fourth

Circuit said, *id.*: "[W]e think a reasonable jury could find that the officer used multiple shocks not to induce Brooks's cooperation, but to punish him for his intransigence . . . ." And, said the Fourth Circuit, the district court erred in deciding a question that was for the jury. *Id.* at 111.

But, the case sub judice does not implicate the Eighth Amendment. And, pertinent here, the Court in *Brooks* pointed out that the same test does not apply to an excessive force claim under the Fourth Amendment. *Id.* at 113. In a footnote, the Court explained "that under the Fourth Amendment, our court has held that because a taser deployment is such a serious use of force, a police officer ordinarily may use a taser against a suspect only in 'a situation in which a reasonable officer would perceive some immediate danger,' and not to compel compliance with police commands." *Id.* at 118 n.5 (quoting *Armstrong*, 810 F.3d at 903).

*Armstrong*, 810 F.3d 892, is also instructive. There, the Fourth Circuit reviewed the district court's grant of summary judgment to the defense in a case in which police officers attempting to execute an involuntary commitment order used a taser multiple times on a mentally ill man who was non-violent. *Id.* at 897, 906. He died as a result. *Id.* at 898.

At the relevant time, Armstrong was seated outdoors, on the ground, "hugging" a signpost, and surrounded by six people, including three police officers and two hospital security officers. *Id.* at 897, 906. The Court characterized Armstrong as "a mentally ill man being seized for his own protection." *Id.* at 906. In its view, with Armstrong seated on the ground, "[a] reasonable officer would have perceived a static stalemate with few, if any, exigencies—not an immediate danger so severe that the officer must beget the exact harm the seizure was intended to avoid." *Id.* Further, the *Armstrong* Court instructed that "'the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance . . . are ordinarily different from those involved

in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense.'" *Id.* at 900 (citing *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010)).

With respect to the second and third *Graham* factors, the Court emphasized: "The degree of force necessary to prevent an individual who is affirmatively refusing to move from fleeing is obviously quite limited." *Armstrong*, 810 F.3d at 901. Moreover, the Court addressed the circumstance of "resisting the seizure." *Id.* In effect, the Court indicated that resistance is not a one-size-fits-all circumstance. Pertinent here, the Court said, *id.* at 901–02 (emphasis added):

> *Noncompliance with lawful orders justifies some use of force, but the level of justified force varies based on the risks posed by the resistance. See Bryan*, 630 F.3d at 830 ("'Resistance,' however, should not be understood as a binary state, with resistance being either completely passive or active . . . . Even purely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.") And, here, the factual circumstances demonstrate little risk— Armstrong was stationary, non-violent, and surrounded by people willing to help return him to the Hospital. That Armstrong was not allowing his arms to be pulled from the post and was refusing to comply with shouted orders to let go, while cause for some concern, do not import much danger or urgency into a situation that was, in effect, a static impasse.

The Court pointed out that "different seizures present different risks of danger." *Id.* at 904 (citing *Parker v. Gerrish*, 574 F.3d 1, 9 (3rd Cir. 2008) ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault.")). The Court observed that it has consistently "declined to equate conduct that a police officer characterized as resistance with an objective threat to safety entitling the officer to escalate force." *Armstrong*, 810 F.3d at 905. Significantly, the Court also said, *id.:* "At bottom, 'physical resistance' is not synonymous with 'risk of immediate danger.'[]"

In examining the proportionality of the defendants' response, the Court indicated that Fourth Circuit precedent "makes clear that tasers are proportional force *only* when deployed in

response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser." *Id.* at 903 (emphasis in *Armstrong*); *see also id.* at 905 (stating that a police officer "may *only* use serious injurious force, like a taser, when an objectively reasonable officer would conclude that the circumstances present a risk of immediate danger that could be mitigated by the use of force") (emphasis in *Armstrong*).   The Court warned: "Force that imposes serious consequences requires significant circumscription." *Id.* at 903.

Also of import, the Court stated: "While the questions whether an arrestee has been restrained and is complying with police directives are, of course, relevant to any inquiry into the extent to which the arrestee 'pose[s] a continuing threat to the officers' safety,' they are not dispositive." *Id.* at 903–04 (quoting *Meyers*, 713 F.3d at 733) (alteration in *Armstrong*).   Indeed, said the Court, "even noncompliance with police directives and nonviolent physical resistance do not necessarily create 'a continuing threat to the officers' safety.'" *Armstrong*, 810 F.3d at 904 (quoting *Meyers*, 713 F.3d at 733).

Notably, the Court admonished: "A rule limiting taser use to situations involving a proportional safety threat does not countenance use in situations where an unrestrained arrestee, though resistant, presents no serious safety threat." *Armstrong*, 810 F.3d at 904.   Indeed, said the Court: "Painful, injurious, serious inflictions of force, like the use of a taser, do not become reasonable simply because officers have authorization to arrest a subject who is unrestrained." *Id.*

The Court concluded that the officers' use of the taser constituted excessive force under the Fourth Amendment. *Id.* at 906.   Nonetheless, the Court determined that the officers were entitled to qualified immunity.   It reasoned that the law at the time did not clearly establish that the use of the taser was unconstitutional. *Id.* at 903, 909.

As indicated, the *Armstrong* Court cited its earlier decision  in *Meyers*, 713 F.3d 723.  *See, e.g.*, *Armstrong*, 810 F.3d at 903.  *Meyers* also involved the use of a taser resulting in death, and provides guidance.

In *Meyers*, members of the BCPD entered the residence of Ryan Meyers,[24] "responding to a report of domestic violence involving Ryan and members of his family."  *Meyers*, 713 F.3d  at 726.  Ryan was forty years old at the time.  *Id.* at 727.  He "had been diagnosed with bipolar disorder at the age of fifteen, and struggled with this mental illness throughout his adulthood."  *Id.* At the time of the encounter, Ryan was six feet tall and weighed about 260 pounds.  *Id.*  at 728.

When the first officer arrived at the Meyers residence, he found Ryan's father and brother in the front yard.  *Id.* at 727.  Ryan's father was "holding a towel against his face to cover a laceration on his nose, which also was swollen."  *Id.*  Ryan's father informed the police officer that "Ryan was inside the home, and that [Ryan's mother] had fled and would not return until the police had removed Ryan from the premises."  *Id.*  From the police officer's "vantage point on the porch of the residence," he "could see that Ryan was pacing inside the house carrying a baseball bat." *Id.*  Ryan's brother informed the officer that before Ryan's mother called the police a fistfight between the brothers had taken place.  *Id.*  Ryan's brother also informed the officer that Ryan was "bipolar" and had mental health issues.  *Id.*

Two other officers arrived at the residence, one of whom was "trained to use a taser[.]"  *Id.* The officers entered the home, and one "ordered Ryan to drop the baseball bat."  *Id.* at 728. According to Ryan's brother, one of the officers then "deployed his taser almost immediately after ordering Ryan to drop the bat, without giving Ryan time to comply with the officer's command."

---

[24] Like the Fourth Circuit in *Meyers,* 713 F.3d 723, I will refer to Ryan Meyers by his first name.

*Id.* "[I]t is undisputed that Ryan was holding the bat when he first was struck by the taser's probe, and that Ryan may have taken a step toward the officers immediately before the probe made contact with his body." *Id.* After the first taser shock, Ryan "did not drop his bat or fall to the floor[.]" *Id.* The tasing officer claimed that after the first shock, "Ryan was still holding the baseball bat and took two more steps toward the officers." *Id.* But, according to Ryan's brother, "Ryan went into convulsions and exclaimed, 'I give up. I give up. Stop. Stop. I give up.'" *Id.* The officer tased Ryan again, causing him "to drop his bat", although Ryan remained "standing and again advanced toward the officers." *Id.* Then, the officer tased Ryan a third time, causing Ryan "to fall to the ground." *Id.*

After Ryan fell to the ground, three officers "sat on Ryan's back." *Id.* Then, the officer tased Ryan for a fourth time. *Id.* The officer then changed the taser's mode and, during a period of slightly more than one minute, "delivered six additional taser shocks to Ryan, which each lasted between two and four seconds." *Id.* After Ryan was tased for the tenth time, "the officers observed that Ryan appeared to be unconscious." *Id.* at 729. An ambulance arrived and found "Ryan in a state of cardiac arrest" and were unable to revive him. *Id.*

Ryan's parents brought suit under § 1983, alleging that "the officers' actions leading to Ryan's death violated his Fourth Amendment rights" and Maryland law. *Id.* The district court (Legg, J.) "held that all three officers involved in the incident were entitled to qualified immunity and awarded summary judgment in their favor." *Id.*

On appeal, the Fourth Circuit determined that the district court erred in awarding summary judgment "in favor of the officer who repeatedly activated his taser at Ryan." *Id.* The Court concluded that the officer's use of his taser the first three times "did not amount to an unreasonable or excessive use of force." *Id.* at 733. It reasoned that "[d]uring the period that" the officer

60

"administered the first three taser shocks, Ryan was acting erratically, was holding a baseball bat that he did not relinquish until after he received the second shock, and was advancing toward the officers until the third shock caused him to fall to the ground." *Id.*  Therefore, the Court ruled that "Ryan posed an immediate threat to the officers' safety, and was actively resisting arrest." *Id.*

But, the Court also determined that: "(1) the one officer's use of the taser was not objectively reasonable after Ryan ceased actively resisting arrest; and (2) a reasonable person in the officer's position would have known that the use of a taser in such circumstances violated clearly established constitutional rights." *Id.* at 726.

With respect to the seven taser shocks that were deployed against Ryan, the Fourth Circuit determined that the officer was not entitled to qualified immunity. *Id.* at 733–35.  It reasoned: "It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest." *Id.* at 734.

The Court also recognized that it was clearly established that "'officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity.'" *Id.* (quoting *Bailey v. Kennedy,* 349 F.3d 731, 744–45 (4th Cir. 2003)).  Because "Ryan was unarmed and effectively was secured with several officers sitting on his back," the Court reasoned that "the seven additional taser shocks administered" by the officer "were clearly 'unnecessary, gratuitous, and disproportionate.'" Therefore, the officer was not entitled to qualified immunity.  *Id.* at 735

61

(quoting *Bailey*, 349 F.3d at 744–45).  The Court remanded the case to the District Court for further proceedings.[25]

Both *Meyers*, 713 F.3d 723, and *Armstrong*, 810 F.3d at 903, make clear that the determination of whether a suspect posed a threat to officers is a factor in the reasonableness analysis.  But, as stated, *Armstrong* also makes clear that "'physical resistance' is not synonymous with 'risk of immediate danger.'[]"  *Id.* at 905.

Furthermore, since 1993, the Fourth Circuit has "warned officers that it is unreasonable to escalate force against a non-dangerous suspect that [sic] is secured or under control, even if that control is brief."  *Lewis,* 98 F.4th at 535; *see Valladares v. Cordero*, 552 F.3d 384, 390–91 (4th Cir. 2009) (recognizing that an officer could not use "unnecessary, gratuitous, and disproportionate" force after the officer had the plaintiff "under full control"); *Bailey*, 349 F.3d at 745 (recognizing that it is clearly established that the officers could not use force after the plaintiff was secured, face down, on the floor, in handcuffs and leg restraints, had not committed a crime, and was not a danger to himself or others); *Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir. 1993) (per curiam) (stating that it is clearly established that once a suspect is pinned to the ground the officer should not use additional force).  The Fourth Circuit has reiterated that, "continuing to apply force to a secured unarmed man, to effectuate a seizure for which the individual's own benefit provides the only justification, constitutes excessive force in violation of the Fourth Amendment."  *Lawhon v. Mayes*, 2021 WL 5294931, at *2 (4th Cir. Nov. 15, 2021).

In Officer Amrhein's response to plaintiffs' interrogatories, ECF 47-2 at 24, he recounted that, as he approached the scene, he saw Officer Lehnert "restrain" Shamdu, "a very large man

---

[25] By the time of the remand, Judge Legg had retired.  The case was reassigned to me for trial.

(approximately 6'5 315 lbs)[.]" *Id.* Officer Amrhein added that Shamdu was "aggressively screaming, balling his fists, and attempting to get to Officer Vitacco." *Id.* Officer Amrhein claimed that he placed himself between Shamdu and Officer Vitacco "to prevent [Shamdu] from being able to reach Officer Vitacco." *Id.* According to Officer Amrhein, Shamdu "pushed off of" Officer Amrhein "with all of his might, and then spun around and struck [Officer Amrhein] in the left side of [his] face with [Shamdu's] hand/wrist." *Id.*

According to Officer Amrhein, Shamdu posed a threat to the officers' safety because he was actively resisting arrest, he struck Amrhein, and he was not "'secured[.]'" ECF 54 at 12 (quoting ECF 50-1 at 24). Specifically, defendants claim that Shamdu was not handcuffed or pinned to the ground when Officer Amrhein tased him. *Id.* The body camera footage shows that, when Amrhein deployed the taser, Shamdu was standing with his back pressed against the police cruiser, with at least one hand in the air, facing Amrhein. ECF 50-14 at 2:09–2:14. Shamdu's alleged strike of Amrhein, and his alleged resistance, if credited, would support a finding that Officer Amrhein reasonably perceived that he or the other officers were in danger.

However, plaintiffs provide quite a different account of events. They dispute that Shamdu struck Officer Amrhein and they contend that he did not actively resist arrest.

The video footage of Officer Amrhein and Officer Lehnert does not show that Shamdu hit Officer Amrhein. *See* ECF 50-17; ECF 50-14. Nor do defendants point to any body camera footage that captures the alleged strike by Shamdu. *See* ECF 47-1 at 16. Rather, Officer Amrhein's body camera video shows the officer running to the scene and then standing in front of Shamdu while Shamdu shouts, "Yo, that's my mother." ECF 50-14 at 1:58–2:07. Shamdu was obviously distraught. But, unlike the decedent in *Meyers,* 713 F.3d at 733, Shamdu was not holding a weapon. Nor was he advancing towards the officers when the taser was deployed.

63

Additionally, although the body camera footage shows that Shamdu was no longer restrained by Officer Lehnert when Officer Amrhein deployed his taser, the footage does not establish if Shamdu became unrestrained because he was resisting arrest or because, as plaintiffs allege, the defendants and Shamdu stumbled. *See* ECF 50-14 at 1:58–2:09; ECF 50-1 at 22. The video becomes blurry but a thud can be heard on the audio. *Id.* at 2:07–2:10. According to plaintiffs, this thud was the result of Officer Lehnert shoving Shamdu into a police vehicle. ECF 50-1 at 22 (citing ECF 50-13 at 2:08-2:13).

The exact location where the taser was deployed on Shamdu's body is also disputed. Defendants claim that the taser struck on Shamdu's upper thigh, where the red dot appeared. Plaintiffs contend that the taser was deployed to Shamdu's "groin area." ECF 50-1 at 23. And, in the BWC, Shamdu exclaims that he was tased near his genitalia. ECF 50-13 at 2:29-2:33.

In sum, there are genuine disputes of material fact as to whether Shamdu struck Officer Amrhein, whether Shamdu was resisting arrest, how Shamdu came to be unsecured, and whether Shamdu posed a "serious safety threat" that would render Officer Amrhein's use of the taser reasonable and proportional. *See Armstrong*, 810 F.3d at 903–05. In the light most favorable to Shamdu, the reasonableness of Officer Amrhein's use of force cannot be resolved at summary judgment. It will be the role of the jury to resolve the factual disputes. *See Williams*, 2025 WL 841836, at *3 (finding there was a "genuine dispute of material fact regarding the [plaintiff's] excessive force claim", and noting that, among the circumstances leading to the use of force, the plaintiff "shoved" an officer attempting to subdue her).

As to Mr. Nalls, plaintiffs allege that Officer Amrhein shoved Mr. Nalls's head "toward the pavement" and dry stunned Mr. Nalls with his taser. ECF 50-1 at 26. Plaintiffs also cite Officer Amrhein's IAS statement, in which he stated that he struck Mr. Nalls with a hammer fist

on the top of his skull, attempted to tase him, may have dry stunned him, and kicked Mr. Nalls in the head with a glancing blow, although he was not sure if his kick connected with Mr. Nalls. *Id.* at 27 (citing ECF 50-20 at 24:28–24:33; 24:4–24:57); *see* ECF 50-20 at 24:45–25:13, 20:30-21:00.

In Reply, defendants claim that "[t]he force used by Defendant Amrhein [against Mr. Nalls] is not unreasonable . . . [f]or the same reason, the use of force by Defendants Schulman, Halstead, and Vitacco . . . is not excessive." ECF 54 at 14.

The body camera footage makes clear that Officer Amrhein was among the four officers who converged on Mr. Nalls before he was handcuffed. *See* ECF 50-14 at 2:57–3:47. But, the video does not make clear what force Officer Amrhein actually used on Mr. Nalls. Nor does the video contradict plaintiffs' version of events.

Again, it is not the role of the Court to decide factual disputes. Officer Amrhein is not entitled to summary judgment as to Mr. Nalls.

### b. Claims of Shamdu against Officer Lehnert

Defendants contend that the body camera footage shows that Officer Lehnert used "reasonable" force against Shamdu. ECF 47-1 at 21. In their view, the video "reveals" that Shamdu took "a swing at Officer Amrhein, striking the officer in the face." *Id.* (citing ECF 47-3 at 2:07; ECF 47-2 at 24). Therefore, defendants argue that "it was reasonable for Officer Lehnert to conclude" that Shamdu "hit or attempted to hit a police officer[.]" ECF 47-1 at 21. Accordingly, they insist that "grabbing" Shamdu, "even pulling [Shamdu] into a police car", was "not unreasonable force." *Id.* at 22.

Plaintiffs dispute defendants' account of events. *See* ECF 50-1 at 22. As discussed, plaintiffs maintain that Shamdu did not strike Officer Amrhein. ECF 50-1 at 22 n.16. And, the body camera footage does not blatantly contradict plaintiffs' assertions. *See* ECF 50-14 at 1:58–

65

2:13.   Moreover, according to plaintiffs, both Officer Lehnert and Officer Amrhein pushed Shamdu backward and "the trio began to stumble[.]"  ECF 50-1 at 22.   And, as indicated, the BWC does not clearly establish how Shamdu became unrestrained.  ECF 50-14 at 1:58–2:09.

Then, according to plaintiffs, the camera footage captures Lehnert "wrapp[ing] his  right arm around Shamdu's torso, and dr[iving] his right shoulder into Plaintiff's abdomen with such force to drive Plaintiff into the marked police vehicle, where [Shamdu] lands with an audible thud." *Id.* at 22 (citing ECF 50-14 at 2:08-2:13).  Plaintiffs assert: "The impact caused a large dent to the police vehicle."  ECF 50-1 at 22–23 (citing ECF 50-18).  And, according to plaintiffs, Shamdu "was under control when Defendant Lehnert drove his shoulder into Plaintiff's torso, before being thrown into the police cruiser."  ECF 50-1 at 23.

Further, plaintiffs claim that after Officer Lehnert pushed Shamdu into the police cruiser, "Lehnert continued to hold" Shamdu as Defendant Vicarini shouted, 'Tase him!' and Defendant Amrhein fired the Taser into Plaintiff Caleb's groin area."  *Id.* (citing ECF 50-14 at 2:10–2:15). But, Officer Amrhein's BWC, which plaintiffs cite in support of this assertion, does not show that Officer Lehnert was holding Shamdu when Amrhein deployed his taser.  ECF 50-14 at 2:10–2:15. Rather, Officer Amrhein's body camera shows that Shamdu was standing with his body pushed against the police cruiser and no one was behind him.  *Id.*

Plaintiffs also discuss conduct that occurred while Shamdu was in handcuffs.  They assert: "Defendant Schulman approached and pushed [Shamdu's] head down, as Defendant Lehnert pulled [Shamdu] up by his arms, causing further injury."  *Id.* (citing ECF 50-17 at 3:50–4:00).

As to the push of Shamdu into the police car, defendants argue that the video "shows merely that [Shamdu] fell into the car[.]"  ECF 47-1 at 22.  They posit that "if Officer Lehnert had pulled [Shamdu] into the police car Officer Lehnert would have been beside" him "when he hit

the police car[.]"   ECF 47-1 at 21 (citing ECF 47-3 at 2:11).  In addition, defendants dispute that Officer Lehnert "used constitutionally unreasonable force when he 'pulled [Shamdu] up by his arms.'"  ECF 54 at 11 (quoting ECF 50-1 at 23).[26]  Defendants insist that this use of force was reasonable, asking: "[H]ow else should a police officer bring a handcuffed person to his feet?"  *Id.*

To the extent that Shamdu premises his claim of excessive force against Officer Lehnert on the allegation that Lehnert was holding Shamdu when he was tased, the allegation is contradicted by the body camera video.

During the time period where plaintiffs allege that Officer Lehnert pushed Shamdu into the police car, Lehnert's body camera footage is blurry.[27]  *See* ECF 50-17 at 2:58–3:06.  Amrhein's BWC shows his hand on Shamdu's chest before the three men fell backward between the cars in the parking lot.  ECF 50-14 at 1:59–2:00.  It also shows Shamdu moving backwards toward the police car and then colliding with the vehicle.  Although Amrhein's BWC shows that Shamdu had contact with the car, it does not clearly show what caused Shamdu's body to hit the car.  On the other hand, the BWC does not blatantly contradict plaintiffs' assertion that Officer Lehnert forcefully pushed Shamdu into the vehicle.  *See id.* at 2:11–2:13.

Before Officer Lehnert restrained Shamdu by the arms, Shamdu pushed past Officer Lehnert.  *See* ECF 50-13 at 0:34–0:37.  To be sure, Shamdu was not initially a criminal suspect.

---

[26] According to defendants, plaintiffs "cannot rely upon" this allegation "to defeat a motion for summary judgment" because it was not included "in their Amended Complaint."  ECF 54 at 11–12.  This is specious.  Of import, a plaintiff need not include every factual detail in a complaint to satisfy Rule 8(a)(2).  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable, and . . . recovery is very remote and unlikely."  *Id.* at 556 (internal quotation marks omitted).  Notably, defendants do not claim that this contention was never disclosed during discovery.

[27] Officer Lehnert's body camera also does not capture a clear visual of Officer Amrhein deploying his taser.  *See* ECF 50-17.

And, he had expressed concern for his sister (Shaneris) and his mother (Dmeza). But, shoving an officer is an assault. This factor weighs against Shamdu. *See Valladares*, 552 F.3d at 390 (agreeing with the district court's analysis that the first *Graham* factor weighed against the arrestee, the plaintiff's minor son, because the arrestee shoved an officer). After this push, Officer Lehnert ordered Shamdu to turn around. Notably, Shamdu put his hands up, with his palms open, at his chest level, indicating he was not a threat. ECF 50-17 at 2:37–2:38.

As to the second factor, after Officer Amrhein, Officer Lehnert, and Shamdu stumbled, Shamdu was temporarily unrestrained. In the light most favorable to plaintiffs, it was reasonable for Officer Lehnert to perceive that Shamdu posed an immediate threat to the officers, because he was no longer restrained. Therefore, the second factor weighs in favor of Officer Lehnert.

According to plaintiffs, Shamdu was not resisting arrest, the third *Graham* factor. Whether Shamdu was temporarily unrestrained because he resisted arrest by breaking free of the officers' grasp or because the three tumbled, as plaintiffs claim, is a question for the jury. Regardless, Shamdu was not restrained. Officer Lehnert was certainly entitled to regain control of Shamdu.

However, in doing so, plaintiffs emphasize the extreme force of the impact when Officer Lehnert pushed Shamdu into the police car. Indeed, as a result, the car was dented. ECF 50-1 at 22.

"It is well-established that law enforcement officers are entitled to use the amount of force necessary to take an individual into custody." *Harmon v. Buchanan*, 164 F. Supp. 2d 649, 655 (W.D.N.C. 2001). And, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson*, 481 F.2d at 1033). To the extent plaintiffs allege that the manner in which Lehnert brought Shamdu to a standing position constituted excessive force, the same maxim

68

applies.  But, in the light most favorable to plaintiff, shoving Shamdu into the police car with such violent force as to dent the vehicle could be regarded as disproportionate.  There is a dispute of material fact as to whether Shamdu struck Officer Amrhein before he and other officers used force to subdue and handcuff Shamdu.  This factual question could alter the reasonableness of the force used by both Officer Lehnert and Officer Amrhein after Shamdu became unrestrained.  But, viewing the evidence in light most favorable to Shamdu,  Officer Lehnert is not entitled to summary judgment as to Shamdu's claim of excessive force.

### c.  Claims of Mr. Nalls against Officer Schulman

Mr. Nalls claims use of excessive force by Officer Schulman.  Defendants contend that "Officer Legge's body worn camera shows that" Officer Schulman "interven[ed] when Plaintiff Nalls accosted Officer Vitacco as he was struggling with Plaintiff Dmeza." ECF 47-1 at 22 (citing ECF 47-4 at 5:51).  They assert that the video shows Officer Schulman grabbing Nalls "from behind" and "pull[ing] him away toward a car." *Id.* at 22.

Of import, plaintiffs describe significant force used by Schulman.  According to plaintiffs, "almost immediately" after Officer Vitacco struck Mr. Nalls with his right hand, causing him to stumble, Officer Schulman "suddenly tackled" Mr. Nalls "from behind and slammed him onto the trunk" of Shaneris's vehicle.  ECF 50-1 at 25.  Moreover, plaintiffs claim that "Schulman had turned off his body-worn camera and failed to turn it back on until after" he pushed Mr. Nalls into the trunk of Shaneris's car.  *Id.* at 25 n.17.[28]  Plaintiffs allege that Officer Schulman's actions resulted in "an audible 'thud.'"  *Id.* at 25 (citing ECF 50-13 at 0:43–0:45).

---

[28] As discussed, Officer Schulman's BWC temporarily stopped recording but the recording resumed later during the fracas.  *See* ECF 50-10; ECF 50-11.  The Court does not know whether Officer Schulman's body camera stopped recording because of a technical difficulty or because Officer Schulman manually turned it off.  Additionally, plaintiffs' counsel does not provide

Further, plaintiffs claim: "When Defendant Schulman finally turned his camera back on, he was talking to [Mr. Nalls], who had his hands out to the side, palms open." ECF 50-1 at 25 (citing ECF 50-10 at 0:00). According to plaintiffs, Mr. Nalls was pleading with Officer Schulman as "his wife was being detained, and the rest of his family was being assaulted." *Id.* (citing ECF 50-10 at 0:10–0:30). Plaintiffs assert that during this time, Officer Schulman "pushed" Mr. Nalls "off the curb, twice, but [Mr. Nalls] continued to plead, stating Plaintiff Dmeza was not resisting arrest." *Id.* (internal citation omitted).

According to plaintiffs, the following interactions with Officer Schulman precipitated the subsequent assault of Mr. Nalls, *id.* at 25–26 (internal citations omitted):

> "[Officer Schulman and Mr. Nalls] appeared to be somewhat calm for a moment, until Defendant Schulman ordered Plaintiff Veraby – who had his back literally against a fence – to 'Get back!'. Defendant Schulman continued to demand Plaintiff Veraby back up, despite the Plaintiff being physically unable to do so. Without any other option, Plaintiff Veraby extended his arms to create space between the two. While Plaintiff Veraby's back was still against the fence, Defendant Schulman grabbed Plaintiff's forearms. At this time, Plaintiff Veraby was clearly afraid for his own safety, and pushed on Defendant Schulman to make space. Defendant Schulman grabbed Plaintiff's forearms again, before shoving him backward into Plaintiff Shaneris's car, again. As Plaintiff Veraby struck the vehicle, Defendant Halstead rushed him, followed by Defendant Schulman. The pair pushed Plaintiff Veraby between the vehicles, and Defendant Halstead claims Shamdu Veraby struck him on the left side of the face. However, this is unsupported by any video footage."

It is at this point that plaintiffs claim that "an all-out assault" of Mr. Nalls began. *Id.* at 26. As to Officer Schulman, plaintiffs claim that he hit Mr. Nalls in the face, citing Officer Schulman's IAS statement in which he claimed he struck Mr. Nalls in the face two or three times. ECF 50-1 at 27 (citing ECF 50-6 at 6:55, 7:22–7:37).

---

information for any BCPD regulations regarding a police officer's obligation to activate his body worn camera.

Of import, Officer Schulman's action of pulling Mr. Nalls into Shaneris's car occurred before Mr. Nalls pushed Officer Schulman. *See* ECF 50-13 at 0:43-45; ECF 50-10 at 0:37–0:40. With respect to Officer Schulman's alleged push of Mr. Nalls into Shaneris's car, Officer Legge's body camera footage shows an interaction between Officer Schulman and Nalls, where Nalls comes close to Officer Vitacco. ECF 50-13 at 0:42-45. However, the footage does not make clear, as plaintiffs allege (ECF 50-1 at 25), whether Officer Vitacco struck Nalls. ECF 50-13 at 0:39–0:45. This is an important factual question that is relevant to the reasonableness of Officer Schulman's use of force in pushing Nalls into Shaneris's car. If, in fact, Vitacco struck Nalls, Schulman's conduct would seem gratuitous.

Considering the *Graham* factors, at the time Officer Schulman allegedly pushed Mr. Nalls into the vehicle, Mr. Nalls had not assaulted any police officer. At most, he verbally protested the arrest of a woman he considered his wife. Therefore, the severity of the crime cuts against Officer Schulman's use of force against Mr. Nalls.

As to the second factor, in the light most favorable to plaintiffs, Mr. Nalls was verbally protesting Dmeza's arrest and he was in close proximity to her. But, he did not pose an immediate threat to the officers. As to the third factor, Mr. Nalls was not under arrest when Officer Schulman pushed him into Shaneris's vehicle, and he was not resisting. The Fourth Circuit has stated that since "November 2011, a police officer's unprovoked tackling of a nonthreatening, nonresisting misdemeanor suspect to effect his arrest violates the Fourth Amendment." *Barfield v. Kershaw Cnty. Sheriff's Off.*, 638 F. App'x 196, 203 (4th Cir. 2016).

A jury may find that, as defendants allege, Officer Schulman pushed Mr. Nalls because Nalls was "accost[ing] Officer Vitacco as he was struggling with Plaintiff Dmeza." ECF 47-1 at 22. This factual determination may affect the reasonableness analysis as to Officer Schulman's

71

use of force. But, this is not a factual dispute for the Court to resolve. Construing the evidence in the light most favorable to plaintiffs, Officer Schulman is not entitled to summary judgment with respect to Mr. Nalls's claim of excessive force in pushing him into Shaneris's car.

Plaintiffs allege that Officer Schulman, along with Officer Halstead, Officer Amrhein, and Officer Vitacco, subsequently assaulted Mr. Nalls. In particular, Officer Schulman inflicted multiple strikes to Mr. Nall's head. ECF 50-1 at 26–27. On these facts, for reasons discussed in the context of Nalls's claims against Officer Halstead, I cannot conclude, as a matter of law, that Officer Schulman's use of force against Mr. Nalls was reasonable.[29]

### d. Claims of Dmeza and Mr. Nalls against Officer Vitacco

Plaintiffs allege that Officer Vitacco "violently assaulted" Dmeza "by slamming" her "into a large metal fence[.]" ECF 21, ¶ 41. They also allege that Officer Vitacco "violently threw" Dmeza "face first into the concrete sidewalk next to the fence" and "violently pressed his knee on top of Plaintiff's head as her face pressed into the concrete." *Id.* ¶ 45. In addition, plaintiffs claim that Dmeza "attempted to surrender at numerous points, only using defensive maneuvers against the physical attack, and she made no attempt to flee." ECF 50-1 at 21 (citing ECF 50-12 at 0:52-1:01; 1:01-1:10; 1:10-1:35; 1:35-1:40).

Defendants argue that Officer Vitacco's use of force against Dmeza was "not unreasonable" under the Fourth Amendment. ECF 47-1 at 23. In their view, Officer Vitacco's

---

[29] As to Shamdu, defendants claim that "any allegations in Plaintiffs' opposition regarding excessive force by Defendant Schulman against [Shamdu] are not properly before this Court" because "such allegations" do not "appear in the Amended Complaint." ECF 54 at 12. In their Opposition, plaintiffs describe the use of force by Officer Schulman against Shamdu, but do not claim that his use of force was unreasonable. ECF 50-1 at 23. In any event, the Court previously dismissed Shamdu's claim of excessive force against Officer Schulman. ECF 27 at 34; ECF 28. That claim is not before the Court.

body camera footage shows that "at worst" he pushed Dmeza against the fence with "minimal force." *Id.* (citing ECF 50-12 at 0:58–1:00). And, they posit that "taking a struggling arrestee . . . to the ground to gain control is not unreasonable force." ECF 47-1 at 24.

But, defendants acknowledge that the "video shows Officer Vitacco taking [Dmeza] with some force down to the sidewalk." *Id.* However, they argue that if Vitacco had taken Dmeza face first, as plaintiffs claim, "Dmeza would be able to prove some serious or permanent injury (evidence of which she has not produced) and at the very least there would [sic] some obvious facial injury such as a scrape or bleeding."[30] *Id.* Instead, defendants claim that the "video shows" Dmeza's "face with no visible injury after" Officer Vitacco pushed her into the concrete. *Id.*

Defendants also concede that the body camera footage shows "Officer Vitacco putting his knee on the back of Plaintiff Dmeza's neck or head[.]" *Id.* However, defendants contend that Officer Vitacco did not do this "'violently[.]'" *Id.* (quoting ECF 21, ¶ 45) (citing ECF 47-10 at 3:20). Moreover, defendants claim that Officer Vitacco placed his knee on Dmeza for "less than twenty seconds, stopping as soon as he gets handcuffs on" her. ECF 47-1 at 24. And, because Dmeza was "struggling with two officers and refusing multiple commands," and because "she cannot prove any serious or permanent injury," defendants contend that the force used against Dmeza by Officer Vitacco was "not unreasonable under the Fourth Amendment." *Id.*

Furthermore, defendants contend that even if, as plaintiffs claim, "the video shows that Defendant Vitacco struck" Dmeza "once in the back of the head", plaintiffs cite no case law "for the proposition that using such force on a suspect who is refusing to comply with many, many

---

[30] Defendants do not cite authority for the proposition that only permanent injury constitutes injury sufficient to establish excessive force.

commands to put her hands behind her back and struggling with two officers . . . is constitutionally unreasonable force." ECF 54 at 10–11.

As noted, defendants claim that Dmeza did not suffer injuries as a result of Officer Vitacco's use of force. But, the evidence is to the contrary. The images of Dmeza's face after the interaction with Officer Vitacco show bleeding and abrasions on her forehead. ECF 50-15.

In the light most favorable to Dmeza, Officer Vitacco's body camera footage shows that he initially moved Dmeza toward the fence by grabbing her arm, to which she responded, "No, no." ECF 50-12 at 0:53-1:00. She also proclaimed that she did not do anything. *Id.* at 1:00–0:03. It is difficult to decipher what transpired next before Dmeza ends up on the ground, and she appears to be face down. *Id.* at 1:05–1:10. Once on the ground, Officer Harshadavid instructed Dmeza to put her hands behind her back, while holding one of Dmeza's hands, with Officer Vitacco taking her other arm and moving her body a short distance down the sidewalk. *Id.* at 1:35–1:45; ECF 50-16 at 2:46–2:54. During the interaction, Dmeza states, "I'm not fighting" and "I'm calm." ECF 50-12 at 1:36–1:48.

Defendants premise their contention that Officer Vitacco's use of force was reasonable on their assertion that Dmeza refused many commands to put her hands behind her back. ECF 54 at 10. It is undisputed that both Officer Harshadavid and Officer Vitacco told Dmeza several times to put her hands behind her back. Dmeza's protests, heard in the video, that she was "not fighting" and was "calm", and the apparent forceful treatment of Dmeza by Officer Vitacco could be construed by the factfinder not as a failure by Dmeza to comply but rather as a lack of opportunity to comply before the officers resorted to the use of force. *See* ECF 50-12 at 1:38–1:41; ECF 50-16 at 2:56-3:03.

At the time Officer Vitacco attempted to handcuff Dmeza, he had already brought her to the ground, with what defendants acknowledge was "some force." ECF 47-1 at 24. In the light most favorable to Dmeza, her alleged failure to immediately offer her hands for handcuffing may have been a "natural physical reaction to the officers' assault[.]" *Lewis,* 98 F.4th at 533. And, the Fourth Circuit has concluded that a suspect's "'frightened,' and 'instinct[ive]' response" to being arrested does not "justify" an officer's "escalation" of force. *Lewis,* 98 F.4th at 533 (quoting *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994)) (alteration in *Lewis*); *see Smith*, 781 F.3d at 103 ("[S]light resistance to [an] attack [does not] justify [an officer's] escalation of . . . conflict.").

At least two district judges within the Fourth Circuit have said: "'[I]t is clearly established under Fourth Circuit law . . . that it is reasonable for a police officer to use physical force, including striking a suspect with his closed fist . . . to subdue a suspect who resists arrest by refusing to present his hands to be cuffed.'" *Warren v. PFC Houston Sauer, L509*, DCN-19-02722, 2021 WL 1310758, at *5 (D.S.C. Apr. 8, 2021) (quoting *Sloan v. Dulak*, 868 F. Supp. 2d 535, 543 (W.D. Va. 2012)); *see Brown v. Gilmore*, 278 F.3d 362, 369–70 (4th Cir. 2002) ("If courts refused to permit the use of proportionate force [when a suspect appears to be resisting arrest], we would be inviting any suspect who is unhappy about an arrest to resist that arrest in the hopes that the officers will simply desist rather than risk liability.").

But, the level of force that may be justified in the face of resistance varies with the circumstances. *Armstrong*, 810 F.3d at 901-02. Indeed, a "nonviolent misdemeanor offense [is] not of the type that would give an officer any reason to believe that [the suspect] was a potentially dangerous individual", warranting a more significant use of force. *See Smith*, 781 F.3d at 102; compare *Wilson v. Flynn*, 429 F.3d 465, 469 (4th Cir. 2005) (concluding that an "officers' use of force was not objectively unreasonable" when officers punched a suspect in the face and sprayed

him with mace in light of the situation confronting the officers: a "volatile domestic disturbance[,] [the suspect's] use of alcohol, [the suspect's] assault of his wife, the presence of a gun in the house, and [the suspect's] active resistance to the officers' efforts to handcuff him[.]").

Whether Dmeza was resisting arrest is relevant to the determination of whether Officer Vitacco's use of force was objectively reasonable. And, there is a genuine dispute of material fact as to whether Dmeza resisted Officer Vitacco's attempt to arrest her. Moreover, even if Dmeza did not promptly put her arms behind her back when directed to do so, she had not been stopped on suspicion of having committed a crime, and an argument can be made that she posed no objective threat to officer safety. Therefore, I shall deny summary judgment to Officer Vitacco as to Dmeza's claims that his use of force was unreasonable.

With regard to Mr. Nalls, plaintiffs assert that there "is no evidence" that Mr. Nalls "physically assaulted Defendant Vitacco." ECF 50-1 at 24. They claim that Officer Vitacco "grabbed" Mr. Nalls "with his left hand before striking him with his right hand, causing Plaintiff to stumble . . ." as he approached Dmeza. ECF 50-1 at 25 (citing ECF 50-13 at 0:40-0:43). Plaintiffs also allege that later in the melee, Officer Vitacco joined Officers Halstead, Amrhein, and Schulman in attacking Mr. Nalls. ECF 50-1 at 26 (citing ECF 50-12 at 2:30). Then, according to plaintiffs, "Defendant Vitacco viciously punched" Mr. Nalls while defendants Amrhein, Halstead, and Schulman "continued their own assaults of" Mr. Nalls. ECF 50-1 at 26–27 (citing ECF 50-10 at 1:11–1:15).

Defendants maintain that Mr. Nalls "put his hands on Officer Vitacco[.]" ECF 47-1 at 11. Yet, defendants also contend that "Officer Vitacco's body worn camera shows that he had no altercation" with Mr. Nalls. *Id.* at 25. Therefore, defendants posit that Officer Vitacco "is entitled to judgment" with respect to Mr. Nalls's excessive force claim. *Id.*

76

Of import, Officer Vitacco's body camera video shows him participating in the fracas with Mr. Nalls after he handcuffed Dmeza. *See* ECF 50-12 at 2:28-2:36. Therefore, defendants' assertion to the contrary is blatantly contradicted by the evidence.

Officer Vitacco's body camera footage also shows Mr. Nalls coming close to Officer Vitacco and Dmeza. ECF 50-12 at 1:02-1:06. Vitacco shouts, "Don't touch me," and Mr. Nalls shouts, "Come on." *Id.* However, it is not by any means clear that Officer Vitacco struck Mr. Nalls as plaintiffs allege (ECF 50-1 at 25), or that Mr. Nalls accosted Officer Vitacco, as defendants claim (ECF 47-1 at 22).

Similarly, Officer Legge's body camera footage shows Mr. Nalls approaching Officer Vitacco as he was arresting Dmeza. ECF 50-13 at 0:40. The video indicates that Officer Vitacco and Mr. Nalls are in close proximity. *Id.* The body camera footage also shows that Mr. Nalls had an exchange with Officer Vitacco as he was arresting Dmeza. But, it does not establish that Mr. Nalls pushed Officer Vitacco. *See id.* at 0:40-0:44. This is a question for the jurors, who must weigh the evidence, including the credibility of the witnesses.

Further, defendants contend that Officer Vitacco's alleged use of force was reasonable as to Mr. Nalls because of Mr. Nalls's alleged assault of Officer Halstead. ECF 54 at 14. However, as stated, there is a genuine issue of material fact as to whether Mr. Nalls assaulted Officer Halstead. The body camera footage does not directly contradict plaintiffs' version of events.

For the reasons stated earlier as to the reasonableness of the force used by Officers Halstead and Schulman, Officer Vitacco is not entitled to summary judgment as to Mr. Nalls's claim of excessive force.

### e.  Claims of Dmeza and Shaneris against Officer Vicarini

Defendants claim that "Officer Vicarini did not employ unreasonable force on either" Dmeza or Shaneris. ECF 47-1 at 12.

As to Dmeza, defendants maintain that Officer Vicarini "used minimal force, at most pushing her for about a second when she attempted to intervene in Officer Vicarini's attempt to remove Shaneris Nalls from the vehicle." *Id.* (citing ECF 47-4 at 4:38). They characterize Officer Vicarini's conduct in pushing Dmeza as "a minimal response to Plaintiff Dmeza physically interfering in Officer Vicarini's attempt to keep Plaintiff Shaneris Nalls out of the vehicle[.]" ECF 47-1 at 13; *see also* ECF 54 at 9–10 (claiming that Officer Vicarini pushed Dmeza "when she attempted to intervene when he was removing" Shaneris "from the car"). They posit that if Officer Vicarini's push constitutes excessive force, "the phrase has no meaning, no guidance for police." ECF 54 at 10.

Plaintiffs dispute that Dmeza attempted to interfere with the officers' "actions of removing Plaintiff Shaneris from the vehicle." ECF 50-1 at 19. According to plaintiffs, "[a]t most, Plaintiff Dmeza verbally protested, and braced herself to limit both the physical and mental injury the Defendants subjected her to." *Id.* at 21. Plaintiffs also claim that Vicarini "'simultaneous[ly]" used force against Dmeza while ordering her to "'Back up.'" *Id.* at 19 (citing ECF 50-3 at 4:34-4:38). They add that, "when an officer attempts to execute an illegal arrest, a person has the 'right to resist the unlawful acts of the officer[.]'" ECF 50-1 at 21 (quoting *West v. Cabell*, 153 U.S. 78, 86 (1894)).

The video footage shows that after Shaneris exited the vehicle, Dmeza leaned into the passenger side of the vehicle. ECF 50-3 at 0:23-0:32. Officer Vicarini ordered her to get out of the car. *See id.* Dmeza complied, stating that she "wasn't doing nothing," or words to that effect.

78

*See id.* at 0:36–0:40.  Officer Vicarini responded: "I know, but I see you reaching in the car that we're going to search."  *See id.* at 0:38–0:42.

Several minutes later, Dmeza again approached the front passenger side of the vehicle, where Shaneris was then seated. *See id.* at 4:30–4:35.  Officer Vicarini said, "Get out of the car," or words to that effect. *See id.*  And, he placed his hand and forearm on Dmeza's chest and pushed her back against the closed rear door of the car. *Id.* at 4:35.  Plaintiffs claim that Officer Vicarini "used his left hand to push Plaintiff Dmeza into the parked vehicle."  ECF 50-1 at 19.  The video shows no further physical interaction between Officer Vicarini and Dmeza.

"The use of force is an intrusion on Fourth Amendment rights, and an officer must have a reason for using or escalating force."  *Dolgos*, 884 F.3d at 181.  However, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' . . . violates the Fourth Amendment."  *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  Indeed, "it is well established that using more force than necessary is not equivalent to using excessive force."  *Cleary v. Green*, CCB-07-1202, 2008 WL 4900548, at *5 (D. Md. Nov. 6, 2008).  And, in the Fourth Circuit, the court considers "the extent of the suspect's injury."  *Veney v. Ojeda*, 321 F. Supp. 2d 733, 742 (E.D. Va. 2004).  Dmeza does not allege that she sustained any injuries from Officer Vicarini's push.

Even assuming that the first three *Graham* factors weigh in favor of Dmeza,  Officer Vicarini's slight push of Dmeza was objectively reasonable.  "For courts to fine-tune the amount of force used in a situation such as this would undercut the necessary element of judgment inherent in a constable's attempts to control a volatile chain of events."  *Brown*, 278 F.3d at 369.  Therefore, with respect to Dmeza's claims against Officer Vicarini for excessive force, he is entitled to summary judgment.

As to Shaneris, defendants claim that the video camera footage contradicts plaintiffs' allegations in the Amended Complaint that Officer Vicarini "'violently threw Plaintiff Shaneris Nalls to the ground'", kneeled on her "'as she cried that she was not attempting to resist'", and "'ultimately placed her under arrest, handcuffing her as she remained on the ground.'" ECF 47-1 at 13 (quoting ECF 21, ¶ 40). Instead, defendants claim that the video footage shows that Shaneris was "anything but stationary and compliant" with Officer Vicarini. ECF 54 at 8. They assert, ECF 47-1 at 13 (internal citations omitted):

> Officer Vicarini moves [Shaneris] against a car. She then attempts to pull away from him, in the direction of the encounter between Plaintiff Dmeza and officers, and screams "Please! Stop it." She also refuses to "give her hands to Ofc Vicarini," so Officer Vicarini then took her to the ground, but not especially forcefully given that (1) she is initially on her hands and knees on the ground; (2) Officer Vicarini has to tell her three times to get on the ground and (3) she has no signs of visible injury and once flat on the ground she is concerned about not having her phone.

As to Officer Vicarini "taking" Shaneris "to the ground", defendants claim that Officer Vicarini's use of force was "reasonable" because Shaneris had "already violated his order to vacate the car before a search could be made", had "attempted to pull away from him while he was attempting to place her under arrest", and "refused to give her hands to Officer Vicarini." *Id.* at 14. Defendants characterize Officer Vicarini's use of force as something "police officers do as a matter of routine when people they are attempting to arrest refuse to cooperate." ECF 54 at 9. They also argue that "kneeling on someone's back to get them in handcuffs is a reasonable use of force." ECF 47-1 at 14.

Plaintiffs disagree, arguing that Vicarini's "actions were completely unreasonable." ECF 50-1 at 17. They contend that Vicarini "lacked probable cause to initiate an arrest" of Shaneris. *Id.* Indeed, plaintiffs insist that Officer Vicarini "gave no orders to Shaneris . . . before taking her down" to the ground. *Id.* at 16 (citing ECF 50-10 at 0:09-0:11). They also assert that Vicarini

80

"afforded [Shaneris] no time to comply with demands–some of which were not given until *after* he began forcing compliance." *Id.* at 17 (emphasis in original). According to plaintiffs, "it is readily apparent from the footage that these orders were not given until Plaintiff Shaneris is forced from a standing position to being on her hands and knees on the ground." ECF 50-1 at 16 n.11 (citing ECF 50-3 at 4:59-5:08).

Plaintiffs posit that Officer Vicarini's use of physical force against Shaneris "began when she was exiting the passenger seat of her car." ECF 50-1 at 15. They maintain that Vicarini "grabbed" Shaneris's arm "before he pushed her towards a parked vehicle." *Id.* (citing ECF 50-3 at 4:37–4:46) (internal citation omitted). They also assert that because Vicarini "was able to control" Shaneris "with one hand," it "is clear" that Shaneris "was not resisting at this time[.]" ECF 50-1 at 15–16. Plaintiffs state: "While Plaintiff Shaneris began to shout when she saw her mother slammed to the ground, Defendant Vicarini still held her by the vehicle." *Id.* at 16 (citing ECF 50-3 at 4:55). Then, Vicarini "suddenly hooked his right arm around Shaneris, and violently took her to the ground." *Id.* (citing ECF 50-3 at 5:02–5:07).

Further, plaintiffs criticize defendants for "oddly skip[ping] over how Plaintiff Shaneris was initially taken down." ECF 50-1 at 16 n. 11. They also dispute defendants' assertion that "'Officer Vicarini ha[d] to tell [Shaneris] three times to get on the ground." *Id.* (quoting ECF 47-1 at 13). Moreover, they contend that defendants "argue a number of points that are unsubstantiated, or outright refuted by the evidence," stating, ECF 50-1 at 17:

> First, Defendants argue Plaintiff Shaneris attempted "to pull away from [Defendant Vicarini]," (ECF 47-1 at 13) without pointing to any evidence of such. At most, Plaintiff turns her body to face toward her mother,[] while remaining directly adjacent to the parked vehicle. (Ex. B at 4:50-5:05). Second, Defendants argue Plaintiff was not taken down forcefully, (ECF 47-1 at 13), but that is also proven untrue . . . . Third, Defendants argue Plaintiff ignored three instructions to get on the ground, yet that only occurred after she was forced from a standing position to being on her hands and knees on the ground. Fourth, they argue Plaintiff had "no

signs of visible injury," but that claim is irrelevant. . . . . Finally, they argue Plaintiff refused "to give her hands to Ofc Vicarini," citing the Statement of Probable Cause, which was authored by the Defendants and contains a number of factual misrepresentations.[]

Officer Vicarini's body camera footage shows that after Shaneris reentered the vehicle, and he instructed her to exit the car, Shaneris complied. ECF 50-3 at 4:33–4:37. But, Officer Vicarini grabbed Shaneris's arms and pressed her against another car. *Id.* at 4:39–4:55. Shaneris began to scream, but it is not clear that she tried to elude his grasp. *Id.* at 4:53–5:03. And, as plaintiffs point out (ECF 50-1 at 16 n.11), although Officer Vicarini ordered Shaneris to the ground, he gave the order after already pushing Shaneris to the ground, to which Shaneris responded, "Alright I'm going." ECF 50-3 at 5:04–5:13.

Then, Officer Vicarini pressed Shaneris's head into the ground. *Id.* at 5:20–5:23. Officer Vicarini grabbed Shaneris's arms to handcuff her and remained kneeling on her back as Shaneris claimed that she could not breathe. *See id.* at 5:41–6:23. Vicarini remained on top of Shaneris for a little more than two minutes and then turned Shaneris on her side after she reiterated that she was having difficulty breathing. *Id.* at 5:49–8:05.

Defendants cite *Pegg*, 845 F.3d 112, to support their claim that Officer Vicarini's use of force against Shaneris was reasonable. *See* ECF 47-1 at 14. In *Pegg*, 845 F.3d at 120, unlike in this case, the plaintiff admitted that he resisted arrest. The *Pegg* Court described the conduct of the plaintiff and the police officer, stating, *id.*:

> After [plaintiff] placed his left hand behind his back he failed to interlock his hands as [the police officer] had just demonstrated to him seconds earlier. [Plaintiff] then attempted to withdraw his right arm from [the police officer's] grasp. [The officer] then briskly, but safely, took [plaintiff] to the ground. [Plaintiff] remained on the ground for less than a minute and no longer than the time [the officer] needed to handcuff him. According to [plaintiff's] own statements, [the officer] did not strike, kick, or verbally abuse him. Instead, [the officer] performed a simple maneuver to ensure [plaintiff's] compliance. Once [plaintiff] was handcuffed, [the officer] assisted [plaintiff] back to a standing position and refrained from any

82

further physical contact.  As a result of the encounter, [plaintiff] claims abrasions minor enough that he treated them at home with Neosporin and peroxide and did not seek medical assistance.

 The Fourth Circuit concluded: "An efficient, lawful arrest of a resisting suspect that causes the suspect to suffer only de minimis injuries does not constitute excessive force."  *Id.*; *see also Somers*, 132 F.4th at 699 (concluding that the officer's "use of force was minimal" and "an appropriate, proportional response to an individual resisting lawful arrest and lawful orders.").

As indicated, it is not clear that Shaneris violated an order of Officer Vicarini to remain outside the vehicle, as defendants contend.  ECF 47-1 at 14.  The record reflects that she stated she was cold, and thus sought shelter in the car.  ECF 50-3 at 4:31-4:33.  Moreover, whether Shaneris was resisting arrest is hotly contested.  Additionally, "the size and stature of the parties involved" is relevant to the reasonableness of force used.  *See Dolgos*, 884 F.3d at 180–181.  Shaneris was a seventeen year old girl and Officer Vicarini is an adult male who appears in the video to have been substantially larger than Shaneris.

In sum, the parties present conflicting versions of events. Genuine disputes of material fact concerning matters essential to any decision regarding the reasonableness of Officer Vicarini's use of force cannot be resolved on summary judgment.

### f.  Claims of Lembert and Mr. Nalls against Officer Halstead

As to Lembert's claim that Officer Halstead used excessive force, defendants concede that, in the light most favorable to plaintiffs, the "video does show" Lembert being "'violently grabbed'" and "being 'violently forced' into a fence."  ECF 47-1 at 19 (quoting ECF 21, ¶¶ 46–47).  However, defendants maintain that this use of force was reasonable because Lembert "ignored multiple commands from Officer Harshadavid to stay and then rushed past her in an attempt to physically intervene in the arrest of Plaintiff Dmeza[.]"  ECF 47-1 at 19; *see also* ECF 54 at 15. According to defendants, "after Defendant Harshadavid was attempting to keep" Lembert "from

intervening" (ECF 54 at 15, citing ECF 50-14 at 1:21), Lembert "started the encounter by pushing Defendant Steigen[.]" ECF 54 at 15 (citing ECF 50-21 at 6:24).

Defendants emphasize that Lembert "was given multiple commands to 'get on the ground' while struggling against multiple officers." ECF 47-1 at 19. (citing ECF 47-8 at 1:28). They concede that "Officer Halstead put his hand around Plaintiff Lembert's neck for about five seconds." ECF 47-1 at 20 (citing ECF 47-9 at 0:50); *see also* ECF 54 at 15 ("Halstead put his hand on [Lembert's] throat for about four seconds."). But, defendants claim that Lembert "was not being strangled, given that he had no trouble yelling at the officers while Officer's Halstead's hands were on his neck." ECF 47-1 at 20. Moreover, defendants explain that Officer Halstead "put his hand on" Lembert because Lembert "ignored multiple commands as captured by Defendant Halstead's body worn camera video." ECF 54 at 15 (citing ECF 50-19 at 0:51). Moreover, defendants point out that Lembert "claims no serious or permanent injury to his neck." ECF 47-2 at 22.

According to defendants, the "video" cited by plaintiffs to show that Officer Halstead "put his knee" on Lembert's back "does not make this apparent." ECF 54 at 15. But, defendants claim that, "even if true, kneeling on [Lembert's] back until he is placed in handcuffs and putting his hand on his throat for a few seconds" was not an unreasonable use of force. *Id.* They point to Lembert's "assault on Defendant Steigen and his refusal to comply with commands[.]" *Id.*

Officer Halstead's body camera footage shows that he intercepted Lembert as Lembert was running past Officer Harshadavid and toward Dmeza. ECF 50-19 at 0:36–0:40. Upon making contact with Officer Halstead, Lembert protested that he "didn't do anything" and that he was "calm." *Id.* at 0:42–0:44. Officer Halstead then ordered Lembert to put his hands behind his back. *Id.* at 0:44–0:45. Halstead's video camera becomes blurry, but a jury could interpret it to show

84

that Officers Halstead, Steigen, and Legge wrestled Lembert to the ground. *Id.* at 0:47–0:49. Plaintiffs claim Officer Halstead "swept" Lembert's legs out from underneath him, although the video does not show this use of force. ECF 50-1 at 29.

Officer Halstead shouted, "Go down when we ask you to," while his hands were around Lembert's neck. ECF 50-19 at 0:49–0:52. Lembert responds, "OK" and "Stop, you're choking me." ECF 50-19 at 0:59–1:04. The video footage is not clear, but it could be construed to show that Officer Halstead kept his hands around Lembert's neck for six or seven seconds, and then placed his hand on top of Lembert's head. *Id.* at 0:50-0:57. At that point, Officer Halstead, along with Officers Legge and Steigen, pushed Lembert on his stomach and handcuffed him. *Id.* at 1:00-1:12.

As to the first *Graham* factor, the severity of the crime at issue, the video footage establishes that, in the mayhem, Lembert did not obey Officer Harshadavid's order to get back. Willful failure to obey a reasonable and lawful order by a police officer is a misdemeanor in Maryland. *See* C.L. § 10-201(c)(3) ("A person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace."); C.L. § 10-201(d) ("A person who violates this section is guilty of a misdemeanor . . . ."). But, as noted, a "nonviolent misdemeanor offense [is] not of the type that would give an officer any reason to believe that [the suspect] was a potentially dangerous individual." *Smith*, 781 F.3d at 102.

The Fourth Circuit shed further light on the misdemeanor of disobeying or obstructing police in *Nazario*, 103 F.4th 213. Although the *Nazario* Court was analyzing obstruction as defined under Virginia law, also a misdemeanor, its analysis of its severity is informative. *Id.* at 234. The Court explained, *id.*:

> A misdemeanor obstruction of justice is slightly more severe [than a non-criminal traffic infraction]— indeed, it is a criminal offense involving the intentional

85

frustration of law enforcement. That offense, however, does not involve violence, nor does it pose sufficient risk of danger to either the public or the police officers to weigh in favor of using significant force.

The offense of disobeying an order of the police, a misdemeanor, is not so severe as to warrant the use of undue force. Therefore, this factor weighs in favor of Lembert.

As to the second factor, construing the facts in the light most favorable to plaintiffs, there is no showing that Lembert posed an immediate threat to officer safety or the safety of others. The officers had no reason to believe that Lembert was armed. He was not stopped initially on suspicion of having committed a crime. Rather, he was a family member who responded to the scene.[31] Notably, after Lembert was pushed against the fence, he was physically restrained and verbally expressed that he was not resisting and was calm.

As to the third *Graham* factor, in the light most favorable to plaintiffs, it does not appear that Lembert was "actively resisting arrest or attempting to evade arrest by flight[.]" *Smith,* 781 F.3d at 102. Lembert repeatedly expressed that he was attempting to comply with the officer's instructions to get down. Although the video is unclear, in the light most favorable to plaintiffs, it appears that Lembert was not given the chance to comply because he was forced to the ground, with the hands of multiple officers around his throat.

There remain questions of material fact that this Court cannot resolve at summary judgment. For example, it is for the jury to determine whether Lembert assaulted Officer Steigen before Officers Halstead, Steigen, and Legge wrestled Lembert to the ground and placed their hands on his neck. Because I must construe the evidence in light most favorable to plaintiffs, I decline to grant summary judgment to Officer Halstead as to Lembert's claim of excessive force.

---

[31] The evidence supports the conclusion that at least some officers knew that Lembert is Dmeza's nephew.

As to Mr. Nalls, defendants contend that Officer Halstead did not use "excessive" force when he struck Mr. Nalls on the head. ECF 54 at 14. They argue that Officer Halstead's use of force was reasonable "for the same reason" that Officer Amrhein's use of force against Mr. Nalls was reasonable. *Id.* Additionally, defendants contend that the use of force against Mr. Nalls was reasonable because Mr. Nalls "assaulted Defendant Halstead by striking him in the face and then 'clenched both of his fists up' even after Defendant Halstead attempted to take him to the ground to get him in custody." *Id.* (citing ECF 50-21 at 3:15, 3:28).

Plaintiffs claim that Officer Halstead and Officer Schulman pushed Mr. Nalls between vehicles. ECF 50-1 at 26 (citing ECF 50-3 at 5:53-5:55). According to plaintiffs, Mr. Nalls only "put his arm out to stop the attack." *Id.* (citing ECF 50-19 at 1:31-1:33). Plaintiffs note that the video footage does not support that Mr. Nalls struck Officer Halstead. *Id.* at 26.

Indeed, defendants do not rely on body camera footage with respect to Mr. Nalls's alleged assault of Officer Halstead. Instead, they rely on their own IAS statements. *See* ECF 54 at 14; ECF 50-1 at 26; ECF 50-21.

According to the IAS statements of Officers Halstead, Vitacco, Schulman, and Amrhein, Mr. Nalls sustained at least one kick and multiple strikes to the body and head, and perhaps a tase. ECF 50-6 at 7:27–7:36; ECF 50-20 at 24:22–25:16; ECF 50-21 at 14:45–14:58; ECF 50-22 at 6:41–6:53. In Officer Halstead's IAS statement, he claimed that he struck Mr. Nalls twice with closed fists. ECF 50-21 at 3:50–4:14.

Regarding Officer Halstead's use of force against Mr. Nalls, Halstead's body camera footage does not capture the entire encounter. *See* ECF 50-19. Nor do the body cameras of the other officers present a clear picture of who delivered which blow to Mr. Nalls.

Plaintiffs claim that Officer Halstead yelled, "'Put your hands behind your back!', while he had his entire body weight on top of" Mr. Nalls.  ECF 50-1 at 26 (citing ECF 50-14 at 3:04–3:10).   The video footage does not blatantly contradict plaintiffs' version of events as to Officer Halstead's use of force.  *See Scott*, 550 U.S. at 380.

In plaintiffs' view, the facts at issue here are akin to *Lewis*, 98 F.4th 521.  There, the plaintiff was a fifteen-year-old male with a documented mental health condition.  *Id.* at 525. Maryland State Trooper Kevin Caraballo received a call to respond to a domestic incident at an apartment complex.  *Id.*  When he arrived at the scene, he found the plaintiff "pacing on a sidewalk [with] his mother . . . crying nearby on her front steps."  *Id.*  As Caraballo approached the mother, she told the officer that "her son had physically assaulted her."  *Id.*  When Caraballo approached the plaintiff, his fists were "clenched" and he "assumed a 'fighting stance,' and shouted, '[Y]o get the fuck away from me.'"  *Id.* at 526 (quoting the district court).  Caraballo "tried talking to [plaintiff], but the teenager maintained a fighting position and continued yelling at him."  *Id.* Sergeant Glenn Ray then arrived.  *Id.*  His body camera captured Caraballo following the plaintiff, "who was backing away and telling" Caraballo "not to touch him."  *Id.*  The two officers together approached the plaintiff, who continued to back away from them and told them not to touch him. *Id.*  Ray reached toward the plaintiff and "ordered him to stop."  *Id.*

The plaintiff "clenched his fists below his waist, bent his knees, and shouted, "[A]in't nobody fucking playing with you.'"  *Id.*  The plaintiff took several more steps from the officers and continued to state that he did not want to be touched.  *Id.*  A few seconds later, Ray pointed his taser at plaintiff and warned him that he would tase him unless he put his hands behind his back.  *Id.*  Plaintiff responded, "no," and the officer "repeated his command" for the plaintiff to "place his hands behind his back."  *Id.*  Then, "[w]ithout verbal warning, both officers," who were

"visibly larger" than plaintiff, lunged toward him, "grabbed him by the front of his shirt, and shove[d] him backward into the grassy area in the parking lot." *Id.* Caraballo executed three elbow strikes, knee strikes, and head strikes. *Id.* at 536–27. Ray tased the plaintiff. *Id.* at 527. Plaintiff sued Caraballo for use of excessive force, in violation of the Fourth and Fourteenth Amendments" and Articles 24 and 26 of the Maryland Declaration of Rights, and "for battery under state tort law.[]" *Id.*[32]

The district court determined that, in the light most favorable to Lewis, a "reasonable jury could conclude that" Caraballo's use of force was disproportionate. *Id.* at 531. The Fourth Circuit considered only whether the district court erred in denying qualified immunity to Caraballo. *Id.* at 530. But, its analysis sheds light on what constitutes excessive force. *Id.* at 530–34.

The Court noted that Caraballo's use of force, striking plaintiff in the head, was "significant[.]" *Id.* The Court reasoned that "it is common sense that the head is a particularly fragile part of the human body" and that "Courts have accordingly recognized the unique danger of strikes to the head." *Id.* at 531–32. Turning to the *Graham* factors, the Court determined that the first factor, severity of the crime, weighed in favor of defendants because plaintiff had been accused of domestic violence. *Id.* at 532.

Turning to the second factor, the Court concluded that plaintiff "posed no '*immediate* threat' to anyone's safety." *Id.* (quoting *Graham*, 490 U.S. at 396) (emphasis in original). It noted that plaintiff was unarmed, did not attempt to attack the officers, was retreating from the officers, and "never voluntarily touched them." *Id.* According to the Court, the threat "posed to the officer" was plaintiff's "'somewhat erratic conduct, his failure to comply with a small number of lawful

---

[32] Plaintiff did not sue Ray. *Lewis*, 98 F.4th at 525.

commands, and two to three instances in which he clenched his fists' while the officers were far from Lewis's reach." *Id.* The Court also pointed out that, "after the officers deployed force and before" one of the officers "began striking" plaintiff's head, plaintiff was "under the weight of the two larger, trained officers and was 'at least partially subdued.'" *Id.*

As to the third factor, the Court noted that plaintiff "made no attempt to flee, and while" he struggled in response to the officers' initiation of force, "'his resistance may merely have been a natural response to the physical nature of the arrest.'" *Id.* at 533 (quoting the district court). "Viewing the evidence in the light most favorable to" plaintiff, the Court reasoned that his response to the officers' conduct "was a natural physical reaction to the officers' assault—a fearful reaction made all the more natural by his young age." *Id.* In its view, a frightened, instinctive response did not justify the officer's escalation. *Id.* (citing *Rowland*, 41 F.3d at 172). The Court said: "A reasonable officer would not think that beating a non-dangerous suspect's head, after elbow-and knee-striking the suspect, was proportionate to the minimal resistance [of the plaintiff.]" *Lewis,* 98 F.4th at 533. The Court concluded that "an officer striking the head of a non-dangerous, non-actively resistant, partially subdued adolescent would not be objectively reasonable." *Id.* at 534.

Defendants claim that plaintiffs' reliance on *Lewis*, 98 F.4th 521, is misplaced because the plaintiff in *Lewis* was "not actively resistant, and was subdued[.]" *See* ECF 54 at 9 n.8. Additionally, unlike the juvenile plaintiff in *Lewis,* Mr. Nalls is an adult male.

To be sure, the footage shows Mr. Nalls shouting at officers, including use of arguably strange language, such as "I will eat you." ECF 50-19 at 1:30–1:31. However, Officer Halstead's body camera footage is blurry. The video does show Mr. Nalls walking backward in his encounter with Officer Schulman, and Officer Schulman pushing Mr. Nalls into Shaneris's car. *Id.* at 1:28–1:32. Officer Halstead rushed to Officer Schulman's side. *Id.* at 1:31. Shortly thereafter, Officer

Halstead's body camera footage stops. *Id.* at 1:31-1:37. It is during this time that defendants claim that Mr. Nalls assaulted Officer Halstead, for which they rely on Officer Halstead's own IAS statement. ECF 54 at 14.

There was no indication that Mr. Nalls was armed. Moreover, this is not a case in which Mr. Nalls initially was regarded as a criminal suspect. Rather, it was clear that Mr. Nalls responded to the scene out of concern for his family. The video makes clear that Mr. Nalls verbally protested the actions of the officers as to his daughter and wife. Mr. Nalls was repeatedly struck, including blows to the head, "a particularly fragile part of the human body." *Lewis*, 98 F.4th at 531. The Fourth Circuit has made clear that "an officer cannot use a plaintiff's 'slight resistance to the attack to justify his escalation of the conflict.'" *Lewis*, 98 F.4th at 533 (quoting *Smith*, 781 F.3d at 103).

There is a dispute of material fact as to whether Mr. Nalls struck Officer Halstead before he was subjected to the use of force, and whether he was resisting arrest. This goes directly to the degree of threat Mr. Nalls posed to the officers to justify their use of force, pertinent to the second and third *Graham* factors. It is for the jury to assess the credibility of the witnesses. On this record, the Court cannot determine, as a matter of law, whether Officer Halstead's use of force against Mr. Nalls, as alleged by plaintiffs, was reasonable or proportional. Therefore, I decline to grant summary judgment to Officer Halstead.

### g. Claims of Lembert and Dmeza against Officer Harshadavid

Defendants maintain that Officer Harshadavid's use of force was reasonable as to both Lembert and Dmeza. ECF 47-1 at 20.

As to Lembert, defendants note that "the only argument that Defendant Harshadavid used excessive force against Plaintiff Lembert is that she 'grabbed his upper body.'" ECF 54 at 14 n.12 (quoting ECF 50-1 at 29). According to defendants, "[t]his is plainly not excessive force[.]" *Id.*

91

Plaintiffs counter that Officer Harshadavid "grabbed" Lembert's "upper body" when Lembert "tried to sidestep" her.  ECF 50-1 at 29 (citing ECF 50-16 at 2:24). But, they do not address how Officer Harshadavid's use of force was excessive.  Nor do they address the *Graham* factors.

Based on the body camera video, it does not appear that Officer Harshadavid used excessive force as to Lembert.  At the beginning of Officer Harshadavid's interaction with Lembert, she opened her hand to indicate that Lembert should stay back, told him to "get back," and touched him at the top of his stomach or lower chest area.  ECF 50-16 at 2:10–2:19.  Lembert ran past Officer Harshadavid's hand, towards Dmeza, and plaintiffs allege that Officer Harshadavid grabbed Lembert's upper body at this time.  *Id.* at 2:20–2:26; *see* ECF 50-1 at 29.  But, Officer Harshadavid was not among the group of officers who surrounded Lembert and pushed him against the fence and subsequently took him to the ground.  ECF 50-16 at 2:27–2:33.

The body camera footage shows that the next interaction Officer Harshadavid had with Lembert occurred a few minutes later.  *Id.* at 4:06–4:14.  Lembert was handcuffed while laying face down, with Officer Steigen on top of him.  *Id.* It appears that Officer Harshadavid came over to Lembert to check his breathing, as he was breathing heavily and Dmeza was asking Officer Steigen to "get off" of her nephew.  *Id.* at 3:57–4:11.

In sum, the only force that plaintiffs allege Officer Harshadavid applied to Lembert occurred when Lembert ignored her verbal order to get back and ran past her outstretched hand, towards Dmeza. *Id.* at 2:14–2:23.  It was de minimis force.  Nor did Lembert sustain any injury.

Officer Harshadavid's minimal contact with Lembert, paired with the fact that Lembert disobeyed her order and ran past her and towards another officer who was restraining another individual, leads to the conclusion that her use of force was reasonable and proportionate.  *See*

92

*Wilson v. Flynn*, 429 F.3d 465, 468 (4th Cir. 2005) (finding that an officer's use of force was objectively reasonable when the suspect "disobeyed [the police officer's] orders and physically resisted when [the police officer] attempted to put [the suspect] in handcuffs."). Therefore, I conclude that Officer Harshadavid is entitled to summary judgment as to Lembert's claims of excessive force in Count I and Count V.

As to Dmeza's claim of excessive force, defendants posit that even if, as Dmeza claims, Officer Harshadavid "'placed her bodyweight on top'" of Dmeza "'before putting Plaintiff in handcuffs,'" this was not excessive or unreasonable force. ECF 47-1 at 20 (quoting ECF 21, ¶ 45); *see also* ECF 54 at 10. They observe that "'the Fourth Circuit has said that 'applying just enough weight to immobilize an individual continuing to struggle during handcuffing is not excessive force.'" ECF 47-1 at 20 (quoting *Armstrong*, 810 F.3d at 906 n.11) (cleaned up). Moreover, defendants maintain that plaintiffs "present no facts that overcome this clear legal standard." ECF 47-1 at 21.

Plaintiffs disagree. They assert that Officer Harshadavid "demanded" that Dmeza "place her hand behind her back" while Dmeza pled "that her elderly mother was inside the restaurant." ECF 50-1 at 20 (citing ECF 50-12 at 1:25). And, they claim that after Officer Vitacco "slammed" Dmeza's head onto the concrete, Officer Harshadavid "resumed demanding Plaintiff put her hands behind her back," and "was actively restraining Plaintiff's right hand, while Defendant Vitacco was pulling her left hand and arm upward." *Id.* (citing ECF 50-12 at 1:38). Officers Vitacco and Harshadavid also "continued to kneel" on Dmeza. ECF 50-1 at 20. And, plaintiffs claim that, "[a]t most, Plaintiff Dmeza verbally protested, and braced herself" to protect against injury. *Id.* at 21. Moreover, plaintiffs assert that Dmeza "attempted to surrender at numerous points, only using defensive maneuvers against the physical attack, and she made no attempt to flee." *Id.*

Officer Harshadavid's body camera footage shows that she approached Dmeza while Officer Vitacco was attempting to subdue her. See ECF 50-16 at 2:30–2:34. The video indicates that Officer Harshadavid placed her body weight on Dmeza as Officer Vitacco attempted to place Dmeza in handcuffs. *Id.* at 2:52–3:50. Dmeza can be heard asking Officer Harshadavid to make Officer Vitacco "stop," or words to that effect. *Id.* at 2:34–2:36. Officer Vitacco's body camera footage shows that as Dmeza was asking for Officer Harshadavid to stop Officer Vitacco, she raised her hand and pointed toward the restaurant and stated, "I have my mother in there." ECF 50-12 at 1:23–1:25. Then, Officer Vitacco shouts, "get her." *Id.* at 1:26-1:28.

Further, the video shows that Officer Vitacco twice attempted to place Dmeza in a prone position on the sidewalk. ECF 50-16 at 2:40–3:19. Both times, Dmeza sat up, apparently so that she could speak directly to Officer Harshadavid. *Id.* After the officers succeeded in placing Dmeza in a prone position, Dmeza did not immediately place her hands behind her back, as the officers requested. *See id.* at 2:50–3:15. However, Dmeza's arms appeared to be stuck beneath her body and she repeatedly told the officers she had asthma while the officers were on top of her, and that she was "calm." *See id.* at 2:50–3:38. Once Dmeza was handcuffed, both officers released their weight. *See id.* at 3:40. Officer Harshadavid then helped Dmeza return to a sitting position. *See id.* at 3:45–3:50.

The video demonstrates a physical struggle between the officers and Dmeza. It also shows Dmeza verbally expressing numerous times that she was not resisting and was "calm," was going to put her hands behind her back, and she was "not fighting" with the officers. ECF 50-12 at 1:18–1:56. The parties present differing interpretations of the video.

In sum, plaintiffs complain that Officer Harshadavid demanded that Dmeza place her hands behind her back, kneeled on Dmeza while handcuffing her, and yanked her arm in an effort to

handcuff her.  ECF 50-1 at 20–22.  Of import, plaintiffs do not allege that Officer Harshadavid continued to use force against Dmeza after she was handcuffed.  And, the body camera footage shows that Officer Harshadavid attempted to calm Dmeza during the chaotic and emotionally charged incident.  ECF 50-16 at 5:10–5:22.

"It is well established that law enforcement officers are entitled to use the amount of force necessary to take an individual into custody." *Cloaninger v. McDevitt*, 06-135, 2007 WL 9734110, at *9 (W.D.N.C. Sept. 26, 2007) (Howell, M.J.), *aff'd sub nom. Cloaninger ex rel. Est. of Cloaninger v. McDevitt*, 555 F.3d 324 (4th Cir. 2009).  Indeed, "[a]pplying 'just enough weight' to immobilize an individual 'continu[ing] to struggle' during handcuffing is not excessive force." *Armstrong*, 810 F.3d at 906 n.11 (quoting *Estate of Phillips v. City of Milwaukee,* 123 F.3d 586, 593 (7th Cir.1997)).  Viewing all of plaintiffs' allegations regarding Officer Harshadavid's use of force in favor of Dmeza, Officer Harshadavid is entitled to summary judgment as to Dmeza's claims of excessive force (Counts I and V).

### h.  Claims of Lembert against Officer Legge

Officer Legge was among the three officers who pushed Lembert against the fence and wrestled him to the ground before handcuffing him.  *See* ECF 50-13 at 0:56–1:04.  Defendants argue that Officer Legge's use of force was reasonable for the same reasons that the use of force by Officers Halstead and Harshadavid was reasonable.  ECF 47-1 at 20 n.6.

Plaintiffs do not allege that Officer Legge participated in the choking of Lembert.  ECF 50-1 at 29–30.  But, they claim that Officer Legge pushed Lembert to the ground without giving Lembert a chance to comply with an order to do so.  *Id.* at 29.  Further, plaintiffs claim that Officer Legge's push, combined with Officer Halstead's alleged sweep of Lembert's legs, caused Lembert to slam to the ground.  *Id.*  Moreover, they claim that after Lembert was "flat on the ground,"

Officer Legge, along with Officers Halstead and Steigen, "used force to press Plaintiff into the sidewalk, despite the fact that he was not resisting." *Id.* at 30. And, they contend that Officer Legge pressed his knee into Lembert's "upper back." *Id.* According to plaintiffs, the officers "were able to handcuff the Plaintiff before Defendant Halstead and Steigen lifted their weight off of" Lembert's back. *Id.*

Defendants disagree with plaintiffs' claim that Officer Legge pushed Lembert "without 'giving [him] the chance to comply', pushing him into the sidewalk, and putting a knee on his back." ECF 54 at 16 (quoting ECF 50-1 at 29). But, defendants maintain that, even if Officer Legge did act in this manner, "pushing someone down, putting weight on someone's back for a few seconds after that someone has assaulted a police officer, ignored commands, and resisted arrest is not excessive force." *Id.*

It is unclear from the body camera footage whether Lembert pushed Officer Steigen before the officers pushed him against the fence. And, it is unclear from the video whether Lembert was given the opportunity to comply with the officers' commands before force was used. But, as noted, plaintiffs do not allege that Officer Legge placed his hands around Lembert's neck.

As stated earlier, "'[a]pplying just enough weight' to immobilize an individual 'continu[ing] to struggle' during handcuffing is not excessive force." *Armstrong*, 810 F.3d at 906 n.11 (quoting *Phillips,* 123 F.3d at 593). But, plaintiffs contend that Lembert was not "actively resisting arrest or attempting to evade arrest by flight." ECF 50-1 at 31. Indeed, the video shows that Lembert told the officers that he was "calm" and "not resisting" arrest as he was wrestled to the ground and as they applied force to him. ECF 50-13 at 0:56–1:19.

Taking the facts in light most favorable to plaintiffs, Lembert was not struggling when Officer Legge pushed Lembert to the ground and kneeled on his upper back. Nevertheless, as to

96

Officer Legge, the pushing of Lembert to the ground during the chaos, and the brief use of pressure while subduing Lembert, does not amount to excessive force. Therefore, Office Legge is entitled to summary judgment as to Lembert's excessive force claim.

### i.    Claims of Lembert against Officer Steigen

Lembert contends that Officer Steigen used excessive force by placing her hands around Lembert's neck. In addition, Lembert claims use of excessive force when Officer Steigen continued to kneel on his back, after he was handcuffed, impeding Lembert's ability to breathe.

Defendants assert that Officer Steigen's body camera footage "shows her putting hands on" Lembert's "neck for about four seconds." ECF 47-1 at 22 (citing ECF 47-8 at 1:41). Further, they claim that "each of the three times Defendant Steigen put hands on [Lembert's] throat" the encounter "lasted a couple seconds." ECF 54 at 15. Defendants note that Lembert did not sustain injury to his neck or back. ECF 47-1 at 22. Therefore, defendants claim that "Officer Steigen's use of force in briefly putting her hands around [Lembert's] neck is not unreasonable under the Fourth Amendment given the circumstances." *Id.* Defendants also argue that Officer Steigen "was on" Lembert's "back for less than 20 seconds." *Id.*; *see also* ECF 54 at 15 ("Defendant Steigen kneels on [Lembert's] back for about 15 seconds") (citing ECF 50-16 at 3:53). Moreover, defendants assert: "The video does not show Plaintiff Lembert pleading that he was not able to breath [sic]." ECF 47-1 at 23.

Further, defendants note that Lembert is a "much larger male who had just been struggling with multiple officers" and therefore Officer Steigen was justified in applying force "to maintain control" of him. *Id*. They argue that Officer Steigen's use of force was reasonable in light of Lembert's "assault on Defendant Steigen, [and] his refusal to follow commands and cooperate in being placed under arrest[.]" ECF 54 at 15–16.

As indicated previously, there is a genuine dispute of material fact as to whether Lembert assaulted Officer Steigen.  Steigen's body camera footage shows that she saw Lembert shouting and protesting the actions of the police officers while Officer Harshadavid was instructing Lembert to stay back.  ECF 50-24 at 1:20–1:24; ECF 50-16 at 2:15–2:23.  Plaintiffs allege that at this point, Officer Steigen placed her hands around Lembert's neck. ECF 50-1 at 29 (citing ECF 50-24 at 1:25).  But, the video footage does not clearly show how Officer Steigen is touching Lembert, although it does reflect her involvement with the other officers in restraining Lembert.  ECF 50-24 at 1:23–1:29.  According to plaintiffs, after the officers pushed Lembert against the fence, Officer Steigen "attempted to choke Plaintiff Lembert."  ECF 50-1 at 29 (citing ECF 50-16 at 1:34–1:36).[33]  Officer Steigen's body camera shows a hand, that appears to be Steigen's reaching towards Lembert's neck, but the video footage is not clear.  *See* ECF 50-24 at 1:34–1:36.

Officer Steigen's BWC shows her hands around Lembert's neck, for what plaintiffs allege was the third time, as the officers brought him to a seated position against the fence.  ECF 50-24 at 1:41–1:44.  The BWC also shows multiple pairs of hands around Lembert's neck at this time. *Id*.  As Lembert expressed that his hands were behind his back and he was not resisting, he asked the officers to stop choking him and to "get off" of his neck.  *Id.* at 1:44–1:53.  Subsequently, officers handcuffed Lembert in the prone position.  ECF 50-13 at 1:21–1:45.

Officer Steigen briefly left Lembert, laying prone and handcuffed, with Officer Legge. ECF 50-13 at 1:39–1:55; ECF 50-24 at 2:16–2:34.  Then, Officer Steigen returned to Lembert and kneeled on his back as he lay handcuffed and prone on the ground.  ECF 50-24 at 2:32–2:37.  When

---

[33] Plaintiffs cite to ECF 50-16, which plaintiffs labeled Exhibit O, to support this contention.  ECF 50-1 at 29.  Plaintiff's Exhibit O corresponds to Officer Harshadavid's BWC (ECF 50-16).  But, Officer Harshadavid's body camera does not capture this alleged interaction. As stated, plaintiffs' allegations are captured by Officer Steigen's BWC (ECF 50-24).

Officer Steigen began kneeling on Lembert, he asked, "Ma'am do you need to be on me like this?" *Id.* at 2:36–2:40. Officer Steigen responded, "That's how it's going to be right now." *Id.* at 2:38–2:42. As Lembert lay on the ground, not moving, Officer Steigen remained on Lembert's back. He appears to be breathing heavily and stated, "You're making it hard for me to breathe." ECF 50-24 at 2:32–3:12.[34] When Lembert told Steigen that he could not breathe, she responded "OK" but does not appear to reduce the pressure she was placing on him. ECF 50-24 at 2:42-2:45.

When Officer Steigen initially put her hands around Lembert's neck, Lembert had disobeyed the verbal orders of Officer Harshadavid to stay back and was moving past her. Even in the light most favorable to plaintiffs, Officer Steigen's use of force, briefly placing her hands around Lembert's neck, was not unreasonable.

But, "'force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.'" *Holman v. Wiggs*, WLO-23-618, 2026 WL 295735, at *4 (M.D.N.C. Feb. 4, 2026) (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)) *report and recommendation adopted*, 2026 WL 624199 (M.D.N.C. Mar. 5, 2026). "Fourth Circuit case law clearly establishes that officers employ excessive force when they assault a suspect that [sic] has been physically restrained, and that suspects have a right to be free from such excessive force." *Goodman v. Barber*, JCF-11-00153, 2012 WL 4928873, at *7 (E.D.N.C. Oct. 16, 2012), *aff'd,* 539 F. App'x 87 (4th Cir. 2013).

After Lembert ran past Officer Harshadavid, the body camera footage does not clearly establish that Lembert continued to disobey the officers. Yet, a jury could conclude that Officer Steigen continued to choke Lembert, and then kneeled on him, while he was handcuffed, on the

---

[34] This is one of many remarks that was initially hard to decipher. But, once heard, it is unmistakable. This may explain why defendants incorrectly assert that Lembert did not claim an inability to breathe.

ground, and struggling to breathe. Such use of force against a nonresistant and nonviolent suspect would be unreasonable. On the other hand, whether Lembert had previously struck Officer Steigen, as defendants allege, could, under the totality of circumstances, change the calculus as to the reasonableness of the force used by Officer Steigen against Lembert.

There are genuine disputes of material fact as to whether Lembert assaulted Officer Steigen and whether Lembert resisted arrest. Accordingly, Officer Steigen is not entitled to judgment as a matter of law as to the reasonableness of her use of force against Lembert.

### j.   Summary

There are genuine disputes of material fact as to the reasonableness of the force used by certain officers against particular plaintiffs. I shall grant summary judgment to defendants with respect to the excessive force claims of Lembert and Dmeza against Officer Harshadavid; Dmeza against Officer Vicarini; and Lembert against Officer Legge. I shall otherwise deny the Motion.

### B.  Battery (Count IX)

In Count IX, lodged against the officer defendants, plaintiffs assert claims of common law battery under Maryland law. ECF 28. "Battery [in Maryland] is commonly defined as a harmful, unlawful, or offensive touching." *Claggett v. State*, 108 Md. App. 32, 47, 870 A.2d 1002, 1009 (1996) (Hollander, J.) (citing *Ford v. State*, 330 Md. 682, 699, 625 A.2d 984, 992 (1993)). The tort of battery is "the unpermitted application of trauma by one person upon any part of the body of another person." *Johnson v. Valu Food, Inc.*, 132 Md. App. 118, 123, 751 A.2d 19, 21 (2000).

"An officer is not liable for battery for using a reasonable amount of force when effectuating a lawful detention or arrest." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (citing *Ashton*, 339 Md. at 119 n.24, 660 A.2d at 471 n.24; *Busch v. State*, 289 Md. 669, 426 A.2d 954, 958 (1981); *Hines v. French*, 157 Md. App. 536, 549–553, 852 A.2d 1047, 1055–56 (2004)). "However, if during a valid arrest 'an officer uses excessive force, or force greater than

100

is reasonably necessary under the circumstances, the officer may be liable' for battery." *Stutzman*, 350 F. Supp. 3d at 383 (quoting *French v. Hines*, 182 Md. App. 201, 266 957 A.2d 1000,1037 (2008) (Hollander, J.)).  Therefore, "[t]o the extent that [a plaintiff] has stated a claim of excessive force under the Fourth Amendment," he or she also has "stated a claim for battery" under Maryland law. *Stutzman*, 350 F. Supp. 3d at 383.

Defendants seek judgment as to Count IX because they claim that the force used by each officer was reasonable.  ECF 47-1 at 11.  For the reasons stated earlier, there are some genuine disputes of material fact as to the reasonableness of the force used by defendants.  Therefore, as to the claim of battery, I shall grant summary judgment in favor of Officer Harshadavid and Officer Legge.  As to Officer Vicarini, I will grant summary judgment with respect to the battery claim of Dmeza. I shall otherwise deny defendants' summary judgment motion as to Count IX.

### C.  Gross Negligence  (Count XII)

In Count XII, plaintiffs assert a claim of gross negligence against each individual defendant.  ECF 28; ECF 21, ¶¶ 208–217.  Defendants ask this Court to enter judgment for them, asserting that the officers' use of force was reasonable.  ECF 47-1 at 11.

"'[G]ross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Stracke v. Estate of Butler*, 465 Md. 407, 419, 214 A.3d 561, 568 (2019) (quoting *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007)); *see also State v. Kramer*, 318 Md. 576, 590, 569 A.2d 674, 681 (1990) (defining gross negligence as "a wanton or reckless disregard for human life."). "Only conduct that is of extraordinary or outrageous character will be sufficient to imply" that a person acted with gross negligence. *Kramer*, 318 Md. at 590, 569 A.2d at 681. "'Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case[,]

101

and is usually a question for the jury and is a question of law only when reasonable [people] could not differ as to the rational conclusion to be reached.'"  *Cooper v. Doyle*, DKC-22-0052, 2024 WL 3568564, at *16 (D. Md. July 29, 2024) (quoting *Cooper v. Rodriguez*, 443 Md. 680, 708–09, 118 A.3d 829, 846 (2015)) (alterations in original) (cleaned up), *reconsideration denied,* 2024 WL 4505008 (D. Md. Oct. 16, 2024), *aff'd in part, appeal dismissed in part,* 163 F.4th 64 (4th Cir. 2025).

The touchstone of the analysis for a claim of gross negligence stemming from an officer's seizure is the reasonableness of the officer's conduct, as enunciated in *Graham*, 490 U.S. 386. *Richardson v. McGriff*, 361 Md. 437, 452, 762 A.2d 48, 56 (2000).  Indeed, "[a] police action deemed to be reasonable in the § 1983 context could clearly not be the basis for a finding of gross criminal negligence on the part of the officer." *Pagotto v. State*, 127 Md. App. 271, 348, 732 A.2d 920, 961 (1999), *aff'd,* 361 Md. 528, 762 A.2d 97 (2000).

As to gross negligence, defendants rely on the same arguments that they advanced with respect to excessive force.  ECF 47-1 at 25–26.  But, I rejected some of those arguments.  As to those defendants for whom I have found summary judgment inappropriate with regard to excessive force, defendants offer no explanation as to why they are entitled to summary judgment as to the claim of gross negligence.

Therefore, with respect to the claims of gross negligence, I will grant summary judgment in favor of Officer Harshadavid and Officer Legge.  I shall grant summary judgment to Officer Vicarini, but solely as to the gross negligence claim of Dmeza.  As to the remaining defendants, I shall deny summary judgment.

102

### D. False Arrest and False Imprisonment (Counts II, VII)

In Count II, Shaneris, Dmeza, and Mr. Nalls have asserted claims of false arrest and false imprisonment, in violation of the Fourth and Fourteenth Amendments. ECF 21, ¶¶ 89-94.[35] Count VII advances the same allegations under Articles 24 and 26 of the Maryland Declaration of Rights. *Id.* ¶¶ 151–156. In general, plaintiffs claim that "there was no reasonable suspicion to support the initial stop of" Shaneris or "the intended search of" her car. ECF 21, ¶ 93.

Specifically, Shaneris asserts claims for false arrest and false imprisonment against Officer Vicarini; Dmeza has lodged claims for false arrest and false imprisonment against Officer Vicarini, Officer Vitacco, and Officer Harshadavid; and, Mr. Nalls asserts those claims against Officer Schulman, Officer Amrhein, Officer Vitacco, and Officer Halstead. *See* ECF 28.

Defendants argue that they "are entitled to judgment" because "there was probable cause" to arrest Shaneris, Dmeza, and Mr. Nalls. ECF 47-1 at 7. After a review of applicable legal principles, I address the claims of each plaintiff, in turn.

### 1.

Claims for false arrest and false imprisonment lodged pursuant to 42 U.S.C. § 1983 "overlap." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Both are "essentially claims alleging a seizure of the person in violation of the Fourth Amendment." *Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001). I will sometimes refer to plaintiffs' claims of false arrest and false imprisonment collectively as claims for false arrest.

"To state a claim for false arrest or imprisonment under § 1983, a plaintiff must demonstrate that he was arrested without probable cause." *Sowers v. City of Charlotte*, 659 F.

---

[35] The Court previously dismissed the false arrest and false imprisonment claims of Shamdu and Lembert. ECF 27 at 51–52; ECF 28.

App'x 738, 739 (4th Cir. 2016) (per curiam) (citing *Street v. Surdyka*, 492 F.2d 368, 372–73 (4th Cir. 1974) ("There is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause."); *see McKenna v. Erickson*, 2025 WL 415738, at *2 (4th Cir. Feb. 6, 2025) (per curiam); *English v. Clarke*, 90 F.4th 636, 646 (4th Cir. 2024); *Harrison v. Deane*, 426 F. App'x 175, 181 (4th Cir. 2011). "A false arrest or imprisonment claim accrues when the arrest is made and, if followed by criminal proceedings, the statute of limitations for false imprisonment begins to run when the plaintiff is detained pursuant to legal process." *Bowers v. Taylor*, DKC-23-2387, 2023 WL 8373212, at *2 (D. Md. Dec. 1, 2023).

Probable cause is "'defined in terms of facts and circumstances sufficient to warrant a prudent [person] in believing that the suspect had committed or was committing an offense.'" *Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir. 2000) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). Notably, "even a very minor criminal offense" committed in the presence of a law enforcement officer may provide probable cause for arrest. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *accord McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019). "In assessing whether probable cause exists, [a court] must examine the totality of the circumstances." *Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000); *see United States v. Allen,* 631 F.3d 164, 172 (4th Cir. 2011). The evaluation of whether an officer acted on the basis of probable cause requires examining facts "from the officer's point of view." *Anderson v. Baltimore Co., MD*, 2025 WL 3459768, at *4 (4th Cir. 2025) (per curiam); *see English*, 90 F.4th at 641.

"Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *see Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (describing probable cause as "a practical, nontechnical conception that deals with the factual and practical

considerations of everyday life"). "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *see Thurston v. Frye,* 99 F.4th 665, 673–74 (4th Cir. 2024) ("'Probable cause has long been understood to encompass circumstances that, while less than a preponderance, warrant suspicion.'") (quoting *United States v. Gondres-Medrano*, 3 F.4th 708, 714 (4th Cir. 2021)). To determine "[w]hether circumstances 'warrant suspicion' turns on the combination of two factors: the suspect's conduct as known to the officer and the nature of the offense." *Thurston*, 99 F.4th at 674.

In particular, probable cause "'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Gates*, 462 U.S. at 232). Thus, "[p]robable cause 'is not a high bar.'" *Wesby*, 583 U.S. at 57 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). In *Pringle*, 540 U.S. at 371, the Supreme Court explained (citations and internal quotation marks omitted):

> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized[.]

Additionally, "[p]robable cause need not be tailored to the offense the arresting official suspected at the time of arrest. Rather, probable cause exists when 'the officer had probable cause to arrest for *any* offense, not just the offense cited at the time of arrest or booking.' . . . Thus, we assess probable cause in relation to any crime identified by the parties in the case, even one identified only during litigation." *Thurston,* 99 F.4th at 674 n.4 (quoting *Wesby*, 583 U.S. at 54 n.2) (emphasis added in *Thurston*).

105

"Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *see Ker v. State of Cal.*, 374 U.S. 23, 37 (1963) ("[T]he lawfulness of these arrests by state officers for state offenses is to be determined by [state] law."); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006), *as amended on denial of reh'g* (May 25, 2006) ("Whether an officer has probable cause to arrest depends on the requirements of the applicable state criminal law."). Section 2-202(b) of the Criminal Procedure Article ("C.P.") of the Md. Code (2025 Repl. Vol.) provides: "A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer may arrest without a warrant any person whom the police officer reasonably believes to have committed the crime."[36]

---

[36] The "*Terry* stop and frisk" is an exception to the Fourth Amendment's warrant requirement. *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, a police officer may stop and temporarily detain an individual for investigative purposes without violating the Fourth Amendment's prohibition against unreasonable searches and seizures, as long as the officer has a reasonable, articulable suspicion, based on specific facts, that criminal activity is afoot. *Id.* at 30; *see United States v. Peters*, 60 F.4th 855, 862 (4th Cir. 2023).

However, a *Terry* stop "must be justified by reasonable suspicion of criminal activity or some other exception" to the warrant requirement. *United States v. Feliciana*, 974 F.3d 519, 522 (4th Cir. 2020); *see United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Reid v. Georgia*, 448 U.S. 438, 440 (1980); *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015); *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011). The purpose of a *Terry* stop is investigative — to verify or to dispel the officer's suspicion surrounding the suspect. *Terry*, 392 U.S. at 22, 30. Reasonable suspicion "is a less demanding standard than probable cause . . . ." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see United States v. Smart,* 91 F.4th 214, 223 (4th Cir.) ("Reasonable suspicion is a low bar"), *cert. denied,* 144 S. Ct. 2671 (2024), *reh'g denied,* ___ U.S. ___, 145 S. Ct. 367 (2024). But, it requires "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (citations omitted); *see also Wingate v. Fulford*, 987 F.3d 299, 305 (4th Cir. 2021); *Feliciana*, 974 F.3d at 523.

In my earlier Memorandum Opinion (ECF 27), I discussed the *Terry* doctrine in connection with the initial vehicle stop. *Id.* at 38–41. I incorporate it here, to the extent relevant.

In making an assessment as to probable cause, a court considers the totality of circumstances. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Peters*, 60 F.4th at 864; *United States v. Cloud*, 994 F.3d 233, 242 (4th Cir. 2021).  As the Fourth Circuit has said, the court "must not discount the officers' experience and training 'to detect the nefarious in the mundane.'" *United States v. Critchfield*, 81 F.4th 390, 395 (4th Cir. 2023) (quoting *United States v. McCoy*, 513 F.3d 405, 415 (4th Cir. 2008)).  On the other hand, a mere "'hunch'" or "'inchoate and unparticularized suspicion'" is not enough.  *Wardlow*, 528 U.S. at 124 (citation omitted); *see United States v. Gist-Davis*, 41 F.4th 259, 264 (4th Cir. 2022).  Indeed, "[c]ourts are 'skeptical of Government attempts to spin . . . largely mundane acts into a web of deception.'" *United States v. Hawkins*, 161 F.4th 242, 246 (4th Cir. 2025) (quoting *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016)).  And, "'[t]o be reasonable is not to be perfect.'"  *Glover*, 589 U.S. at 381 (citation omitted).

Probable cause is a defense under § 1983 for false arrest and false imprisonment claims. *See Pierson v. Ray*, 386 U.S. 547, 557 (1967) ("[T]he defense of good faith and probable cause, which . . . [is] available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under [§] 1983."); *White v. Maryland Transp. Auth.*, 151 F. Supp. 2d 651, 655 (D. Md. 2001) ("On the federal claims for false arrest, false imprisonment, and malicious prosecution, the dispositive question is probable cause.").

### 2.

#### a.  Shaneris Nalls and Officer Vicarini

Defendants contend that Officer Vicarini "had probable cause to detain" Shaneris "and search the vehicle under both federal and Maryland law."  ECF 47-1 at 8.  They identify two offenses that allegedly provided Officer Vicarini with probable cause to arrest Shaneris: (i)

107

possession of marijuana and (ii) obstructing and hindering a law enforcement officer in the performance of his duty. *Id.* at 8–9.[37]    I consider each ground, in turn.

**i.**

Defendants assert probable cause for Shaneris's arrest based on the strong odor of marijuana that Officer Vicarini smelled as he approached the vehicle. ECF 47-1 at 7–8; *see* ECF 47-2 at 14; ECF 54 at 3. And, they note that when Officer Vicarini "spoke to" Shaneris, she "admitted that she had marijuana in the car." ECF 47-1 at 8. According to defendants, "[o]nce Officer Vicarini smelled marijuana he had probable cause to detain Ms. Nalls and search the vehicle under both federal and Maryland law." *Id.*[38]

---

[37] In their Reply, defendants assert, for the first time, that Shaneris also "resisted arrest", claiming this constitutes yet another basis to support the legality of Shaneris's arrest. ECF 54 at 5. I decline to consider this belated contention.

I am mindful that "it is irrelevant to the probable cause analysis what crime a suspect is eventually charged with . . . ." *Sennett v. United States*, 667 F.3d 531, 535 (4th Cir. 2012) (citation omitted). But, a court need not consider arguments made for the first time in a party's reply. *See, e.g.*, *United States v. Al–Hamdi,* 356 F.3d 564, 571 n. 8 (4th Cir. 2004) (declining to consider argument first raised in reply brief); *see also United States v. Williams,* 445 F.3d 724, 736 n.6 (4th Cir. 2006) (declining to consider an argument raised for the first time in the reply brief); *Hanlin–Cooney v. Frederick Cnty., Md.*, WDQ-13-1731, 2014 WL 576373, at *11 n.32 (D. Md. Feb. 11, 2014) (declining to consider an argument first raised in the reply brief). The rationale behind this general principle is that that the opposing party would be prejudiced by a consideration of the argument, because of a lack of opportunity to respond. *See Clawson v. FedEx Ground Package Sys., Inc.*, 451 F.Supp.2d 731, 735 (D. Md. 2006) (citing *United States v. Head*, 340 F.3d 628, 630 n. 4 (8th Cir. 2003)).

Even if I were to consider this ground, however, plaintiffs vigorously dispute the claim that Shaneris resisted arrest. Resolution of the factual issue would be a question for the jury.

[38] Defendants rely, in part, on federal law to support their claim that the odor of marijuana was sufficient to support probable cause to arrest Shaneris. *See* ECF 47-1 at 8. However, as stated earlier, when determining whether an arrest by State police was supported by probable cause, the court looks to State law. *See Michigan*, 443 U.S. at 36; *Ker*, 374 U.S. at 37; *Pourghoraishi*, 449 F.3d at 761.

Plaintiffs characterize "[t]he encounter" between Shaneris and Defendants Schulman and

Vicarini as "a stop." ECF 50-1 at 5. Moreover, they contend that there was no probable cause to

arrest Shaneris. *Id.* at 4.[39]

Plaintiffs dispute that the officers smelled marijuana. *Id.* at 7. Rather, as discussed, *infra*,

they claim that Officers Vicarini and Schulman "deemed the vehicle suspicious when Plaintiff

Shaneris and her friends gave the 'fucking crim' look.'" *Id.* Plaintiffs also point to "discrepancies"

in the evidence "as to whether" Officer Vicarini smelled "burnt marijuana" or if there "was a smell

of marijuana upon approach, after approach, or at all." *Id.* They posit that Officers Vicarini and

Schulman "undoubtedly fabricated the smell of marijuana, causing a detention to start, before they

arrested Plaintiff Shaneris and violated her constitutional rights." *Id.* at 11.

In *Santos v. Frederick County Bd. of Comm'rs*, 725 F.3d 451 (4th Cir. 2013), the Court

explained that there are "three categories of police-citizen encounters," *id.* at 460–61:

> First, "consensual" encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Second, brief investigative detentions—commonly referred to as "Terry stops"—require reasonable, articulable suspicion of criminal activity. *Terry* [*v. Ohio*, 392 U.S. 1, 21 (1968)]. Finally, arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2006).
>
> A police-citizen encounter rises to the level of a Fourth Amendment seizure when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . . " *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *Terry*, 392 U.S. at 19 n.16). This inquiry is objective, [*United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002)], asking whether "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Jones*, 678 F.3d at 299 (quoting [*United States v. Mendenhall*, 446 U.S. 544, 554 (1980)]). An encounter generally

---

[39] Plaintiffs also argue that the stop "was not supported by reasonable, articulable suspicion . . . ." ECF 50-1 at 6. Defendants do not rely on reasonable suspicion, however. Rather, defendants assert that defendants are entitled to summary judgment as to plaintiffs' false arrest claims because the arrests were supported by probable cause. ECF 47-1 at 7–11.

remains consensual when, for example, police officers engage an individual in routine questioning in a public place. *United States v. Gray*, 883 F.2d 320, 323 (1989) . . . .

Here, the officers approached the vehicle allegedly because they suspected illegal activity. ECF 21, ¶ 26.  In his IAS statement, Officer Vicarini claims that upon passing Shaneris's vehicle in a marked police car, he observed that the girls within Shaneris's car appeared "increasingly nervous at [the police officers'] presence", which Officer Vicarini thought was "suspicious."  ECF 50-4 at 3:04–3:11.[40]  Plaintiffs allege that, when Officer Vicarini and Officer Schulman "approached the vehicle," its "windows . . . were rolled up."  ECF 21, ¶ 29.  The officers then "demanded" that Shaneris "roll down the window."  *Id.*  According to plaintiffs, Shaneris "placed the key in the ignition and turned the battery on so she could roll the driver's window down, [because] she reasonably believed she was not free to leave."  *Id.*  Plaintiffs state: "It is . . . at this point . . . that the Officers would have reasonably been able to smell marijuana and discern that its origin was this particular vehicle."  *Id.* ¶ 29 n.1.

The police were permitted to approach the car in the parking lot, without implicating the Fourth Amendment's protections. *See United States v. Lewis*, 606 F.3d 193, 197–98 (4th Cir. 2010).  Neither Officer Schulman nor Officer Vicarini had activated their body cameras to record their initial approach to Shaneris's vehicle.  *See* ECF 50-3; ECF 50-10; ECF 50-11.  Nor is there video footage that captures Officer Vicarini ordering Shaneris to lower her window.  But, the

---

[40] Defendants do not argue that the girls' apparent nervousness provided sufficient basis for Officer Vicarini and Officer Schulman to stop the vehicle or to arrest Shaneris.  The Fourth Circuit has observed: "[N]ervousness is not a *particularly* good indicator of criminal activity, because most everyone is nervous when interacting with the police.  But we have held that nervousness can still be a relevant factor to the reasonable suspicion inquiry where (1) the suspect's nervousness is extreme—unusual, beyond the norm, or evasive—and (2) the officer articulates specific facts supporting his conclusion that the suspect was extremely nervous."  *Smart,* 91 F.4th at 226 (cleaned up) (internal citations and quotation marks omitted) (emphasis in *Smart*).

events occurred on a January night, and when Vicarini's body camera footage begins, Shaneris's

car window is the only one that is rolled down.  ECF 50-3 at 0:00-0:35.  Furthermore, in his IAS

statement, Officer Vicarini states that he "got" Shaneris to exit the car.  ECF 50-4 at 3:52–3:59.

In the light most favorable to plaintiffs, I will assume that Officer Vicarini ordered Shaneris

to roll down her window and then to exit the vehicle.[41]   A minor might have believed that she was

not free to leave.  *Cf. United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) ("A law

enforcement officer need not always 'display an intimidating demeanor or use coercive language'

for a suspect to believe he cannot decline an officer's requests or otherwise terminate the

encounter.") (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)).

Accordingly, a seizure occurred for purposes of the Fourth Amendment when the officers

---

[41] Courts are divided about whether a police officer's request that the occupant of a car roll down the car window amounts to a Fourth Amendment seizure.  *Compare United States v. Barry*, 394 F.3d 1070, 1075 (8th Cir. 2005) ("[Officers'] conduct in approaching [suspect's] parked vehicle and knocking on the window did not amount to a show of authority such that a reasonable person would believe he was not at liberty to ignore [the officers'] presence and go about his business", and concluding that no seizure occurred during that part of the encounter); *Purce v. United States*, 482 A.2d 772, 777 (D.C. 1984) (no seizure when officer "tapped on the car window, awakened [the occupant], and asked him for identification"); *Akins v. State*, 596 S.E.2d 719, 721 (Ga. Ct. App. 2004) (no seizure when officer asked the occupant of a parked car "to roll down her window in order to talk to her and determine her well-being")*; People v. Clark*, 541 N.E.2d 199, 203 (Ill. App. Ct. 1989) (no seizure when officer "tapped on the window" of a parked car, "identified himself, and said to open it"); *State v. O'Neil*, 62 P.3d 489, 497–98 (Wash. 2003) (no seizure when officer "shined his spotlight" on parked car, "approached the car and shined a flashlight into it," and "asked [the occupant] to roll his window down"), *with United States v. Ingram*, 151 F. App'x 597, 598–99 (9th Cir. 2005) (seizure occurred when officer approached parked car and "directed" the occupant "to roll down his window"); *United States v. Carroll*, 591 F.2d 1132, 1135 (5th Cir. 1979) ("The Agents' tapping on the window and their questioning of [the occupant] constituted a stop within the meaning of the Fourth Amendment."); *Borowicz v. North Dakota Dep't of Transp.,* 529 N.W.2d 186, 188 (N.D. 1995) (stating that "a stop arguably occurred when [a police officer] requested [the occupant of a parked car] to open the door of the pickup and asked [him] to produce his driver's license"); *Maine v. Patterson*, 868 A.2d 188, 192–93 (Me. 2005) (seizure occurred when police officer approached a "vehicle parked among other cars in a well-used university parking lot" and "instructed" the occupant "to roll down the window").

approached Shaneris in her car, directed her to lower her window, and instructed her to exit the vehicle.

With regard to the defendants' claim that the interaction occurred because of the smell and presence of marijuana, the parties, surprisingly, fail to discuss Maryland's sea change in the law as to possession of small quantities of marijuana. Of import, "[i]n 2014, the [Maryland] General Assembly decriminalized possession of less than ten grams of marijuana." *Pacheco v. State*, 465 Md. 311, 320, 214 A.3d 505, 510 (2019). With the enactment of Md. Code (2012 Repl. Vol., 2014 Supp.), C.L. §§ 5-601(c)(2) and 5-601.1, "the possession of less than ten grams of marijuana became a civil offense." *Id.* at 327, 214 A.3d at 514. [42] After this change in the law, "courts in Maryland and others across the country have grappled with the constitutionality of searches and seizures that are based, at least in part, on the odor of marijuana." *Pacheco,* 465 Md. at 320, 214 A.3d at 510.

---

[42] In 2022, the Maryland Constitution was amended, permitting the use and possession of cannabis by individuals over the age of 21. Md. Const. art. XX § 1. "It is, therefore, no longer 'illegal [in Maryland] to possess any quantity of marijuana.'" *Hutt v. State*, No. 1667, Sept. Term 2022, 2024 WL 3811309, at *6 n.3 (Md. Ct. Spec. App. Aug. 14, 2024) (quoting *Bowling v. State*, 227 Md. App. 460, 476, 134 A.3d 388, 398 (2016)); *see Moore v. Maryland Hemp Coalition, Inc.* 267 Md. App. 169, 193, 343 A.3d 624, 638 (2025), *cert. denied sub nom. Maryland Hemp Coalition, Inc. v. Moore*, No. 311, Sept. Term, 2025, 2026 WL 316224 (Md. Jan. 28, 2026).

Furthermore, "[i]n 2023, the General Assembly enacted § 1-211 of the Criminal Procedure Article ['C.P.'] of the Maryland Code, which, among other things, prevents law enforcement officers from stopping and searching vehicles based solely on the odor of marijuana, and excludes any evidence obtained from such a search from being admissible in judicial proceedings. Both the constitutional amendment and [C.P.] § 1-211 took effect July 1, 2023." *Hutt,* 2024 WL 3811309, at *6 n.3. But, § 1-211 does not apply retroactively to searches or stops conducted prior to July 1, 2023, on the basis of the odor of marijuana. *Cutchember v. State*, __ Md. __, __ A.3d __, 2026 WL 591287, at *1 (March 3, 2026).

In 2017, in *Robinson v. State*, 451 Md. 94, 99, 152 A.3d 661, 665 (2017), the Maryland Court of Appeals[43] held that "a law enforcement officer has probable cause to search a vehicle where the law enforcement officer detects an odor of marijuana emanating from the vehicle, as marijuana in any amount remains contraband, notwithstanding the decriminalization of possession of less than ten grams of marijuana; and the odor of marijuana gives rise to probable cause to believe that the vehicle contains contraband or evidence of a crime." The Court explained: "[D]ecriminalization is not synonymous with legalization, and possession of marijuana remains unlawful." *Id.*

Two years after *Robinson*, in *Pacheco*, 465 Md. 311, 214 A.3d 505, the Maryland Court of Appeals revisited the legal significance of the odor of marijuana emanating from a motor vehicle. Decided in August 2019, the *Pacheco* Court considered a search incident to arrest that occurred after officers "observed Mr. Pacheco in the driver's seat of what they further described as a 'suspicious,' though legally parked, vehicle," from which the odor of "'fresh burnt' marijuana emanat[ed]", and there was also a "joint . . . in the center console." *Id.* at 332, 214 A.3d at 517.

The *Pacheco* Court considered whether "the circumstances leading up to the officers' search of" the defendant "supplied probable cause that he had committed either a felony or a misdemeanor in the officers' presence." *Id.* at 331, 214 A.3d at 517. The court noted that since 2017, the Maryland Court of Appeals had "identified three crimes that the odor of marijuana may

---

[43] In the Maryland general election held in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. But, I shall refer to the courts by the names that were in effect when the cited decisions were issued.

113

indicate are occurring: possession of ten grams or more of marijuana, possession of marijuana with the intent to distribute, or the operation of a vehicle under the influence of a controlled dangerous substance." *Id.* (citing *Robinson*, 451 Md. at 133, 152 A.3d at 684).

The State argued that there was probable cause to suspect Pacheco had possession of ten grams or more of marijuana, based on what the police officers had observed. *Pacheco*, 465 Md. at 332, 214 A.3d at 517. But, the court concluded that the police lacked "probable cause to arrest Mr. Pacheco based on the belief that he was committing, had committed, or was about to commit a crime in their presence." *Id.* at 333, 214 A.3d at 517. The court noted that, apart from the police officers' observations, "little else was presented that addressed why this minimal amount of marijuana, which is not a misdemeanor, but rather a civil offense, gave rise to a fair probability that Mr. Pacheco possessed a criminal amount of marijuana on his person." *Id.* at 333, 214 A.3d at 518. But, the court noted that, "[i]n a different case, additional facts or testimony beyond what we have here may well have compelled a different result." *Id.*

*Penaranda v. State*, No. 1361, Sept. Term, 2021, 2023 WL 3862430, at *1 (Md. App. June 7, 2023), although unreported, is informative. In that case, on December 4, 2019, the police stopped Penaranda for speeding after following him for over three hours. *Id.* at *1, 3. The officers "immediately smelled the odor of marijuana coming from Penaranda's car and asked Penaranda, the car's sole occupant, to step out of the car." *Id.* Penaranda did not immediately comply. *Id.* Then, "the police pulled him out [of his vehicle], walked him to the rear of the car, and observed that he was still giving off a strong odor of marijuana." *Id.* The police searched Penaranda and uncovered "a veritable pharmacopeia of illegal drugs, but which did not include marijuana" and then "conducted a search of his car (finding a small amount of marijuana)." *Id.*

114

The police issued Penaranda "a civil citation for possession of less than 10 grams of marijuana." *Id.* at *1 n.1.  However, Penaranda was indicted for possession of a variety of illegal narcotics, and possession of heroin and fentanyl with intent to distribute. *Id.* at *1.  Penaranda did not challenge the lawfulness of the initial stop.  *Id.*  Rather, he sought to suppress the evidence police gathered from the search of his person.  *Id.* The lower court denied Penaranda's motion to suppress. *Id.*

The *Penaranda* Court observed: "The *Pacheco* Court did not instruct us as to what weight to accord to the odor of marijuana, except that alone it was insufficient to generate probable cause[.]" *Id.*  Further, the court emphasized that the *Pacheco* Court instructed that "the odor of marijuana does not give rise to general probable cause that the person may have any kind of contraband or weapons." *Id.* (citing *Pacheco*, 465 Md. at 329, 214 A.3d at 515).

Of relevance, the Appellate Court of Maryland considered "that Penaranda's person and car smelled of marijuana", in light of *Pacheco,* 465 Md. at 329, 214 A.3d at 515, and *Robinson,* 451 Md. 94, 152 A.3d 661.  *Penaranda*, 2023 WL 3862430, at *5–6.  The court concluded that there was "little reason to infer that the smell [of marijuana] was related to either a felony or a misdemeanor committed in the presence of police that would justify an arrest and then a search incident to a lawful arrest." *Id.* at *5.  Accordingly, the court gave "this odor of marijuana relatively little weight in" its analysis as to whether the police had probable cause to arrest Penaranda. *Id.*  Ultimately, the court concluded that the police lacked probable cause to arrest Penaranda. *Id.* at *7.  Accordingly, it reversed the lower court. *Id.*

Here, the seizure took place in January 2020.  By that time, for some six years, possession of less than 10 grams of marijuana was only a civil offense in Maryland.  And, the incident occurred five months *after* the decision of the Maryland high court in *Pacheco*, 465 Md. 311, 214

A.3d 505, in which the court concluded that the odor of marijuana did not provide probable cause to arrest, because it did not give rise to a fair probability that the defendant possessed a criminal quantity of marijuana. *See id.* at 333, 214 A.3d at 518.

As plaintiffs emphasize, there are "discrepancies as to whether there was [the] smell of marijuana upon approach [of the car], after approach, or at all." ECF 50-1 at 7. Put simply, plaintiffs contend that the officers fabricated the claim of an odor of marijuana.[44] They note, *inter alia*, that no marijuana had been smoked, and suggest that the human nose could not otherwise have detected such a small quantity in a vehicle with the windows rolled up.[45]

In his IAS statement, Officer Schulman stated that he did not "know if . . . you could smell the odor of marijuana, but it got to the point where we found out that, I think the female said, I do have some marijuana." ECF 50-6 at 2:53–3:02.[46] But, the incident reports prepared by Officer Schulman and Officer Vicarini, respectively, reflect that Officer Vicarini claimed to have smelled

---

[44] Curiously, defendants assert that it is undisputed that Officer Vicarini smelled the odor of marijuana as he approached Shaneris's vehicle. *See* ECF 54 at 3 ("[T]hat Defendant Vicarini did smell marijuana as he approached the car is an undisputed fact."); ECF 47-1 at 3–4. To the contrary, plaintiffs vigorously dispute the contention.

[45] The Supreme Court explained in *Illinois v. Caballes,* 543 U.S. 405 (2005), a case cited by plaintiffs (ECF 50-1 at 8 n.6), that courts treat "a canine sniff by a well-trained narcotics-detection dog as '*sui generis*' because it 'discloses only the presence or absence of narcotics, a contraband item.'" *Caballes,* 543 U.S. at 409 (citation omitted). Indeed, drug detection dogs generally can smell odors that humans cannot discern. *See Florida v. Harris*, 568 U.S. 237, 249 (2013) ("A well-trained drug-detection dog *should* alert [an officer] to . . [residual] odors; his response to them might appear a mistake, but in fact it is not.") (emphasis in original).

[46] In the Amended Complaint, plaintiffs acknowledge that after being stopped by Officer Schulman and Officer Vicarini, "Plaintiff Shaneris Nalls admitted to being in possession of a rolled marijuana cigarette, commonly referred to as a 'roach,' which she handed over to the officers." ECF 21, ¶ 31. But, defendants do not rely on that statement to establish probable cause. Rather, they claim that Officer Vicarini had probable cause to arrest Shaneris for marijuana possession based on the alleged odor of marijuana. *See* ECF 47-1 at 7–8; ECF 54 at 3. Accordingly, I do not consider here whether Shaneris's admission was lawfully obtained and provided probable cause to arrest her.

marijuana upon his approach to the Honda. ECF 47-2 at 14; ECF 50-5 at 1. Whether Officer Vicarini did in fact smell marijuana—or could have smelled it—is a credibility question for the jury. *See Storrs v. Rozeboom*, BCB-21-175, 2025 WL 1531677, at *8 (D. Neb. May 29, 2025) ("Whether [Officers] perceived an odor of marijuana to support the determination is a disputed issue of fact.") (quoting *Smith v. Rozeboom*, 108 F.4th 1064, 1072 (8th Cir. 2024)); *Gatling v. Roland*, CAR-10-55, 2011 WL 2711226, at *8 (M.D. Ga. July 13, 2011) ("[W]hether the officers smelled, saw, and heard what they claim is a question for a jury."), *aff'd,* 458 F. App'x 819 (11th Cir. 2012).

Notably, the investigation revealed a quantity of less than 10 grams of marijuana in the vehicle. *See* ECF 50-8 (BCPD Forensic Services Laboratory Report) (jar had 8.72 grams of plant matter, and a cigarette, not analyzed). Indeed, Officer Vicarini stated at the time: "The amount of weed that was in there, you guys wouldn't have had anything done to you . . . . I wouldn't have written you a civil citation . . . ." ECF 50-3 at 18:50-19:01. Moreover, the Honda's windows were rolled up on that January night. Given that no burnt marijuana was recovered from the vehicle or the plaintiffs, and noting that the quantity of marijuana that was recovered was under 10 grams, a jury could discredit Vicarini's assertion that he detected the odor of marijuana emanating from the Honda. Put another way, the small quantity of marijuana found in the car makes it less likely that, if unlit, its scent was so strong that Officer Vicarini could smell it as he approached the vehicle with the windows rolled up.

Moreover, unlike in *Pacheco*, the officers here do not aver that, upon approach to the car, they saw a marijuana cigarette. Rather, they learned of the marijuana upon questioning Shaneris. And, a jury could decide the evidence supports a finding that the officers approached Shaneris's

vehicle not because of the smell of marijuana but because the females in the parked vehicle gave Vicarini and Schulman the "fucking crim look[.]" *See* ECF 50-3 at 15:30–15:34.

However, if a jury credits Officer Vicarini's claim that he smelled marijuana, as he alleges, the officers arguably could investigate. But, even so, as of 2019, the Maryland Court of Appeals had stated in *Pacheco*, 465 Md. at 318, 214 A.3d at 508, that the smell of "'fresh burnt' marijuana" and the presence of a joint were not enough to arrest. Defendants do not address the circumstance that, at the time Shaneris was arrested, an adult's possession of less than ten grams of marijuana was not a criminal offense under Maryland law.[47] Nor do defendants proffer any facts, aside from the alleged odor coming from Shaneris's car, to support probable cause to suspect that Shaneris possessed more than ten grams of marijuana.

Given the significant factual dispute regarding whether the officers smelled marijuana when they approached the vehicle, I cannot conclude, as a matter of law, that Officer Vicarini had probable cause to arrest Shaneris for a marijuana violation.

However, the alleged marijuana violation led to a melee that, in turn, resulted in other alleged criminal misconduct of Shaneris and her family members. I turn to those contentions.

**ii.**

Defendants claim that Officer Vicarini also "had probable cause to arrest" Shaneris because she "reentered the vehicle and sat in it before the car had been searched." ECF 47-1 at 8; *see also* ECF 54 at 3. According to defendants, by reentering the vehicle, Shaneris "disobeyed a lawful order" of the police. ECF 47-1 at 9. Moreover, defendants claim that with this action Shaneris was "'obstructing and hindering a law enforcement officer in the performance of his

---

[47] Defendants do not refer the Court to any law regarding prosecution of a juvenile for possession of marijuana. The police learned of her age only after she was stopped.

118

duty'", *i.e.*, the vehicle search, which constitutes a common law offense in Maryland.  *Id.* (quoting *Titus v. State*, 423 Md. 548, 558, 32 A.3d 44, 50 (2011)).

As to hindering, plaintiffs claim: "Defendants offer no evidence that Plaintiff Shaneris was ordered to remain outside of the vehicle[.]"  ECF 50-1 at 8.  They allege that Shaneris "exited the vehicle near the start of the encounter" and reentered the vehicle  in an attempt "to stay warm on a cold January night."  *Id.* at 8–9.  According to plaintiffs, "once in the vehicle, Plaintiff did not refuse the orders of Defendant Vicarini.  She was never afforded the chance to obey."  *Id.* at 9.[48]

In Maryland, it is a common law offense to obstruct and hinder a police officer in the performance of his duty.  *Titus*, 423 Md. at 552, 32 A.3d at 47; *Att'y Grievance Comm'n of Maryland v. Sheinbein*, 372 Md. 224, 242–43, 812 A.2d 981, 991 (2002); *Oakman v. State*, No. 391, Sept. Term 2019, 2020 WL 1866938, at *5 (Md. Ct. Spec. App. Apr. 14, 2020).  The elements of this offense are as follows, *Parks v. State,* 259 Md. App. 109, 125 n.16, 302 A.3d 1099, 1109 n.16 (2023) (quoting *Titus*, 423 Md. at 552, 32 A.3d at 47):

> "(1) a police officer engaged in the performance of a duty; (2) an act, or perhaps an omission, by the accused which obstructs or hinders the officer in the performance of that duty; (3) knowledge by the accused of facts comprising element (1); and (4) intent to obstruct or hinder the officer by the act or omission constituting element (2)."

---

[48] In support of their claim, plaintiffs point out that Shaneris "was not arrested for failure to obey or obstruction of justice, as [sic] least not as it pertains to her attempt to re-enter the vehicle."  ECF 50-1 at 9.  Plaintiffs also emphasize that "the charges" filed against Shaneris were "devoid of claims for failure to obey a lawful order."  *Id.* at 10 (citing ECF 50-7).  But, as defendants note, what Shaneris was charged with "is irrelevant" as to "whether probable cause existed to make [a] warrantless arrest."  ECF 54 at 6 (citing *Dist. of Columbia v. Wesby,* 583 U.S. 48, 64 (2018)); *see Devenpeck*, 543 U.S. at 153 ("The rule that the offense establishing probable cause must be 'closely related' to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest is inconsistent with [the Supreme Court's] precedent."); *Sennett*, 667 F.3d at 535–36 (internal citation omitted) ("[I]t is irrelevant to the probable cause analysis what crime a suspect is eventually charged with . . . or whether a person is later acquitted of the crime for which she or he was arrested[.]").

The offense is comprised of "three different categories of conduct: (1) *positive direct obstruction,* in which the officer acts directly against the defendant or the defendant's property and is physically resisted; (2) *passive direct obstruction,* where the officer seeks to make the defendant act directly and the defendant refuses or fails to act as required; and (3) *positive indirect obstruction,* where 'the police are not acting directly against the [defendant] but are acting indirectly against other citizens *who are, or may be, about to commit offenses* against the criminal law, and the [defendant] does an act which obstructs them in their general duty to prevent or detect crime, intending to frustrate the police operation.'" *DiPino v. Davis*, 354 Md. 18, 33, 729 A.2d 354, 361–62 (1999) (quoting *Cover v. State,* 297 Md. 398, 405–06, 466 A.2d 1276, 1280 (1983)) (emphasis in *DiPino*).

Of import, "'where the alleged hindering is . . . indirect . . . the crime may [not] be based solely on intent, without regard to whether there has in fact been some degree of hindrance.'" *Dipino*, 354 Md. at 34–35, 729 A.2d at 362 (quoting *Cover,* 297 Md. at 416, 466 A.2d at 1285). "The specific conduct punishable" for hindering, or obstructing an officer of the law in the performance of his duties, "in contrast to conduct punishable as resisting arrest, d[oes] not need to rise to the level of violence or resistance and could be verbal in nature." *Rich v. State*, 205 Md. App. 227, 244, 44 A.3d 1063, 1073 (2012). Furthermore, an "arrest[] is not essential to the offense of resisting, hindering, or obstructing an officer in the performance of his duties." *Busch*, 289 Md. at 677, 426 A.2d at 958.

Again, willful failure to obey a lawful order of a police officer is a misdemeanor in Maryland. *See* C.L. §§ 10-201(c)(3), 10-201(d).  And, it is well established that an officer making a traffic stop may order the driver and the passengers to exit the car "pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).

But, there are genuine issues of material fact as to whether Officer Vicarini had probable cause to suspect Shaneris of the fourth element of hindering, *i.e.*, intent to hinder. Defendants argue that by reentering the vehicle, Shaneris "disobeyed a lawful order and . . . obstructed the effort to search the vehicle." ECF 47-1 at 9. But, plaintiffs claim that the "body-worn camera footage shows that" Shaneris "was not instructed to remain out of the vehicle at any time." ECF 50-1 at 9.

Officer Vicarini's body camera shows that at the time Shaneris reentered the vehicle, Officer Vicarini was standing near the vehicle and had not begun to search it. ECF 50-3 at 4:31–4:34. But, if Officer Vicarini had not ordered Shaneris to remain out of the vehicle, then there would be no basis for Officer Vicarini to suspect that Shaneris intended to hinder his search of the car by reentering the vehicle.

In my view, there is considerable uncertainty as to whether Officer Vicarini ever ordered Shaneris to remain outside the vehicle. And, there is no basis to conclude that Shaneris, a minor, knew she was not allowed to reenter her vehicle on a cold January night. Officer Vicarini is not entitled to summary judgment as to Shaneris's claim of false arrest on the basis that he had probable cause to arrest Shaneris for hindering when she reentered the vehicle.

**b. Dayaneris Dmeza and Officers Vicarini, Vitacco, and Harshadavid**

Defendants claim that Officers Vicarini, Vitacco, and Harshadavid had probable cause to arrest Dmeza for hindering and for assault of Officer Vicarini. ECF 47-1 at 10; ECF 54 at 6.

As discussed, after Shaneris reentered her car, Officer Vicarini ordered Shaneris to exit the vehicle. ECF 50-3 at 4:34–4:40. Officer Harshadavid's body camera shows Dmeza moving between Officer Vicarini and Shaneris. ECF 50-16 at 2:02–2:04. Within a second or two, it appears that Officer Vicarini pushed Dmeza. *Id.* at 2:03–2:06. But, defendants characterize

121

Dmeza's actions as physically intervening "to stop Officer Vicarini from removing Ms. Nalls or arresting her[.]"  ECF 47-1 at 10.

The elements for hindering or intervening in a police officer in the performance of his duty were stated earlier.  I need not repeat them.

"In Maryland, second degree assault codifies and criminalizes common law assault." *Crouch v. City of Hyattsville*, DKC-09-2544, 2012 WL 6019296, at *5 (D. Md. Nov. 30, 2012).  It is codified at C.L. § 3-203(a) of the Maryland Code (2021 Repl. Vol., 2025 Supp.).  C.L. § 3-203(a) provides that a "person may not commit an assault."[49]  The Maryland Criminal Pattern Jury Instructions reflect that at trial the State must prove that the accused: "(1) caused offensive physical contact with, or harm to, the victim; (2) the contact was the result of an intentional or reckless act and was not accidental; and (3) the contact was not consented to by the victim or was not legally justified."  *Crouch*, 2012 WL 6019296, at *5.

As to defendants' claim that the officers had probable cause to arrest Dmeza for hindering, the case of *Hayes v. City of Seat Pleasant, Md.,* 469 F. App'x 169 (4th Cir. 2012), is instructive. The incident began with a seemingly innocuous encounter between plaintiffs, a married couple with a five-year-old daughter, and a police officer.  *Id.* at 170.  The husband asked the police officer, who was parked in a cruiser across from his driveway, to move so he could back out of his driveway.  *Id.*  According to plaintiffs, the officer responded by yelling and subsequently stopped the husband's vehicle.  *Id.*  The incident escalated when the wife, who was standing on the sidewalk, holding her child's hand,  asked the police officer "why he was stopping her car and harassing her husband."  *Id.*  Plaintiffs asserted that the police officer responded by shouting at the wife, exiting his police car, and grabbing "her arm and pull[ing] out his baton[.]"  *Id.* at 171.

---

[49] This provision has not been amended since 2015.

The husband exited his vehicle and "asked" the police officer "to take his hands off of" his wife and "requested that he call a female officer." *Id.* The police officer told the husband to stay back, which he did. *Id.* Nonetheless, the police officer pepper sprayed both the husband and wife. *Id.* And, the police officer subsequently arrested both of them, charging them with a variety of offenses, including obstructing and hindering. *Id.* After a jury found them not guilty of all charges, they filed a suit against the police officer and the municipality for which he worked. *Id.*

The husband had "testified that he exited the vehicle out of instinct when he saw a big officer manhandling [his] wife with a baton in his hand while she was holding their daughter's hand." *Id.* at 173 (internal quotation marks omitted).[50] But, he "remained at least seven feet from" the police officer and, "when ordered to stay back, he obeyed." *Id.* Moreover, he "watched" the police officer "twist his wife's arm while holding their hysterical child's hand, [but he] did not attempt to stop" the officer "or interfere with the arrest." *Id.*

The district court granted the defendants' summary judgment motion, "finding there was probable cause for" the police officer "to initiate an investigatory traffic stop and probable cause to arrest" the plaintiffs. *Id.* at 171. It characterized "the conduct at issue" as "positive indirect obstruction." *Id.* With regard to the wife, the district court found that the police officer "'could have reasonably believed that'" the wife "'was hindering by verbally accosting'" the police officer "'even after he told her to move away from the scene.'" *Id.* (quoting the district court). Additionally, the district court found that with, respect to the husband, "'a number of facts evidence[d] that [the husband] was hindering, such as [the husband's] behavior, his statements to [the police officer] to take his hands off his wife, and his movement away from the car after the

---

[50] I assume the husband testified at his criminal trial, but the opinion does not specify.

officer ordered him to stay back.'"  *Id.*   On appeal, the Fourth Circuit considered whether the defendant police officer had "probable cause to lawfully arrest" for hindering.  *Id.* at 172.

The Fourth Circuit's "review of the record . . . reveal[ed] two conflicting versions of what transpired" between the police officer and the plaintiffs.  *Id.*   In its view, "these disputed facts" went to "the heart of whether probable cause existed to arrest" plaintiffs "for hindering, rendering summary judgment inappropriate."  *Id.*   The Court concluded that although defendants claimed that the wife "interfered with" the stop of her husband, it was "unclear that [the wife] verbally accosted [the police officer] at all or interfered with the stop, such that [the] officer [] was unable to continue, much less that she *intended* to do so, a requisite element of a hindering offense."  *Id.* (emphasis in original).

Therefore, the Court vacated the district court's grant of summary judgment in favor of defendants as to plaintiffs' constitutional claims for unlawful seizure, excessive force, and state tort claims for false arrest, battery and malicious prosecution, and remanded for further proceedings.  *Id.* at 169.   It said that "[w]hat transpired between" the defendant officer and plaintiffs "is a matter of disputed fact that goes directly to the heart of whether" the officer was acting within the contours of his authority when he arrested the plaintiffs.  *Id.*

Similarly, as to Officer Vicarini's interaction with Dmeza, the parties provide completely different accounts of what transpired.  And, it is for the jury to decide the facts.

To support the defendants' claim that there was probable cause to arrest Dmeza for hindering and second degree assault, defendants cite the Statement of Probable Cause, prepared by Officer Vicarini, in which he claimed that Dmeza "grab[bed] a hold of" him and "trie[d] to push him away from her daughter."  ECF 54 at 6 (citing ECF 50-2 at 4–5).   Additionally, defendants point to Officer Vicarini's IAS statement, in which he claimed that Dmeza grabbed his

124

upper body.  ECF 54 at 6 (citing ECF 50-4 at 10:22).  According to defendants, this conduct constituted probable cause for Dmeza's arrest.  ECF 47-1 at 10.

Plaintiffs disagree with defendants' characterization of Dmeza's behavior.  According to plaintiffs, "Dmeza did not resist or obstruct the search of the vehicle."  ECF 50-1 at 11.   After Officer Vicarini saw Shaneris reenter the car, he ordered her to get out of the car.  ECF 50-3 at 4:30–4:37.  Plaintiffs claim that the video footage shows that Dmeza "did *not* physically intervene with Defendant Vicarini removing Plaintiff Shaneris from the vehicle."  ECF 50-1 at 11. (emphasis in original) (cleaned up).  Instead, plaintiffs claim the body camera footage shows that Dmeza followed Shaneris as she "walked toward the vehicle[.]"  *Id.* (citing ECF 50-3 at 4:33).  According to plaintiffs, only "then" did Officer Vicarini demand that Dmeza "'back up,'" to which Dmeza responded, "'Alright, relax.'"   *Id.* (citing ECF 50-3 at 4:35–4:36).  And, they contend that, "[w]ithin a second, Defendant Vicarini shoved Plaintiff Dmeza in the chest and into the parked car."  *Id.*  (citing ECF 50-3 at 4:37).

As indicated, in Vicarini's IAS statement, he claims that Dmeza "grabbed him" somewhere in his upper body.  ECF 50-4 at 6:21–6:24, 10:10-10:12.  The video does not clearly show what happened.  But, it does not support defendants' contention that Dmeza engaged in offensive physical contact with Officer Vicarini, a required element of assault.  *See id.* at 6:21-6:24, 10:10–10:26; ECF 47-2 at 14.  Nor does the body camera footage blatantly contradict plaintiffs' version of events.

In the light most favorable to plaintiffs, the evidence indicates that Dmeza attempted to diffuse the situation, asking Officer Vicarini to "relax" as he ordered her daughter to exit the car.  ECF 50-3 at 4:35–4:36.  Indeed, Dmeza's actions were far less disruptive than the husband's actions in *Hayes*, 469 F. App'x at 171–72.  Dmeza did not shout at Officer Vicarini nor, as shown

125

on the video footage, did she engage in any physical interaction to prevent him from performing his duty.  Dmeza's actions, as described by plaintiffs and as shown on the body camera footage, do not reflect an intent to hinder Officer Vicarini, a required element of the offense.

In short, there exists a genuine dispute of material fact as to the alleged assault of Vicarini by Dmeza and what actions, if any, Dmeza took to obstruct the search of the vehicle.  Defendants rely on this alleged conduct to support their claim of probable cause to arrest Dmeza.  Accordingly, Officer Vicarini, Officer Vitacco, and Officer Harshadavid are not entitled to summary judgment with respect to Dmeza's claim of false arrest.

### c.  Shamdu Veraby Nalls and Officers Schulman, Amrhein, Vitacco, and Halstead

Defendants contend that Mr. Nalls's conduct "provided probable cause that he was obstructing an officer and committing second degree assault."  ECF 47-1 at 11.  In particular, defendants claim that Officers Schulman, Amrhein, Vitacco, and Halstead had probable cause to arrest Mr. Nalls because Mr. Nalls "physically intervened" in Officer Vitacco's arrest of Dmeza "and put his hands on Officer Vitacco[.]"  *Id.* (citing ECF 15-3 at 0:39-0:43 and ECF 47-5 (Officer Vitacco's BWC), at 1:02-1:06).

Plaintiffs counter that in Officer Vitacco's IAS statement he "never stated Plaintiff Veraby *physically* intervened."  ECF 50-1 at 12 (emphasis in original).  Further, plaintiffs claim that defendants "have failed to produce any evidence that [Mr. Nalls] assaulted Defendant Vitacco. Instead, Defendant Vitacco, himself, stated he was not assaulted."  ECF 50-1 at 12.  Moreover, plaintiffs claim that Mr. Nalls "would ultimately be placed under arrest (after being assaulted) by Defendant Schulman, Amrhein, Vitacco, and Halstead.  That arrest . . . was illegal."  *Id.* at 13.

In their Reply, defendants add that there was probable cause to arrest Mr. Nalls "because he '*attempted* to physically intervene and *obstruct* the arrest of Plaintiff Dmeza.'"  ECF 54 at 7 (emphasis in ECF 54) (quoting ECF 47-1 at 4).  They contend that, "[e]ven if the video evidence

126

were not clear that Defendant Veraby Nalls 'physically intervened'" in Dmeza's arrest, "Maryland law does not require physical contact or even direct obstruction" for conduct to qualify as "obstruction of a police officer[.]" ECF 54 at 7. Defendants also argue that it is undisputed that Mr. Nalls "committed second degree assault on Defendant Schulman." *Id.* (citing ECF 50-2 at 8; ECF 50-6 at 5:46; ECF 50-4 at 19:02).

The elements of the offenses of hindering and second degree assault were set forth earlier. I incorporate them here.

In Officer Vicarini's Incident Report, he claims that during Dmeza's arrest, Mr. Nalls grabbed "a hold of Lt. Schulman's arms[.]" ECF 47-2 at 16. The Statement of Probable Cause provides, ECF 50-2 at 8:

> Shamdu Veraby Nalls was standing next to Ofc Vitacco and Ofc Harshadavid when they were performing the arrest of Defendant Dayaneris Dmeza. Lt. Schulman was speaking to Defendant Shamdu Veraby Nalls continuously telling him to stay calm and to stand back from the officers. Even though Lt. Schulman continued his de-escalation, Defendant Shamdu Veraby Nalls refused to cooperate and even moved in between Sgt. Steigen and Ofc Vitacco. As Lt. Schulman again tries to get Defendant Shamdu Veraby Nalls to move away willingly, Defendant Shamdu Veraby Nalls grabs a hold of Lt. Schulman's arms and states, "you don't want any of this.". Lt. Schulman then forcibly removes Defendant Shamdu Veraby Nalls away from the other officers and attempts to place him under arrest.

As to the alleged assault of Officer Schulman, plaintiffs point to the video evidence, claiming that it shows that Mr. Nalls had his back against the fence. They state, ECF 50-1 at 26 (internal citations omitted):

> [Mr. Nalls] extended his arms to create space between [himself and Officer Schulman]. [ECF 50-10 at 0:30–0:35]. While Plaintiff Veraby's back was still against the fence, Defendant Schulman grabbed Plaintiff's forearms. (*Id.* at 0:37). At this time, Plaintiff Veraby was clearly afraid for his own safety, and pushed on Defendant Schulman to make space. Defendant Schulman grabbed Plaintiff's forearms again, (*Id.* at 0:38), before shoving him backward into Plaintiff Shaneris's car, again [ECF 50-3 at 5:51–5:53].

Plaintiffs also claim: "When an officer attempts to execute an illegal arrest, a person has the 'right to resist by force, using no more than was necessary to resist the unlawful acts of the officer[.]'" *Id.* at 12 (quoting *West*, 153 U.S. 7 at 86).  They add that "a third person may go to the defense of another who is being illegally arrested."  ECF 50-1 at 12 (quoting *Tipton v. State*, 1 Md. App. 556, 562, 232 A.2d 289, 292 (1967)).

In Maryland, "[w]hen a warrantless arrest is not supported by probable cause, an individual may use reasonable force to resist."  *Riggins v. State*, 223 Md. App. 40, 61, 115 A.3d 224, 237 (2015).  But, at the time Mr. Nalls allegedly pushed Officer Schulman, he was not yet under arrest. Plaintiffs' telling of the facts affirms that Mr. Nalls "pushed on Defendant Schulman[.]"  ECF 50-1 at 26.  Therefore, Mr. Nalls's use of force against Officer Schulman, however minimal, is undisputed.

Mr. Nalls's conduct in pushing Officer Schulman was enough to give rise to probable cause for his arrest for the offense of second degree assault.  Therefore, Officers Schulman, Amrhein, Vitacco, and Halstead are entitled to summary judgment as to Mr. Nalls's claims for false arrest in Counts II and VII.

### d.  Summary

Shaneris, Dmeza, and Mr. Nalls were arrested following a police stop of Shaneris.  Taking the evidence in light most favorable to plaintiffs, Officer Vicarini and Officer Schulman approached Shaneris, a minor, and her three girlfriends, sitting in a parked vehicle, with the engine off, because they supposedly looked suspicious.  Whether Officer Vicarini smelled or could smell marijuana upon his approach to the vehicle is, as discussed, a question for the jury to decide.

The body camera footage clearly establishes that Dmeza, Shaneris's mother, and her father, Mr. Nalls, were upset by the police interaction with their daughter.  The scene grew tense as more family members arrived.  There remain genuine disputes of material fact with respect to whether

128

the conduct of Shaneris and Dmeza gave rise to probable cause for their arrest.  Defendants are not entitled to summary judgment as to Count II and Count VII with respect to Shaneris or Dmeza. However, because Mr. Nalls pushed Officer Schulman, defendants are entitled to summary judgment as to Nalls's claims of false arrest.

### E.  Common Law False Arrest (Count X)

Under Maryland law, a plaintiff alleging common law false arrest must show (1) a deprivation of liberty, (2) "without consent," and (3) "without legal justification."  *Heron v. Strader*, 361 Md. 258, 264, 761 A.2d 56, 59 (2000); *see Rovin v. State,* 488 Md. 144, 180, 321 A.3d 201, 222 (2024).  "The test of legal justification, in the context of false arrest and false imprisonment, is judged by the principles applicable to the law of arrest."  *Id.* (internal quotation marks and citations omitted).  "Therefore, 'where the basis of a false imprisonment action is an arrest by a police officer, the liability of the police officer for false imprisonment will ordinarily depend upon whether or not the officer acted within his legal authority to arrest."  *Id.* at 264–65 (quoting *Montgomery Ward v. Wilson*, 339 Md. 701, 721, 664 A.2d 916, 925 (1995)); *see Hines v. French*, 157 Md. App. 536, 551, 852 A.2d 1047, 1055 (2004) ("False imprisonment [and] false arrest . . . 'can only occur when there is no legal authority or justification for the arresting officer's actions.'") (citation omitted).

The Maryland Court of Appeals has observed: "The term legal justification has created some confusion in other courts."  *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 654, 261 A.2d 731, 738 (1970) (citing *Roberts v. Hecht Co.,* 280 F. Supp. 639 (D. Md. 1968)).  "This confusion arises because of the frequent statement that probable cause is not a defense to an action for false imprisonment but legal justification is."  *Paul*, 256 Md. at 654, 261 A.2d at 73.  For example, in *Roberts*, 280 F. Supp. at 643, the court concluded that there was probable cause to detain the plaintiff but "no justification for such detention."

129

In *Ashton v. Brown*, 339 Md. 70, 122, 660 A.2d 447, 473 (1995), the Maryland Court of Appeals observed that, "[i]n light of the legislative extension of the authority to make warrantless arrests, it appears in the present case that if a police officer . . . had probable cause to believe that the curfew ordinance"—a misdemeanor—"was being violated . . . the police officer could have arrested the [violator] with lawful justification, even though the curfew ordinance was in fact invalid."  Arrest for a misdemeanor may be legally justified by the existence of probable cause if the General Assembly has authorized arrest for a misdemeanor based on the existence of probable cause.  *See id.*

In *Okwa*, 360 Md. at 190, 757 A.2d at 134, the Maryland Court of Appeals said: "One of the many powers given to police officers in this State is the authority, under certain circumstances, to make arrests without an arrest warrant.  The boundaries of this particular authority are defined in [the] Maryland Code." Under Maryland statutory law, a warrantless arrest is legally justified if supported by probable cause. *See* C.P. § 2-202.  Therefore, an officer who has probable cause to arrest an individual for a misdemeanor offense is legally justified in doing so.

It follows that the essential question in determining whether a plaintiff has stated a claim for common law false arrest is the same question that was central to the analysis of Counts II and VII: was there probable cause for each arrest in question? As a result, my prior analysis with respect to Counts II and VII controls the disposition of Count X.

Accordingly, I will grant summary judgment to Officer Schulman, Officer Amrhein, Officer Vitacco, and Officer Halstead as to the claim of Mr. Nalls in Count X for common law false arrest.  But, I will deny summary judgment to Officer Vicarini, Officer Vitacco, and Officer Harshadavid as to the claims of Shaneris and Dmeza for common law false arrest.

## V. Qualified Immunity

Defendants claim that they are "entitled to judgment on Plaintiffs' federal claims on the basis of qualified immunity[.]" ECF 54 at 16.[51]  They assert: "Even construing the facts in a light favorable to Plaintiffs, they cite no case law showing that the conduct of any defendant violated clearly established rights." *Id.*

In light of my ruling, as to plaintiffs' federal excessive force claims (Count I), I will address qualified immunity only as to Officer Amrhein, Officer Lehnert, Officer Halstead, Officer Steigen, Officer Vitacco, Officer Schulman, and Officer Vicarini.[52]

---

[51] In the Motion, defendants do not claim that they are entitled to qualified immunity with regard to plaintiffs' federal claims of false arrest (Count II). *See* ECF 47-1 at 7–11.  But, in their Opposition, plaintiffs argue that defendants are not entitled to qualified immunity as to the federal false arrest claims.  ECF 50-1 at 13–14.  In Reply, defendants assert that the officers are entitled to qualified immunity, arguing that Officer Vicarini would "not have" been put "on notice" that he "did not have probable cause to arrest either plaintiff for obstruction or second degree assault." ECF 54 at 17–18.

Qualified immunity is an affirmative defense.  *Hicks v. Ferreyra*, 64 F.4th 156, 169 (4th Cir. 2023); *Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 305 (4th Cir. 2006).  This means it falls to defendants to assert it.  Ordinarily, courts "do not consider arguments raised for the first time in a reply brief." *U.S. S.E.C. v. Pirate Inv. LLC*, 580 F.3d 233, 255 n.23 (4th Cir. 2009).  Defendants have offered no basis to support a departure from this principle, particularly on such an important issue.

Furthermore, as the Fourth Circuit explained in *Hupp*, 931 F.3d at 320, when there are "disputes of fact" that "preclude a finding that a reasonable officer . . . would have believed that probable cause existed for" a plaintiff's arrest, qualified immunity is inappropriate. The *Hupp* Court reversed the district court's grant of qualified immunity to an officer for plaintiff's false arrest claim because there were disputes of fact as to whether plaintiff's conduct constituted obstruction under West Virginia law. *Id.* at 318–21.  Similarly, in this case, the facts on which defendants rely to establish probable cause to arrest Dmeza and Shaneris are disputed. Accordingly, even if defendants had properly raised this defense, it would be improper to grant qualified immunity at this stage.

[52] "[U]nder Maryland law, federal qualified immunity is not a defense for state constitutional torts." *Borzilleri v. Mosby*, 189 F. Supp. 3d 551, 560 n.4 (D. Md. 2016), *aff'd,* 874 F.3d 187 (4th Cir. 2017). Therefore, the qualified immunity analysis pertains only to plaintiffs' federal law claims.

## A.

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Barrett v. PAE Government Services, Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *Wesby*, 583 U.S. at 62–63) (cleaned up); *see Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam); *Taylor v. Riojas*, 592 U.S. 7, 7–10 (2020) (per curiam); *City of Tahlequah Okla. v. Bond*, 595 U.S. 9, 12 (2021) (per curiam); *Reichle v. Howards*, 566 U.S. 658, 664 (2012).   A legion of Fourth Circuit rulings are to the same effect.  *See, e.g., Benton*, 139 F.4th at 292; *Wells v. Fuentes*, 126 F.4th 882, 889 (4th Cir. 2025); *Cooper v. Doyle,* 163 F.4th 64, 79 (4th Cir. 2025); *Belton v. Loveridge,* 129 F.4th 271, 277 (4th Cir. 2025); *Caraway v. City of Pineville*, 111 F.4th 369, 381 (4th Cir. 2024); *Rambert*, 107 F.4th at 393; *Gutierrez*, 103 F.4th at 230; *Younger*, 79 F.4th at 385; *Hulbert v. Pope*, 70 F. 4th 726, 732 (4th Cir. 2023); *Franklin v. City of Charlotte*, 64 F.4th 419, 530, 534-35 (4th Cir. 2023); *Hicks v. Ferreyra*, 64 F.4th 156, 169 (4th Cir. 2023); *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, 584 U.S. 1013 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015).

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024); *Hicks*, 64 F.4th at 169; *Barrett*, 975 F.3d at 428–29; *Betton*, 942 F.3d at 190; *Wilson*, 893 F.3d at 219; *Smith*, 781 F.3d at 100.  An official who makes an honest but objectively unreasonable

132

mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).  In other words, the doctrine affords "government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam).  But, "[q]ualified immunity does not permit law enforcement to act with impunity, throwing our nation's constitutional commitments to the winds of individual discretion." *Somers*, 132 F.4th at 695.

Numerous cases support these principles. *See, e.g., Reichle*, 566 U.S. at 664; *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Atkinson*, 100 F.4th at 504; *Robertson v. Anderson Mill Elem. School*, 989 F.3d 282, 288 (4th Cir. 2021); *Ray v. Roane*, 948 F.3d 222, 229–30 (4th Cir. 2020); *Hupp*, 931 F.3d at 317; *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582–83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Fourth Circuit has explained: "'Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as

133

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Garrett v. Clarke*, 74 F.4th 579, 583 (4th Cir. 2023) (quoting *Davison*, 19 F.4th at 640); *see also King v. Riley*, 76 F.4th 259, 264–65 (4th Cir. 2023); *Owens*, 767 F.3d at 395.  So, even if a defendant officer violated a particular plaintiff's Fourth Amendment rights, the officer would be entitled to summary judgment "if those rights weren't clearly established." *Amisi v. Brooks*, 93 F.4th 659, 668 (4th Cir. 2024).

"'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (internal citations and quotation marks omitted); *see Zorn,* 2026 WL 795469, at *2; *Rivas-Villegas,* 595 U.S. at 5; *Atkinson*, 100 F.4th at 505; *King*, 76 F.4th at 265; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018); *see also Thurston*, 99 F.4th at 678 ("[A] right is only clearly established if it has a 'sufficiently clear foundation in then-existing precedent.'") (quoting *Wesby*, 583 U.S. at 63).  Put another way, the "clearly established" standard "requires that the contours of the legal rule be 'so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Garrett*, 74 F.4th at 584 (quoting *City of Tahlequah*, 595 U.S. at 12) (internal quotation marks omitted); *see Nazario*, 103 F.4th at 230 ("The unlawfulness of an official's conduct must be apparent in light of pre-existing law") (internal citations omitted).

Conversely, "[a] right is not clearly established if existing precedent does not place the constitutional question 'beyond debate.'" *Zorn*,  2026 WL 795469, at *2 (quoting *Rivas-Villegas*, 595 U.S. at 5) (cleaned up); *see Kisela*, 584 U.S. at 104; *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *Benton*, 139 F.4th at 292; *King*, 76 F.4th at 265–66; *Tarashuk v. Givens*, 53 F.4th 154, 162 (4th Cir. 2022).  "'Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a

134

rule of virtually unqualified liability simply by alleging violation of extremely abstract facts.'" *Atkinson*, 100 F.4th at 506 (citation omitted). "In the end, the key inquiry is whether 'the law provided fair warning that [the officer's] conduct was unconstitutional.'" *Id.* (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017)) (additional citation and internal quotation marks omitted) (alteration in *Atkinson*); *see Thompson*, 878 F.3d at 98.

"The inquiry into whether a constitutional right is 'clearly established' requires defining the right at issue." *Hicks*, 64 F.4th at 170; *see Atkinson*, 100 F.4th at 504; *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022); *Halcomb*, 992 F.3d at 319–20. "The Supreme Court has cautioned against defining a right with 'a high level of generality'. . . ." *Hicks*, 64 F.4th at 170 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)); *see City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019); *White v. Pauly*, 580 U.S. 73, 79 (2017); *Younger*, 79 F.4th at 385. "Principles stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice." *Zorn,* 2026 WL 795469, at *2 (quoting *Kisela*, 584 U.S. at 105). "Defining the right at a high level of generality, 'avoids the crucial question whether the offic[er] acted reasonably in the particular circumstances that he or she faced.'" *Atkinson*, 100 F.4th at 505 (citation omitted) (alteration in *Atkinson*); *see Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). Therefore, the court must "define the right at issue with specificity." *Knibbs*, 30 F.4th at 223.[53]

To determine whether qualified immunity applies, courts generally conduct a two-step inquiry. *Saucier*, 553 U.S. at 201; *Benton*, 139 F.4th at 288; *Atkinson*, 100 F.4th at 504; *Martin v.*

---

[53] Defining the right at issue is not necessarily an easy task. In *Younger*, 79 F.4th 373, which involved the brutal beating of a prisoner by correctional officers, the district court defined the right at issue as a "prisoner's 'right to be protected from malicious attack . . . from the very officials tasked with ensuring their security.'" *Id.* at 386 n.20. But, the Fourth Circuit concluded that the district court's definition was too general. *Id.* According to the Fourth Circuit, the district court "failed to heed [the] requirement" of specificity. *Id.*

*Short*, 2024 WL 3200715, *2 (4th Cir. 2024); *Hicks*, 64 F.4th at 169; *King,* 76 F.4th at 265; *Thorpe v. Clarke*, 37 F.4th 926, 933 (4th Cir. 2022); *Est. of Jones v. City of Martinsburg*, 961 F.3d 661, 667 (4th Cir. 2020).  First, the court asks whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a constitutional [or statutory] right[.]" *Saucier*, 533 U.S. at 201.  Second, the court asks whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see also Cannon v. Village of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018); *Scinto*, 841 F.3d at 235.

"If the initial prong is satisfied, [the court] evaluate[s] whether the right at issue was clearly established at the time of the officer's conduct."  *Wilson*, 893 F.3d at 219.  "Accordingly, even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'"  *Id.* (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)) (alteration in *Wilson*).

"The plaintiff bears the burden of proof on the first question—*i.e.,* whether a constitutional violation occurred . . .  [and] [t]he defendant bears the burden of proof on the second question—*i.e.*, entitlement to qualified immunity." *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007) (en banc) (internal citations omitted); *see also Atkinson*, 100 F.4th at 504; *Thurston*, 99 F.4th at 673; *Stanton*, 25 F.4th at 233.  Although "'[c]ourts are no longer required to analyze these questions sequentially, . . . it is often the better approach' to 'determine first whether the plaintiff

136

has alleged a deprivation of a constitutional right at all.'" *Dolgos*, 884 F.3d at 178 (internal citation omitted).[54]

Qualified immunity is an affirmative defense. *Hicks*, 64 F.4th at 169; *Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 305 (4th Cir. 2006). But, it does not merely provide a defense to liability. Rather, it provides "*immunity from* suit . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in *Mitchell*); *see Gilliam v. Sealey*, 932 F.3d 216, 229 (4th Cir. 2019), *cert. denied,* 589 U.S. 1305 (2020)*; see also Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526).

As indicated, if an official is shown to have violated the rights of a plaintiff, the court must "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).

In assessing qualified immunity, a court in Maryland is guided by cases from the Supreme Court, the Fourth Circuit, and "the highest court of the state in which the action arose." *Thompson*, 878 F.3d at 98; *see Dean v. McKinney*, 976 F.3d 407, 417 (4th Cir. 2020). In the absence of controlling authority, the court considers "whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority." *Thompson*, 878 F.3d at 98 (internal quotation marks omitted). And, "even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity

---

[54] The Fourth Circuit has "effectively done away with the clearly established prong of qualified immunity for a subset of deliberate indifference cases," *Younger*, 79 F.4th at 385 n. 17, namely, cases in which an alleged "Eighth Amendment violation[] inherently include[s] knowing disregard for the law." *Pfaller*, 55 F.4th at 445–48; *see Thorpe*, 37 F.4th at 939.

from suit 'if a reasonable person in the officer's position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Strickland*, 917 F.3d at 768; *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam).

Of import, "[t]here is no requirement that the 'very action in question [must have] previously been held unlawful' for a reasonable official to have notice that his conduct violated that right." *Scinto*, 841 F.3d at 236 (second alteration in *Scinto*) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *see Quinn v. Zerkle*, 111 F.4th 281, 294 (4th Cir. 2024) (stating that a right need not have been recognized "on identical facts for it to be deemed clearly established"). Government officials "can still be on notice that their conduct violates established law even in novel factual circumstances, so long as the law provided fair warning that their conduct was wrongful." *Dean*, 976 F.3d at 418 (internal citation and quotation marks omitted); *see also Hope*, 536 U.S. at 741 (concluding that cases involving "fundamentally" or "materially similar" facts are not necessary to a finding that the law is clearly established); *Nazario,* 103 F.4th at 231 ("[T]he phrase clearly established will include not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked.") (internal quotation marks and citations omitted). The court "need not assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense." *Nazario*, 103 F.4th at 233 (citing *Strickland*, 917 F.3d at 770) (internal quotation marks omitted) (cleaned up. In short, there does not need to be "'a case directly on point'" for a right to be clearly established. *White*, 580 U.S. at 79 (quoting *Mullenix*, 577 U.S. at 12).

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v.*

138

*Millender*, 565 U.S. 535, 546 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–19.

The question of qualified immunity may be decided at the summary judgment stage. *See Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003); *accord Saucier*, 533 U.S. at 200 ("Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation.") (internal quotation marks omitted). However, "consideration of the qualified immunity question does not 'override the ordinary rules applicable to summary judgment proceedings.'" *Rambert*, 107 F.4th at 399 (quoting *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005)); *see Pritchett,* 973 F.2d at 313 ("Because qualified immunity is designed to shield officers not only from liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged."); *see also Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579–80 (4th Cir. 2017) ("In this procedural posture, we may not credit defendant's evidence, weigh the evidence, or resolve factual disputes in the defendants' favor."). Although the purely legal question of whether the constitutional right at issue was clearly established "is always capable of decision at the summary judgment stage," a genuine question of material fact regarding "whether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial." *Pritchett,* 973 F.2d at 313 (citing *Mitchell,* 472 U.S. at 526).

139

In other words, when a factual dispute "precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." *Willingham,* 412 F.3d at 560.   The Fourth Circuit explained in *Hutcheson*, 80 F.4th at 515:

> [I]f, after construing the historical facts in favor of the non-moving party, the court determines the officers' conduct was unreasonable, summary judgment for the officers is improper. The case would then proceed to trial for a jury to resolve not the ultimate question of the conduct's reasonableness—because that is a question for the court—but the disputes over any material historical facts.[] Then, after the jury resolves those disputes, the court decides the objective reasonableness of the officers' conduct. On the other hand, if at the summary judgment stage, the court decides the officers' conduct was reasonable—even when construing the historical facts in favor of the non-moving party—summary judgment is appropriate. In that situation, the factual dispute is not material because, even if the jury believes the nonmovant's version of events, no constitutional violation occurred.

Thus, the issue of qualified immunity is a question of law, but only when "the historical facts are sufficiently settled." *Rambert*, 107 F.4th at 398; *see Scott*, 550 U.S. at 381 n. 8 ("At the summary judgment stage, . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, . . . the reasonableness of Scott's actions—or, in Justice STEVENS' parlance, [w]hether [respondent's] actions have risen to a level warranting deadly force . . .—is a pure question of law."); *Armstrong*, 80 F.4th at 513 ("When there is no dispute about the historical facts—the who, what, where and when of what happened—the objective reasonableness of officers' conduct is a matter of law to be decided by the court").

Conversely, summary judgment on qualified immunity grounds is improper where there is a genuine dispute of material fact as to whether the officers acted reasonably. *See Bolick v. Anderson*, ___ F.4th ___, 2026 WL 706427, at *7 (4th Cir. Mar. 13, 2026) (vacating grant of

summary judgment to defendant officers in an Eighth Amendment inhumane conditions claim because there were factual disputes as to whether, by depriving plaintiff of out-of-cell exercise, defendants had caused plaintiff to suffer a sufficiently serious deprivation of right or whether defendants had acted with deliberate indifference, thereby violating plaintiff's clearly established right as an incarcerated individual to adequate exercise); *Harris*, 927 F.3d at 281–282 (reversing grant of summary judgment to defendant officer because of genuine disputes of material fact pertinent to qualified immunity); *Connor v. Thompson*, 647 F. App'x 231, 239 (4th Cir. 2016) (affirming district court's denial of defendants' summary judgment motion on qualified immunity grounds because the facts, viewed in the light most favorable to plaintiff, "would be sufficient to support a trier of fact's finding that shooting Carter amounted to excessive force[ ]" and because "a reasonable officer would know that shooting Carter under the circumstances presented by [plaintiff's] version of the facts would be unlawful[ ]"); *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 180 (4th Cir. 1998) ("'[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants.'") (quoting *Buonocore v. Harris*, 65 F.3d 347, 359-60 (4th Cir. 1995)); *Cooper*, 2024 WL 3568564, at *15 (denying summary judgment on qualified immunity because there was a "material factual dispute . . . as to whether Defendant Officers acted reasonably by shooting decedent in the back").

**B.**

Defendants claim that they are entitled to qualified immunity for each excessive force claim. ECF 54 at 18. They contend that "[t]he factual thread that runs through" the cases on which plaintiffs rely in their Opposition is "a compliant, secured, non-resisting suspect on whom officers used obviously disproportionate force." ECF 54 at 20. But, they insist that "[n]o such factual situation pertains here" because "[n]ot one of these plaintiffs was compliant, secured and non-

141

resisting when force was used." *Id.* They add: "There is not one case that would have put any of these Defendants on notice beyond all doubt that the force they used was excessive." *Id.* Plaintiffs disagree. ECF 50-1 at 18, 21, 24, 28, 30.

Notably, neither side has defined plaintiffs' constitutional rights with the requisite specificity. *See* ECF 47-1; ECF 50-1; ECF 54.

### 1. Claims of Shamdu and Mr. Nalls against Officer Amrhein

Defendants argue that Officer Amrhein is entitled to qualified immunity as to the use of tasers against Shamdu and Mr. Nalls because "it was and is not clearly established that the use of a  taser is unreasonable when used on a noncompliant, resisting suspect." ECF 47-1 at 18.

As to Shamdu, it is undisputed that Officer Amrhein deployed his taser on him, although the exact location of where he tased Shamdu is disputed. Plaintiffs claim that at the time Officer Amrhein deployed his taser, Shamdu was already "under control" after being pushed into the police car by Officer Lehnert. ECF 50-1 at 23. The video footage shows that after Shamdu collided with the police car, with his back against the car, he raised at least one hand, arguably in surrender, while facing Officer Amrhein. ECF 50-14 at 2:10–2:15.

Many of the facts leading up to Officer Amrhein's use of his taser against Shamdu remain disputed. But, in the light most favorable to Shamdu, this is not a case in which the police had initially suspected Shamdu of criminal misconduct. Rather, Shamdu, along with other family members, came to the parking lot because the police were investigating possible marijuana possession by Shamdu's sister. He was clearly distraught, according to the video evidence.

Moreover, Shamdu was restrained by Officer Lehnert, with both his arms behind his back, and had been pushed backward by Officer Amrhein. ECF 50-14 at 1:59–2:05. Plaintiffs allege that Shamdu, Officer Amrhein, and Officer Lehnert then stumbled backwards and Shamdu became unrestrained. Defendants disagree.

142

According to plaintiffs, Officer Lehnert then pushed Shamdu into a police car with enough force to make a dent in the police car. While Shamdu was merely standing, albeit unrestrained, Officer Amrhein's body camera shows that Shamdu put at least one of his hands up in the air, with his palm open, in a sign of apparent surrender. *See Patterson v. Randazzo,* 160 F. Supp. 3d 849, 861 (M.D.N.C. 2016) ("Raising one's hands is a sign of surrender."). Nor was there any indication that Shamdu was armed. Nevertheless, Officer Amrhein deployed his taser once, causing Shamdu to fall to the ground. Moreover, Officer Amrhein did not issue an order or a warning before deploying the taser. *See* ECF 50-14 at 2:09–2:14.

I shall define the constitutional right at issue as the right of a distraught, unarmed citizen who is restrained after responding to the scene of a police investigation involving relatives, but who became temporarily unrestrained under disputed circumstances, and who has been forcefully pushed against a car and had at least one hand up in the air, to be free from tasing. *See Armstrong*, 810 F.3d at 905.

Previously, I discussed cases involving the use of tasers, and incorporate the discussion here. Suffice it to say, the Fourth Circuit explained in 2016 that "[p]ainful, injurious, serious inflictions of force, like the use of a taser, do not become reasonable simply because officers have authorization to arrest a subject who is unrestrained." *Id.* at 904.[55] The Fourth Circuit made clear that "taser use is unreasonable force in response to resistance that does not raise a risk of immediate danger[.]" *Id.* at 905.

---

[55] I discussed *Armstrong* earlier, at length. Defendants claim that *Armstrong,* 810 F.3d 892, has "nothing factually to do with punching or kicking but rather is about taser use" and, accordingly "would be inapplicable in putting officers on notice in cases not involving [tasers]." ECF 54 at 18. This is a remarkably narrow view of *Armstrong*. In my view, *Armstrong* prescribes valuable guidance in force cases that is not limited to the use of tasers, as the discussion will illustrate.

"To ring the 'clearly established' bell, there need not exist a case on all fours with the facts at hand.  In other words, 'the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent the denial of qualified immunity.'" *Hunter*, 789 F.3d at 401 (quoting *Edwards v. City of Goldsboro,* 178 F.3d 231, 251 (4th Cir.1999)).  Viewing the evidence in light most favorable to Shamdu, his behavior did not convey to a reasonable officer that he presented an immediate danger so as to render the unwarned use of a taser proportional and constitutional in light of clearly established constitutional limitations on such force.

Therefore, Officer Amrhein is not entitled to qualified immunity as to Shamdu's claim of excessive force.

As to Mr. Nalls, plaintiffs allege that Officer Amrhein shoved Mr. Nalls's head "toward the pavement" and dry stunned him with his taser.  ECF 50-1 at 26.  Additionally, relying on Officer Amrhein's IAS statement, plaintiffs allege that Officer Amrhein kicked Mr. Nalls in the head and delivered a hammer strike to the top of his head.  *Id.* at 27.  The body camera footage does not blatantly contradict plaintiffs' allegations.

Defendants contend that, even in a light most favorable to Mr. Nalls, "there was a prolonged physical struggle with multiple officers as they attempted to gain control of [Mr. Nalls], despite repeated commands to put his hands behind his back[.]"  ECF 47-1 at 17.  Furthermore, defendants maintain that, "even if Plaintiff Nalls had his hands behind his back, Officer Amrhein has qualified immunity" because it "is not clearly established that merely having one's hands behind his back and face down makes the use of force alleged here unconstitutional."  *Id.* According to defendants, "[t]he key consideration is whether the suspect is not resisting, fully compliant and not a threat to the officers."  *Id.*

Plaintiffs insist that at the time Officer Amrhein applied force to Mr. Nalls, Mr. Nalls had fallen and struck his head on a police cruiser. ECF 50-1 at 26. Additionally, according to plaintiffs, Officer Halstead put his entire body weight on top of Mr. Nalls. *Id.* They also claim that during this time, the officers handcuffed one of Mr. Nalls's hands. *Id.* at 27. Although both of Mr. Nalls's hands were not initially handcuffed, in the light most favorable to Mr. Nalls, he was secured when he fell to the ground because Officer Halstead was on top of him and Mr. Nalls did not actively resist. Therefore, he had been subdued and did not pose an immediate danger to Officer Amrhein. Then, "after [Mr. Nalls] was beaten, kicked, and tased, the defendants cuffed" Mr. Nalls's other hand and "finally stopped the assault." *Id.* Officer Amrhein's body camera footage does not blatantly contradict this version of events. *See* ECF 50-14 at 2:53–3:48.

I shall define the constitutional right at issue as the right of an apparently unarmed, subdued citizen, who initially was not suspected of criminal misconduct, but who was distraught because his minor daughter was stopped by police for marijuana possession, to be free from head strikes and taser use when he presents no immediate danger to an arresting officer.

As stated, when this incident took place in January 2020, it was clearly established that "taser use is unreasonable force in response to resistance that does not raise a risk of immediate danger[.]" *See Armstrong*, 810 F.3d at 905. Taking the evidence in light most favorable to Mr. Nalls, at the time Officer Amrhein deployed his taser, Mr. Nalls had already fallen to the ground and Officer Halstead had his entire body weight on top of Mr. Nalls.

Moreover, it was "clearly established by 2018" that "a non-dangerous, non-actively resistant, 'at least partially subdued'" arrestee has a "right to be free from excessive force in the form of head strikes." *Lewis*, 98 F.4th at 534. Moreover, by 2013, it was "already clearly established that suspects can be secured without handcuffs when they are pinned to the ground,

145

and that such suspects cannot be subjected to further force." *Jones*, 961 F.3d at 668. And, as stated earlier, the Fourth Circuit has emphasized "the unique danger of strikes to the head" because "the head is a particularly fragile part of the human body[.]" *Lewis*, 98 F.4th at 531–32.

Officer Amrhein had "fair warning" that such use of force against Mr. Nalls is excessive. He is not entitled to qualified immunity. *See Booker*, 855 F.3d at 538.

### 2.   Claims of Shamdu against Officer Lehnert

Defendants argue that Officer Lehnert is entitled to qualified immunity as to Shamdu's claim of excessive force. ECF 47-1 at 22. Taking the evidence in light most favorable to plaintiffs, Officer Lehnert pushed Shamdu into the police car with enough force to dent the vehicle. But, defendants contend that "there was no case law that would have put Officer Lehnert on notice that such conduct, against a suspect who was anything but compliant, would have violated the Fourth Amendment." *Id.* Plaintiffs disagree. ECF 50-1 at 24.

I previously defined the right in the context of the tasing of Shamdu. Here, I shall define the constitutional right at issue as the right of a distraught, unarmed citizen who is restrained after responding to the scene of a police investigation involving a relative, but who became temporarily unrestrained under disputed circumstances, to be free from being pushed by an officer into a police vehicle with such force as to dent the car.

The Fourth Circuit has explained: "Since at least 1994, when we decided *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994), it has been clear that serious physical force – there, a wrestling maneuver that cracked a suspect's knee – is constitutionally excessive when used against an individual suspected, at most, of a minor crime, who is unarmed, and who does not attempt to flee or physically attack the officer – even if the suspect offers passive resistance, struggling with the officer after an initial use of force against the suspect." *Livingston v. Kehagias*, 803 F. App'x 673, 684 (4th Cir. 2020). Furthermore, the Fourth Circuit has stated that "it was clearly established in

146

2006 that the constitutional line had been crossed when an officer, confronted with an individual suspected only of a misdemeanor and who passively resisted by refusing to give up her hands, responded by throwing her to the ground, kneeing her, and twisting her arm." *Id.* at 685 (citing *Smith*, 781 F.3d at 102–03).

Moreover, as of 2009, the Fourth Circuit found that it was clearly established that a police officer used excessive force when he slammed an unarmed fifteen-year-old's head into a car. *Valladares*, 552 F.3d at 390–91. And, in 2015, the Fourth Circuit stated that an officer engages in excessive force when he takes "a situation where there obviously was no need for the use of any significant force and yet [takes] an unreasonably aggressive tack that quickly escalated it to a violent exchange when the suspect instinctively attempted to defend himself." *Smith*, 781 F.3d at 104. And, in *Johnson v. City of Fayetteville*, 91 F. Supp. 3d 775, 804 (E.D.N.C. 2015), the district court determined that as of 2011, "precedent from the Fourth Circuit would put a reasonable officer on notice that use of a leg sweep or slamming a suspect in a car, where the suspect is not resisting arrest, violates clearly established law."

To be sure, when Officer Lehnert pushed Shamdu, the scene was chaotic. Moments before, Officer Lehnert had been restraining Shamdu, holding both of his arms behind his back. ECF 50-14 at 1:59–2:04. Shamdu was clearly in distress about the way his mother and sister were being treated by police and verbally protested. *Id.* Around this time, Officer Amrhein pushed Shamdu backward in the chest. *Id.* Officer Lehnert, Officer Amrhein, and Shamdu then moved backwards between two vehicles in the parking lot. *Id.* at 2:03–2:08. Plaintiffs claim that Shamdu became temporarily unrestrained when the three men stumbled. ECF 50-1 at 22. Plaintiffs assert that it was at this moment that Officer Lehnert forcefully pushed Shamdu into the police vehicle. *Id.* As stated, the body camera footage of the incident is blurry and does not blatantly contradict plaintiffs'

147

version of events.  But, defendants contend that the vehicle sustained damages of $300 as a result of Shamdu's contact with it.  ECF 47-2 at 15.

Defendants contend that before Officer Lehnert pushed Shamdu, Shamdu struck Officer Amrhein. ECF 47-1 at 21.  They premise their argument that Officer Lehnert is entitled to qualified immunity entirely on a disputed factual question, *i.e.*, whether Shamdu was "compliant."  *See id.* at 22.   But, "it is the jury's role," not the court's, "to decide whose version of facts is correct." *Smith,* 781 F.3d at 106.

Taking the evidence in light most favorable to plaintiffs, as I must, Shamdu had not been suspected of a crime in the first instance, and there was no indication he was armed.  Although Shamdu had previously pushed Officer Lehnert to get closer to his mother, Shamdu had offered his hands up peacefully when Officer Lehnert sought to restrain him.  ECF 50-17 at 2:37. At most, he took actions to "instinctively defend himself" during the alleged stumble.  *See Smith*, 781 F.3d at 104.  In any event, Shamdu did not try to attack the officers or move toward them.  Rather, it was Officer Lehnert who escalated the situation by forcefully pushing Shamdu into a car with enough force to dent it.

Officer Lehnert had fair warning that the use of violent force is disproportionate and excessive when faced with an individual who is not attempting to flee or physically attack the officers.  Accordingly, taking the evidence in the light most favorable to plaintiffs, Officer Lehnert is not entitled to qualified immunity.

### 3.   Claims of Mr. Nalls against Officer Schulman

With regards to Officer Schulman's alleged tackling of Mr. Nalls into the trunk of Shaneris's car, Defendants do not argue that Officer Schulman is entitled to qualified immunity. ECF 47-1 at 22; *see also* ECF 54.  Defendants claim that Officer Schulman is entitled to qualified immunity as to Mr. Nalls's claim of excessive force, for the same reasons offered by Officer

148

Amrhein, Officer Halstead, and Officer Vitacco. ECF 47-1 at 22. Therefore, my analysis as to the force used against Mr. Nalls by Officer Amrhein in the form of head strikes applies with equal weight to Officer Schulman.

Officer Schulman is not entitled to qualified immunity.

### 4. Claims of Dmeza and Mr. Nalls against Officer Vitacco

Plaintiffs claim that Officer Vitacco "cannot claim qualified immunity for grabbing Plaintiff Dmeza, pushing her into a fence, then slamming her into the concrete." ECF 50-1 at 21. Defendants counter that Officer Vitacco is entitled to qualified immunity because "case law had not established that" his use of force against Dmeza "was unreasonable[.]" ECF 47-1 at 24. Defendants acknowledge that "'[t]ackling a non-threatening, *non-resisting* individual to the ground does allege a Fourth Amendment excessive force claim.'" *Id.* (emphasis in ECF 47-1) (quoting *Horowitz v. Sherman*, DKC-19-2459, 2020 WL 5339843, at *4 (D. Md. Sept. 4, 2020)). However, they argue that Dmeza was "not compliant." ECF 47-1 at 24.

At the outset, Dmeza, as with all plaintiffs except Shaneris, was not stopped on suspicion that she had committed a crime. Rather, she became ensnared in a melee that grew from the officers' interaction with her minor child.

I define the constitutional right at issue as the right of a non-resistant individual, who was not initially suspected of a crime, to be free from being pushed and dragged to the ground to effect an arrest. As stated, another district court has found that before 2020, "Fourth Circuit case law clearly establishe[d] that the use of gratuitous force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of officers or the public." *Johnson*, 91 F. Supp. 3d at 804 (citing *Rowland*, 41 F.3d at 174).

Taking the evidence in the light most favorable to plaintiffs, Dmeza did not present a threat to Officer Vitacco that would warrant the use of gratuitous force, such as slamming her to the

149

ground and moving her by one arm on the sidewalk in an attempt to handcuff her. *See* ECF 50-16 at 2:36–2:54; ECF 50-12 at 1:05–1:17.

As to Mr. Nalls's claim of excessive force against Officer Vitacco, defendants incorporate their arguments as to why Officers Amrhein, Vitacco, Halstead, and Schulman are entitled to qualified immunity. ECF 47-1 at 22. For the reasons stated earlier as to the use of head strikes against Mr. Nalls, Officer Vitacco is not entitled to qualified immunity.

### 5. Claims of Shaneris against Officer Vicarini

Defendants contend that Officer Vicarini is entitled to qualified immunity with respect to Shaneris's excessive force claim. They claim that "conduct far more violent in tackling someone to the ground was established to violate the Fourth Amendment only when the suspect was nonresistant or nonthreatening at the time." ECF 47-1 at 15. In their view, this does not apply to Shaneris.

Regarding Officer Vicarini's use of force before Shaneris was handcuffed, plaintiffs claim that when Shaneris exited the vehicle, Officer Vicarini grabbed her arm, pushed her towards a parked vehicle, and then "violently took her to the ground." ECF 50-1 at 15–16. According to plaintiffs, Officer Vicarini used his "right hand and baton to brace against" Shaneris's upper head and upper torso. *Id.* at 16. According to plaintiffs, when Shaneris raised her head and "plead[ed] with officers to not tase her brother", Officer Vicarini "used his forearm to press" Shaneris's "face back into the pavement, before he grabbed her left hand and spun her on the pavement as she shouted in pain." *Id.* (citing ECF 50-3 at 5:22, 5:38). Then, according to plaintiffs, Officer Amrhein approached and "threatened to tase Plaintiff Shaneris, before Defendant Vicarini states, 'We're good.'" *Id.* (citing ECF 50-3 at 5:47).

From the video footage it appears that Officer Vicarini kneeled on Shaneris's back to place her in handcuffs. ECF 50-3 at 5:07–6:06; *see* ECF 50-1 at 16 (plaintiffs claiming that "Defendant

150

Vicarini kneeled on" Shaneris while handcuffing her). After Shaneris was handcuffed, he continued to kneel on her even after she complained that she could not breathe. ECF 50-3 at 5:51–8:05; *see* ECF 50-12 at 3:44–3:46, 4:12–4:14; ECF 50-24 at 2:24–2:29. At the time Officer Vicarini exerted this force, Shaneris was an unarmed, seventeen year old girl whose stature is smaller than that of Officer Vicarini.

I define the right at issue as the right of an unarmed, compliant minor, suspected of marijuana possession, to be free from a forceful takedown to the ground and then, once handcuffed and in a prone position on the ground, to be free from being kneeled on by a police officer after complaining that she could not breathe.

As defendants acknowledge, the Fourth Circuit has established that "[b]oth before and after November 1999, courts have consistently applied the *Graham* holding and have consistently held that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *Jones*, 325 F.3d at 532; *see* ECF 47-1 at 15 (quoting *Jones*, 325 F.3d at 532). Moreover, "courts around the country have recognized and spoken at length of the dangers of exerting force on a prone and handcuffed individual." *Myers v. City of Charleston*, TEJ-19-00757, 2021 WL 925326, at *12 (S.D.W. Va. Mar. 10, 2021) (citing cases). Indeed, "[i]t is clearly established that handcuffing a subject and forcibly keeping him in a prone position, absent further resistance, constitutes excessive force." *Id.*

In plaintiffs' telling, the entire interaction between Officer Vicarini and Shaneris after she reentered the vehicle and before she was handcuffed lasted roughly one minute and ten seconds. *See* ECF 50-1 at 15–16. Although Officer Vicarini's actions in bringing Shaneris to the ground do not appear much more severe than the officer's actions in *Pegg,* 845 F.3d 112, the plaintiff in

151

*Pegg* admitted to resisting arrest. Here, Shaneris insists that she was not resisting arrest when Officer Vicarini attempted to handcuff her.

As to whether Officer Vicarini's forceful takedown violated a clearly established right, Judge Osteen's analysis in *Bottom v. City of Salisbury,* OJ-21-322, 2023 WL 5207983 (M.D.N.C. Aug. 14, 2023), an excessive force case, is instructive. The case arose from a traffic stop in North Carolina that took place in May 2019, eight months before Shaneris's arrest. *Id.* at *1. There, the police determined that a car was speeding. *Id.* at *2. The officers "decided to deploy stop sticks to disable the vehicle." *Id.* Although the police officers never engaged in a high speed chase, the sticks stopped the vehicle and the plaintiff moved her car to the shoulder. *Id.* at *3. An officer approached the vehicle and the driver, a 67 year old woman, "held her hands out of the open window," which the officer "interpreted to mean she was not holding a weapon." *Id.* Two other officers arrived at the scene and approached the door. *Id.* As the three officers approached the plaintiff's car, one officer "drew his firearm and pointed it at" plaintiff and another officer "drew his baton." *Id.* One of the officers "opened the passenger side door and unbuckled" the plaintiff's seatbelt." *Id.* "At approximately the same time, the driver's side door opened,[] and" another officer stood in the door. *Id.*

What happened next was disputed by the parties. *Id.* But, the officer's body camera reflected that one officer "briefly place[d] his hand on [plaintiff's] arm and gesture[d] for her to exit the vehicle." *Id.* Another officer appeared to unfasten the plaintiff's seatbelt. *Id.* Then, the plaintiff briefly looked "at the officers on the passenger side" and another officer "grab[bed] her left arm and appear[ed] to pull on her to exit the vehicle." *Id.* The plaintiff grasped the steering wheel. *Id.* Then, another officer grabbed plaintiff's "left arm in one hand and her hair in the other and forcefully pull[ed] her from the vehicle and onto the ground." *Id.* Before being pulled

from the vehicle, plaintiff stated that she had "heard officers tell her to exit the vehicle." *Id.* After being pulled from the car, "there was a brief struggle on the ground" as the officers "handcuffed" the plaintiff "behind her back." *Id.* Plaintiff's left arm was tense "for a few moments, and she tucked her right arm under her body." *Id.* During the handcuffing, the officer pushed down on plaintiff's shoulder blade as he pulled her left arm behind her back, dislocating her shoulder. *Id.*

The court concluded that the officer who dragged the plaintiff from her car, by her hair, and onto the ground, "after providing her mere seconds to comply with orders to exit," used unnecessary force. *Id.* at *12. Therefore, the court considered whether the officer was entitled to qualified immunity. *Id.* at *13. The court considered "whether, on May 30, 2019, it was clear to a reasonable officer that it was unlawful to approach an older female suspect in an automobile with a drawn firearm and permit her eight seconds to exit the vehicle before pulling her out by the hair and handcuffing her when the suspect failed to heed blue lights and sirens but did not actively resist arrest or evade police." *Id.* at *14 (internal quotation marks omitted). The court noted that "[a]lthough the precise factual scenario has not been addressed by the Fourth Circuit or the Supreme Court, Fourth Circuit precedent would put a reasonable officer on notice that this conduct was unconstitutional." *Id.*

Moreover, the court determined that it was clearly established that the officer who had pulled the plaintiff from the car by her hair and pushed her onto the ground had violated her constitutional rights and was not entitled to qualified immunity. *Id.* at *14. In reaching that conclusion, the court cited *Young v. Prince George's Cnty., Maryland*, 355 F.3d 751, 757 (4th Cir. 2004), in which the Fourth Circuit established that "[t]he measures taken by an officer to disarm a suspect must be reasonable under the totality of the circumstances." *See Bottom,* 2023 WL

153

5207983, at *13–14.  The district court noted that as in *Young,* "plaintiff was stopped for a minor offense and did not actively resist officers."  *Id.* at *14.

Here, Shaneris was not an elderly woman.  Rather, she was at the other end of the age spectrum; she was a female juvenile, not yet eighteen years of age, detained for a possible  minor offense.  Taking the evidence in light most favorable to Shaneris, she was not resisting arrest.  Yet, she was forcefully taken down to the ground and pushed into the pavement, without an opportunity to comply with any directive.  Moreover, the video footage, taken in the light most favorable to plaintiffs, shows that Officer Vicarini continued to kneel on Shaneris for an extended period even after she was handcuffed, although she was not resisting, and even after she complained that she could not breathe.

At the time of the arrest, "Fourth Circuit case law clearly establishe[d] that the use of gratuitous force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of officers or the public."  *Johnson*, 91 F. Supp. 3d at 804 (citing *Rowland*, 41 F.3d at 174).

There remain disputes of material fact as to whether Shaneris was, in fact, resisting arrest.  This may well change the analysis regarding Officer Vicarini's entitlement to qualified immunity.  However, at this stage, based on disputed facts, Officer Vicarini is not entitled to qualified immunity.

### 6.  Claims of Mr. Nalls and Lembert against Officer Halstead

Plaintiffs claim that Officer Halstead and Officer Schulman "pushed" Mr. Nalls between two vehicles in the parking lot.  ECF 50-1 at 26.  They also claim that Officer Halstead put his "entire body weight on top of" Mr. Nalls.  *Id.*  Further, they allege that "Defendant Halstead kicked" Mr. Nalls in the head, "letting out an audible grunt while doing so."  *Id.*  Additionally,

154

plaintiffs reference Officer Halstead's IAS statement, in which he claimed that he struck Mr. Nalls in the face two times. *Id.* at 27 (citing ECF 50-21 at 14:45–15:00).

Defendants maintain that the qualified immunity that would apply to Officer Amrhein for his use of head strikes on Mr. Nalls "would also apply to same [sic] claim for excessive force against Officer Halstead[.]" ECF 47-1 at 18. Viewing the evidence in the light most favorable to Mr. Nalls, and for the reasons stated earlier as to Officer Amrhein's use of head strikes, Officer Halstead is not entitled to qualified immunity with respect to Mr. Nalls.

As to Lembert's claims of excessive force, defendants contend that Officer Halstead is entitled to qualified immunity because it is not "clearly established that putting one's hands on a resistant arrestee's neck while he ignores repeated commands to get on the ground is unreasonable under the Fourth Amendment." ECF 47-1 at 20.

However, as indicated, taking the evidence in light most favorable to plaintiffs, the video does not show that Lembert was resisting the officers when he was pushed against the fence. Moreover, as stated, a reasonable jury could find that Lembert was already restrained when Officers Halstead and Steigen each applied choke holds,[56] and when Officer Halstead swept Lembert's legs from under him. Furthermore, Lembert repeatedly asked the officers to "stop choking" him, get off his neck, reiterated that he was not resisting, and his hands were behind his back while the officers continued to apply force to his neck. ECF 50-24 at 1:43–1:55; ECF 50-16 at 0:53–1:08.

As to Lembert's claim of excessive force against Officer Halstead, I will define the constitutional right at issue as the right of an apparently unarmed, non-resistant individual who

---

[56] The Merriam Webster's Dictionary defines "choke hold" as, "a hold that involves strong choking pressure applied to the neck of another[.]" *Choke Hold*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/PJK6-GRBM (last accessed March 24, 2026).

responded to the scene of an investigation of a minor relative, but who was not himself initially a suspect of criminal wrongdoing, to be free from excessive force in the form of choke holds and leg sweeps used to bring the individual to the ground.

As early as 1993, the Fourth Circuit "warned officers that it is unreasonable to escalate force against a non-dangerous suspect that is secured or under control, even if that control is brief." *Lewis*, 98 F.4th at 535 (citing *Kane*, 987 F.2d 1005); *see Valladares*, 552 F.3d at 390–91; *Bailey*, 349 F.3d at 745; *Brooks v. McKimmie*, DLB-23-0208, 2025 WL 1018882, at *13 (D. Md. Apr. 4, 2025) .

The district court's analysis in *Johnson*, 91 F. Supp. 3d 775, provides guidance.  There, the court considered whether, "on April 17, 2011, it was clear to a reasonable officer that it was unlawful to effect a leg sweep on a suspect or charge a suspect across a parking lot into a parked vehicle when the suspect is not actively resisting arrest." *Id.* at 803–04.  The court concluded that "precedent from the Fourth Circuit would put a reasonable officer on notice that use of a leg sweep or slamming a suspect in a car, where the suspect is not resisting arrest, violates clearly established law." *Id.* at 804.

In reaching that conclusion, the district court cited *Rowland*, 41 F.3d 167, which the Fourth Circuit decided in 1994.  *Rowland* "arose out of a scuffle between a police officer and a citizen over a lost five dollar bill." *Id.* at 171.  The plaintiff, Rowland, was a 37 year old "mildly retarded" man who possessed "a severe speech impediment." *Id.*  The officer, believing that Rowland had stolen a five dollar bill, "used disabling force to gain control" of the plaintiff, grabbing him by the collar. *Id.* at 172.  Then, the officer allegedly "punched" Rowland "and threw him to the ground" before using "a wrestling maneuver, throwing his weight against Rowland's right leg and wrenching the knee until it cracked." *Id.*  The district court denied the officer's claim of qualified

immunity. *Id.* at 171. The Fourth Circuit affirmed. *Id.* at 174. It observed that "it is impossible to escape the conclusion that a man suffered a serious leg injury over a lost five dollar bill." *Id.*

*Jones*, 325 F.3d at 532, decided in 2003, is also noteworthy. There, the Fourth Circuit determined that a defendant officer was not entitled to qualified immunity when the officer "severely injured" the plaintiff "by knocking him to the floor and jumping on him" even though the plaintiff was drunk and using foul language, the plaintiff was "unarmed, handcuffed, and alone in a  secured room in the sheriff's headquarters, having come there voluntarily and not under arrest or suspected of any crime." *Id.* at 532.

In *Bailey,* 349 F.3d at 745, decided in 2003, the Fourth Circuit denied qualified immunity to the defendant officers, finding that they "violated clearly established law in using force to seize [the plaintiff] when he had committed no crime and when they had no reason to believe he was a danger to himself or others." Of import, the Court said, *id.*: "It was especially clear that they were not entitled to use force after [the plaintiff] was secured face down on the floor in handcuffs and leg restraints."

Defendants argue that "it was" not "clearly established that putting one's hands on a resistant arrestee's neck while he ignores repeated commands to get on the ground is unreasonable." ECF 47-1 at 20. As discussed, the matter of whether Lembert resisted officers and disobeyed commands after the officers rushed at him and pushed him against the fence is a disputed question of fact that cannot be determined at summary judgment. But, the video footage does not corroborate that Lembert was resisting officers in a manner that would justify the force used by Officer Halstead and Steigen, *i.e.*, placing their hands on Lembert's neck and sweeping his legs out from under him to force him onto the ground.

157

Moreover, any claim of a lack of notice as to what the law required at the time rings hollow. As Judge Blake observed in *Black v. Webster*, CCB-20-3644, 2022 WL 169669 (D. Md. Jan. 18, 2022), *Jones* and *Bailey*, decided long before this incident, provided police officers with "sufficiently particularized and unambiguous notice that the continued application of unnecessary pressure on someone after he has stopped resisting and no longer poses a threat to the officers or others constitutes excessive force." *Id.* at *11 (citing *Jones*, 325 F.3d 520, and *Bailey,* 349 F.3d 731). And, as the district court said in *Johnson*, 91 F. Supp. 3d at 804, since *Rowland* it is clearly established "that the use of gratuitous force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of officers or the public."

Therefore, at this juncture, Officer Halstead is not entitled to qualified immunity with regard to Lembert's claim of excessive force.

### 7.  Claims of Lembert against Officer Steigen

As stated, plaintiffs allege that after Lembert tried to sidestep Officer Harshadavid, Officer Steigen placed her hands on Lembert's neck a total of three times.  ECF 50-1 at 29–30. Additionally, plaintiffs allege that Officer Steigen placed her forearm against Lembert's  throat. *Id.* at 30.  Moreover, plaintiffs contend that Officer Steigen, Officer Halstead, and Officer Legge all "used force to press" Lembert into the sidewalk, even though plaintiffs claim that Lembert was not resisting. *Id.*  Furthermore, plaintiffs allege that after Lembert was handcuffed, and while prone, Officer Steigen "placed a knee into his back, and a hand on his shoulder." *Id.*  They claim that Steigen remained in this position as Lembert "visually and audibly gasped for air, and others plead, 'He's got asthma!'" *Id.* (citing ECF 50-16 at 3:53–4:06).  According to plaintiffs, although Lembert had trouble breathing, Steigen did not release pressure until Officer Harshadavid approached.  ECF 50-1 at 30.

158

Defendants argue that Steigen is entitled to qualified immunity as to Lembert's excessive force claim "as it pertains to his neck." ECF 47-1 at 23. They reiterate that it was not "clearly established that putting one's hands on a resistant arrestee's neck while he ignores repeated commands to get on the ground is unreasonable under the Fourth Amendment." *Id.* at 20.

For the reasons stated earlier with respect to Lembert's claim of excessive force against Officer Halstead, and viewing the evidence in light most favorable to plaintiffs, Officer Steigen is not entitled to qualified immunity as to the choke hold. In 2020, it was clearly established that wrestling a non-resistant individual to the ground, who had not been suspected in the first instance of committing a crime, by placing hands around his neck, constitutes excessive force.

As to the force exerted on Lembert's back after he was subdued, I shall define the constitutional right at issue as the right of a non-resistant, handcuffed individual, laying in a prone position, and who is struggling to breathe, to be free from extended pressure on his back.

As stated, the Fourth Circuit has established that "[b]oth before and after November 1999, courts have consistently applied the *Graham* holding and have consistently held that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *Jones*, 325 F.3d at 532. However, "[r]estraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *Phillips*, 123 F.3d at 593. But, Lembert disputes that he resisted arrest.

*Lawhon v. Edwards,* 477 F. Supp. 3d 428, 447–49 (E.D. Va. 2020), *aff'd sub nom. Lawhon v. Mayes*, 2021 WL 5294931, at *2 (4th Cir. Nov. 15, 2021), is instructive. The district court denied qualified immunity to officers who, taking plaintiffs' allegations as true, held the decedent, Lawhon, "down in the prone position for over five minutes", even "after he exclaimed 'I can't

159

breathe'", allegedly causing his death. *Id.* at 447 (quoting the complaint).[57]  Lawhon "was actively resisting detention after he was secured in handcuffs—at least initially." *Id.* at 448.  Of import, the defendants "constantly monitored Lawhon while they maintained him in the prone position—asking him if he was okay and inquiring about his ability to breathe." *Id.* at 448.  But, the court found that "[t]hese allegations not only form a sufficient claim for excessive force, but it was clearly established in January 2018 that Defendants' alleged conduct constituted a Fourth Amendment violation." *Id.* at 447.

The Fourth Circuit affirmed. *Lawhon*, 2021 WL 5294931, at *1.  In finding that the force used was excessive, the Fourth Circuit explained that Lawhon "had committed no crime, once outnumbered and handcuffed he could not have posed any risk to the safety of the officers or others, and viewing the evidence in the light most favorable to [plaintiff], he did not actively resist or attempt to evade the officers." *Id.* at *2.  The Court also emphasized that Lawhon "suffered the most severe injury possible–death." *Id.*

Turning to the question of whether Lawhon's right was clearly established, the Fourth Circuit observed that, "prior to January 2018, a number of [its] sister circuits held that the specific conduct of creating asphyxiating conditions by applying force to a person's body while holding them in the prone position constitutes excessive force in violation of the Fourth Amendment." *Id.* at *2 n.1 (citing cases).  Indeed, the Fourth Circuit recognized that by 2018 "[c]ontrolling authority at the time clearly established that officers could not continue to apply force to an already-restrained person who posed no threat." *Id.* at *2.  The Court noted that it "has repeatedly 'denied qualified immunity to officers who used excessive force against individuals who had not

---

[57] The court determined "that the force employed by Defendants to initially seize and restrain Lawhon—up to the point of placing Lawhon in handcuffs—was not excessive." *Lawhon*, 477 F. Supp. 3d at 448.

committed any crimes, were secured in handcuffs, and posed no threat to the officers or others.'" *Id.* (quoting *Yates*, 817 F.3d at 887–888). And, it observed that the defendants did "not cease the use of force even after [Lawhon] became motionless and unresponsive." *Lawhon*, 2021 WL 5294931, at *2. In view of its own precedent, the Fourth Circuit concluded that "[o]fficers in January 2018 had abundant notice that they could not continue to use force against a restrained individual in these circumstances." *Id.*

Of course, there are important factual distinctions between *Lawhon* and this case. Thankfully, no one died in this case. But, that does not diminish the critical instruction of the Fourth Circuit: A law enforcement officer may not apply gratuitous force to a restrained person, in a prone position, who posed no threat to anyone's safety.

In *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893 (6th Cir. 2004), the Sixth Circuit's analysis of the use of asphyxiating pressure is also instructive. Defendants' use of force culminated in the death of Champion, who was 32 years of age. *Id.* at 895. He "completely lacked the ability to care for himself on account of his autism" and "was nonresponsive and unable to speak." *Id.* at 896–97. At the relevant time, he was on an outing to a store with a professional caretaker when he became very agitated, "hitting himself in the face and biting his hand", a behavior he frequently exhibited. *Id.* at 896. Champion's caretaker called 911. *Id.* When the officer arrived, the caretaker informed the officer that Champion was "mentally ill" but did not tell the officer that Champion was non-verbal and unresponsive. *Id.*

Champion continued to batter himself as the officer approached. *Id.* The officer told Champion to stop, but Champion continued to advance towards the officer and then grabbed the officer's shirt. *Id.* at 896–97. The officer "pushed Champion's hand away and delivered a short burst of pepper spray." *Id.* at 897. As more officers arrived, they attempted to arrest Champion

161

and "decided to take Champion to the ground in the entrance foyer of the store, an area with carpeting." *Id.*  Upon bringing Champion to the ground, the officers handcuffed him with two sets of handcuffs and then used a hobble device to bind his ankles together.  *Id.*

The EMT who arrived could not "find a pulse on Champion and asked the Officers to remove the handcuffs, which they promptly did." *Id.* at 898.  Then, "Champion went into cardiac arrest; despite effort [sic] to resuscitate him, he was pronounced dead on arrival at the hospital." *Id.*  Champion's family members subsequently brought suit against the officers under § 1983.

The § 1983 claim was "premised on the Officers' alleged use of pepper spray and [their] application of asphyxiating pressure" after Champion had been restrained and was laying on the ground.  *Id.* at 897. Five witnesses "testified that the Officers continued to sit or otherwise put pressure on Champion's back while he was prone on the ground with his face towards the carpet." *Id.* at 898.

On appeal, the Sixth Circuit concluded that, taking the facts in the light most favorable to plaintiffs, the officers "lay on top of Champion, a mentally retarded individual who had stopped resisting arrest and posed no flight risk, and sprayed him with pepper spray even after he was immobilized by handcuffs and a hobbling device." *Id.* at 901.  The court determined that the force was not objectively reasonable and turned to whether "Champion's right to be free from this particular type of force was clearly established." *Id.* at 901. Of relevance, the Sixth Circuit found that it was "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Id.* at 903.

The court stated: "Creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes

162

objectively unreasonable excessive force." *Id.* It observed that both the Fifth Circuit and other district courts in the Sixth Circuit "have highlighted the dangers of putting pressure on a prone, bound, and agitated detainee." *Id.* at 903–904. The court said: "No reasonable officer would continue to put pressure on that arrestee's back after the arrestee was subdued by handcuffs, an ankle restraint, and a police officer holding the arrestee's legs." *Id.* at 905. Accordingly, the Sixth Circuit affirmed the district court's denial of qualified immunity to the arresting officers. *Id.*

Lembert was not initially suspected of criminal misconduct. When Officer Steigen applied force to Lembert, he was already handcuffed and on the ground. Thus, Lembert was secured and did not pose a threat to officer safety. Furthermore, Lembert told the officer of his difficulty in breathing. Additionally, Dmeza continually alerted Officer Steigen that Lembert suffered from asthma, and asked Officer Steigen to "get off" her nephew. ECF 50-16 at 3:50–4:05, 4:10–4:22. Yet, Officer Steigen did not release pressure. ECF 50-24 at 2:42–3:05. It was only when Officer Harshadavid intervened that Officer Steigen repositioned Lembert on his side to ease his breathing. ECF 50-24 at 3:05–3:14. Even when Lembert had turned on his side, handcuffed, he asked Officer Steigen to release pressure on him, and she again appears not to have moved. *Id.* at 5:01–5:09.

Fortunately, unlike in *Lawhon,* 2021 WL 5294931, and *Champion*, 380 F.3d 893, Lembert did not die because of Officer Steigen's continued pressure on his back. But, that does not mean that the conduct was of no consequence.

Indeed, unlike the defendants in *Lawhon,* 477 F. Supp. 3d 428, 448, the body camera footage reflects that Officer Steigen did not check with Lembert to assure that he could breathe. And, she continued to apply pressure even when Lembert complained that he was having trouble breathing. *See* ECF 50-24 at 2:43–3:14. Impeding one's ability to breathe is significant.

163

In January 2020, an officer in Officer Steigen's position would have had fair warning that placing extended pressure on a handcuffed, non-resistant individual's back, when the individual is laying prone and experiencing difficulty breathing, constitutes the use of excessive force. Taking the evidence in light most favorable to plaintiffs, Officer Steigen is not entitled to qualified immunity for her use of force against Lembert after he had been handcuffed.

## VI. Conclusion

For the foregoing reasons, I shall grant the Motion as to the claims of excessive force (Count I and Count V), battery (Count IX), and gross negligence (Count XII) in favor of the following defendants: Officer Harshadavid as to the claims of Lembert and Dmeza; Officer Legge as to the claims of Shamdu; and Officer Vicarini as to the claims of Dmeza. Furthermore, I will grant summary judgment in favor of Officers Schulman, Amrhein, Vitacco, and Halstead with respect to the claims of false arrest (Count II, Count VII, and Count X) asserted by Mr. Nalls. The Motion is otherwise denied.

An Order follows, consistent with this Memorandum Opinion.

Date:  March 30, 2026                                        _____/s/_____
                                                            Ellen Lipton Hollander
                                                            United States District Judge

| ECF Number | Exhibit |
|---|---|
| | **EXHIBIT APPENDIX**<br>Shamdu Caleb Nalls, *et al. v.* Baltimore County, Maryland, *et al.*,<br>ELH-23-183 |
| ECF 1-1 | Internal Affairs Section ("IAS") Letter of December 15, 2021 |
| ECF 47-2 at 1–13 | Vicarini Answers to Shamdu's First Set of Interrogatories |
| ECF 47-2 at 13–16 | Vicarini Incident Report |
| ECF 47-2 at 17–30 | Amrhein Answers to Shamdu's First Set of Interrogatories |
| ECF 50-2 | Statement of Probable Cause, prepared by Officer Vicarini |
| ECF 50-3 | Vicarini Body Worn Camera ("BWC") |
| ECF 50-4 | Vicarini IAS Statement |
| ECF 50-5 | Schulman Incident Report |
| ECF 50-6 | Schulman IAS Statement |
| ECF 50-7 | Shaneris Nalls Baltimore County Police Department Juvenile Referral |
| ECF 50-8 | Baltimore County Police Department Lab Report |
| ECF 50-9 | Vitacco IAS Statement |
| ECF 50-10 | Schulman BWC |
| ECF 50-11 | Schulman Initial BWC |
| ECF 50-12 | Vitacco BWC |
| ECF 50-13 | Legge BWC |
| ECF 50-14 | Amrhein BWC |
| ECF 50-15 | Photographs of Dmeza |
| ECF 50-16 | Harshadavid BWC |
| ECF 50-17 | Lehnert BWC |
| ECF 50-18 | Photographs of damage to Police Vehicle |
| ECF 50-19 | Halstead BWC |
| ECF 50-20 | Amrhein IAS Statement |
| ECF 50-21 | Halstead IAS Statement |
| ECF 50-22 | Vitacco IAS Statement |
| ECF 50-23 | Photographs of Mr. Nalls |
| ECF 50-24 | Steigen BWC |